## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## EVANSVILLE DIVISION

EDWARD C SNUKIS, JR Co-Administrator of  )
the Estate of Edward C. Snukis, and          )
SAMANTHA SNUKIS Co-Administrator of the  )
Estate of Edward C. Snukis,                  )
                                             )
                Plaintiffs,              )
                                             )
                v.                         )      Case No. 3:21-cv-00135-TWP-MPB
                                             )
MATTHEW O TAYLOR, TREVOR KOONTZ,             )
NICHOLAS HACKWORTH, and                      )
CITY OF EVANSVILLE, INDIANA,                 )
                                             )
                Defendants.              )

## ORDER ON DEFENDANTS' MOTION TO DISMISS
## COUNTS I–IX, COUNT XI, AND RELIEF SOUGHT

       This matter is before the Court on a Motion to Dismiss Counts I–IX, Count XI, and Relief

Sought (the "Motion") filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendants

Matthew O. Taylor ("Taylor"), Trevor Koontz ("Koontz"), Nicholas Hackworth ("Hackworth")

(Taylor, Koontz, and Hackworth, collectively, the "Officers"), and the City of Evansville, Indiana

(the "City") (the Officers and the City, together, "Defendants") (Filing No. 33).  Plaintiffs Edward

C. Snukis, Jr. and Samantha Snukis (together, "Plaintiffs") initiated this action as the co-

administrators of the Estate of Edward C. Snukis ("the Estate"), alleging claims against Defendants

under 42 U.S.C. § 1983 ("Section 1983") and several state law claims.  Plaintiffs seek to redress

the deprivation of Edward Snukis' ("Snukis") constitutional rights after he was detained by the

Officers and died in custody.  Plaintiffs also assert several state law tort claims and request the

equitable appointment of a receiver to train and supervise the City's law enforcement officers.

Defendants seek dismissal  all of Plaintiffs' claims except Count X, a claim of *respondeat superior*

liability as to the tort claims, as well as dismissal of the request for equitable relief. For the following reasons, the Court **grants in part and denies in part** the Motion.

## I.     <u>BACKGROUND</u>

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the Estate as the non-moving party. *See Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

At approximately 7:44 p.m., on September 13, 2019, an employee of an Evansville car dealership called 911 to report that Snukis was "hanging around" the dealership and "appeared to be impaired." The employee stated Snukis was standing near the road and that he was "afraid [Snukis was] going to get hit." The employee did not indicate Snukis was violent, armed, or had committed any crime (Filing No. 1 at ¶ 10). Approximately five minutes after the call, the Evansville Police Department ("EPD") issued a dispatch about an "intoxicated person". *Id.* at ¶ 11. The dispatch was categorized as a "Priority 4." The EPD Operational Guidelines define Priority 4 as a service call for "[s]ituations requiring a routine response in which there is no urgency involved . . . (Public Intoxication, Standby, General Complaints, etc.)". *Id.* at ¶ 12.

At approximately 7:52 p.m., two EPD officers—Taylor and Koontz—arrived at the dealership. Snukis was not injured, combative, or in a confined area. *Id.* at ¶ 14. He was unarmed. *Id.* at ¶ 18. Immediately upon arriving, Koontz approached Snukis and repeatedly demanded that Snukis place his hands on his head. *Id.* at ¶ 14. Koontz grabbed Snukis' arm. Snukis asked what was happening, but Koontz did not reply. *Id.* at ¶ 15. Koontz and Taylor began yelling at Snukis. At no point did Koontz or Taylor identify themselves, ask Snukis to identify himself, or explain why they were there. *Id.* at ¶ 16.

Snukis pulled away from Koontz, but as he did, he fell and struck his head on the ground. *Id.* at ¶ 17.  Snukis was tased multiple times.  When Snukis tried to stand up, he was tased again. Once Snukis was finally able to stand, he ran away from Koontz and Taylor, who chased and eventually caught Snukis. Snukis fell face down onto the ground, and Koontz and Taylor proceeded to jump on Snukis and hold him down.  *Id.* at ¶ 18.

While holding Snukis down, Koontz and Taylor repeatedly struck Snukis in the head, back and shoulders.  They forced Snukis to remain prone with his head, face, and mouth on the ground while they attempted to handcuff him.  Koontz and Taylor used their hands, arms, and legs to keep pressure on Snukis' head, neck, shoulders, chest, and back.  *Id.*  While subdued, Snukis' speech became slurred, and his breathing became difficult. Then Snukis stopped speaking and breathing altogether, but Koontz and Taylor continued to assault Snukis and restrain him in a prone position. *Id.*  Hackworth then arrived and began assisting in restraining and handcuffing Snukis.  *Id.* at ¶ 19. After Snukis had become unresponsive, the Officers left him face-down on the ground for several minutes without providing or calling for any medical assistance.  *Id.* at ¶ 22.  Snukis died while being detained as a result of the Officers' use of force.  *Id.* at ¶ 21.

According to Plaintiffs, after Snukis died, the City failed to adequately investigate the Officers' conduct or discipline the Officers. *Id.* at ¶ 23(g). The City did not recognize or investigate "obvious falsehoods in the Officers' accounts that [Snukis] was 'aggressive' and was 'approaching the officers in an aggressive manner' when compared to video recordings and other evidence" of the incident "that demonstrate[] that the Officers' accounts were false.  *Id.* at ¶ 23(h). The EPD investigated the incident, but no outside agency was involved in the investigation. *Id.* at ¶ 64.  The Officers were not disciplined.  *Id.*

Plaintiffs allege Snukis' death resulted from certain *de facto* policies, practices, and customs maintained by the City that encourage the use of excessive force. Plaintiffs further allege that the City employs a "code of silence where officers and supervisors cover up the use of excessive force by fabricating accounts in police reports, internal affairs investigations, and statements to the media, all of which is designed to falsely exonerate officers and protect the City from potential liability". *Id.* at ¶ 32(b). Prior to Snukis' death, consistent with the "code of silence," the City negotiated a contract with the police union containing a provision regarding the use of force. That provision allows officers to take up to three days to make a statement to investigators, during which time the officers may speak with legal counsel and prepare a written statement, and allows the officers to refer to their written statements during investigative interviews. *Id.* at ¶ 65. Plaintiffs allege that the City's policies, practices, and customs "created an environment that allowed the Officers to believe that they could act with impunity and without fear of retribution." *Id.* at ¶ 63.

Plaintiffs further allege that the City failed to train its officers on "the reasonable and appropriate use of force during investigations, detentions, and arrests, and intervention in the excessive use of force by fellow officers," including training on the dangers of using TASER devices and of positional and compression asphyxia. *Id.* at ¶¶ 32(d), 70.

