UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| EDWARD C. SNUKIS, JR. and<br>SAMANTHA SNUKIS,<br>Co-Administrators of the Estate of<br>Edward C. Snukis<br><br>Plaintiffs<br><br>vs.<br><br>CITY OF EVANSVILLE, INDIANA;<br>MATTHEW O. TAYLOR, in his individual<br>capacity as an Evansville police officer;<br>TREVOR KOONTZ, in his individual<br>capacity as an Evansville police officer; and<br>NICHOLAS HACKWORTH, in his<br>individual capacity as an Evansville police officer<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) CASE NO. 3:21-cv-00135-MPB-MJD<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>BRIEF IN SUPPORT OF DEFENDANT CITY OF EVANSVILLE'S<br>MOTION FOR SUMMARY JUDGMENT</u>

Comes now the Defendant City of Evansville ("City"), by counsel and pursuant to

Federal Rule of Procedure 56, and submits its Brief in support of its Motion for Summary

Judgement on all remaining claims of Plaintiffs' Complaint.

## I.        Introduction

There is no evidence to support Plaintiffs' claims against the City that it had a "code of

silence" policy, failed to adopt policies, or failed to train its officers, which allowed officers to

act "with impunity and without fear of retribution." (Dkt. 66 at 22, 31-32; DKt. 94, ¶2(a).) Nor is

there evidence that the same was the moving force behind any constitutional violation committed

against Snukis. Rather, the undisputed evidence shows the City had policies in place and trained

its officers, including Defendants Matthew O. Taylor, Trevor Koontz, and Nicholas Hackworth

("Defendant Officers"), to prepare them for their encounter with Edward Snukis ("Snukis"), who

1

actively resisted law enforcement, by fleeing and force, was under the influence of methamphetamine, and eventually needed medical attention.

Further, Defendant City is entitled to summary judgment on Plaintiffs' state law claims. First, for Plaintiffs' state law claims of common law negligence (Count IV), intentional infliction of emotional distress (Count VI), and negligent infliction of emotional distress (Count VII), Defendant City is immune under the Indiana Tort Claims Act ("ITCA"), and such claims are barred because Snukis was contributorily negligent. For Plaintiffs' claim of common law assault and battery (Count V) and wrongful death (Count XI), Defendant City is entitled to summary judgment because Defendant Officers' uses of force were reasonable under the circumstances. Finally, Defendant City is entitled to summary judgment for Plaintiffs' claim of wrongful death (Count XI), as there is no evidence that Defendant Officers' actions and/or inactions were the proximate cause of Snukis' death.

Accordingly, Defendant City is entitled to summary judgment on all remaining claims against them:

- *Monell* Liability under 42 U.S.C. §1983 (Count II) against Defendant City for employing custom or practice (a *de facto* "code of silence") of failing to accurately report or adequately investigate uses of excessive force by EPD officers and failing to discipline those officers, which allows officers, including the Officers here, to use excessive force "with impunity and without fear of retribution." (Dkt. 66 at 22, 31-32; DKt. 94, ¶2(a);

- *Monell* Liability under 42 U.S.C. §1983 (Count II) against Defendant City for failing to adopt certain policies that led to the violation of Snukis' rights (Dkt. 66 at 22-23, 31-32; Dkt. 94, ¶1(d);

2

- *Canton* Liability under 42 U.S.C. §1983 (Count III) against Defendant City for failing to adequately train its officers, including on the reasonable and appropriate use of force (*e.g.,* tasers) during investigations, detentions and arrests, the dangers of positional and compression asphyxia, and the intervention in the excessive use of force by fellow officers and that Defendant City was aware that excessive uses of force were likely to result from the lack of training (Dkt. 66 at 24; Dkt. 94, ¶(a)); and

- *Canton* Liability under 42 U.S.C. §1983 (Count III) against Defendant City for failing to train and supervise its officers (Dkt. 94, ¶(b)); and

- State law claims of negligence (Count IV), assault and battery (Count V), intentional infliction of emotional distress (Count VI), negligent infliction of emotional distress (Count VII), respondeat superior (Count X), and wrongful death under Indiana Code § 34-23-1-2 (Count XI).

## II.    Statement of Undisputed Facts

1.      On September 13, 2019, multiple 911 calls were received regarding a white, bald male, with no shirt and jeans near Green River Road in Evansville Indiana, including:

   a.      At 2:14 p.m. at 4424 Vogel Road, Evansville at German American Bank of a "suspicious" white, bald male with no shirt "on the back lot looking into a red Niss[an car,]" (Ex. 1 – CAD Report, p. 5).

   b.      At 2:57 p.m. at 1356 N. Green River Road of a theft in progress of "a male in the back kitchen who tried stealing something," and identified as the same previous suspect run at German American Bank (CAD Report, p. 1);

   c.      At 3:22 p.m. at 4602 Vogel Road of a white male with an unbuttoned shirt "standing in front of the business with a can of something in his hand looking into veh[icles]," (CAD Report, p. 8)

3

      d.      At 7:44 p.m. at 1801 N. Green River Road of an intoxicated person (CAD Report, p. 3); and

      e.      At 7:44 p.m. at the corner of Congress Avenue and Indiana Street of a white male in a green short sleeve button down with buttons open and jeans that "keeps coming onto the back parking lot . . . standing out by the body shop sign" by the "rear lot by the semis," (CAD Report, p. 4).

2.      The original callers for an intoxicated person said they had to ask Snukis to leave the body shop, which is for employees only, several times. (Ex. 2 – Supplemental Reports, p. 1.) Both said he was aggressive and was unsteady on his feet and kept walking into the roadway when they called 911. (Supplemental Reports, p. 1.)

3.      At approximately 7:52 P.M. Officers Taylor and Koontz "were dispatched to 4300 E. Division Street for an intoxicated white male wearing green button down shirt (buttons open) and jeans. He had been going in and out of the lot, fenced in area, and had walked into the trim and body shop which is for employee`s only," which is near Green River Road in Evansville. (Ex. 3 – Incident Report, p. 3; CAD Report, p. 1; Ex. 4 – Aerial Photo.)

4.      When Officers Taylor and Koontz arrived, they were in full police uniforms and driving a fully marked police vehicle. (Ex. 5 – Koontz Vid., 00:00-00:31[1]; Ex. 6 – Taylor Vid. at 00:21-00:38.)

5.      Officer Taylor observed that Snukis matched the description of the person who had been reported to be trespassing in the area, including that he was a white male, was wearing a green button down shirt, and jeans, and noticed he "appeared to be under some form of intoxication." (Ex. 7 – Use of Force Report, p. 2.)

---

[1] All citations to the video refer to the timestamp of the applicable video.

6.      Officer Koontz told Snukis, "Sir, put your hands on your head real quick." (Ex. 5 - Koontz Vid. at 0:00:31; Ex. 6 - Taylor Vid., 00:37; Ex. 7 - Use of Force Report, pp. 2-3.)

7.      Officers Taylor and Koontz approached Snukis and twice stated, "Sir, put your hands up." (Ex. 5 - Koontz Vid. at 00:31.)

8.      Snukis responded to those commands by raising his voice and positioning himself in a fighting stance, so Officer Koontz then placed his hands on Snukis in an attempt to put his hands behind his back and detain Snukis. (Ex. 5 - Koontz Vid., 00:32-45; Ex. 6 - Taylor Vid., 00:38; Ex. 8 - Koontz Dep. (151:22-23; Ex. 7 - Use of Force Report, p. 3.]

9.      Snukis did not comply and, instead, tensed up, broke away, and punched Officer Koontz in the face/mouth area, striking his nose, before running away. (Ex. 8 - Koontz Dep., 152:1-2; Ex. 9 - Taylor Dep., 100:20-21; Ex. 7 - Use of Force Report, pp. 3-4; Ex. 5 - Koontz Vid., 00:32-00:45; Ex. 6 - Taylor Vid., 00:38-00:48; Ex. 5 - Koontz Vid. at 13:17.)

