UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

| | |
|---|---|
| EDWARD C. SNUKIS, JR. and | ) |
| SAMANTHA SNUKIS, | ) |
| Co-Administrators of the Estate of | ) |
| Edward C. Snukis | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| vs. | ) CASE NO. 3:21−cv−00135−MPB−MJD |
| | ) |
| CITY OF EVANSVILLE, INDIANA; | ) |
| MATTHEW O. TAYLOR, in his individual | ) |
| capacity as an Evansville police officer; | ) |
| TREVOR KOONTZ, in his individual | ) |
| capacity as an Evansville police officer; and | ) |
| NICHOLAS HACKWORTH, in his | ) |
| individual capacity as an Evansville police officer | ) |
| | ) |
| Defendants | ) |

**BRIEF IN SUPPORT OF DEFENDANTS MATTHEW TAYLOR, TREVOR KOONTZ, AND NICHOLAS HACKWORTH'S MOTION FOR SUMMARY JUDGMENT**

Come now the Defendants Officer Matthew O. Taylor ("Officer Taylor"), Officer Trevor Koontz ("Officer Koontz"), and Officer Nicholas Hackworth ("Officer Hackworth"), each in their individual capacity, (Officer Taylor, Officer Koontz, and Officer Hackworth are referred to collectively as the "Defendant Officers"), by counsel and pursuant to Federal Rule of Civil Procedure 56, and submit their Brief in support of their Motion for Summary Judgement on all remaining claims of Plaintiffs' Complaint (dkt. 1; dkt. 94).

## I.     Introduction

At approximately 7:40 p.m. on September 13, 2019, Officers Taylor and Koontz—in full police uniform and marked police vehicle—were dispatched to a car dealership in Evansville, Indiana based upon 911 calls that employees of the car dealership had observed a bald man, no shirt, and jeans acting intoxicated, looking inside vehicles, and entering a business after being

1

asked to leave. Upon arrival, Officers Taylor and Koontz encountered Edward Snukis ("Snukis"), who matched the description and appeared intoxicated. When Officer Koontz approached Snukis, he attempted to secure him and asked him to put his hands behind his back. In response, Snukis jerked away, punched Officer Koontz in the mouth, and ran.

In response, Officer Taylor deployed his taser on Snukis; however, it was not effective and after Snukis continued to forcibly resist the officers, Officer Taylor deployed it for a second time, which, again, was ineffective. Snukis then fled from the officers on foot until he tripped over a manhole cover. While on the ground, Snukis continued to fight with Officers Taylor and Koontz, including by grabbing at Officer Taylor's testicles and taser holster, tensing up, jerking away, and disobeying commands to quit resisting and put his hands behind his back. Shortly before Snukis was placed in handcuffs, Officer Hackworth arrived and assisted in detaining Snukis.

Around the time he was handcuffed, Defendant Officers observed Snukis was unconscious and, as shown on multiple body cameras, (1) turned Snukis over onto his back within 7 seconds, (2) checked for and confirmed he had a pulse and was breathing within only 14 seconds, and (3) within 16 seconds, called for an ambulance. Thereafter, Defendant Officers, including Officer Hackworth—who was a trained emergency medical technician ("EMT")— continued to monitor Snukis, asked if he could hear them, performed sternum rubs, and monitored his pulse and breathing. During that time, Defendant Officers observed that he was breathing, swallowing, and that his chest was moving.

However, after approximately three and a half minutes, Defendant Officers could not confirm Snukis had a pulse. In response, they (1) informed dispatch, (2) removed his handcuffs within 20 seconds, (3) began chest compressions within 27 seconds (4) began using a portable

defibrillator within 83 seconds; (5) placed an airway into Snukis and began pumping air into his mouth, and (6) informed dispatch that chest compressions had begun. Defendant Officers continued to perform chest compressions for more than four minutes until an ambulance and other medical personnel arrived on scene and took over Snukis' medical care. At that time, the medical personnel checked Snukis and stated, "We got a pulse."

In light of the undisputed evidence, Defendant Officers employed objectively reasonable force and rendered medical aid in an objectively reasonable manner. In addition, Defendant Officers' actions did not violate a clearly established right. Accordingly, they are entitled to summary judgment on all remaining claims against them:

- Count I – Violation of Fourth Amendment under 42 U.S.C. §1983 against Defendant Officers for excessive force (Dkt. 66 at 31-32; Dkt. 94, ¶¶1(a)-(b));

- Count I – Violation of Fourth Amendment under 42 U.S.C. §1983 against Defendant Officers for failure to provide adequate medical care (Dkt. 66 at 31-32; Dkt. 94, ¶1(c)); and

- Count I – Violation of Fourth Amendment under 42 U.S.C. §1983 against Officer Taylor for failure to supervise and intervene (Dkt. 66 at 31-32; Dkt. 94, ¶¶1(b), 3(b)).

## II.     Statement of Undisputed Facts

1.      On September 13, 2019, multiple 911 calls were received regarding a white, bald male, with no shirt and jeans near Green River Road in Evansville Indiana, including:

a.      At 2:14 p.m. at 4424 Vogel Road, Evansville at German American Bank of a "suspicious" white, bald male with no shirt "on the back lot looking into a red Niss[an car,]" (Ex. 1 – CAD Report, p. 5).

3

b. At 2:57 p.m. at 1356 N. Green River Road of a theft in progress of "a male in the back kitchen who tried stealing something," and identified as the same previous suspect run at German American Bank (CAD Report, p. 1);

c. At 3:22 p.m. at 4602 Vogel Road of a white male with an unbuttoned shirt "standing in front of the business with a can of something in his hand looking into veh[icles]," (CAD Report, p. 8)

d. At 7:44 p.m. at 1801 N. Green River Road of an intoxicated person (CAD Report, p. 3); and

e. At 7:44 p.m. at the corner of Congress Avenue and Indiana Street of a white male in a green short sleeve button down with buttons open and jeans that "keeps coming onto the back parking lot . . . standing out by the body shop sign" by the "rear lot by the semis," (CAD Report, p. 4).

2.     The original callers for an intoxicated person said they had to ask Snukis to leave the body shop, which is for employees only, several times. (Ex. 2 – Supplemental Reports, p. 1.) Both said he was aggressive and was unsteady on his feet and kept walking into the roadway when they called 911. (Supplemental Reports, p. 1.)

3.     At approximately 7:52 P.M. Officers Taylor and Koontz "were dispatched to 4300 E. Division Street for an intoxicated white male wearing green button down shirt (buttons open) and jeans. He had been going in and out of the lot, fenced in area, and had walked into the trim and body shop which is for employee`s only," which is near Green River Road in Evansville. (Ex. 3 – Incident Report, p. 3; CAD Report, p. 1; Ex. 4 – Aerial Photo.)

4

4.      When Officers Taylor and Koontz arrived, they were in full police uniforms and driving a fully marked police vehicle. (Ex. 5 – Koontz Vid., 00:00-00:31[1]; Ex. 6 – Taylor Vid. at 00:21-00:38.)

5.      Officer Taylor observed that Snukis matched the description of the person who had been reported to be trespassing in the area, including that he was a white male, was wearing a green button down shirt, and jeans, and noticed he "appeared to be under some form of intoxication." (Ex. 7 – Use of Force Report, p. 2.)

6.      Officer Koontz told Snukis, "Sir, put your hands on your head real quick." (Ex. 5 - Koontz Vid. at 0:00:31; Ex. 6 - Taylor Vid., 00:37; Ex. 7 - Use of Force Report, pp. 2-3.)