On September 1, 2021, two of Snukis' children—Edward C. Snukis, Jr., and Samantha Snukis—filed this action as the co-administrators of Snukis' estate, alleging Fourth Amendment violations, as well as numerous state law claims, against the Defendants. The Complaint alleges Snukis was unreasonably seized by the Officers in violation of his Fourth Amendment rights, and that the City is liable for the constitutional violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) ("*Monell*") and *City of Canton v. Harris*, 489 U.S. 378 (1989)

("*Canton*"). Defendants seek dismissal of the Section 1983 claims, asserting the Officers are entitled to qualified immunity and that Hackworth did not participate in the alleged constitutional violation, and all but one of the state law claims, arguing those claims are barred by the Indiana Tort Claims Act ("ITCA").

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A party seeking dismissal under Rule 12(b)(6)'s requirement that the complaint state a claim upon which relief can be granted bears a heavy burden.  In making this determination, the court views the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true and drawing all reasonable inferences from those allegations in favor of the plaintiff.  *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003).  The plaintiff "receives the benefit of imagination" at this stage "[as long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994).  Thus, a complaint should only be dismissed pursuant to Rule 12(b)(6) when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).  "To withstand a Rule 12(b)(6) challenge . . . 'the plaintiff must give enough details about the subject-matter of the case to present a story that holds together,' and the question court should ask is '*could* these things have happened, not *did* they happen.'"  *Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529, 533 (7th Cir. 2011) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010)) (emphasis in original).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  In *Bell Atlantic Corp. v. Twombly*, the United

States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level."  550 U.S. 544, 555 (2007).  Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient.  *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support").  The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.  Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

### III.    DISCUSSION

Plaintiffs assert eleven claims in their Complaint.  Count I alleges violations of Snukis' Fourth Amendment rights by the Officers under Section 1983.  Counts II and III assert Section 1983 liability against the City pursuant to *Monell v. Department of Social Services* and *City of Canton v. Harris*, respectively.  Counts IV through VII and XI are state law tort claims brought against the Officers for negligence, assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress, respectively.  Counts VIII and IX are state law torts against the City for negligent supervision and retention and negligent training, respectively.  Count X is a separate claim of *respondeat superior* incorporating Counts IV through VII as to the City. Count XI is a claim for wrongful death under Indiana Code § 34-23-1-2. In their Complaint, Plaintiffs also request equitable relief in the form of "the appointment of a receiver or similar

authority to ensure that the City properly trains and supervises its law enforcement officers." (Filing No. 1 at 21, § (C).)

Defendants move to dismiss all claims except Count X. Defendants argue the Officers are entitled to qualified immunity as to Count I, that Hackworth did not participate in any unconstitutional seizure, that Plaintiffs have failed to sufficiently plead Counts II and III, that Counts IV–IX and XI are barred by the ITCA,[1] and that Plaintiffs are not entitled to the requested equitable relief. The Court will address each of Defendants' arguments in turn.

## A.    Count I—Violation of Fourth Amendment Rights under Section 1983

Defendants move to dismiss certain Section 1983 claims alleged in Count I. First, Defendants move to dismiss Plaintiffs' claims of inadequate medical care as to all Officers, arguing the Officers are entitled to qualified immunity. Defendants also move to dismiss all claims under Section 1983 against Hackworth, arguing that he did not participate in any unreasonable use of force against Snukis. Defendants' Motion does not address all of Plaintiffs' potential theories of liability under Section 1983 (*e.g.*, use of excessive force, failure to supervise, failure to intervene), so the Court will address only whether Plaintiffs have sufficiently alleged a claim that the Officers violated Snukis' constitutional rights by failing to provide adequate medical care, and the claim that Hackworth violated Snukis' constitutional rights.

### 1.    Failure to Provide Medical Care

Defendants argue the Officers are entitled to qualified immunity as to the claim that they violated Snukis' Fourth Amendment rights by failing to provide adequate medical care. (Filing No. 37 at 5.) "The doctrine of qualified immunity protects government officials from liability for

---

[1] Defendants request dismissal of "Counts VIII, IX, and XI against the Officers" (Filing No. 33). Based on Defendants' briefing, it is apparent that Defendants are requesting dismissal of Counts VIII, IX, and XI in their entirety and that their more limited request for dismissal was made in error.

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted). In determining whether qualified immunity applies, courts consider, in the light most favorable to the party asserting an injury, (1) whether the officer violated a constitutional right; and (2) whether that right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Defendants challenge only the second prong.

"A right is 'clearly established' when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted)). "The Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality,' and the Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted.'" *Volkman*, 736 F.3d at 1090 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), and *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987)).

To determine whether the Officers are entitled to qualified immunity, the Court must determine whether as of September 13, 2019, the law had clearly established that a police officer violates an arrestee's Fourth Amendment rights by not rendering or requesting medical assistance for several minutes after the officers have caused the arrestee to become unresponsive and to stop breathing. Because Plaintiffs allege that all three Officers physically restrained Snukis until he became unresponsive and stopped breathing and that all three waited for several minutes to provide or request medical assistance, the Court's Fourth Amendment analysis applies equally to each of the Officers.

The Court will first look to see if the right was clearly established by controlling precedent from the Supreme Court and Seventh Circuit Court of Appeals. *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000).  If no controlling precedent exists, "we broaden our survey to include all relevant caselaw in order to determine 'whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 431 (7th Cir. 1989)); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (requiring a "robust consensus of cases of persuasive authority" (quotation marks omitted)). Alternatively, in "rare cases, where the constitutional violation is patently obvious, the plaintiffs may not be required to present the court with any analogous cases." *Jacobs*, 215 F.3d at 767.

Defendants argue that by September 13, 2019, an arrestee's Fourth Amendment right to medical care had not been clearly established, citing the Seventh Circuit's June 2019 unpublished decision in *Royal v. Norris*, 776 F. App'x 354 (7th Cir. 2019).  Defendants also offer as "further proof that the alleged 'right' to medical care is not clearly established" caselaw purportedly showing that the Seventh Circuit has not even determined whether claims of inadequate medical care are evaluated under the Fourteenth Amendment's deliberate indifference standard or the Fourth Amendment's objective reasonableness standard.  (Filing No. 34 at 4.)  In response, the Plaintiffs cite *Estate of Perry v. Wenzel*, 872 F.3d 439 (7th Cir. 2017), arguing that an arrestee's right to medical care was established in this Circuit several years before September 2019, and that an arrestee's Fourth Amendment claims of inadequate medical care are evaluated under an objective reasonableness standard.

Plaintiffs are correct.  A pre-trial arrestee's right to reasonable medical care under the Fourth Amendment was clearly established by the Seventh Circuit over a decade ago.  *See Lopez*

*v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) ("Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction."); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007); *Ortiz v. City of Chicago*, 656 F.3d 523, 530–31 (7th Cir. 2011); *see also Perry*, 872 F.3d at 453 (citing *Ortiz*, 656 F.3d at 530). Plaintiffs also correctly note that a pre-trial arrestee's claims of inadequate medical care are evaluated under the Fourth Amendment's objective reasonableness standard. *Ortiz*, 656 F.3d at 530 (citing *Williams*, 509 F.3d at 403 (announcing factors courts should consider in evaluating whether an officer's response to an arrestee's medical needs was reasonable)). Snukis clearly had a Fourth Amendment right to adequate medical care as of September 13, 2019.