10.     Snukis' punch caused Officer Koontz to fall to the ground. (Ex. 5 - Koontz Vid., 00:32-45; Ex. 8 - Koontz Dep., 152:4.)

11.     Officer Taylor then deployed his taser on Snukis, and both Officer Koontz and Officer Taylor issued commands to Snukis to get on the ground. (Ex. 5 - Koontz Vid., 00:50-57; Ex. 6 - Taylor Vid. 1, 00:49-00:58; Ex. 7 - Use of Force Report, p. 3.)

12.     The taser deployed by Officer Taylor did not get a good connection and Snukis "rolled his body and broke the leads from the [taser]." (Ex. 5 - Koontz Vid., 01:04; Ex. 6 - Taylor Vid., 00:58; Ex. 7 - Use of Force Report, pp. 3-4; Ex. 8 - Koontz Dep., 152:10; *see* Ex. 10 - Hackworth Vid. 2, 09:44.)

13.     Snukis then attempted to pull out the taser barbs and continued to roll around on the ground, attempting to stand up, before he eventually stood up. (Ex. 6 - Taylor Vid., 00:59-01:007.)

14.     Officer Taylor then deployed his taser again on Snukis, without effect, and Snukis once again, broke free and took off running in the opposite direction, so Officers Taylor and Koontz began chasing Snukis. (Ex. 5 - Koontz Vid., 01:11; Ex. 6 - Taylor Vid., 01:05; *see* Ex. 10 - Hackworth Vid. 2, 9:45; *see also* Ex. 8 - Koontz Dep. 152:12-20; Ex. 7 - Use of Force Report, p. 3.]

15.     Officer Taylor then informed dispatch that Snukis was running. (Ex. 6 - Taylor Vid., 01:11.)

16.     After running nearly half a block, Snukis tripped over a manhole cover and fell in a parking lot. (Ex. 6 - Taylor Vid., 01:23; *see* Ex. 8 - Koontz Dep. 153:2; *see also* Ex. 10 - Hackworth Vid. 2, 10:01.)

17.     Officer Taylor then got on top of Snukis' top half, while Officer Koontz took control of his bottom half, consistent with the training they received. (Ex. 8 - Koontz Dep., 153:4-6.)

18.     Snukis continued to resist Officers Taylor and Koontz' attempts to place him in handcuffs, including:

     a.     Reaching at Officer Taylor and Koontz (Ex. 6 - Taylor Vid., 01:27; Ex. 8 - Koontz Dep., 153:10; Ex. 10 - Hackworth Vid. 2, 10:09);

     b.     Telling Officers Taylor and Koontz to "leave me alone you fucking cocksuckers," (Ex. 6 - Taylor Vid., 01:32);

    c.      Disobeying commands to "put your hands behind your back and stop resisting" and "quit resisting; give me your hand," (Ex. 6 - Taylor Vid., 1:43-3:25; Ex. 5 – Koontz Vid., 02:41-03:17; Ex. 8 - Koontz Dep., 153:11-12);

    d.      Grabbing at Officer Taylor's genitalia area at least three times (Ex. 7 - Use of Force Report, p. 3; Ex. 9 - Taylor Dep., 91:15); and

    e.      Reaching for Officer Taylor's taser holster (Ex. 9 - Taylor Dep., 131:6-9; Ex. 7 - Use of Force Report, pp. 3-4.)

19.     In response to those actions, Officer Taylor "struck Snukis in the left side of the head approximately 6 times in an attempt to get pain compliance and to get him to release his grip on [Officer Taylor's] inner thigh," which caused Snukis to let go of Officer Taylor. (Ex. 7 - Use of Force Report, p. 3.)

20.     While Snukis was actively resisting, he continued to shout and make noises towards the officers. (Ex. 6 - Taylor Vid., 01:38-3:11.)

21.     At one point, Officer Koontz gained control of one arm, but Snukis still kept his other hand under his body, despite Officer Koontz and Officer Taylor's commands to "quit resisting; give me your other hand." (Ex. 6 - Taylor Vid., 3:09-3:30; Ex. 8 - Koontz Dep., 153:15.)

22.     Snukis was fighting with Officers Taylor and Koontz the entire time while they were attempting to handcuff and secure him. (Ex. 10 - Hackworth Vid. 2, 10:17.)

23.     After approximately three and a half minutes, Officers Taylor and Koontz were able to secure Snukis and place him in handcuffs with his hands behind his back. (Ex. 5 - Koontz Vid., 0:03:29; Ex. 6 - Taylor Vid., 03:42; Ex. 7 - Use of Force Report, p. 3.)

24.     Officer Hackworth arrived as Officers Taylor and Koontz were securing Snukis with handcuffs. (Ex. 11 - Hackworth Vid. 1, 2:48; Ex. 10 - Hackworth Vid. 2, 1:35.)

25.     Defendant Officers ceased using force against Snukis after Snukis was in handcuffs with his hands behind his back. (Ex. 5 - Koontz Vid., 03:44; Ex. 10 – Hackworth Vid. 2, 01:35; Ex. 6 - Taylor Vid., 03:42; Ex. 7 - Use of Force Report, pp. 4-5.)

26.     Defendant Officers did not observe Snukis lose consciousness until "about the time we had him in handcuffs." (Ex. 5 - Koontz Vid., 12:26.)

27.     After Defendant Officers secured Snukis (Ex. 10 - Hackworth Vid. 2, 1:35; Ex. 6 - Taylor Vid., 03:42):

     a.     Within 7 seconds, they turned Snukis over onto his back (Ex. 10 - Hackworth Vid. 2, 1:42; Ex. 6 - Taylor Vid., 3:50);

     b.     Within 14 seconds, they checked his pulse to make sure he "is breathing," (Ex. 10 - Hackworth Vid. 2, 1:49; Ex. 6 - Taylor Vid., 3:51); and

     c.     Within 16 seconds, Officer Hackworth requested medical assistance (*i.e.,* "AMR,") through dispatch, which confirmed, "I'll get AMR going." (Ex. 5 - Koontz Vid., 3:15; Ex. 10 - Hackworth Vid. 2, 1:51; Ex. 6 - Taylor Vid., 4:00; Ex. 1 - CAD Report, p. 4.)

(*See generally*, Ex. 7 - Use of Force Report, p. 3.)

28.     Defendant Officers confirmed Snukis was breathing at that time. (Ex. 10 - Hackworth Vid. 2, 2:02; Ex. 6 - Taylor Vid., 4:12.)

29.     After turning Snukis over and shouting, "Sir, can you hear me?" Defendant Officers also performed sternum rubs. (Ex. 5 - Koontz Vid., 03:56-4:06; Ex. 11 - Hackworth Vid. 1, at 3:18; Ex. 6 - Taylor Vid., 4:02.)

30.     Officer Hackworth again checked for Snukis' pulse and, again, confirmed he was still breathing and observed him "moving his mouth." (Ex. 10 - Hackworth Vid. 2, 2:25-2:32; Ex. 6 - Taylor 4:35; Ex. 8 - Koontz Dep. 154:7-9.)

31.     Officer Koontz stated, "Yeah, he's breathing . . . I can feel his chest moving up now." (Ex. 5 - Koontz Vid., 4:11; Ex. 8 - Koontz Dep. 154:7-9; Ex. 11 - Hackworth Vid. 1, at 3:22.)

32.     Soon thereafter, Snukis could be heard making sounds. (Ex. 5 - Koontz Vid., 04:20.)

33.     Officer Hackworth then advised the other Defendant Officers to roll Snukis onto his side. (Ex. 10 - Hackworth Vid. 2, 2:35.)