7.      Officers Taylor and Koontz approached Snukis and twice stated, "Sir, put your hands up." (Ex. 5 - Koontz Vid. at 00:31.)

8.      Snukis responded to those commands by raising his voice and positioning himself in a fighting stance, so Officer Koontz then placed his hands on Snukis in an attempt to put his hands behind his back and detain Snukis. (Ex. 5 - Koontz Vid., 00:32-45; Ex. 6 - Taylor Vid., 00:38; Ex. 8 - Koontz Dep. (151:22-23; Ex. 7 - Use of Force Report, p. 3.]

9.      Snukis did not comply and, instead, tensed up, broke away, and punched Officer Koontz in the face/mouth area, striking his nose, before running away. (Ex. 8 - Koontz Dep., 152:1-2; Ex. 9 - Taylor Dep., 100:20-21; Ex. 7 - Use of Force Report, pp. 3-4; Ex. 5 - Koontz Vid., 00:32-00:45; Ex. 6 - Taylor Vid., 00:38-00:48; Ex. 5 - Koontz Vid. at 13:17.)

10.     Snukis' punch caused Officer Koontz to fall to the ground. (Ex. 5 - Koontz Vid., 00:32-45; Ex. 8 - Koontz Dep., 152:4.)

---

[1] All citations to the video refer to the timestamp of the applicable video.

11.     Officer Taylor then deployed his taser on Snukis, and both Officer Koontz and Officer Taylor issued commands to Snukis to get on the ground. (Ex. 5 - Koontz Vid., 00:50-57; Ex. 6 - Taylor Vid. 1, 00:49-00:58; Ex. 7 - Use of Force Report, p. 3.)

12.     The taser deployed by Officer Taylor did not get a good connection and Snukis "rolled his body and broke the leads from the [taser]." (Ex. 5 - Koontz Vid., 01:04; Ex. 6 - Taylor Vid., 00:58; Ex. 7 - Use of Force Report, pp. 3-4; Ex. 8 - Koontz Dep., 152:10; *see* Ex. 10 - Hackworth Vid. 2, 09:44.)

13.     Snukis then attempted to pull out the taser barbs and continued to roll around on the ground, attempting to stand up, before he eventually stood up. (Ex. 6 - Taylor Vid., 00:59-01:007.)

14.     Officer Taylor then deployed his taser again on Snukis, without effect, and Snukis once again, broke free and took off running in the opposite direction, so Officers Taylor and Koontz began chasing Snukis. (Ex. 5 - Koontz Vid., 01:11; Ex. 6 - Taylor Vid., 01:05; *see* Ex. 10 - Hackworth Vid. 2, 9:45; *see also* Ex. 8 - Koontz Dep. 152:12-20; Ex. 7 - Use of Force Report, p. 3.]

15.     Officer Taylor then informed dispatch that Snukis was running. (Ex. 6 - Taylor Vid., 01:11.)

16.     After running nearly half a block, Snukis tripped over a manhole cover and fell in a parking lot. (Ex. 6 - Taylor Vid., 01:23; *see* Ex. 8 - Koontz Dep. 153:2; *see also* Ex. 10 - Hackworth Vid. 2, 10:01.)

17.     Officer Taylor then got on top of Snukis' top half, while Officer Koontz took control of his bottom half, consistent with the training they received. (Ex. 8 - Koontz Dep., 153:4-6.)

18.     Snukis continued to resist Officers Taylor and Koontz' attempts to place him in handcuffs, including:

   a.     Reaching at Officer Taylor and Koontz (Ex. 6 - Taylor Vid., 01:27; Ex. 8 - Koontz Dep., 153:10; Ex. 10 - Hackworth Vid. 2, 10:09);

   b.     Telling Officers Taylor and Koontz to "leave me alone you fucking cocksuckers," (Ex. 6 - Taylor Vid., 01:32);

   c.     Disobeying commands to "put your hands behind your back and stop resisting" and "quit resisting; give me your hand," (Ex. 6 - Taylor Vid., 1:43-3:25; Ex. 5 – Koontz Vid., 02:41-03:17; Ex. 8 - Koontz Dep., 153:11-12);

   d.     Grabbing at Officer Taylor's genitalia area at least three times (Ex. 7 - Use of Force Report, p. 3; Ex. 9 - Taylor Dep., 91:15); and

   e.     Reaching for Officer Taylor's taser holster (Ex. 9 - Taylor Dep., 131:6-9; Ex. 7 - Use of Force Report, pp. 3-4.)

19.     In response to those actions, Officer Taylor "struck Snukis in the left side of the head approximately 6 times in an attempt to get pain compliance and to get him to release his grip on [Officer Taylor's] inner thigh," which caused Snukis to let go of Officer Taylor. (Ex. 7 - Use of Force Report, p. 3.)

20.     While Snukis was actively resisting, he continued to shout and make noises towards the officers. (Ex. 6 - Taylor Vid., 01:38-3:11.)

21.     At one point, Officer Koontz gained control of one arm, but Snukis still kept his other hand under his body, despite Officer Koontz and Officer Taylor's commands to "quit resisting; give me your other hand." (Ex. 6 - Taylor Vid., 3:09-3:30; Ex. 8 - Koontz Dep., 153:15.)

22.     Snukis was fighting with Officers Taylor and Koontz the entire time while they were attempting to handcuff and secure him. (Ex. 10 - Hackworth Vid. 2, 10:17.)

23.     After approximately three and a half minutes, Officers Taylor and Koontz were able to secure Snukis and place him in handcuffs with his hands behind his back. (Ex. 5 - Koontz Vid., 0:03:29; Ex. 6 - Taylor Vid., 03:42; Ex. 7 - Use of Force Report, p. 3.)

24.     Officer Hackworth arrived as Officers Taylor and Koontz were securing Snukis with handcuffs. (Ex. 11 - Hackworth Vid. 1, 2:48; Ex. 10 - Hackworth Vid. 2, 1:35.)

25.     Defendant Officers ceased using force against Snukis after Snukis was in handcuffs with his hands behind his back. (Ex. 5 - Koontz Vid., 03:44; Ex. 10 – Hackworth Vid. 2, 01:35; Ex. 6 - Taylor Vid., 03:42; Ex. 7 - Use of Force Report, pp. 4-5.)

26.     Defendant Officers did not observe Snukis lose consciousness until "about the time we had him in handcuffs." (Ex. 5 - Koontz Vid., 12:26.)

27.     After Defendant Officers secured Snukis (Ex. 10 - Hackworth Vid. 2, 1:35; Ex. 6 - Taylor Vid., 03:42):

> a.     Within 7 seconds, they turned Snukis over onto his back (Ex. 10 - Hackworth Vid. 2, 1:42; Ex. 6 - Taylor Vid., 3:50);
>
> b.     Within 14 seconds, they checked his pulse to make sure he "is breathing," (Ex. 10 - Hackworth Vid. 2, 1:49; Ex. 6 - Taylor Vid., 3:51); and
>
> c.     Within 16 seconds, Officer Hackworth requested medical assistance (*i.e.,* "AMR,") through dispatch, which confirmed, "I'll get AMR going." (Ex. 5 - Koontz Vid., 3:15; Ex. 10 - Hackworth Vid. 2, 1:51; Ex. 6 - Taylor Vid., 4:00; Ex. 1 - CAD Report, p. 4).

(*See generally*, Ex. 7 - Use of Force Report, p. 3.)