As Plaintiffs note, in 2017, the Seventh Circuit clearly established that an officer's failure to take any action in light of a detainee's serious medical need precludes qualified immunity. 872 F.3d at 460. In *Estate of Perry*, an arrestee, Perry, died in custody less than twenty-four hours after his arrest. The Seventh Circuit succinctly summarized the events leading to Perry's death:

> Shortly after he was arrested, Perry suffered a seizure. The City transported him to the hospital where he received treatment. But, after he returned to the City jail, the City failed to provide Perry with medical care even though he displayed signs of deteriorating health. Instead, they shackled him and placed a spit mask over his face. The City officers ignored his cries for help, his complaints that he could not breathe, and transferred him to the County's Criminal Justice Facility. After arriving at the County's Criminal Justice Facility, the County nurses decided that Perry was medically unfit to be booked into the jail. Yet, they provided him with no medical care and failed to remove the spit mask, which was seeping blood. When a nurse finally removed the spit mask, it was clear that Perry was no longer breathing. Although emergency efforts were taken, they were unsuccessful and Perry died on the County facility's floor.

*Id.* at 445.

The court held that by September 13, 2010 (the date Perry died), it had been clearly established that arrestees, including Perry, have a Fourth Amendment right to adequate medical care under an objective reasonableness standard. The court then reasoned that "judged by the objectively reasonable standard of the Fourth Amendment, the failure to take *any* action in light of a serious medical need would violate that standard." *Id.* at 460 (emphasis in original).[2]

In their reply, Defendants argue that *Estate of Perry* narrowly applies only to failure to provide *any* medical care—not failures to provide *immediate* medical care, as Plaintiffs have alleged. Defendants assert that in a later case, *Royal v. Norris*, the Seventh Circuit held that the Fourth Amendment right to medical care was not clearly established. (Filing No. 38 at 2.) Defendants misread *Estate of Perry* and *Royal*.

Defendants are mistaken . *Estate of Perry*'s application is not limited to only cases in which officers fail to provide any medical care whatsoever.  Indeed, the defendants in *Estate of Perry* took Perry to a hospital for treatment after his first seizure.  "But, simply because Perry received treatment at some point during his detention [did] not completely absolve the officers from liability as a matter of law.  Rather, his hospitalization must be considered among the other facts when determining whether or not the officers were reasonable in the way that they treated Perry *after* his return from the hospital."  *Id.* at 454.  Further, three minutes after Perry arrived at the county's Criminal Justice Facility, where he died just minutes later, an ambulance was called.  Four minutes after calling an ambulance, the defendants declared a medical emergency and tried to revive Perry using a resuscitation bag and defibrillator.  *Id.* at 450, 458.  However, those efforts came only after Perry had become entirely unresponsive.  *Id.* at 450.  So *Estate of Perry* clearly establishes not

---

[2] Defendants argue that the Seventh Circuit's emphasis on the word "any" indicates the narrowness of its holding. (Filing No. 38 at 2, n.2.) The emphasis plainly reflects the egregiousness of the defendants' inaction, not the narrowness of the court's holding.

only a Fourth Amendment right to medical care, but also a right to prompt medical care. *Id.* at 454, 458; *see Acosta v. City of Chicago*, No. 15 CV 8333, 2018 WL 3630011, at *7 (N.D. Ill. July 3, 2018) ("[T]he right is prompt access to medical care, and whether officers can deny or delay an arrestee's access to a hospital when faced with a serious need is beyond debate. . . . As such, [the officer] was on notice that when an arrestee is in serious need of medical care, he must promptly summon medical support. Qualified immunity does not shield [the officer] from liability here.") (citing *Estate of Perry*, 872 F.3d at 459; *Ortiz*, 656 F.3d at 535).

Moreover, *Royal* does not narrow the holding in *Estate of Perry*.  It merely serves as an example of the type of prompt medical attention that would not be objectively unreasonable.  In *Royal*, the arrestee, Royal, ingested cocaine shortly before his arrest and died in custody a few hours later.  Royal's estate alleged that the officers involved in Royal's detention violated his Fourth Amendment right by failing to provide adequate medical treatment.  776 Fed. App'x at 355.  The Seventh Circuit agreed that "the right at issue is an arrestee's Fourth Amendment right to medical care," which requires "the court [to] ask[] whether the officer's conduct was objectively reasonable."  *Id.* at 358. The similarities between *Royal* and *Estate of Perry* end there.  "Immediately after being put on notice that Royal might have ingested cocaine, the officers repeatedly asked him whether he had swallowed any, asked how he felt, explained the danger of eating cocaine, and assured him that he would not face additional criminal penalties for telling them if he had."  *Id.* at 358.  Royal denied ingesting anything, but the officers, "in an abundance of caution, asked paramedics to independently evaluate him. . . . [who] determined that he did not need medical care."  *Id.*  Officers continued to ask Royal how he was feeling while transporting him to the police station.  Soon after being placed in an interrogation room, Royal had a seizure. As soon as an officer saw Royal in distress, he "[i]mmediately called for an ambulance, rolled

Royal over, and began performing first aid." *Id.* at 356.  The Seventh Circuit concluded that "[b]ecause the officers did not 'fail to take any action,' *Estate of Perry* would not have put them on notice that their response to Royal was clearly unconstitutional." *Id.* at 358.

The Seventh Circuit has held in other similar cases that officers do not act unreasonably by promptly providing or requesting medical care for subdued or unconscious arrestees.  *See Sallenger v. City of Springfield*, 630 F.3d 499 (7th Cir. 2010) (finding officers did not unreasonably delay medical care to arrestee who had stopped breathing while being detained by officers because "as soon as the officers realized [arrestee] was unconscious, they removed the hobble, began CPR, and summoned an ambulance. . . [T]he officers administered medical care very soon, if not immediately, after realizing that [he] was not breathing."); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997) (finding officers did not act unreasonably by calling an ambulance while arrestee was being subdued and, once arrestee was handcuffed and placed in prone position, by closely monitoring arrestee to ensure he was moving or breathing); *Seay v. City of Indianapolis*, No. 18-cv-161, 2020 WL 6710799, at *7 (S.D. Ind. Nov. 16, 2020) (finding no Fourth Amendment violation for failure to provide medical treatment because "[t]he police officers did not delay the treatment that [the arrestee] received by even a fraction of a second"). None of these cases limits an arrestee's clearly established right to prompt medical care.

Having concluded that by September 13, 2019, it was clearly established that Snukis had a Fourth Amendment right to prompt medical attention in response to a serious medical condition, the Court must more narrowly determine whether it was also clearly established that a failure to delay medical attention to an arrestee who is unresponsive and not breathing for several minutes is objectively unreasonable.  The Court concludes that it was.