34.     Officer Hackworth informed dispatch that Snukis was unresponsive and additionally requested to "roll fire," which is referred to EFD who could provide additional medical assistance. (Ex. 5 – Koontz Vid., 0:05:07; Ex. 6 - Taylor Vid., 05:06; Ex. 8 - Koontz Dep., 154:22-23; Ex. 11 - Hackworth Vid. 1, at 4:12; Ex. 10 - Hackworth Vid. 2, 2:50.)

35.     Officer Hackworth then checked Snukis' pulse again, confirming he had a pulse and that "he's swallowing." (Ex. 5 - Koontz Vid., 0:05:16; Ex. 10 - Hackworth Vid. 2, 3:00-3:12; Ex. 6 - Taylor Vid., 05:17; Ex. 8 - Koontz Dep., 154:12-15.)

36.     Officer Hackworth continued to check on Snukis' condition, including using a flashlight, and repeatedly checking for a pulse; Officer Hackworth can, again, be heard confirming Snukis was breathing and had a faint pulse. (Ex. 5 - Koontz Vid., 0:05:50-0:06:41; Ex. 11 - Hackworth Vid. 1, at 4:35; Ex. 10 - Hackworth Vid. 2, 3:12-4:04.)

37.     Officer Taylor then went to civilians who had gathered in the area and advised them that the "sergeant is going to want to talk to you." (Ex. 6 - Taylor Vid., 05:57.)

38.     After Snukis did not regain consciousness, Officer Hackworth ran to his police vehicle to obtain medical supplies while Officers Koontz stayed with and continued to monitor Snukis. (Ex. 11 - Hackworth Vid. 1, at 5:40; Ex. 10 - Hackworth Vid. 2, 4:06.)

39.     Officer Hackworth then inserted a breathing tube in order to pump air into Snukis' lungs. (Ex. 10 - Hackworth Vid. 2, 05:00.)

40.     Upon checking Snukis again, Officer Hackworth stated that he was "not getting a pulse" (Ex. 6 - Taylor Vid., 07:15) and then asked either Officer Taylor or Koontz to check his pulse, which that officer did (Ex. 6 - Taylor Vid., 07:18) and

   a.     Within 5 seconds, started to remove the handcuffs from Snukis so they could provide care (Ex. 6 - Taylor Vid., 07:23);

   b.     Within 20 seconds, completed removal of the handcuffs (Ex. 6 - Taylor Vid., 07:38); and

   c.     Within 27 seconds, Officer Taylor began chest compressions. (Ex. 6 - Taylor Vid., 07:45; Ex. 5 - Koontz Vid., 07:15-07:40; Ex. 11 - Hackworth Vid. 1, at 06:58; Ex. 10 - Hackworth Vid. 2, 05:06);

   d.     Within 29 seconds, Officer Hackworth ran back to his car to retrieve a portable defibrillator to use on Snukis, which issued audible instructions that can be heard on the body camera; (Ex. 11 - Hackworth Vid. 1, at 7:05; Ex. 5 - Koontz Vid., 08:17; Ex. 10 - Hackworth Vid. 2, 05:41; Ex. 6 - Taylor Vid., 07:47); and

   e.     Within 83 seconds, the portable defibrillator was placed on Snukis (Ex. 6 - Taylor Vid., 08:41)

41.     However, after the device analyzed Snukis' heart rhythm, it stated, "Shock not advised." (Ex. 5 - Koontz Vid., 08:50; Ex. 10 - Hackworth Vid. 2, 06:27; Ex. 6 - Taylor Vid., 09:04.)

42.     Defendant Officers informed dispatch that they had initiated chest compressions on Snukis. (Ex. 5 - Koontz Vid., 08:07; Ex. 10 - Hackworth Vid. 2, 5:51.)

43.     Officer Taylor then resumed chest compressions. (Ex. 5 - Koontz Vid., 08:50; Ex. 10 - Hackworth Vid. 2, 06:27; Ex. 6 - Taylor Vid., 09:07.)

44.     At the same time chest compressions were being performed, Officer Hackworth placed an airway in Snukis to force air to get to Snukis' lungs and began pumping air into Snukis' mouth. (Ex. 10 - Hackworth Vid. 2, 7:42; Ex. 6 - Taylor Vid., 9:10.)

45.     After Officer Taylor had been performing chest compressions for a while, Officer Koontz took over on the chest compressions. (Ex. 5 - Koontz Vid., 08:46; Ex. 11 - Hackworth Vid. 1, at 10:39; Ex. 10 - Hackworth Vid. 2, 6:34; Ex. 6 - Taylor Vid., 11:24.)

46.     Officer Koontz then instantly continued performing chest compressions, which were continued by a third officer. (Ex. 5 - Koontz Vid., 08:52-12:51; Ex. 11 - Hackworth Vid. 1, at 10:39-10:48; Ex. 10 - Hackworth Vid. 2, 6:57.)

47.     While Defendant Officers were rendering medical assistance, other officers were working on crowd control as unknown third parties were asking questions; those officers can be heard speaking with that crowd. (Ex. 10 - Hackworth Vid. 2, 8:30.)

48.     Officer Hackworth later took over chest compressions from Officer Koontz. (Ex. 10 - Hackworth Vid. 2, 9:16.)

49.     After AMR and EFD arrived on scene, they took over medical care for Snukis. (Ex. 6 - Taylor Vid., 11:54; Ex. 11 - Hackworth Vid. 1, at 11:09; Ex. 5 - Koontz Vid., 12:51; Ex. 10 - Hackworth Vid. 2, 10:25.)

50.     Defendant Officers continued to assist AMR and EFD as requested. (Ex.  10 - Hackworth Vid. 2, 10:26-33:02.)

51.     Thereafter, one of the AMR paramedics checked Snukis for a pulse and stated, "We got a pulse." (Ex. 10 - Hackworth Vid. 2, 20:39.)

52.     AMR transported Snukis to the hospital. (Ex. 10 - Hackworth Vid. 2, 23:28-31:33.)

53.     Defendant Officers attended to, stayed with, and monitored Snukis at all times until medical assistance arrived. (*See generally*, Ex. 5 - Koontz Vid.; *see generally* Ex. 6 - Taylor Vid.; *see generally* Ex. 11 - Hackworth Vid. 1; *see generally* Ex. 10 - Hackworth Vid. 2.)

54.     As a result of Snukis' punch, Officer Koontz had blood dripping down his face but did not seek any medical attention or attend to his injuries until after medical assistance arrived for Snukis. (Ex. 5 - Koontz Vid., 13:13; Ex. 8 - Koontz Dep. 155:5-6; Ex. 7 - Use of Force Report, p. 4.)

55.     Officer Koontz's injuries were observed by medical personnel on scene. (Ex. 5 - Koontz Vid., 13:17.)

56.     Following an autopsy, the Vanderburgh County Coroner determined the cause of death to be "methamphetamine intoxication with a contribution by cardiomegaly." (Ex. 12 – Autopsy Report, p. 2.)

57.     The City conducted an investigation into Snukis' death, which included the review of the case reports, review of the CAD report, review of the autopsy report, creation of

additional supplemental reports, blood draws from Officers Taylor and Koontz, interviews with multiple witnesses, reviews of body cameras, and creation of a timeline of events. (Ex. 13 – Lewis Dep., 18:8-20:1, 23:13-29:9, 31:20-31:23, 38:23-40:11, 45:11-16; Ex. 14 – Snukis Death Investigation Report.)

58.     The City also conducted an investigation and reviewed the uses of force employed by Defendant Officers. (*See* Use of Force Reports.)

59.     Through the course of discovery, the City produced all EPD reports relating to the Snukis incident, including all documents relating to the City's investigation into Snukis' death, all reports regarding the uses of force by Defendant Officers, and all Operational Guidelines, and the City is not aware of any document—other than attorney-client privileged or work product materials—relating to Snukis that has been withheld. (Ex. 15 – Kirby Dep., 138:11-142:13.)