28.     Defendant Officers confirmed Snukis was breathing at that time. (Ex. 10 - Hackworth Vid. 2, 2:02; Ex. 6 - Taylor Vid., 4:12.)

29.     After turning Snukis over and shouting, "Sir, can you hear me?" Defendant Officers also performed sternum rubs. (Ex. 5 - Koontz Vid., 03:56-4:06; Ex. 11 - Hackworth Vid. 1, at 3:18; Ex. 6 - Taylor Vid., 4:02.)

30.     Officer Hackworth again checked for Snukis' pulse and, again, confirmed he was still breathing and observed him "moving his mouth." (Ex. 10 - Hackworth Vid. 2, 2:25-2:32; Ex. 6 - Taylor 4:35; Ex. 8 - Koontz Dep. 154:7-9.)

31.     Officer Koontz stated, "Yeah, he's breathing . . . I can feel his chest moving up now." (Ex. 5 - Koontz Vid., 4:11; Ex. 8 - Koontz Dep. 154:7-9; Ex. 11 - Hackworth Vid. 1, at 3:22.)

32.     Soon thereafter, Snukis could be heard making sounds. (Ex. 5 - Koontz Vid., 04:20.)

33.     Officer Hackworth then advised the other Defendant Officers to roll Snukis onto his side. (Ex. 10 - Hackworth Vid. 2, 2:35.)

34.     Officer Hackworth informed dispatch that Snukis was unresponsive and additionally requested to "roll fire," which is referred to EFD who could provide additional medical assistance. (Ex. 5 – Koontz Vid., 0:05:07; Ex. 6 - Taylor Vid., 05:06; Ex. 8 - Koontz Dep., 154:22-23; Ex. 11 - Hackworth Vid. 1, at 4:12; Ex. 10 - Hackworth Vid. 2, 2:50.)

35.     Officer Hackworth then checked Snukis' pulse again, confirming he had a pulse and that "he's swallowing." (Ex. 5 - Koontz Vid., 0:05:16; Ex. 10 - Hackworth Vid. 2, 3:00-3:12; Ex. 6 - Taylor Vid., 05:17; Ex. 8 - Koontz Dep., 154:12-15.)

36.     Officer Hackworth continued to check on Snukis' condition, including using a flashlight, and repeatedly checking for a pulse; Officer Hackworth can, again, be heard confirming Snukis was breathing and had a faint pulse. (Ex. 5 - Koontz Vid., 0:05:50-0:06:41; Ex. 11 - Hackworth Vid. 1, at 4:35; Ex. 10 - Hackworth Vid. 2, 3:12-4:04.)

37.     Officer Taylor then went to civilians who had gathered in the area and advised them that the "sergeant is going to want to talk to you." (Ex. 6 - Taylor Vid., 05:57.)

38.     After Snukis did not regain consciousness, Officer Hackworth ran to his police vehicle to obtain medical supplies while Officers Koontz stayed with and continued to monitor Snukis. (Ex. 11 - Hackworth Vid. 1, at 5:40; Ex. 10 - Hackworth Vid. 2, 4:06.)

39.     Officer Hackworth then inserted a breathing tube in order to pump air into Snukis' lungs. (Ex. 10 - Hackworth Vid. 2, 05:00.)

40.     Upon checking Snukis again, Officer Hackworth stated that he was "not getting a pulse" (Ex. 6 - Taylor Vid., 07:15) and then asked either Officer Taylor or Koontz to check his pulse, which that officer did (Ex. 6 - Taylor Vid., 07:18) and

   a.     Within 5 seconds, started to remove the handcuffs from Snukis so they could provide care (Ex. 6 - Taylor Vid., 07:23);

   b.     Within 20 seconds, completed removal of the handcuffs (Ex. 6 - Taylor Vid., 07:38); and

   c.     Within 27 seconds, Officer Taylor began chest compressions. (Ex. 6 - Taylor Vid., 07:45; Ex. 5 - Koontz Vid., 07:15-07:40; Ex. 11 - Hackworth Vid. 1, at 06:58; Ex. 10 - Hackworth Vid. 2, 05:06);

   d.     Within 29 seconds, Officer Hackworth ran back to his car to retrieve a portable defibrillator to use on Snukis, which issued audible instructions that

can be heard on the body camera; (Ex. 11 - Hackworth Vid. 1, at 7:05; Ex. 5 - Koontz Vid., 08:17; Ex. 10 - Hackworth Vid. 2, 05:41; Ex. 6 - Taylor Vid., 07:47); and

e.  Within 83 seconds, the portable defibrillator was placed on Snukis (Ex. 6 - Taylor Vid., 08:41)

41.  However, after the device analyzed Snukis' heart rhythm, it stated, "Shock not advised." (Ex. 5 - Koontz Vid., 08:50; Ex. 10 - Hackworth Vid. 2, 06:27; Ex. 6 - Taylor Vid., 09:04.)

42.  Defendant Officers informed dispatch that they had initiated chest compressions on Snukis. (Ex. 5 - Koontz Vid., 08:07; Ex. 10 - Hackworth Vid. 2, 5:51.)

43.  Officer Taylor then resumed chest compressions. (Ex. 5 - Koontz Vid., 08:50; Ex. 10 - Hackworth Vid. 2, 06:27; Ex. 6 - Taylor Vid., 09:07.)

44.  At the same time chest compressions were being performed, Officer Hackworth placed an airway in Snukis to force air to get to Snukis' lungs and began pumping air into Snukis' mouth. (Ex. 10 - Hackworth Vid. 2, 7:42; Ex. 6 - Taylor Vid., 9:10.)

45.  After Officer Taylor had been performing chest compressions for a while, Officer Koontz took over on the chest compressions. (Ex. 5 - Koontz Vid., 08:46; Ex. 11 - Hackworth Vid. 1, at 10:39; Ex. 10 - Hackworth Vid. 2, 6:34; Ex. 6 - Taylor Vid., 11:24.)

46.  Officer Koontz then instantly continued performing chest compressions, which were continued by a third officer. (Ex. 5 - Koontz Vid., 08:52-12:51; Ex. 11 - Hackworth Vid. 1, at 10:39-10:48; Ex. 10 - Hackworth Vid. 2, 6:57.)

47.     While Defendant Officers were rendering medical assistance, other officers were working on crowd control as unknown third parties were asking questions; those officers can be heard speaking with that crowd. (Ex. 10 - Hackworth Vid. 2, 8:30.)

48.     Officer Hackworth later took over chest compressions from Officer Koontz. (Ex. 10 - Hackworth Vid. 2, 9:16.)

49.     After AMR and EFD arrived on scene, they took over medical care for Snukis. (Ex. 6 - Taylor Vid., 11:54; Ex. 11 - Hackworth Vid. 1, at 11:09; Ex. 5 - Koontz Vid., 12:51; Ex. 10 - Hackworth Vid. 2, 10:25.)

50.     Defendant Officers continued to assist AMR and EFD as requested. (Ex.  10 - Hackworth Vid. 2, 10:26-33:02.)

51.     Thereafter, one of the AMR paramedics checked Snukis for a pulse and stated, "We got a pulse." (Ex. 10 - Hackworth Vid. 2, 20:39.)

52.     AMR transported Snukis to the hospital. (Ex. 10 - Hackworth Vid. 2, 23:28-31:33.)

53.     Defendant Officers attended to, stayed with, and monitored Snukis at all times until medical assistance arrived. (*See generally*, Ex. 5 - Koontz Vid.; *see generally* Ex. 6 - Taylor Vid.; *see generally* Ex. 11 - Hackworth Vid. 1; *see generally* Ex. 10 - Hackworth Vid. 2.)