The Seventh Circuit has held that an officer's response to a medical condition need not always be immediate to be reasonable. *Sallenger*, 630 F.3d at 504 ("The Fourth Amendment requires reasonableness, not immediacy"). Yet "[e]ven a brief delay" in providing care "may be unconstitutional." *Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005) (citing *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) (holding that a fifteen-minute delay in treating inmate cardiac arrest may violate Eighth Amendment)); *see Estate of Perry*, 872 F.3d at 458, 460 (finding nurses who delayed medical care for seven minutes were not entitled to qualified immunity). As the Supreme Court stated *in dicta* in June 2019, "unconsciousness . . . is *itself* a medical emergency." *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2537 (2019). And as the Seventh Circuit has acknowledged, "[f]ailure to breathe and failure to regain consciousness are undoubtedly life-threatening medical conditions that are obvious to a layperson." *Orlowski v. Milwaukee Cnty.*, 872 F.3d 417, 423 (7th Cir. 2017). "A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes." *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (finding that officers' fourteen-minute delay in checking prisoner's breathing or pulse, calling for medical assistance, or administering CPR, with no reason for delaying care, could establish officers' deliberate indifference in violation of the Fourteenth Amendment's Due Process Clause).

In 2005, the Seventh Circuit held that officers act with *deliberate indifference* by delaying medical assistance to an asphyxiated prisoner for just ten minutes, absent good reason for the delay. In *Bradich ex rel. Estate of Bradich v. City of Chicago*, 413 F.3d 688, 691 (7th Cir. 2005), a deceased detainee's estate alleged several officers violated detainee's Fourteenth Amendment due process rights by delaying their call for medical assistance for ten minutes. In that case, the detainee hanged himself in his cell. When the officers found him shortly thereafter, he was still

alive.  The officers immediately cut him down but waited ten minutes to call for medical assistance.
The detainee's estate claimed the officers spent those ten minutes concealing their own violations
of required procedures.  The detainee died before paramedics arrived.  *Id.* at 691.  The district court
entered summary judgment in favor of the officers, finding they were entitled to qualified
immunity, but the Seventh Circuit disagreed.  *Id.*at 692.  "[N]o reasonable officer could think that
the Constitution allowed him to cover up his own misconduct at the expense of a prisoner's life.
Further proceedings may vindicate the lockup keepers' position that the delay was much less than
ten minutes and that they provided well-meaning, if inept, care in the interim, but matters are too
uncertain to allow summary judgment."  *Id.*

Additionally, there is a robust consensus among other federal circuit and district courts that
it is at least unreasonable, if not grossly negligent or deliberately indifferent, for an officer to delay
medical care for even a few minutes after rendering an arrestee unconscious. *Jones v. City of
Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008) ("[E]ach of the officers present—the six who
subdued Jones and the three sergeants who arrived afterwards—knew that the handcuffed Jones
was not breathing. Therefore each knew of a substantial risk of serious harm to Jones's safety while
he was in their custody and disregarded that risk by failing to provide aid [for a prolonged period].
. . . [T]he officers who subdued Jones and the sergeants who arrived soon after are not entitled to
qualified immunity on the failure to provide medical care claim."); *Estate of Owensby v. City of
Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005) ("Each officer viewed Owensby in significant
physical distress, yet made no attempt to summon or provide any medical care until several minutes
later, when [one officer] checked on Owensby and discovered that he was not breathing. This
evidence is sufficient to demonstrate that each officer's failure to provide medical care to Owensby
constituted a violation of the Fourteenth Amendment."); *Estate of Booker v. Gomez*, 745 F.3d 405,

421–32 (10th Cir. 2014) ("[T]he contours of the right are clearly established that any reasonable officer in the Defendants' position (and with their training) would have known that failing to check Mr. Booker's vital signs, perform CPR, or seek medical care for three minutes when he was limp and unconscious as a result of the Defendants' use of force could violate the Constitution."); *Ashworth v. Round Lake Beach Police Dep't*, No. 03 C 7011, 2005 WL 1785314, at \*7–8 (N.D. Ill. July 21, 2005) ("The officers became aware of a serious risk to James's health when he slumped over in the back seat of the squad car. . . . Finally, after paramedics were called, neither [of the officers] . . . attempted to perform CPR on James in the two to five minutes it took the medical technicians to arrive. . . . Leaving James inside the car, handcuffed, slumped over and non-responsive, for five minutes showed a reckless disregard of James's safety."); *Petro v. Town of West Warwick ex rel. Moore*, 889 F. Supp. 2d 292, 312–13 (D.R.I. 2012) (finding officers acted with gross negligence after noticing arrestee, who had been handcuffed face-down in the back of a police car, was unconscious and waiting almost two minutes to request routine medical assistance and providing no medical care until they saw medical rescue arriving, approximately four minutes twenty seconds after arrestee became unconscious); *Howe v. Town of North Andover*, 854 F. Supp. 2d 131, 142 (D. Mass. 2012) ("If . . . Howe was dragged, unconscious, to the police cruiser after being pinned to the ground under the weight of approximately eight officers for eleven minutes, [a jury] could certainly find that the inaction of the Witnessing Officers constituted deliberate indifference to his serious medical needs."); *Watson-Nance v. City of Phoenix*, No. CV-08-1129, 2011 WL 13152466, at \*6–7 (D. Ariz. June 16, 2011) (finding officers acted with deliberate indifference by keeping arrestee in prone position for nine minutes after she "mellowed out, stopped resisting, and became calm, quiet, and still," and by failing to: "call for medical personnel until after Watson was restrained; place Watson on her side or back or sit her upright so her

respiration was not impaired; make timely notice Watson was in serious distress and thus delayed effective intervention; administer life saving measure, in violation of their . . . training; alert the fire department and paramedics Watson had coded and her situation was now extremely urgent; and promptly remove Watson's handcuffs, even after they claim to have known Watson had no pulse and was not breathing and being ordered to do so by a paramedic"); *see also, cf.*, *McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) (concluding officer who was trained in but did not perform CPR on unconscious prisoner for seven minutes not entitled to qualified immunity); *Tlamka v. Serrell*, 244 F.3d 628, 633 (8th Cir. 2001) (concluding officer who was trained in but did not perform CPR on unconscious prisoner for ten minutes not entitled to qualified immunity) ("We are somewhat wart of [the] allegation that the delay was 10 minutes long and of the almost unthinkable suggestion that the officers were doing nothing to assist Tlamka during that time. At this stage of the litigation, however, we must accept the facts . . . as true.").

It was clearly established by September 13, 2019, that arrestees have a Fourth Amendment right to prompt medical care in response to a serious medical condition. It was also clearly established by then that an arrestee who has become unresponsive and stopped breathing is suffering from a serious medical condition, and that it is objectively unreasonable for officers to delay medical care for several minutes. Taking Plaintiffs' allegations as true, the Officers' delay in providing or summoning medical assistance for Snukis for several minutes was objectively reasonable under clearly established law. Defendants' Motion to Dismiss Plaintiffs' Section 1983 claim of inadequate medical care is **denied**.