### EPD Policies, Training, and Supervision

60.     EPD has numerous policies that relate to the Snukis incident, including Detainment and arrests (OG 14.00; OG 400.00), Use of Discretion (OG 114.00), Injuries to Persons, including detainees (OG 119.00; OG 153.00; OG 153.02; OG 226.00), Case Investigations (OG 139.00; OG 421.00; OG 145.03; OG 140.00), Handling, Transporting, and Booking Prisoners, which includes information on positional asphyxia (OG 153.00; OG 226.00), Handling the Street Drunk (OG 172.00), Supervising Officers (OG 180.00; OG 403.00), Mental Illness and Commitment Papers (OG 184.00), Firearms Qualifications and Range Procedures (OG 356.01), Use of Force, including TASER. (OG 359.00; OG 359.01; OG 356.01), Incident Reports (OG 500.00; OG 501.00; OG 494.00). (Ex. 16 – Excerpts of Operational Guidelines).

61.     As part of their training with the Evansville Police Department ("EPD") and prior to their interaction with Snukis, Defendant Officers were trained on all EPD policies, including

all Operational Guidelines, and situations similar to Snukis involving a suspect who disregards commands, flees, and actively resists being placed in handcuffs by striking the officer and providing medical assistance to a suspect. Those Operational Guidelines included: Detainment and Arrests (OG 14.00; OG 400.00), Use of Discretion (OG 114.00), Injuries to Persons, including detainees (OG 119.00; OG 153.00; OG 153.02; OG 226.00), Case Investigations (OG 139.00; OG 421.00; OG 145.03; OG 140.00), Handling, Transporting, and Booking Prisoners, which includes information on positional asphyxia (OG 153.00; OG 226.00), Handling the Street Drunk (OG 172.00), Supervising Officers (OG 180.00; OG 403.00), Mental Illness and Commitment Papers (OG 184.00), Firearms Qualifications and Range Procedures (OG 356.01), Use of Force, including TASER. (OG 359.00; OG 359.01; OG 356.01), Incident Reports (OG 500.00; OG 501.00; OG 494.00). (Ex. 17 – Hackworth Aff., ¶5; Ex. 18 – Taylor Aff., ¶5; Ex. 19 – Koontz Aff., ¶5.)

62.     As an EPD officer, Defendant Officers also received training in obtaining and confirming a pulse, providing chest compressions, and using a portable defibrillator. (Taylor Aff., ¶6; Taylor Aff., ¶6; Hackworth Aff., ¶6.)

63.     In addition to his training as an EPD officer and prior to his interaction with Snukis, Officer Hackworth had been trained and worked as an emergency medical technician ("EMT"), which included placing an airway into a person for purposes of allowing air to get to the person's lungs and had received certifications in CPR and in Pre-Hospital Trauma Life Support. (Ex. 20 - Hackworth Depo., 23:13-24:4, 65:12-17; Hackworth Aff., ¶9.)

64.     When asked, Plaintiffs were not aware of (1) any policymaker that was involved in Snukis' death, (2) any policy, practice, or custom that related to Snukis' death, (3) any lack of policy, practice, or custom that related to Snukis' death, (4) any other incident that was similar to

14

Snukis' incident, (5) any false statements regarding Snukis by the City and/or its employees, or (6) any lack of training by the City that related to Snukis' death. (Ex. 21 – Samantha Depo., 61:6-64:11; Ex. 22 – Edward Depo., 61:11-63:22.)

### III.     Standard of Review

As this Court has found:

> The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence."

*Ellis v. City of Indianapolis*, No. 117CV03857TWPMJD, 2019 WL 1859297, at *2 (S.D. Ind. Apr. 24, 2019) (internal citations omitted).

### IV.     Argument

**A.     Defendant City is entitled to summary judgment as to Plaintiffs' *Monell* claim for employing a "code of silence" that allows officers, including the Officers here, to use excessive force "with impunity and without fear of retribution."**

"[T]o prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself." *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021). Where the municipality has not directly violated the plaintiff's rights and instead caused an employee to do so, the plaintiff must demonstrate that the municipality acted with deliberate indifference to the plaintiff's

constitutional rights. *Id.* at 987. Additionally, the plaintiff must prove that the municipality's action was the "moving force" behind the plaintiff's violation. *Id.*

A successfully established *Monell* claim can fall under one of the following three categories: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) the decision of an official with final policy-making authority. *Altizer v. Retherford*, No. 14-cv-31, 2015 WL 3843668, at *4 (S.D. Ind. June 22, 2015) (citing *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)).

Here, Plaintiffs allege Defendant City is liable for employing a "custom or practice (a de facto 'code of silence') of failing to accurately report and adequately investigate uses of excessive force by police officers and failing to discipline those officer, which allows those officers to use excessive force with impunity and without fear of retribution." (Dkt. 94, ¶2(a).)

### i.   There was no constitutional violation by Defendant Officers.

"It is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [a plaintiff's] constitutional rights." *Houskins*, 549 F.3d at 493 (citations omitted). As there was no constitutional violation by Defendant Officers, *see* Defendant Officers' Motion for Summary Judgment, Supporting Brief, and Designation of Evidence,[2] Plaintiffs' *Monell* claim against Defendant City fails. *See Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010); *see Petty v. City of Chicago*, 754 F.3d 416, 424–25 (7th Cir. 2014) (noting that a constitutional injury is a requirement of a *Monell* claim).

### ii.   There was no express policy of Defendant City that caused Snukis' constitutional injury.

---

[2] Defendant City incorporates, by reference, all arguments raised by Defendant Officers in their Motion for Summary Judgment, Supporting Brief, and Designation of Evidence to show Defendant Officers did not violate Snukis' constitutional rights.

There is no evidence that Defendant City had an express policy of a "code of silence" or "of failing to report, investigate, or discipline [excessive uses of force]" that "created an environment that allowed the Officers to believe that they could act with impunity," or make "false statements," as alleged by Plaintiffs. (Dkt. 66 at 19 (citing Dkt. 1 at ¶¶ 32, 64); Dkt. 94, ¶2(a)-(c).) Plaintiffs also concede they aer not aware of any policy, practice, or custom or any lack of policy, practice, or custom that related to Snukis' death. (Fact No. 64.)

While Plaintiffs reference a "three (3) day[]" period where officers are permitted to wait "to be interviewed in connection with a misconduct investigation," (Dkt. 94, ¶2(a)), there is no evidence that such is an express policy that "created an environment that allowed [Defendant] Officers to believe that they could act with impunity" or of making "false statements." Further, there is no evidence that Defendant Officers made any "false statements." (*See* Fact No. 64.) Finally, there is no evidence that the "three day" period was an express policy of Defendant City that was the "moving force" behind any constitutional violation alleged to be suffered by Snukis. *See First Midwest Bank,* 988 F.3d at 986.

Plaintiffs also reference a collective bargaining agreement which provides that the "City will not release the content of any Internal Affairs File, Employment File or any Personnel File of any officer . . . unless that officer expressly consents to such release or such information is subpoenaed and Defendant City has resisted said subpoena in the appropriate court to the best of the City's." (Dkt. 94, ¶2(c).) However, there is no evidence that any record relating to Snukis was withheld. Rather, Defendant City produced all EPD reports relating to the Snukis incident, including Defendant City's investigation into Snukis' death, use of force reports, and all Operational Guidelines, and Defendant City is not aware of any document—other than attorney-client privileged or work product materials—relating to Snukis that has been withheld. (Fact No.

59.) Importantly, there is no evidence that such alleged policy was the "moving force" behind any constitutional violation alleged to be suffered by Snukis.

### iii.      No widespread practice of Defendant City caused Snukis' constitutional injury.

As the Seventh Circuit stated in *Giese v. City of Kankakee*, "Although we have previously recognized that a defendant's "code of silence" can give rise to a valid *Monell* claim, such a claim requires more than evidence of "individual misconduct by ... officers"; it requires "a *widespread practice* that permeates a critical mass of an institutional body." 71 F.4th 582, 589 (7th Cir. 2023); *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir.2003) ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference.")