54.     As a result of Snukis' punch, Officer Koontz had blood dripping down his face but did not seek any medical attention or attend to his injuries until after medical assistance arrived for Snukis. (Ex. 5 - Koontz Vid., 13:13; Ex. 8 - Koontz Dep. 155:5-6; Ex. 7 - Use of Force Report, p. 4.)

55.     Officer Koontz's injuries were observed by medical personnel on scene. (Ex. 5 - Koontz Vid., 13:17.)

56.     Following an autopsy, the Vanderburgh County Coroner determined the cause of death to be "methamphetamine intoxication with a contribution by cardiomegaly." (Ex. 12 – Autopsy Report, p. 2.)

57.     The City conducted an investigation into Snukis' death, which included the review of the case reports, review of the CAD report, review of the autopsy report, creation of additional supplemental reports, blood draws from Officers Taylor and Koontz, interviews with multiple witnesses, reviews of body cameras, and creation of a timeline of events. (Ex. 13 – Lewis Dep., 18:8-20:1, 23:13-29:9, 31:20-31:23, 38:23-40:11, 45:11-16; Ex. 14 – Snukis Death Investigation Report.)

58.     The City also conducted an investigation and reviewed the uses of force employed by Defendant Officers. (*See* Use of Force Reports.)

59.     Through the course of discovery, the City produced all EPD reports relating to the Snukis incident, including all documents relating to the City's investigation into Snukis' death, all reports regarding the uses of force by Defendant Officers, and all Operational Guidelines, and the City is not aware of any document—other than attorney-client privileged or work product materials—relating to Snukis that has been withheld. (Ex. 15 – Kirby Dep., 138:11-142:13.)

**EPD Policies, Training, and Supervision**

60.     EPD has numerous policies that relate to the Snukis incident, including Detainment and arrests (OG 14.00; OG 400.00), Use of Discretion (OG 114.00), Injuries to Persons, including detainees (OG 119.00; OG 153.00; OG 153.02; OG 226.00), Case Investigations (OG 139.00; OG 421.00; OG 145.03; OG 140.00), Handling, Transporting, and Booking Prisoners, which includes information on positional asphyxia (OG 153.00; OG 226.00), Handling the Street Drunk (OG 172.00), Supervising Officers (OG 180.00; OG 403.00), Mental

Illness and Commitment Papers (OG 184.00), Firearms Qualifications and Range Procedures

(OG 356.01), Use of Force, including TASER. (OG 359.00; OG 359.01; OG 356.01), Incident

Reports (OG 500.00; OG 501.00; OG 494.00). (Ex. 16 – Excerpts of Operational Guidelines).

61.     As part of their training with the Evansville Police Department ("EPD") and prior

to their interaction with Snukis, Defendant Officers were trained on all EPD policies, including

all Operational Guidelines, and situations similar to Snukis involving a suspect who disregards

commands, flees, and actively resists being placed in handcuffs by striking the officer and

providing medical assistance to a suspect. Those Operational Guidelines included: Detainment

and Arrests (OG 14.00; OG 400.00), Use of Discretion (OG 114.00), Injuries to Persons,

including detainees (OG 119.00; OG 153.00; OG 153.02; OG 226.00), Case Investigations (OG

139.00; OG 421.00; OG 145.03; OG 140.00), Handling, Transporting, and Booking Prisoners,

which includes information on positional asphyxia (OG 153.00; OG 226.00), Handling the Street

Drunk (OG 172.00), Supervising Officers (OG 180.00; OG 403.00), Mental Illness and

Commitment Papers (OG 184.00), Firearms Qualifications and Range Procedures (OG 356.01),

Use of Force, including TASER. (OG 359.00; OG 359.01; OG 356.01), Incident Reports (OG

500.00; OG 501.00; OG 494.00). (Ex. 17 – Hackworth Aff., ¶5; Ex. 18 – Taylor Aff., ¶5; Ex. 19

– Koontz Aff., ¶5.)

62.     As an EPD officer, Defendant Officers also received training in obtaining and

confirming a pulse, providing chest compressions, and using a portable defibrillator. (Taylor

Aff., ¶6; Taylor Aff., ¶6; Hackworth Aff., ¶6.)

63.     In addition to his training as an EPD officer and prior to his interaction with

Snukis, Officer Hackworth had been trained and worked as an emergency medical technician

("EMT"), which included placing an airway into a person for purposes of allowing air to get to

14

the person's lungs and had received certifications in CPR and in Pre-Hospital Trauma Life

Support. (Ex. 20 - Hackworth Depo., 23:13-24:4, 65:12-17; Hackworth Aff., ¶9.)

64.    When asked, Plaintiffs were not aware of (1) any policymaker that was involved

in Snukis' death, (2) any policy, practice, or custom that related to Snukis' death, (3) any lack of

policy, practice, or custom that related to Snukis' death, (4) any other incident that was similar to

Snukis' incident, (5) any false statements regarding Snukis by the City and/or its employees, or

(6) any lack of training by the City that related to Snukis' death. (Ex. 21 – Samantha Depo.,

61:6-64:11; Ex. 22 – Edward Depo., 61:11-63:22.)

### III.    Standard of Review

As this Court has found:

> The purpose of summary judgment is to "pierce the pleadings and to assess the
> proof in order to see whether there is a genuine need for trial. Federal Rule of Civil
> Procedure 56 provides that summary judgment is appropriate if "the pleadings,
> depositions, answers to interrogatories, and admissions of file, together with the
> affidavits, if any, show that there is no genuine issue as to any material fact and that
> the moving party is entitled to a judgment as a matter of law." In ruling on a motion
> for summary judgment, the court reviews "the record in the light most favorable to
> the non-moving party and draw[s] all reasonable inferences in that party's favor."
> "However, inferences that are supported by only speculation or conjecture will not
> defeat a summary judgment motion." Additionally, "[a] party who bears the burden
> of proof on a particular issue may not rest on its pleadings, but must affirmatively
> demonstrate, by specific factual allegations, that there is a genuine issue of material
> fact that requires trial." "The opposing party cannot meet this burden with
> conclusory statements or speculation but only with appropriate citations to relevant
> admissible evidence."

*Ellis v. City of Indianapolis*, No. 117CV03857TWPMJD, 2019 WL 1859297, at *2 (S.D.

Ind. Apr. 24, 2019) (internal citations omitted).

Significant to this matter, "when opposing parties tell two different stories, one of

which is blatantly contradicted by the record, so that no jury could believe it, a court

should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007) (summary judgment was

appropriate where video footage of the incident at issue clearly contradicted the version

of events set forth by the non-movant).