### 2. Hackworth's Involvement in Unlawful Use of Force

Defendants argue Plaintiffs have not properly asserted a Section 1983 claim against Hackworth because they "*do not allege* any specific acts of Officer Hackworth other than 'assisting with restraining and handcuffing [Snukis],' which, according to the Complaint, occurred *after* the

uses of force by Taylor and Koontz against [Snukis]" (Filing No. 34 at 6 (emphasis in original)

(quoting Filing No. 1 at ¶ 19)).   In response, Plaintiffs recite the several additional allegations

asserted against the Officers collectively.   Defendants reply that Plaintiffs' use of the defined term

"Officers" is unclear and insufficient to state a claim against Hackworth.

The Seventh Circuit has held that under Rule 8's notice pleading standard, "[e]ach

defendant is entitled to know what he or she did that is asserted to be wrongful." *Bank of Am.,*

*N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).   But as Defendants state in their brief, the

Complaint plainly alleges that when Hackworth arrived on the scene, he helped restrain and

handcuff Snukis, who by that time was already lying face down on the ground silent, not moving,

and not breathing (Filing No. 1 at ¶¶ 19, 22).   Those allegations are sufficient to plausibly state

claims against Hackworth for excessive force and a failure to intervene. *California v. Hodari*, 499

U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or

application of physical force to restrain movement . . . ."); *Abdullahi v. City of Madison*, 423 F.3d

763, 774 (7th Cir. 2005) ("[I]f [the officer] applied deadly force [by placing deadly pressure on

arrestee] while he was lying prone on the ground with his arms behind him, this would violate

[arrestee's] Fourth Amendment rights, as would an unjustifiable failure by the other officers to

intervene. . . . Presumably, if it would have been apparent to the other officers, just by watching,

that [the officer] was applying potentially deadly pressure to [arrestee] while he was lying prone

then, the officers would not be entitled to qualified immunity.").

Further, a "Complaint does not necessarily fail to meet the notice pleading requirements of

Rule 8 merely because it refers to Defendants collectively." *Heartland Consumer Prods. LLC v.*

*DineEquity, Inc.*, No. 17-cv-01035, 2018 WL 465784, at *4 (S.D. Ind. Jan. 18, 2018). Plaintiffs

defined "Officers" as referring to all three Officers (*e.g.*, Filing No. 1 at ¶ 23). The Complaint

plausibly alleges that all of the Officers continued to use force to restrain Snukis after he had stopped breathing, (Filing No. 1 at ¶¶ 19–21), and that none of the Officers rendered or called for medical assistance for several minutes afterwards.  *Id.* at ¶ 22.  These allegations are enough to place Hackworth on notice that he and the other two Officers may be liable for their failure to provide adequate medical care under the Fourth Amendment.  Although Defendants note Plaintiffs may have used the term "Officers" in paragraph eighteen of the Complaint to refer to only Koontz and Taylor, that error would hardly make the rest of Plaintiffs' Complaint so unclear that Hackworth would not have fair notice of the potential Section 1983 claims against him.  Defendant's request to dismiss Hackworth from Count I is **denied**.

### B.    Counts II—*Monell* Liability under Section 1983

Plaintiffs allege the City is liable under *Monell* for maintaining an unwritten "police code of silence" that "created an environment that allowed the Officers to believe that they could act with impunity," resulting in the violation of Snukis' constitutional rights (Filing No. 1 at ¶¶ 32, 63). "[A] municipality is not vicariously liable for the constitutional torts of its employees but is answerable only for the consequences of its policies."  *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001) (citing *Monell*, 436 U.S. at 694 (1978)).  This rule prevents municipalities from being held liable "'solely on the basis of the existence of an employer-employee relationship with a tortfeasor'" and stems from doubt that Congress intended to use the threat of liability "'to oblige municipalities to control the conduct of *others*.'"  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (emphasis in original) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 478–79 (1986)).

To hold a municipality liable, a plaintiff must prove that the municipality's "*deliberate* conduct . . . was the 'moving force' behind the injury alleged," resulting in a "direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 404 (emphasis in original).  A plaintiff may satisfy this burden by proving that "the unconstitutional act complained

of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Altizer v. Retherford*, No. 14-cv-31, 2015 WL 3843668, at *4 (S.D. Ind. June 22, 2015) (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)).

The Supreme Court held in *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, that federal courts must not apply a "'heightened pleading standard'—more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure—in civil rights case alleging municipal liability under . . . § 1983." 507 U.S. 162, 164 (1993). "The *Leatherman* holding has survived the Court's later civil pleading decisions in *Iqbal* and *Twombly*, which require the pleader to allege a 'plausible' claim." *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016). Plaintiffs do "not have to plead evidence", and "a complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing." *McCormick v. City of Chicago*, 230 F.3d 319, 324–25 (7th Cir. 2000).

Keeping this lenient standard in mind, Plaintiffs have sufficiently alleged a claim under *Monell*. Plaintiffs allege the City employs a custom or practice (a *de facto* "code of silence") of failing to accurately report or adequately investigate uses of excessive force by EPD officers and failing to discipline those officers, which allows officers, including the Officers here, to use excessive force "with impunity and without fear of retribution." (Filing No. 1 at ¶¶ 32, 61, 63.) Plaintiffs' theory of liability is neither novel nor uncommon. *See*, *Ferguson v. Cook Cnty.*, No. 20-cv-4046, 2021 WL 3115207, at *12 (N.D. Ill. July 22, 2021) ("[T]he Complaint is fairly clear that it is premised on the theory that the City maintains a custom or practice of failing to investigate, discipline, and/or terminate officers who engage in misconduct, causing its officers …

to 'feel that they can act with impunity and without fear of reprimand or discipline.' Courts in this district have denied motions to dismiss, motions for summary judgment, and motions to vacate jury verdicts which have been premised on a similar theory of Monell liability." (citation omitted)) (collecting cases denying dispositive motions in cases premised on "code of silence" theory of liability).

Defendants argue Plaintiffs' claim is insufficient because it fails to allege any "*other* instances of unconstitutional conduct that resulted in harm to another individual in a similar manner as [Snukis]." (Filing No. 38 at 5.) As the Seventh Circuit recently made clear in *White v. City of Chicago*, Plaintiffs are "not required to identify every other or even one other individual" who suffered the same allegedly unconstitutional treatment to plead a plausible claim under *Monell*. *White*, 829 F.3d at 844 (citing *Jackson v. Marion Cnty.*, 66 F.3d 151, 152–53 (7th Cir. 1995)). "Post-*White* courts analyzing *Monell* claims . . . have 'scotched motions to dismiss' premised on arguments that the complaint does not contain allegations beyond those relating to the plaintiff." *Williams v. City of Chicago*, No. 16-cv-8271, 2017 WL 3169065, at \*9 (N.D. Ill. July 26, 2017) (quoting *Stokes v. Ewing*, 2017 WL 2224882, at \*4 (N.D. Ill. May 22, 2017)) (collecting cases).