A *Monell* claim requires an injury caused by a policy; not a random event. *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005). Shortcomings in an investigation are not indicative of a custom or policy; rather, they are indicative of one flawed investigation which cannot support a *Monell* claim. *Alexander v. City of South Bend*, 433 F.3d 550, 557-558 (Cir. 2006). The 7th Circuit has held that superficial investigations where an officer faced no official discipline for her actions may raise serious questions about accountability among police officers, but a *Monell* claim requires more than this. *Rossi v. City of Chicago*, 790 F.3d 729 (Cir. 2015).

Here, Plaintiffs allege Defendant City employs a "custom or practice" of a "code of silence." (Dkt. 1 at ¶¶ 32, 61, 63.) However, when asked Plaintiffs were not aware of any policy, practice, or custom that related to Snukis' death, any lack of policy, practice, or custom that related to Snukis' death, any other incident that was similar to Snukis' incident, or any lack of training or supervision by Defendant City that related to Snukis' death. (Fact No. 64.) Simply put, there is no evidence of any "widespread practice" of a "code of silence" that was the

18

"moving force" behind any constitutional violation against any other person, other than as alleged against Snukis. *See First Midwest Bank,* 988 F.3d at 986.

There is also no evidence that there was such a high risk of constitutional injury from Snukis that the "single incident" theory of municipal liability applies here. *See Connick v. Thompson*, 563 U.S. 51, 63, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (describing the "narrow range of circumstances" in which "a pattern of similar violations might not be necessary to show deliberate indifference") (citation omitted). In such cases, the "risk of constitutional violations [is] so high and the need for training so obvious that the municipality's failure to act can reflect deliberate indifference and allow an inference of institutional culpability, even in the absence of a similar prior constitutional violation." *J.K.J. v. Polk County*, 960 F.3d 367, 380 (7th Cir. 2020). "Qualifying circumstances under this doctrine are rare"; "[a] constitutional violation must be a 'blatantly obvious' consequence of inaction for single-incident liability" to apply. *Orozco v. Dart*, 64 F.4th 806, 825–26 (7th Cir. 2023). This is in large part due to the fact that Defendant City had policies and training and supervision in place for Defendants Officers' interactions with Snukis and Defendant Officers were trained in the same. (Fact Nos. 60-61.)

Finally, even looking to the isolated incident involving Snukis, there is no evidence to support Plaintiffs' allegations that Defendant City failed to investigate the matter or made false statements. Rather, Defendant City did conduct an investigation into Snukis' death, which included speaking with multiple witnesses, obtaining surveillance video, and generating reports. (Fact No. 57.) Defendant City also conducted an investigation into and reviewed the uses of force employed by Defendant Officers. (Fact No. 58.)

### iv.      No action by a policy maker

As Plaintiffs admit, they are not aware of any policymaker that was involved in Snukis' death. (Fact No. 64.) Accordingly, the same cannot support Plaintiffs' *Monell* claim.

**B.      Defendant City is entitled to judgment on Plaintiffs' *Monell* liability claim for allegedly failing to adopt certain policies.**

In situations that call for procedures, rules, or regulations, the failure to make a policy itself may provide a basis for municipal liability. *Sims v. Mulcahy*, 902 F.2d 524 (7th Cir. 1990); *Murray v. City of Chicago*, 634 F.2d 365, 366–67 (7th Cir.1980). Where a municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction." *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012). In this regard, a single isolated incident of wrongdoing by a non-policymaker is generally insufficient to establish municipal acquiescence in unconstitutional conduct. *See Tuttle*, 471 U.S. at 823–24, 105 S.Ct. at 2436; *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir.1986).

Here, Plaintiffs allege, "[b]y refusing to adopt and enforce policies that deter the use of excessive force and provide for meaningful investigations of complaints of excessive force, Defendant City created an environment that allowed the Officers to believe that they could act with impunity and without fear of retribution." (Dkt. 1, ¶63.) However, there is no evidence to support those allegations.

First, there is no evidence that Defendant City adopted an official policy <u>not</u> to adopt such "policies." While Plaintiffs cite to alleged "changes to the policies at issue in this case, including "General Order No. 20-O-10, dated October 14, 2020," (Dkt. 94, ¶2(d)), such is not evidence of an express policy that caused Snukis' constitutional injury. First, Federal Rule of Evidence 407 prevents the admission of evidence of the subsequent measures to prove "culpable conduct." Second, an alleged potential policy change <u>after</u> Snukis' incident could not support a *Monell* claim of an express policy that caused his injury.

Second, there is no evidence that Defendant City had actual or constructive notice that any alleged failure to adopt such "policies" would result in the constitutional violations allegedly

suffered by Snukis. Nor is there evidence to support any contention that there was such a high risk of constitutional injury from Snukis that the "single incident" theory of municipal liability applies here.

Finally, there is no evidence the Defendant City's alleged policy not to adopt "policies that deter the use of excessive force and provide for meaningful investigations of complaints of excessive force policies" was the moving force behind any constitutional violation against Snukis.

While it is Plaintiffs' "put up or shut up" obligation, the undisputed evidence shows that at the time of the Snukis incident (September 2019), the City had policies in place and trained EPD officers, including Defendant Officers, on the same circumstances they faced with Snukis. (Fact No. 60.) Accordingly, Plaintiffs cannot show a failure by Defendant City to adopt a policy and Defendant City is entitled to summary judgment.

## C. Defendant City of Evansville is entitled to judgment on Plaintiffs' *Canton* Liability claim (Count III).

As found by the United States Supreme Court:

In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. See *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training'" is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Canton*, 489 U.S., at 388, 109 S.Ct. 1197. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id*., at 389, 109 S.Ct. 1197.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty*., 520 U.S., at 410, 117 S.Ct. 1382. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes

21

city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*, at 407, 117 S.Ct. 1382. The city's "'policy of inaction'" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate *62 the Constitution." *Canton*, 489 U.S., at 395, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in de facto respondeat superior liability on municipalities ...." *Id.*, at 392, 109 S.Ct. 1197; see also *Pembaur*, *supra*, at 483, 106 S.Ct. 1292 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ... ").

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U.S., at 409, 117 S.Ct. 1382. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.*, at 407, 117 S.Ct. 1382. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Connick*, 563 U.S. at 61 (citation omitted).

i.     **Defendant City is entitled to summary judgment, as there is no underlying constitutional violation.**

As with Plaintiffs' *Monell* claim, a municipality cannot be liable when there is no underlying constitutional violation by a municipal employee. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010). Accordingly, Plaintiffs' *Canton* claim fails, as Defendants Officers did not violate Snukis' Fourth Amendment rights.[3]

ii.    **Plaintiffs cannot satisfy the three elements of *Canton*.**

As this Court found, in support of their *Canton* claim, Plaintiffs "do not allege a pattern of similar constitutional violations." (Dkt. 66, p. 24.) Further, Plaintiffs conceded they were not aware

---

[3] Defendant City incorporates, by reference, all arguments raised by Defendant Officers in their Motion for Summary Judgment, Supporting Brief, and Designation of Evidence to show Defendant Officers did not violate Snukis' constitutional rights.

of any other incident that was similar to Snukis' incident or any lack of training by Defendant City that related to Snukis' death. (Fact No. 64.) Accordingly, Plaintiffs must prove the "single-incident" liability. *Connick*, 131 S. Ct. at 1361 (In *Canton,* the Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference.") The Supreme Court acknowledged that "single-incident" liability was "rare." *Id.*

However, as stated in *Canton*, it will not suffice to show that an injury or accident could have been avoided "if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury . . . ." *Canton*, 489 U.S. at 391, 109 S.Ct. at 1206. "[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *Id.* However, "[m]ere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability under section 1983 on an inadequate training theory." *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989) (citation omitted). Rather, Plaintiffs must show both that Defendant City failed to train its officers (or provided inadequate training), and that Defendant City was on notice that a constitutional violation was a highly predictable consequence of that lack of training. *McKinney v. Vigo Cnty. Sheriff's Dep't*, No. 219CV00413JMSDLP, 2021 WL 1268109, at *11 (S.D. Ind. Apr. 6, 2021) (citing *Woodward v. Correctional Medical Services of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004)).