IV.       Argument

**A.**    **Defendant Officers are entitled to judgment in their favor as to Plaintiffs' § 1983 claim that Defendant Officers used excessive force (Count I).**

Excessive force claims in the course of making an arrest, investigatory stop, or other

seizure of a person are analyzed under the Fourth Amendment's objective reasonableness

standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). The objective reasonableness inquiry is

examined by the "totality of the circumstances to determine whether the intrusion on the citizen's

Fourth Amendment interests was justified by the countervailing government[al] interests at

stake." *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000). This objective

reasonableness of force is a legal determination rather than a pure question of fact for the jury to

decide. *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

In the assessment of excessive force claims, courts "must remain cognizant of the

incredibly difficult task facing law enforcement officers called to address fluid situations," and

therefore the "reasonableness of an officer's actions must be assessed from the perspective of a

reasonable officer on the scene, not based on the 20/20 vision of hindsight." *Williams v. Indiana

State Police Dept.*, 797 F.3d 468, 473 (7th Cir. 2015) (citations and quotations omitted). This

includes the "recognition that officers are often forced to make split second judgments in tense,

uncertain, and rapidly evolving situations, as to the amount of force necessary in a particular

situation." *Id.*

Factors to be considered in determining whether force was reasonable include: 1) the

severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of

the officers or others; and 3) whether the suspect is actively resisting arrest or attempting to

evade arrest by flight. *Graham,* 490 U.S. at 396; *Turner v. City of Champaign,* 979 F.3d 563, 567 (7th Cir. 2020). Circumstances in which a subject is "actively resisting arrest" is a touchstone of the *Graham* analysis. *Id.* Examples of active resistance are kicking and flailing, declining to follow instructions while acting belligerently, and swatting an officer's hands away. *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018). When an officer uses greater force than reasonably necessary to make an arrest, he violates the arrestee's Fourth Amendment right. *Day v. Wooten*, 947 F.3d 453, 460-61 (7th Cir. 2020) (citing *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003)).

### i.   Officer Taylor's uses of force were reasonable.

Plaintiffs claim Officer Taylor used excessive force when he tased Snukis and "**As Mr. Snukis began to flee**, Officer[] Taylor [] pursued him on foot and knocked him to the ground, . . . restrained him face down in the dirt, used pain compliance measures to subdue him, and struck Snukis in the head several times with a closed first to achieve pain compliance." (Dkt. 94, ¶ 1(b).)

### (a)   Uses of his taser.

"Courts generally hold that the use of a taser against an *actively resisting suspect* either does not violate clearly established law or is constitutionally reasonable." *Abbott v. Sangamon Cnty., Ill*., 705 F.3d 706, 727 (7th Cir. 2013) (emphasis added). The Court in *Abbott* went on to list a litany of cases upholding this principle. *See id*. (citing *Clarett v. Roberts,* 657 F.3d 664, 674–75 (7th Cir.2011), *United States v. Norris,* 640 F.3d 295, 303 (7th Cir.2011), *Forrest v. Prine,* 620 F.3d 739, 745–46 (7th Cir.2010), *see also Hagans v. Franklin Cnty. Sheriff's Office,* 695 F.3d 505, 509–10 (6th Cir.2012); *Marquez v. City of Phoenix,* 693 F.3d 1167, 1175 (9th Cir.2012); *Hoyt v. Cooks,* 672 F.3d 972, 979–80 (11th Cir.2012); *McKenney v. Harrison,* 635 F.3d 354, 360 (8th Cir.2011); *Zivojinovich v. Barner,* 525 F.3d 1059, 1073 (11th Cir.2008);

*Draper v. Reynolds,* 369 F.3d 1270, 1278 (11th Cir.204); *Hinton v. City of Elwood, Kan.,* 997 F.2d 774, 781 (10th Cir.1993).)

Here, when Officer Taylor first approached Snukis, he knew that Snukis matched the description of the person who had been reported to be trespassing and committing the crime of theft in the area. (Fact No. 5.) After Officers Taylor and Koontz approached Snukis, Snukis disobeyed commands to put his hands on his head and/or up, pulled away when they grabbed him, punched Officer Koontz in the face/mouth causing Officer Koontz to fall, and then ran away. (Fact Nos. 6-10; Dkt. 1, ¶17.) After that active resistance, Officer Taylor deployed his taser for the first time. (Fact Nos. 11.)

Thereafter, Officer Taylor recognized that his taser did not achieve a good connection, as Snukis continued to ignore commands to stay on the ground and continued to actively resist, including by rolling onto his back to break the taser leads, jerking away from the officers, and then standing up to flee away. (Fact Nos. 12-13; *see* Dkt. 1, ¶17.) As a result of that continued active resistance, Officer Taylor deployed his taser a second time, which again had no effect, and Snukis, again, broke free and ran. (Fact No. 14.) Because Snukis was actively resisting, Officer Taylor's uses of his taser were objectively reasonable. *See Abbott*, 705 F.3d at 727.

**(b)    Strikes to Snukis, including strikes to Snukis' head, were reasonable.**

The Fourth Amendment permits the use of "significant force to subdue someone who is actively resisting lawful detention." *Turner,* 979 F.3d at, 596; *See also Fitzgerald v. Santoro,* 707 F.3d 725, 734 (7th Cir. 2020) (arm bar and wrist-lock techniques that broke detainee's arm were not excessive because she was actively resisting); *King v. Spears,* 2019 WL 632290 at *7 (W.D. Wisc. February 14, 2019) (closed fist strikes were a reasonable response to the significant and continued threat posed by the plaintiff.). Examples of active resistance include: 1) kicking and flailing; 2) declining to follow instructions while acting in a belligerent manner, and swatting an

18

arresting officer's hands away while backpedaling. *Dockery,* 911 F.3d at 467. Law enforcement officers are allowed to "graduate their response to the demands of a particular situation," because "the amount of that is justified increases as the confrontation escalates." *Estate of Phillips v. City of Milwaukee,* 123 F.3d 586, 593 (7th Cir. 1997).

Here, Plaintiffs allege Officer Taylor's uses of force, including "restraining Snukis, face down in the dirt and us[ing] pain compliance measures to subdue him" and "str[iking] Snukis in the head several times with a closed first to achieve pain compliance" violated Snukis' Fourth Amendment rights. (Dkt. 94, ¶1(b).) As demonstrated above, prior to those uses of force, Snukis matched the description of a person who had committed a crime, actively resisted Officers Taylor and Koontz, and Officer Taylor's uses of the taser were ineffective. *See* §IV(A)(i)(a), *supra*. Thereafter, and prior to the complained-above uses of force, Plaintiffs concede that Snukis "began to flee" Officers Taylor and Koontz. (Dkt. 94, ¶1(b); *see* Fact Nos. 19-21.)

While Plaintiffs allege Snukis was knocked to the ground, the evidence shows Snukis tripped over a manhole, while he was resisting arrest by fleeing. (Fact No. 16.) Thereafter, Snukis continued to fight with Officers Taylor and Koontz, including: 1) jerking away; 2) tensing up; 3) reaching at Officers Taylor and Koontz; 4) grabbing at Officer Taylor's genitalia area at least three times; 5) reaching for Officer Taylor's taser holster; 6) disobeying their commands to stop resisting and place his hands behind his back; and 7) telling the officers "leave me alone you fucking cocksuckers." (Fact No. 17-18.)