In *White v. City of Chicago*, the plaintiff alleged a Chicago police officer violated his Fourth Amendment rights by seeking an arrest warrant without presenting the issuing judge enough information to establish probable cause. 829 F.3d at 839. The officer submitted a standard criminal complaint form in applying for the warrant against the plaintiff. The plaintiff also asserted a *Monell* claim against the City of Chicago "for the allegedly widespread practice of seeking arrest warrants on the basis of the conclusory complaint forms." *Id.* at 841. The district court dismissed the *Monell* claim as insufficient, but the Seventh Circuit held that the plaintiff's conclusory

allegation of the City's widespread practice, "[t]ogether with the individual claim against [the officer] and the standard printed form that does not require specific factual support for an application for an arrest warrant, . . . was enough to satisfy the 'short and plain statement of the claim' requirement of Rule 8(a)(2)." *Id.* at 844.

Here, Defendants' actions (or lack thereof) following Snukis' death and the City's contract negotiations with the police union sufficiently support the allegations of a *de facto* "code of silence." Plaintiffs allege that after Snukis' death but before an investigation had been completed, Defendants made false statements about Snukis' arrest, including "that the Officers and others were in a dangerous situation and/or were justified in using the type of force they did" and that Snukis was "at fault for his own death". ([Filing No. 1 at ¶ 31](#).) The City also allegedly failed to investigate the Officers' accounts that Snukis was being "aggressive" and "approaching the officers in an aggressive manner," despite "video recordings and other evidence of the Officers' contact with [Snukis]" demonstrating the Officers' accounts were false. *Id.* at ¶ 23(h). The Complaint further alleges that the EPD investigated Snukis' death, but "no outside agency was involved in the investigation." *Id.* at ¶ 64. Ultimately, according to the Complaint, "the Officers were not disciplined." *Id.* These allegations, which the Court must assume to be true, show the Defendants dutifully enacting the "code of silence" to shield the Officers from reprimand.

Plaintiffs also allege that the City negotiated a contract with the police union that affords officers certain privileges with respect to investigations. Specifically, before giving a statement to investigators, EPD officers may spend up to three days consulting with an attorney and preparing a written statement and that the officers may refer to their written statements during their interviews. ([Filing No. 1 at ¶ 65](#).) The factual allegations regarding these investigation policies, with the allegations of the false statements, inadequate investigation, and absence of discipline

following Snukis' death, adequately support the Plaintiffs' claim that the City's *de facto* "code of silence" resulted in the Officers' violation of Snukis' constitutional rights. *See Fix v. City of Chicago*, No. 21-cv-2843, 2022 WL 93503, at *4 (N.D. Ill. Jan. 10, 2022) ("Plaintiffs' allegations and reasonable inferences suggest that this widespread practice allows Chicago Police Officers to engage in unlawful conduct without facing consequences. Construing the facts in plaintiffs' favor, because they have plausibly alleged that the widespread practice allows the officers to engage in excessive force with impunity, they have sufficiently alleged that the practice was the moving force behind the constitutional violations they suffered.") (collecting similar cases); *see also Cooper v. City of Indianapolis*, No. 17-cv-02467, 2017 WL 5889716, at *2 (S.D. Ind. Nov. 29, 2017) ("Mr. Cooper sets forth the individual treatment he received, alleges that Officer Davis and other employees 'acted pursuant to official policy,' and alleges that the City 'had an official policy, procedure, or protocol authorizing its officers to use excessive force in situations such as described in this Complaint. At the motion to dismiss stage, this is enough to sufficiently state a § 1983 claim against the City.").

The Court need not address the sufficiency of Plaintiffs' allegation that the City's failure to adopt certain policies led to the violation of Snukis' rights because their factual allegations regarding the "code of silence" are sufficient to withstand dismissal. (Filing No. 1 at ¶ 63; Filing No. 34 at 10–11.)

At this stage of the proceedings, Plaintiffs have "nudged" their *Monell* claim "across the line from conceivable to plausible," so Defendants' Motion as to Count II is **denied**. *Twombly*, 550 U.S. at 570.

## C.   **Count III—*Canton* Liability under Section 1983**

In *Canton*, the United States Supreme Court held that training programs, or lack thereof, may give rise to Section 1983 liability. 489 U.S. at 388; *Ruiz-Cortez v. City of Chicago*, 931 F.3d

592, 599 (7th Cir. 2019) (recognizing that failure-to-supervise claims fall within the scope of *Monell* and *Canton* liability). Failure-to-train claims are subject to "rigorous standards of culpability and causation," *Brown*, 520 U.S. at 405, and are "appropriate only when inadequate training 'amounts to deliberate indifference to the rights of persons with whom the [employee] come into contact.'" *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021) (quoting *Canton*, 489 U.S. at 388). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409). Deliberate indifference can also be established based on a single incident that was a "highly predictable consequence" of a failure to provide specific training. *Id.* at 63–64 (quoting *Brown*, 520 U.S. at 409; citing *Canton*, 489 U.S. at 390 n.10); *see also Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (quoting *Brown*, 520 U.S. at 409).

Plaintiffs do not allege a pattern of similar constitutional violations. Instead, they allege that the City failed to adequately train its officers on "the reasonable and appropriate use of force during investigations, detentions and arrests, and intervention in the excessive use of force by fellow officers," and that the City was aware that excessive uses of force were "likely to result" from the lack of training (Filing No. 1 at ¶ 70, 73). Plaintiffs' allegations further specify that the City's failure to train included a failure "to train its police officers concerning the dangers of restraining persons and the dangers of use of TASER electronic control devices", and "the dangers of positional and compression asphyxia". *Id.* at ¶ 32(d)–(e). The Seventh Circuit has held that "it is obvious that police officers would encounter situations where they would need protocols on the use of excessive force." *J.K.J.*, 960 F.3d at 381. Plaintiffs have sufficiently alleged a lack of