Here, Plaintiffs alleged Defendant City failed to adequately train and supervise its officers on "the reasonable and appropriate use of force," including tasers, "intervention in the excessive use of force by fellow officers," and "the dangers of positional and compression asphyxia" and

that Defendant City was aware that excessive uses of force were "likely to result" from the lack of training or supervision. (Dkt. 1, ¶¶32(d)-(e), 70, 73.)

### 1. Plaintiffs cannot show Defendant City failed to train or supervise its officers on the circumstances that arose with Snukis.

When asked Plaintiffs were not aware of any lack of training by Defendant City that related to Snukis' death. (Fact No. 64.) Rather, the evidence shows Defendant City has various policies applicable to the Snukis incident and the Defendant Officers were trained in the same, including Detainment and arrests (OG 104.00; OG 400.00), Use of Discretion (OG 114.00), Injuries to persons, including detainees (OG 119.00; OG 153.00; OG 153.02; OG 226.00), Case Investigations (OG 139.00; OG 421.00; OG 145.03; OG 140.00), Handling, Transporting, and Booking Prisoners, which includes information on positional asphyxia (OG 153.00; OG 226.00), Handling the Street Drunk (OG 172.00), Supervising officers (OG 180.00; OG 403.00), Mental Illness and Commitment Papers (OG 184.00), Firearms Qualifications and Range Procedures (OG 356.01), Use of force, including TASER (OG 359.00; OG 359.01; OG 356.01), Incident Reports (OG 500.00; OG 501.00; OG 494.00). (Fact No. 60.)

Defendant Officers were trained on EPD's policies, including all Operational Guidelines, and situations similar to Snukis, including confronting a suspect who disregards commands, flees, and actively resists being placed in handcuffs, including by striking the officer, and providing medical assistance to a suspect. (Fact Nos. 60-61.) Accordingly, Plaintiffs' *Canton* claim based on the "single-incident" theory and a failure to train or supervise the Defendant Officers for the incident involving Snukis fails, as the evidence shows the City had policies in place to prepare them for the incident involving Snukis and trained and supervised EPD officers, including Defendant Officers, on each.

### 2. There is no evidence that Defendant City's failure to train or supervise amounted to "deliberate indifference" to the constitutional rights of Snukis.

To be actionable under § 1983, Defendant City's failure to train or supervise must amount to "deliberate indifference" to the constitutional rights of Plaintiffs. *Canton*, 489 U.S. at 388, 109 S.Ct. at 1204. Interpreting *City of Canton,* the Seventh Circuit has found that deliberate indifference is shown only where "the policymakers have actual or constructive notice" of a "particular omission that is likely to result in constitutional violations." *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 867 (S.D. Ind. 2006) (citing *Cornfield by Lewis v. Consolidated High School District No. 230,* 991 F.2d 1316, 1327 (7th Cir.1993)). A "showing of simple or even heightened negligence will not suffice." *Board of County Commr's*, 520 U.S. at 407, 117 S.Ct. at 1390.

There is no evidence showing Defendant City had actual or constructive notice of any lack of necessary training or supervision *and* that such purported lack of necessary training or supervision was the result of a "deliberate" or "conscious" choice by the City. Absent any such evidence, any shortcomings in the training or supervision can only be classified as negligence by Defendant City and any argument that the Defendant Officers' unconstitutional conduct could have been avoided by more or better training or supervision is inadequate to support a *Canton* claim. *Canton*, 489 U.S. at 391, 109 S.Ct. at 1206.

**3.     There is no evidence that Defendant City's alleged conscious decision not to train or supervise Defendant Officers was the moving force behind Snukis' constitutional deprivations.**

Finally, to establish any *Canton* liability, Plaintiffs must show the lack training or supervision "actually caused" the constitutional deprivation at issue here. *Canton*, 489 U.S. at 390, 109 S.Ct. at 1205. Here, not only is there is no evidence that Defendant City consciously decided not to train or supervise EPD officers on the appropriate use of force, dangers of tasers, and dangers of positional and compression asphyxia, but there is no evidence that such conscious

decision was the "moving force" behind the Snukis' constitutional deprivations. (*See* Fact No.

63.) Accordingly, summary judgment on this claim is proper.

**D.      Defendant City is immune from Plaintiffs' claim of common law negligence (Count IV), intentional infliction of emotional distress (Count VI), and negligent infliction of emotional distress (Count VII) under the Indiana Tort Claims Act ("ITCA").**

The Indiana Supreme Court has recognized additional exceptions to ITCA immunity

"where other statutes impose affirmative obligations or limitations on law enforcement."

*Ashcraft v. City of Crown Point, Ind.,* 2:13–CV–080 JD, 2013 WL 5934612, at *6 (N.D.Ind.

Nov. 5, 2013) (citing *Wilson v. Isaacs,* 929 N.E.2d 200, 204 (Ind.2010)). "Add on claims such as

negligence and intentional infliction of emotional distress do not survive simply because they are

a product of improper conduct. Instead, the law enforcement immunity provision of the ITCA

precludes state law claims of negligence and negligent infliction of emotional distress." *Strain v.

Minnick*, No. 2:14-CV-00374-WTL, 2015 WL 6550628, at *4 (S.D. Ind. Oct. 28, 2015) (citing

*Miller v. City of Anderson,* 777 N.E.2d 1100, 1104 (Ind.Ct.App.2002) (immunity applied to

claim of negligence where plaintiff alleged false arrest); *City of Anderson v. Weatherford,* 714

N.E.2d 181, 185–86 (Ind.Ct.App.1999) (immunity applied to claim of intentional infliction of

emotional distress where plaintiff alleged false arrest)). Therefore, consistent with Indiana Code

§ 34-13-3-3, summary judgment is proper in favor of Defendant City on is Plaintiffs' claims of

common law negligence, intentional infliction of emotional distress, and negligent infliction of

emotional distress.

**E.      Because Plaintiff was contributorily negligent, Plaintiffs' recovery is barred on their state law claims of common law negligence (Count IV), intentional infliction of emotional distress (Count VI), and negligent infliction of emotional distress (Count VII).**

As stated in *Indiana State Police v. Est. of Damore*, 194 N.E.3d 1147, 1158 (Ind. Ct.

App. 2022), *transfer denied,* 205 N.E.3d 200 (Ind. 2023) (citing Ind. Code § 34-51-2-2):

> If a plaintiff brings a claim of negligence against a governmental entity under the Indiana Tort Claims Act (ITCA), the Indiana Comparative Fault Act does not apply; instead, in such cases, contributory negligence on the part of a plaintiff provides a complete defense to liability for the defendants and other government actors who fall within the scope of the ITCA. In other words, under contributory negligence, a plaintiff is wholly barred from recovery 'when he or she is negligent and this negligence is even slightly the cause of the alleged damages.' The existence of contributory negligence is generally an issue of fact for the jury. It may be a question of law appropriate for summary judgment 'if the facts are undisputed and only a single inference can be drawn therefrom.'

(internal citations omitted).