Finally, in response to that combativeness and active resisting **both** Officers Taylor and Koontz, Officer Taylor's use of strikes, including several closed fists to Snukis' head, and pain compliance measures to subdue him. *See Turner,* 979 F.3d at 596; *Billingsley v. City of Fort Wayne*, No. 1:17-CV-00066-SLC, 2018 WL 6697075, at *8 (N.D. Ind. Dec. 20, 2018) (finding

officer's strikes to the head of an actively resisting subject was objectively reasonable in order to gain control of subject); *see Escarcega v. Jordan*, 701 F. App'x 338, 342 (7th Cir. 2017) ("[T]he evidence shows that Escarcega was resisting arrest at all times when force was used, and using force, such as punches, to gain control of a non-compliant suspect is not clearly excessive." (citation omitted) ); *Johnson v. Larabida Children's Hosp.*, 372 F.3d 894, 898 (7th Cir. 204) (finding the officer's use of a single blow to the plaintiff's head with his walkie-talkie was reasonable where the plaintiff admitted she threatened bodily harm, provoked a breach of peace at the hospital, and battered the officer); *Prymer v. Ogden,* 29 F.3d 1208, 1216 (7th Cir. 1994) (concluding that an officer's strike to an arrestee's face to avoid being spat on was objectively reasonable); *Nail v. Gutierrez*, No. 1:06-CV-292 PS, 2008 WL 4545332, at *6 (N.D. Ind. Oct. 10, 2008) (finding it important that the officers had stopped using force once the plaintiff was handcuffed, emphasizing that it was "not a case where the officers[ ] beat up an arrestee after he no longer posed a threat"); *Duran v. Sirgedas,* 240 Fed. Appx. 14, 117 (7th Cir .2007) (no excessive force where officer struck suspect in the leg with a baton and punched him in the head with a closed fist, where suspect struggled with officers and bit one of them). Once Snukis ceased actively resisting, all uses of force stopped. (Fact No. 25.) Such uses of force, including the strikes to Snukis' head, were objectively reasonable.

**ii.      Officer Koontz's uses of force were reasonable.**

Plaintiffs allege Officer Koontz used excessive force when he "knocked [Snukis] to the ground, . . . restrained him face down in the dirt[ and] used pain compliance measures to subdue him." (Dkt. 94, ¶ 1(b).) As demonstrated above, the evidence shows Snukis tripped. (Fact No. 16.) Further, the evidence shows that Officer Koontz's restraining of Snukis and use of pain compliance measures were in response to Snukis' active resistance. *See* §§ IV(A)(i)(b), (ii). Such uses of force were reasonable under the circumstances. *See Turner,* 979 F.3d at 596.

iii.       **Officer Hackworth's uses of force were reasonable.**

Plaintiffs do not allege any specific use of force by Officer Hackworth, other than he "assisted with restraining Mr. Snukis" after he had "stopped breathing." (Dkt. 94, ¶ 1(b)-(c).) When Officer Hackworth arrived on scene, he observed Snukis actively resisting Officers Taylor and Koontz, who had not been able to secure Snukis. (Fact Nos. 24; *see* § IV(A)(iii).) Due to those circumstances, Officer Hackworth's "assist[ance] with restraining" Mr. Snukis" was reasonable. *See Turner,* 979 F.3d at 596. Further, there is no evidence that Snukis had "stopped breathing" when Officer Hackworth assisted with restraining him. Due to the foregoing, Officer Hackworth is entitled to summary judgment on Plaintiffs' excessive force claim. *See Turner,* 979 F.3d at 596.

iv.       **Defendant Officers are entitled to qualified immunity for their uses of force.**

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and quotation marks omitted). In determining whether qualified immunity applies, courts consider, in the light most favorable to the party asserting an injury, (1) whether the officer violated a constitutional right; and (2) whether that right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

"A right is 'clearly established' when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quotation marks omitted)). "The Supreme Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality,' and the Seventh Circuit has long held that 'the test for immunity should be whether the law was clear in relation to the specific facts confronting the

public official when he acted.'" *Volkman*, 736 F.3d at 1090 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), and *Colaizzi v. Walker*, 812 F.2d 34, 308 (7th Cir. 1987)).

Once raised, the plaintiff carries the burden of overcoming the affirmative defense. *Sparing*, 266 F.3d at 688 (citing *Spiegel v. Cortese,* 196 F.3d 717 (7th Cir. 1999); *Clash v. Beatty*, 77 F.3d 145, 147-48 (7th Cir. 1996)). To place the constitutional question beyond debate, the precedent must be "particularized to the facts of the case." *Dockery*, 911 F.3d at 466 (citing *White v. Pauly*, 580 U.S. 73, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017). "As applied to a Fourth Amendment excessive-force claim, the qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.'" *Dockery*, 911 F.3d at 466 (citing *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013).)

1.      **Two uses of a taser.**

The video shows that Snukis was uncooperative and actively resisting, including by attempting to flee and by using force against Officers Taylor and Koontz (*i.e.*, jerking away, tensing up, punching Officer Koontz in the face causing Officer Koontz to fall, and running). (Fact Nos. 6-11.) Plaintiffs also cannot show that Officer Taylor's second use of the taser was objectively unreasonable, as it was used in response to recognizing that the first taser deployment was not effective, and Snukis continuing to ignore commands to stay on the ground, roll on the ground to break the taser leads, attempting to pull out the taser barbs, standing up again, and actively resist, including by force and flight. (Fact Nos. 12-14; *see* Dkt. 1, ¶17.) Plaintiffs cannot cite to any legal authority "particularized to the facts of the case" showing Officer Taylor's first or second use of his taser was unconstitutional. *Dockery*, 911 F.3d at 466.

2.      **Strikes to Snukis' head.**

Officer Taylor used several strikes to Snukis' head following the ineffectiveness of the two uses of the taser, Snukis continuing to disregard commands, and in response to Snukis'

active resistance, including reaching at Officers Taylor and Koontz, grabbing at Officer Taylor's genitalia area at least three times, and reaching for Officer Taylor's taser holster. (Fact Nos. 14-19.) As such, a reasonable police officer could have felt threatened by Snukis' actions. *See Billingsley v. City of Fort Wayne*, No. 1:17-CV-00066-SLC, 2018 WL 6697075, at *7 (N.D. Ind. Dec. 20, 2018); *see, e.g., Griggs v. Brewer*, 841 F.3d 308, 316 (5th Cir. 2016) (stating that even when a handcuffed arrestee kicked an officer, he obviously still posed a threat to the officer); *Hamilton for J.H. v. City of Fort Wayne*, No. 1:16-CV-132-TLS, 2017 WL 5467038, at *8-9 (N.D. Ind. Nov. 13, 2017) (same); *see Duran,* 240 Fed. Appx. at 117 (7th Cir .2007) (finding qualified immunity where officer punched suspect in the head with a closed fist and used additional force, where suspect struggled with officers and bit one of them). Plaintiffs cannot cite to any settled authority to put Officer Taylor on notice that his use of strikes to the head to subdue Snukis in such circumstances where he was still actively resisting violated Snukis' constitutional rights.

### 3.  Restraining Snukis and use of pain compliance.

Officers Taylor and Koontz restrained and used pain compliance measures to gain control of Snukis, following the effectiveness of the taser and in response to his active resistance. Similarly, Officer Hackworth's "assist[ance] with restraining Mr. Snukis" was in response to the same active resistance by Snukis. "There is no question that police are justified in using a higher degree of force to restrain a suspect whom they reasonably believe to be dangerous or a flight risk." *Thomas v. City of Fort Wayne*, No. 1:06-CV-320 PS, 2008 WL 282348, at *5 (N.D. Ind. Jan. 31, 2008) (citing *Smith v. City of Chicago,* 242 F.3d 737, 743-44 (7th Cir.2001)). Again, Plaintiffs cannot cite to any legal authority "particularized to the facts of the case" showing such uses were unconstitutional. *Dockery*, 911 F.3d at 466.

**B.     Defendants are entitled to judgment in their favor as to Plaintiffs' § 1983 claim that Defendant Officers failed to provide medical care (Count I).**

**i.     Defendant Officers provided objectively reasonable medical care.**

The Seventh Circuit has determined that a pre-trial arrestee has a right to reasonable medical care under the Fourth Amendment. *See Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) ("Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction."); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007); *Ortiz v. City of Chicago*, 656 F.3d 523, 530–31 (7th Cir. 2011); *see also Estate of Perry v. Wenzel*, 872 F.3d 439, 453 (7th Cir. 2017) (citing *Ortiz*, 656 F.3d at 530).