adequate training on the use of excessive force,[3] which is sufficient to allege deliberate indifference at this early stage in pleadings.  *Compare Twomey v. Land*, No. 19-CV-225, 2020 WL 6048138, at *4 (N.D. Ind. Oct. 13, 2020) ("Plaintiff does allege that Chief Land knowingly failed to instruct Crown Point police officers on the constitutional limitations on the use of force and the constitutional requirement of probable cause for an arrest.  If the Officers were not trained in these areas, the alleged constitutional violations of excessive force and arrest without probable cause are a 'highly predictable consequence' of such a failure to train. Given the liberal pleading standards, Plaintiff's allegations are sufficient to state a *Monell* claim for failure to train." (quoting *Connick*, 563 U.S. at 63–64)); *with* ([Filing No. 34 at 11](#)–12); *Land v. Wayne Cnty. Sheriff's Dep't*, No. 09cv365, 2010 WL 2195454, at *2 (S.D. Ind. May 27, 2010) (dismissing claim failing to specify type of training defendants allegedly failed to receive); *Hutchens v. Harrison*, No. 08cv5366, 2009 WL 1139121, at *6 (N.D. Ill. Ap. 28, 2009) (dismissing claim failing to specify type of training defendants allegedly failed to receive); *Martin v. Luckett*, No. 07-cv-2800, at *3 (N.D. Ill. Nov. 3, 2009) (dismissing claim where plaintiff alleged county's failure to train on use of force but also deputies' failure to follow county's policies on use of force); *Khan v. Martinez*, No. 17-CV-354, 2017 U.S. Dist. LEXIS 198524, at *5 (N.D. Ind. Dec. 1, 2017) (dismissing claim alleging failure to train on importance of making regular welfare checks because "there is no allegation that the training, or lack thereof, amounted to deliberate indifference").

---

[3] The Court need not address whether allegations the City failed to "modify" its training sufficiently state a *Canton* claim. Plaintiffs alleged that the City either failed to provide proper training or failed to modify its training, and that the former allegation is sufficient. "[P]leading in the alternative is expressly permitted by Fed. R. Civ. P. 8(d)(2), and nothing in *Twombly*, *Iqbal*, and their progeny suggests that is no longer true. Pleading alternative statements of fact does not make any of them less plausible, and if one is sufficient, then the pleading is sufficient." *Johnson v. City of Hammond*, No. 14 CV 281, 2016 WL 1244016, at *3 (N.D. Ind. Mar. 29, 2016) (finding plaintiff sufficiently alleged *Monell* claim by alleging city "authorized *or* turned a blind eye" to practices of racial profiling (emphasis in original)).

The Court recognizes, as urged by Defendants, that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train" and that such claims require a "stringent standard of fault." *Connick*, 563 U.S. at 61.  But at this stage, Plaintiffs need only state a possible claim, not a winning one.  Dismissal is appropriate only if it appears with certainty that Plaintiffs cannot establish any set of facts that would entitle them to relief.  That is not the case here.  Defendants' Motion to Dismiss Count III is **denied**.

**D.      Counts IV–IX and XI—State Law Tort Claims**

Defendants move to dismiss Plaintiffs' state law tort claims.  Plaintiffs allege six tort claims relating to the Officers' detention of Snukis—Count IV for negligence, Count V for assault and battery, Count VI for intentional infliction of emotional distress, Count VII for negligent infliction of emotional distress, and Count XI for wrongful death under Indiana Code § 34-23-1-2. Defendants argue Plaintiffs assert Counts IV–VII and XI against only the Officers personally but that the ITCA bars personal liability.  Plaintiffs also allege two tort claims relating to the City's conduct—Count VIII for negligent supervision and retention and Count IX for negligent training. Defendants contend these claims are "discretionary functions" that are immune under the ITCA. The Court will discuss these two groups of tort claims in turn.

**1.      Torts Arising from Officers' Conduct: Counts IV—Negligence; Count V—Assault and Battery; Count VI—Intentional Infliction of Emotional Distress; Count VII—Negligent Infliction of Emotional Distress; Count XI Wrongful Death**

Defendants argue Counts IV, V, VI, VII, and XI were asserted against the Officers in their individual capacities and that individual liability is barred by the ITCA, at Indiana Code § 34-13-3-5(b) (Filing No. 34 at 14–15).  Plaintiffs respond that they do not oppose dismissal of the Officers individually, assuming they may be granted leave to replead those claims if the City later claims the Officers acted outside the scope of their employment.

Dismissal of Counts IV, V, VI, VII, and XI should be dismissed without prejudice.  Before the Court explains the straightforward reason for dismissal, it must first briefly address the glaring inaccuracies and omissions in Defendants' briefing.  Defendants assert that "Plaintiffs make clear they are bringing their claims against the Officer in their individual capacities", and that "Plaintiffs bring [Counts IV, V, VI, and VII] *solely* against the Officers" (Filing No. 34 at 14–15) (emphasis added).  Defendants even quote the following from paragraph twenty-eight of the Complaint: "Plaintiffs are suing the Officers in their individual capacities".  *Id.* at 14.  However, that paragraph reads in whole:

> At all pertinent times, the Officers were employed by the City and acting under color of state law and in the course and scope of their employment with the City. *The City is responsible for the wrongful acts that they committed within the scope of their employment* pursuant to respondeat superior. *To the extent that the City claims that the Officers' actions are criminal, clearly outside the scope of their employment, malicious, or willful and wanton*, Plaintiffs are suing the Officers in their individual capacity.

(Filing No. 1 at ¶ 28 (emphasis added).)   Plaintiffs also asserted a Count X for "Respondeat Superior" against the City—which the Defendants have not moved to dismiss and do not mention in either of their briefs—alleging that "the City is also liable to the Plaintiffs under the doctrine of respondeat superior." *Id.* at ¶ 117.  Plaintiffs plainly alleged that they have not just brought Counts IV, V, VI, and VII "*solely* against the Officers," but, first and foremost, against the City.

Plaintiffs explain in their response brief that they have asserted liability against the Officers only to the extent that the City claims they acted outside the scope of their employment, and that Count X incorporates Plaintiffs' tort claims as to the City (Filing No. 37 at 10–11).  Plaintiffs nevertheless do not oppose the dismissal of the Officers individually from Counts VI, V, VI, VII, and XI, assuming the dismissal will be "without prejudice to refile pending the City filing its answer to the Complaint and assuming liability for the Officers' actions" (Filing No. 37 at 11).

On reply, Defendants assert that in their response, Plaintiffs do not dispute that "Plaintiffs have brought their state law claims against the Officers, in their individual capacity" and "[i]nstead . . . make reference to potential allegations the City could make at some future date in an answer" and "cite to matters outside the pleadings in an attempt to defeat Defendants' Motion" (Filing No. 38 at 7–8). Defendants inaccurately summarize Plaintiffs' response and then mischaracterize Plaintiffs' request for leave to replead as based on theoretical matters outside the scope of the pleadings. But the legal basis for Plaintiffs' request is quoted in Defendants' initial brief and cited in Plaintiffs' response:

> A lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally. *However, if the governmental entity answers that the employee acted outside the scope of the employee's employment, the plaintiff may amend the complaint and sue the employee personally.*

Ind. Code § 34-13-3-5(b) (emphasis added); (Filing No. 34 at 14). Defendants omit any reference to this statutory provision in their reply brief. The Court notes for purposes of future briefing that these types of creative summaries and selective omissions are not persuasive and serve neither the interests of justice nor judicial efficiency.