Contributory negligence applies when a plaintiff's conduct "falls below the standard to which he should conform for his own protection and safety. Lack of reasonable care that an ordinary person would exercise in like or similar circumstances is the factor upon which the presence or absence of negligence depends." *Jones v. Gleim*, 468 N.E.2d 205, 207 (Ind. 1984); *Hundt v. La Crosse Grain Co.*, 446 N.E.2d 327, 329 (Ind. 1983)). In other words, "[c]ontributory negligence is the failure of a person to exercise for his own safety that degree of care and caution which an ordinary, reasonable, and prudent person in a similar situation would exercise." *Id.* at 599 (quoting *Brown v. N. Ind. Publ. Serv. Co.*, 496 N.E.2d 794, 798 (Ind. Ct. App. 1986)). When "the facts are undisputed and only a single inference can reasonably be drawn therefrom, the question of contributory negligence becomes one of law" and summary judgment is appropriate. *Id.* (*quoting Jones*, 468 N.E.2d at 207 (Ind. 1984)).

In *Estate of Damore*, the Indiana Court of Appeals granted summary judgment in favor of the municipal entity on claims brought by the plaintiff for injuries sustained as the result of a high speed chase, because of the plaintiff's "driving behavior in the minutes prior to the accident, i.e., his fleeing from the police at high speeds before reaching the Portage tollbooth." *Id.* at 1158; *see Wages v. State*, 863 N.E.2d 408 (Ind. Ct. App. 2007) (municipality entitled to summary

judgment on the basis of contributory due to plaintiff's "erratically" driving shortly before the accident that resulted in his death.)

The undisputed facts of the body camera videos shows Snukis was at least partially responsible for his injuries. First, a person owes a duty not to resist law enforcement, including by fleeing and by force. I.C. § 35-41.1-3-1. Here, Snukis actively resisted law enforcement, including by running, punching Officer Koontz, tensing up, and grabbing at the genitalia of Officer Taylor. (Fact Nos. 9-24.) Second, as found by the Corner, Snukis' use of methamphetamine was, at the very least, a contributing factor in his death. (Fact No. 55.) Accordingly, the undisputed facts show Snukis was contributory negligent and summary judgment is proper.

**F.      Defendant City of Evansville is entitled to judgment on Plaintiffs' claim of common law assault and battery (Count V).**

An actor commits a battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person ... and (b) a harmful contact with the person of the other directly or indirectly results." *Mullins v. Parkview Hosp., Inc.,* 865 N.E.2d 608, 610 (Ind.2007). However, a law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to enforce a criminal law or to effect a lawful arrest. I.C. § 35-41-3-3(b). A battery claim under Indiana law alleging excessive force by law enforcement is measured by the same standards set forth above for excessive force under the Fourth Amendment. See *Fidler v. City of Indianapolis*, 428 F.Supp.2d 857, 866 (S.D.Ind.2006) ("Indiana's excessive force standard effectively parallels the federal [Fourth Amendment] standard.").

Excessive force claims in the course of making an arrest, investigatory stop, or other seizure of a person are analyzed under the Fourth Amendment's objective reasonableness

standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The objective reasonableness inquiry is examined by the "totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government[al] interests at stake." *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000). This objective reasonableness of force is a legal determination rather than a pure question of fact for the jury to decide. *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

In the assessment of excessive force claims, courts "must remain cognizant of the incredibly difficult task facing law enforcement officers called to address fluid situations," and therefore the "reasonableness of an officer's actions must be assessed from the perspective of a reasonable officer on the scene, not based on the 20/20 vision of hindsight." *Williams v. Indiana State Police Dept.*, 797 F.3d 468, 473 (7th Cir. 2015) (citations and quotations omitted). This includes the "recognition that officers are often forced to make split second judgments in tense, uncertain, and rapidly evolving situations, as to the amount of force necessary in a particular situation." *Id.*

Factors to be considered in determining whether force was reasonable include: 1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officers or others; and 3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham,* 490 U.S. at 396; *Turner v. City of Champaign,* 979 F.3d 563, 567 (7th Cir. 2020). Circumstances in which a subject is "actively resisting arrest" is a touchstone of the *Graham* analysis. *Id.* Examples of active resistance are kicking and flailing, declining to follow instructions while acting belligerently, and swatting an officer's hands away. *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018). When an officer uses greater force than reasonably necessary to make an arrest, he violates the arrestee's Fourth Amendment right. *Day*

29

*v. Wooten*, 947 F.3d 453, 460-61 (7th Cir. 2020) (citing *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003)).

i.       **Officer Taylor's uses of force were reasonable.**

Plaintiffs claim Officer Taylor used excessive force when he tased Snukis and "**As Mr. Snukis began to flee**, Officer[] Taylor [] pursued him on foot and knocked him to the ground, . . . restrained him face down in the dirt, used pain compliance measures to subdue him, and struck Snukis in the head several times with a closed first to achieve pain compliance." (Dkt. 94, ¶ 1(b).)

(a)       **Uses of his taser.**

"Courts generally hold that the use of a taser against an *actively resisting suspect* either does not violate clearly established law or is constitutionally reasonable." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 727 (7th Cir. 2013) (emphasis added). The Court in *Abbott* went on to list a litany of cases upholding this principle. *See id.* (citing *Clarett v. Roberts,* 657 F.3d 664, 674–75 (7th Cir.2011), *United States v. Norris,* 640 F.3d 295, 303 (7th Cir.2011), *Forrest v. Prine,* 620 F.3d 739, 745–46 (7th Cir.2010), *see also Hagans v. Franklin Cnty. Sheriff's Office,* 695 F.3d 505, 509–10 (6th Cir.2012); *Marquez v. City of Phoenix,* 693 F.3d 1167, 1175 (9th Cir.2012); *Hoyt v. Cooks,* 672 F.3d 972, 979–80 (11th Cir.2012); *McKenney v. Harrison,* 635 F.3d 354, 360 (8th Cir.2011); *Zivojinovich v. Barner,* 525 F.3d 1059, 1073 (11th Cir.2008); *Draper v. Reynolds,* 369 F.3d 1270, 1278 (11th Cir.204); *Hinton v. City of Elwood, Kan.,* 997 F.2d 774, 781 (10th Cir.1993).)

Here, when Officer Taylor first approached Snukis, he knew that Snukis matched the description of the person who had been reported to be trespassing and committing the crime of theft in the area. (Fact No. 5.) After Officers Taylor and Koontz approached Snukis, Snukis disobeyed commands to put his hands on his head and/or up, pulled away when they grabbed

him, punched Officer Koontz in the face/mouth causing Officer Koontz to fall, and then ran away. (Fact Nos. 6-10; Dkt. 1, ¶17.) After that active resistance, Officer Taylor deployed his taser for the first time. (Fact Nos. 11.)

Thereafter, Officer Taylor recognized that his taser did not achieve a good connection, as Snukis continued to ignore commands to stay on the ground and continued to actively resist, including by rolling onto his back to break the taser leads, jerking away from the officers, and then standing up to flee away. (Fact Nos. 12-13; *see* Dkt. 1, ¶17.) As a result of that continued active resistance, Officer Taylor deployed his taser a second time, which again had no effect, and Snukis, again, broke free and ran. (Fact No. 14.) Because Snukis was actively resisting, Officer Taylor's uses of his taser were objectively reasonable. *See Abbott*, 705 F.3d at 727.

### (b)      Strikes to Snukis, including strikes to Snukis' head, were reasonable.

The Fourth Amendment permits the use of "significant force to subdue someone who is actively resisting lawful detention." *Turner,* 979 F.3d at, 596; *See also Fitzgerald v. Santoro,* 707 F.3d 725, 734 (7th Cir. 2020) (arm bar and wrist-lock techniques that broke detainee's arm were not excessive because she was actively resisting); *King v. Spears,* 2019 WL 632290 at *7 (W.D. Wisc. February 14, 2019) (closed fist strikes were a reasonable response to the significant and continued threat posed by the plaintiff.). Examples of active resistance include: 1) kicking and flailing; 2) declining to follow instructions while acting in a belligerent manner, and swatting an arresting officer's hands away while backpedaling. *Dockery,* 911 F.3d at 467. Law enforcement officers are allowed to "graduate their response to the demands of a particular situation," because "the amount of that is justified increases as the confrontation escalates." *Estate of Phillips v. City of Milwaukee,* 123 F.3d 586, 593 (7th Cir. 1997).