Claims regarding conditions of confinement for pretrial detainees, like Snukis, are governed by the Fourth Amendment and its objectively unreasonable standard. *Lopez*, 464 F.3d at 719. "To establish a Fourth Amendment denial of medical care claim, [plaintiff] must establish that (1) defendants' failure to provide him with medical care was objectively unreasonable under the circumstances, and (2) defendants' conduct caused him harm." *LaSalvia v. City of Evanston*, 806 F. Supp. 2d 143, 1050 (N.D. Ill. 2011); *see also Ortiz*, 656 F.3d at 530.

Four factors are relevant in determining whether an officer's response to a pretrial detainee's medical needs was objectively unreasonable: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz*, 656 F.3d at 530. "[T]he Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." *Williams*, 509 F.3d at 403.

The Fourth Amendment requires reasonableness, not immediacy. *Sallenger v. City of Springfield*, 630 F.3d 499 (7th Cir. 2010). Even where the officers could have acted faster, "the Constitution does not demand perfection." *Pulera v. Sarzant*, 966 F.3d 540, 555 (7th Cir. 2020) (officers' response to arrestee's attempted suicide was reasonable where officers waited a few seconds for back-up before entering cell to cut arrestee down, officers had pressure off arrestee's neck in two minutes and summoned ambulance less than five minutes). Defendant Officers provided medical care upon notice that Snukis was experiencing a need for medical attention.

**1.    Defendant Officers acted promptly when they had notice of Snukis' need for medical attention.**

Adequate notice may be given by words or through observation of the arrestee's physical symptoms. *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007); *see also Williams* 509 F.3d at 392.

**(a)    Defendant Officers did not have notice of Snukis' need for medical attention while he was actively resisting, by force and flight.**

From when Officers Koontz and Taylor first approached Snukis, until about the time they secured him in handcuffs, there is no evidence that Officers Koontz and Taylor had notice that Snukis had a need for medical attention. (Fact Nos. 5-26.) Rather, during that period, Snukis was actively resisting, including by flight and force, reaching at the officers, jerking away, disregarding their commands, and yelling and making other noises. (Fact Nos. 6-26.) Similarly, Officer Hackworth did not have notice during that time, as he did not arrive until shortly before Snukis was handcuffed. (Fact Nos. 24-26.)

**(b)    Defendant Officers had notice that Snukis needed medical attention when they observed he was unconscious and later when he did not have a pulse.**

The first time Defendant Officers had notice that Snukis required medical attention is when they observed him unconscious "about the time [they] had him in handcuffs." (Fact No.

26.) Defendant Officers then had notice that Snukis required additional medical assistance when Officer Hackworth stated that he was "not getting a pulse" and asked either Officer Taylor or Koontz to check Snukis. (Fact No. 40.) In response to each notice, Defendant Officers provided prompt, reasonably objective medical assistance. *See* §(IV)(B)(i), *infra*.

2. **The seriousness of the medical need in light of the circumstances, applicable EPD policies, and whether the Defendant Officers' conduct caused the harm.**

Courts have held that a loss of consciousness and a bloody lip is not an objectively serious medical need. *Bocchino v. City of Atl. City*, 179 F. Supp. 3d. 387,406 (D.N.J. 2016) (see collection of cases). Here, when Defendant Officers first observed Snukis unconscious but with a pulse, was swallowing, felt his chest moving, and was making sounds, it was not unreasonable for Defendant Officers to believe Snukis' medical needs were not serious and that continuing to observe him, check his pulse, and call for medical assistance (*i.e.,* AMR and EFD) was sufficient. (Fact Nos. 26-39.) Rather, it was not until Officer Hackworth could not locate a pulse on Snukis that it was then reasonable for Defendant Officers to believe Snukis' medical needs were serious.

When reviewing the seriousness of the medical need, courts also take into consideration "policies that may endanger the well-being of those in custody." *Ortiz*, 656 F.3d at 531 (reviewing a police department's "policy of prohibiting detainees from taking medication in lockup unless the individual is transported to Cermak Hospital is central to our inquiry.") Here, there is no evidence of any EPD policy that endangered the well-being of Snukis. Rather, EPD has policies directly relating to assessing the medical needs of detainees. (Fact No. 60 (Injuries to Persons, including detainees (OG 119.00; OG 153.00; OG 153.02; OG 226.00, Handling, Transporting, and Booking Prisoners, which includes information on positional asphyxia (OG 153.00; OG 226.00), Handling the Street Drunk (OG 172.00).)

Lastly, in evaluating the medical need, the Seventh Circuit also held that a plaintiff "must also show that the defendants' conduct caused the harm of which she complains." *Ortiz*, 656 F.3d at 530 (citing *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir.2010). Here, there is no evidence that Snukis would not have died if Defendant Officers had provided other, reasonable medical assistance when either they had notice Snukis (i) was unconscious or (ii), later, was not breathing. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (Summary judgment "is the put up or shut up moment in a lawsuit . . . ."

### 3.    The scope of treatment

"[T]he Fourth Amendment reasonableness inquiry necessarily takes into account the sufficiency of the steps that officers did take." *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 600-01 (7th Cir. 2011). The Fourth Amendment does not require a law enforcement officer to provide what hindsight reveals to be the most effective medical care to an arrestee. *Id*. Promptly calling an ambulance after being notified of an arrestee's medical need "will typically qualify as reasonable." *Id*. (citing *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) ("[A] police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not administer CPR.")); *see also Sallenger*, 630 F.3d at 503-4 (officers' actions not objectively unreasonable where, soon after realizing arrestee was unconscious and not breathing, officers removed restraint, began CPR, and summoned an ambulance); *Dukes v. Freeport Health Network Mem'l Hosp.*, No. 3:19-CV-50189, 2022 WL 1085208, at *17 (N.D. Ill. Apr. 11, 2022) (officer's response to arrestee's medical need was not objectively unreasonable where officer called for an ambulance immediately); *Seay v. City of Indianapolis*, No. 118CV00161TWPDLP, 2020 WL 6710799, at *8 (S.D. Ind. Nov. 16, 2020) (officers entitled to summary judgment on medical care claim where officers promptly called ambulance and did not interfere with medical treatment

being provided); *Flerlage v. Vill. of Oswego*, No. 13-CV-6024, 2017 WL 5903819, at *10 (N.D. Ill. Nov. 30, 2017) (same).

### (a)   Treatment provided in response to observing Snukis unconscious.

When Defendant Officers observed Snukis unconscious, and after he was secured in handcuffs, they immediately turned Snukis onto his back, called for medical assistance, checked for and found a pulse and confirmed he was breathing, **all within a matter of sixteen seconds**. (Fact Nos. 26-27.) Thereafter, Defendant Officers turned Snukis over, asked if Snukis could hear them, performed sternum rubs, and continued to monitor Snukis, including repeatedly checking for a pulse, checking and confirming his breathing, using a flashlight to see him better, hearing him make sounds, and observing his chest moving. (Fact Nos. 28-36.) After Snukis still did not regain consciousness, Officer Hackworth, a trained EMT, obtained medical supplies from his police vehicle, including a breathing tube, which he inserted to pump air into his lungs. (Fact Nos. 38-39.) Such actions constituted objectively reasonable and prompt medical attention. *See Florek*, 649 F.3d at 600-01; *Tatum*, 441 F.3d at 1099; *Sallenger*, 630 F.3d at 503-4.