That being said, Plaintiffs' have alleged that the Officers were acting within the scope of their employment, and under the plain language of Indiana Code § 34-13-3-5(b), Plaintiffs' state law tort claims as to the Officers are barred. Plaintiff may replead such claims against the Officers if the City later files an answer stating the Officers acted outside the scope of their employment. "An amendment to the complaint by the plaintiff under this subsection must be filed not later than one hundred eighty (180) days from the date the answer was filed and may be filed notwithstanding the fact that the statute of limitations has run." Ind. Code § 34-13-3-5(b).

The Court **grants dismissal** as to Counts IV, V, VI, VII, and XI as to only the Officers and **dismisses** those claims **without prejudice**. Counts IV, V, VI, VII, X and XI as to the City remain pending.

**2.    Torts Arising from City's Conduct: Count VIII—Negligent Supervision and Retention; Count IX—Negligent Training**

Defendants argue the two remaining tort claims against the City for negligent supervision and retention and for negligent training are also barred by the ITCA. Plaintiffs do not oppose dismissal of Counts VIII and IX for the reasons argued by Defendants, but they request leave to amend their Complaint "if such is warranted."

The Court finds that Counts VIII and Count IX should be **dismissed without prejudice**. Under the ITCA, governmental entities are not liable for "[t]he performances of a discretionary function". Ind. Code § 34-13-3-3(a)(7). Courts have held that training, retention, and supervision are "discretionary functions" and therefore generally subject to immunity under the ITCA. *See, e.g.*, *Strain v. Minnick*, No. 14-cv-00374, 2015 WL 6550628, at *4 (S.D. Ind. Oct. 28, 2015) (dismissing claims of negligent supervision, retention, and training as discretionary functions); *Smith v. Ciesielski*, 975 F. Supp. 2d 930, 943 (S.D. Ind. 2013) ("So long as none of the police department's personnel decisions relating to the Defendant officers violated clearly established constitutional or federal rights, then the City is exempt from suit."); *Coleman v. Curry*, 2013 WL 5232196, at *9 (S.D. Ind. Sept. 16, 2013) (barring suit against police department under the ITCA for "decisions as to how to train and supervise employees and/or officers"); *Lamb v. City of Bloomington*, 741 N.E.2d 436, 441 (Ind. Ct. App. 2001) (upholding dismissal of claim regarding negligent instruction and/or training of firefighters as relating to discretionary function).

Accordingly, the Court **grants** Defendants' Motion as to Counts VIII and IX and **dismisses** those claims **without prejudice**.

E.    **Request for Equitable Relief**

Defendants lastly move to dismiss Plaintiffs' request that the Court appoint a receiver to "ensure that the City properly trains and supervises its law enforcement officers" (Filing No. 1 at 21). Defendants argue that Plaintiffs lack standing to request injunctive relief under Section 1983. Plaintiffs do not oppose dismissal of their request for injunctive relief on the condition that they be granted leave to amend the Complaint "if such is warranted."

Defendants' position as to this claim is well-taken and supported by controlling case law. "It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. at 495–96 (1974). "Without a 'showing of any real or immediate threat that the plaintiff will be wronged again,' [a plaintiff] lack[s] standing to request, and the district court lack[s] jurisdiction to award, . . . [a] permanent injunction." *Lopez-Aguilar v. Marion Cnty. Sheriff's Dep't*, 924 F.3d 375, 396 (7th Cir. 2019) (citation omitted) (quoting *Lyons*, 461 U.S. at 111) (reversing district court's entry of stipulated judgment permanently enjoining officers from seizing or detaining persons under certain circumstances); *see Knox. v. McGinnis*, 998 F.2d 1405, 1414–15 (7th Cir. 1993) (holding plaintiff lacked standing to pursue request for preliminary and permanent injunction barring prison officials from using certain type of restraint because he could not "establish a real and immediate threat that he again will be subject to use of the [restraint]").

Because Snukis has passed away, there is no risk of future harm, and the Estate lacks standing to pursue injunctive relief. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 192 (2000) (holding courts do not have "license . . . to retain jurisdiction over

30

cases in which one or both of the parties plainly lack a continuing interest, as when the parties have settled or a plaintiff pursuing a nonsurviving claim has died"); *see also, e.g.*, *Kermode v. Farley*, No. 09cv584, 2014 WL 12704991, at *4 (S.D. Miss. Feb. 14, 2014) ("Kermode's death in the present case removes any continuing harm—or threat of harm—as to him."); *Stauber v. City of New York*, No. 03 Civ. 9162, 2004 WL 1593870, at *17 (S.D.N.Y. July 16, 2004) ("[Plaintiff Gutman, who died on February 25, 2004, does not have standing to sue for injunctive relief, because future harm to Gutman cannot be shown."); *Blake v. Southcoast Health Sys, Inc.*, 145 F. Supp. 2d 126, 137 (D. Mass. 2001) ("[T]here is no possibility that the named defendants can harm Betty Ann in the future because their discrimination and malpractice killed her. . . . [H]er Estate lacks standing to sue for an injunction.").

The Court therefore **grants** Defendants' Motion to Dismiss as to the request for equitable relief (Filing No. 21 at 21, § C) and **denies** the requested relief **with prejudice**.

## IV.    CONCLUSION

For the reasons discussed above, the Court **GRANTS in part and DENIES in part** Defendants' Motion to Dismiss (Filing No. 33). The Court **denies** the Motion to Dismiss Counts I, II, and III, and the Motion to Dismiss Counts IV–VII and XI as to the City.  The Court **grants** the Motion to Dismiss Counts IV–VII and XI as to the Officers only, Counts VIII and IX, and Plaintiffs' request for equitable relief.  Counts IV–VII and XI are **dismissed without prejudice**[4] as to Defendants Taylor, Koontz, and Hackworth.  Counts VIII and IX are also **dismissed without**

---

[4] "[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed . . . [unless] amendment would be futile or otherwise unwarranted."  *Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 519, 520 (7th Cir. 2015).

**prejudice**.  Lastly, the Court **dismisses with prejudice** the Plaintiffs' request for equitable relief in the form of appointment of a receiver (Filing No. 21 at 21, § C).

Plaintiffs are granted leave until **Monday, July 18, 2022**, to file an amended complaint if such filing would not be futile.  If nothing is filed by that date, this matter will proceed with the claims in Count I against the Officers, and Counts II–VII and X–XI against the City.  This Order does not bar Plaintiffs from later amending their Complaint pursuant to Indiana Code § 34-13-3-5(b).

**SO ORDERED**.

Date:   6/27/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Mark E. Miller
MARK MILLER LAW OFFICE
mmiller@indianalawonline.com

Rick A. Cory
DANKS & DANKS
rcory@danks-danks.com

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com

Keith W. Vonderahe
ZIEMER STAYMAN WEITZEL & SHOULDERS
kvonderahe@zsws.com

Clifford R. Whitehead
ZIEMER STAYMAN WEITZEL & SHOULDERS LLP
cwhitehead@zsws.com