Here, Plaintiffs allege Officer Taylor's uses of force, including "restraining Snukis, face down in the dirt and us[ing] pain compliance measures to subdue him" and "str[iking] Snukis in

31

the head several times with a closed first to achieve pain compliance" violated Snukis' Fourth Amendment rights. (Dkt. 94, ¶1(b).) As demonstrated above, prior to those uses of force, Snukis matched the description of a person who had committed a crime, actively resisted Officers Taylor and Koontz, and Officer Taylor's uses of the taser were ineffective. *See* §IV(F)(i)(a), *supra*. Thereafter, and prior to the complained-above uses of force, Plaintiffs concede that Snukis "began to flee" Officers Taylor and Koontz. (Dkt. 94, ¶1(b); *see* Fact Nos. 19-21.)

While Plaintiffs allege Snukis was knocked to the ground, the evidence shows Snukis tripped over a manhole, while he was resisting arrest by fleeing. (Fact No. 16.) Thereafter, Snukis continued to fight with Officers Taylor and Koontz, including: 1) jerking away; 2) tensing up; 3) reaching at Officers Taylor and Koontz; 4) grabbing at Officer Taylor's genitalia area at least three times; 5) reaching for Officer Taylor's taser holster; 6) disobeying their commands to stop resisting and place his hands behind his back; and 7) telling the officers "leave me alone you fucking cocksuckers." (Fact No. 17-18.)

Finally, in response to that combativeness and active resisting **both** Officers Taylor and Koontz, Officer Taylor's use of strikes, including several closed fists to Snukis' head, and pain compliance measures to subdue him. *See Turner,* 979 F.3d at 596; *Billingsley v. City of Fort Wayne*, No. 1:17-CV-00066-SLC, 2018 WL 6697075, at *8 (N.D. Ind. Dec. 20, 2018) (finding officer's strikes to the head of an actively resisting subject was objectively reasonable in order to gain control of subject); *see Escarcega v. Jordan*, 701 F. App'x 338, 342 (7th Cir. 2017) ("[T]he evidence shows that Escarcega was resisting arrest at all times when force was used, and using force, such as punches, to gain control of a non-compliant suspect is not clearly excessive." (citation omitted) ); *Johnson v. Larabida Children's Hosp.*, 372 F.3d 894, 898 (7th Cir. 204) (finding the officer's use of a single blow to the plaintiff's head with his walkie-talkie was

reasonable where the plaintiff admitted she threatened bodily harm, provoked a breach of peace at the hospital, and battered the officer); *Prymer v. Ogden,* 29 F.3d 1208, 1216 (7th Cir. 1994) (concluding that an officer's strike to an arrestee's face to avoid being spat on was objectively reasonable); *Nail v. Gutierrez,* No. 1:06-CV-292 PS, 2008 WL 4545332, at *6 (N.D. Ind. Oct. 10, 2008) (finding it important that the officers had stopped using force once the plaintiff was handcuffed, emphasizing that it was "not a case where the officers[ ] beat up an arrestee after he no longer posed a threat"); *Duran v. Sirgedas,* 240 Fed. Appx. 14, 117 (7th Cir .2007) (no excessive force where officer struck suspect in the leg with a baton and punched him in the head with a closed fist, where suspect struggled with officers and bit one of them). Once Snukis ceased actively resisting, all uses of force stopped. (Fact No. 25.) Such uses of force, including the strikes to Snukis' head, were objectively reasonable.

### ii.       Officer Koontz's uses of force were reasonable.

Plaintiffs allege Officer Koontz used excessive force when he "knocked [Snukis] to the ground, . . . restrained him face down in the dirt[ and] used pain compliance measures to subdue him." (Dkt. 94, ¶ 1(b).) As demonstrated above, the evidence shows Snukis tripped. (Fact No. 16.) Further, the evidence shows that Officer Koontz's restraining of Snukis and use of pain compliance measures were in response to Snukis' active resistance. *See* §§ IV(V)(i)(b), (ii). Such uses of force were reasonable under the circumstances. *See Turner,* 979 F.3d at 596.

### iii.      Officer Hackworth's uses of force were reasonable.

Plaintiffs do not allege any specific use of force by Officer Hackworth, other than he "assisted with restraining Mr. Snukis" after he had "stopped breathing." (Dkt. 94, ¶ 1(b)-(c).) When Officer Hackworth arrived on scene, he observed Snukis actively resisting Officers Taylor and Koontz, who had not been able to secure Snukis. (Fact Nos. 24; *see* § IV(F)(iii).) Due to those circumstances, Officer Hackworth's "assist[ance] with restraining" Mr. Snukis" was

reasonable. *See Turner,* 979 F.3d at 596. Further, there is no evidence that Snukis had "stopped breathing" when Officer Hackworth assisted with restraining him. Due to the foregoing, Officer Hackworth is entitled to summary judgment on Plaintiffs' battery and assault claims.

**G.    Defendant City of Evansville is entitled to judgment on Plaintiffs' claim of respondeat superior (Count X).**

Because Plaintiffs' claims fail, Defendant City is entitled to judgment on Plaintiffs' claim of respondeat superior.

**H.    Defendant City of Evansville is entitled to judgment on Plaintiffs' claim of wrongful death (Count XI).**

**i.    Because Defendant Officers' uses of force were constitutionally reasonable, Defendant City is entitled to judgment in its favor.**

Similar to Plaintiffs' battery claim, Plaintiffs' claim of wrongful death under Indiana Code § 34-23-1-1 rises or falls with their § 1983 excessive force claims. *Est. of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 864 (S.D. Ind. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015). For the reasons discussed above, *see* §(IV)(F), Defendant Officers' uses of force against Snukis were constitutionally reasonable; accordingly, Defendant City is entitled to judgment in its favor.

**ii.    There is no evidence that Defendant Officers' actions and/or inactions were the proximate cause of Snukis' death.**

Indiana's wrongful death statute permits the recovery of damages for an individual's death "[w]hen the death ... is caused by the wrongful act or omission of another." I.C. § 34-23-1-1. While Plaintiffs argue Defendant Officers use of a taser and positional asphyxiation were the proximate causes of Snukis' death, the undisputed evidence shows otherwise.

First, the tasers had no apparent effect on Snukis. (Fact Nos. 11-14.) Even more, there is no evidence they were the cause of Snukis' death. Second, the corner determined Snukis' cause of death was "methamphetamine intoxication with a contribution by cardiomegaly." (Fact No.

55.) Third, there is no evidence that any alleged failure to provide medical care by Defendant Officers caused Snukis' death. Accordingly, there is no evidence that positional asphyxiation was the proximate cause of Snukis' death. For those reasons, Defendant City is entitled to summary judgment on Plaintiffs' wrongful death claim. *See Est. of Williams*, 26 F. Supp. 3d at 864.

## CONCLUSION

For the foregoing reasons, Defendant City respectfully requests that the Court grant its Motion for Summary Judgment and award it all other relief that is just and proper in the premises.

Respectfully submitted,

*/s/ Clifford R. Whitehead*
Robert L. Burkart, #16664-82
Clifford R. Whitehead, #28836-49
Bernard J. Lobermann, IV, #36886-49
ZIEMER STAYMAN WEITZEL & SHOULDERS, LLP
20 N.W. First Street, 9th Floor
P.O. Box 916
Evansville, IN 47706
T: (812) 424-7575
F: (812) 421-5089
E-mail:   rburkart@zsws.com
          cwhitehead@zsws.com
          blobermann@zsws.com
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I certify that on September 20, 2023, a copy of the foregoing was electronically served on counsel of record.

*/s/ Clifford R. Whitehead*
Clifford R. Whitehead