### (b)   Treatment provided in response to Snukis not having a pulse.

After Officer Hackworth had notice that Snukis did not have a pulse and asked another officer to confirm, Defendant Officers acted quickly to inform dispatch of the same, removed his handcuffs (5-20 seconds), began chest compressions (27 seconds), retrieved a portable defibrillator (29 seconds) and began using it (83 seconds), placed an airway into Snukis and began pumping air into his mouth, and informed dispatch that chest compressions had begun. (Fact Nos. 40-42.) Defendant Officers continued chest compressions until AMR and EFD arrived on scene and took over the medical care of Snukis. (Fact No. 43-50.) At that time, AMR checked Snukis and stated, "We got a pulse." (Fact No. 51.) Accordingly, Defendant Officers provided

objectively reasonable and prompt medical attention. *See Florek*, 649 F.3d at 600-01; *Tatum*, 441 F.3d at 1099; *Sallenger*, 630 F.3d at 503-4.

### 4.   Police interests, including administrative, penological, or investigatory concerns.

Prior to securing Snukis and due to Snukis' active resistance, Defendant Officers had an interest in protecting themselves, protecting the public, and enforcing the law, prior to providing medical assistance. *See Ortiz*, 656 F.3d at 530 (citing *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)). After Snukis was secured and confirming he had a pulse, Defendant Officers had other police interests, including monitoring other civilians in the area to ensure the scene remained safe, informing dispatch of the situation, and calling for a supervisor for investigative purposes. (Fact Nos. 47.) Defendant Officers also had an interest ensuring Officer Koontz received medical attention for his injuries incurred, in part, by Snukis' punch to Officer Koontz's face; however, Officer Koontz chose to tend to Snukis' medical care before seeking medical assistance for himself. (Fact Nos. 54-54.) Due to those external considerations, Defendant Officers' actions were reasonable.

### ii.   Alternatively, Defendant Officers are entitled to qualified immunity, as they did not violate a clearly established constitutional right, based upon the evidence.

As further stated above, the Doctrine of Qualified Immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See* §(IV)(A)(iv) (citing *Pearson*, 555 U.S. 223).

As this Court found, courts have repeatedly determined that qualified immunity is proper when officers provide objectively reasonable medical attention. *See Royal v. Norris*, 776 F. App'x 354 (7th Cir. 2019) (finding qualified immunity for officers who provided prompt medical care after being placed on notice of a subject's medical issues, including repeatedly asking him

how he was feeling, calling paramedics, and finally calling for an ambulance); *see* Dkt. 66 at 13 (collecting cases, including *Sallenger v. City of Springfield*, 630 F.3d 499 (7th Cir. 2010) (officers acted reasonably when after the officers realized plaintiff was unconscious, they removed the hobble, began CPR, and summoned an ambulance); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997); *Seay*, No. 18-cv-161, 2020 WL 6710799, at *7 (S.D. Ind. Nov. 16, 2020)); *Florek*, 649 F.3d at 600-01; *Tatum*, 441 F.3d at 1099; *Sallenger*, 630 F.3d at 503-4.

Here, while this Court previously analyzed qualified immunity under the allegations of the Complaint (dkt. 66), based upon the undisputed facts, Defendant Officers did not violate a clearly established right when they provided reasonable, prompt medical attention. First, Defendant Officers stated that they did not observe Snukis to be unconscious until near the time he was placed in handcuffs, and prior to that time, he actively resisted Defendant Officers, as further described above. (Fact No. 26.) Accordingly, Defendant Officers did not violate a clearly established right to provide medical attention to an actively resisting subject and before they had notice of the subject's need for medical attention.

As further described above, after Defendant Officers observed that Snukis was unconscious, they acted immediately, including requesting medical assistance (*i.e.,* AMR and EFD), turning him onto his back, repeatedly checking and confirming he had a pulse, confirming he was breathing, applying sternum rubs, and observing him at all times. (Fact Nos. 26-39; *see* §(IV)(B)(i)). Based on the undisputed evidence, Defendant Officers acted objectively reasonable, did not violate a clearly established constitutional right, and are entitled to qualified immunity.

Later, again as described above, Defendant Officers provided additional, reasonable and prompt medical assistance when they determined Snukis did not have a pulse, including

informing dispatch, removing his handcuffs, beginning chest compressions, retrieving additional medical supplies, using a portable defibrillator, and placing an airway into Snukis and pumping air into his mouth, all within a little more than 1 minute. (Fact Nos. 40.) Thereafter, Defendant Officers continued to perform chest compressions until AMR and EFD arrived on scene and took over the medical care of Snukis. (Fact No. 42-49.) At that time, AMR checked Snukis and stated, "We got a pulse." (Fact No. 51.) Based on the undisputed evidence, Defendant Officers did not violate a clearly established constitutional right and are entitled to qualified immunity.

## C.   Officer Taylor is entitled to judgment on Plaintiffs' claim for failure to intervene (Count I)

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Doxtator v. O'Brien*, 39 F.4th 852, 864–65 (7th Cir. 2022) (citations omitted). In sum, an officer must know that a citizen's rights are being infringed, and he must have a "realistic opportunity" to intervene. *Id*. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id*. (citations omitted).

Here, Plaintiffs claim "Officer Taylor failed to properly supervise and intervene with Officer Koontz's use of excessive force." Dkt. 94, ¶¶1(b), 3(b). Plaintiffs allege Officer Koontz used excessive force when he "knocked [Snukis] to the ground, . . . restrained him face down in the dirt[ and] used pain compliance measures to subdue him." (Dkt. 94, ¶ 1(b).) As demonstrated

31

above, Snukis was not knocked down but tripped, was actively resisting by flight and force—including punching Koontz in the face, grabbing at Officer Taylor's taser, grabbing at Officer Taylor's genitalia, and tensing up and jerking away— and the events surrounding Snukis unfolded quickly, Officer Taylor, who was engaged in restraining Snukis, did not have a reasonable opportunity to intervene in the use of force, as a matter of law. Further, because Officer Koontz did not violate any constitutional right of Snukis, *see* §§(IV)(A)-(B), *supra*, summary judgment is proper for Officer Taylor. *See Rosado v. Gonzalez,* 832 F.3d 714, 718 (7th Cir. 2016) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation….") (quoting *Harper v. Albert,* 400 F.3d 1052, 1064 (7th Cir. 2005)). Finally, because Officer Koontz is entitled to qualified immunity for his actions, Officer Taylor is entitled to qualified immunity on Plaintiffs' failure to intervene claim. *See* §§(V)(A)-(B), *supra*.

## V.      CONCLUSION

For the foregoing reasons, Defendant Officers respectfully request that the Court grant their Motion for Summary Judgment and award them all other relief that is just and proper in the premises.

Respectfully submitted,

*/s/ Clifford R. Whitehead*
Robert L. Burkart, #16664-82
Clifford R. Whitehead, #28836-49
Bernard J. Lobermann, IV, #36886-49
ZIEMER STAYMAN WEITZEL & SHOULDERS, LLP
20 N.W. First Street, 9th Floor
P.O. Box 916
Evansville, IN 47706
T: (812) 424-7575
F: (812) 421-5089
E-mail:     rburkart@zsws.com
               cwhitehead@zsws.com

blobermann@zsws.com
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I certify that on September 20, 2023, a copy of the foregoing was electronically served on counsel of record.

*/s/ Clifford R. Whitehead*
Clifford R. Whitehead