UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

EDWARD C. SNUKIS, JR. and SAMANTHA SNUKIS, Co-Administrators of the Estate of Edward C. Snukis,

Plaintiffs,

-v-

CITY OF EVANSVILLE, INDIANA; MATTHEW O. TAYLOR, in his individual capacity as an Evansville police officer; TREVOR KOONTZ, in his individual capacity as an Evansville police officer; and NICHOLAS HACKWORTH, in his individual capacity as an Evansville police officer,

Defendants.

CASE NO. 3:21-cv-00135-MPB-MJD

The videotaped 30(b)(6) deposition upon oral examination of City of Evansville, by JOSEY LEWIS, a witness produced and sworn before me, Erika L. Kessler, RPR, CSR (IL), CCR (MO), Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Plaintiff at the offices of ZIEMER STAYMAN WEITZEL & SHOULDERS, LLP, 20 NW First Street, Ninth Floor, Evansville, Indiana, on August 22, 2023, at 9:10 a.m., pursuant to the Federal Rules of Civil Procedure.

the contents of that folder and file to prepare for the deposition --

A. Yes, sir.

Q. -- today? What's the -- in your system, what you reviewed in preparation for your deposition today, what's the name of the folder that you looked into?

A. I just had the case number, and I believe it just had Mr. Snukis' name on it.

Q. How many case numbers were there associated with this case, as you understand it?

A. I believe there -- I believe there was two, but there might have been more.

Q. Okay.

A. I don't know for medical purposes.

Q. All right. And you -- have you reviewed all two or three, whatever it is, folders for in preparation for your deposition today?

A. Yes.

Q. Okay. You don't happen to remember the incident numbers?

A. I can look them up. I have mine. If you don't mind, I can.

Q. I don't mind.

MR. WHITEHEAD: Just answer the question.

THE WITNESS: Oh, sorry. I don't know off the top of my head.

MR. MILLER: I would ask the witness to look it up since he's got his iPad in front of him, or maybe it's in the binder, so I know what to show him.

MR. WHITEHEAD: No. We're not going to get into files that I have not reviewed, taken a look at and into his personal items right now, so no.

BY MR. MILLER:

Q. Okay. We'll spend a lot of time looking through my files.

A. Okay.

Q. Okay. Well, let's -- before we do that, based on your review of the files you did review to prepare for your deposition today, which will hopefully be able to figure out what those were, tell me about -- you said there were at least two investigations. Can you tell me something to describe the first one? What investigation would you want to start with? I want to ask you questions about it.

A. So what I investigated -- and AIU and what we do, anytime someone dies within the city limits, with the exception if someone's under Hospice, AIU

investigates. So if someone has a heart attack at their house, so in this case, death investigation, that was the primary one that I investigated.

Q. Okay. Are you familiar with an investigation related to battery on a law enforcement officer?

A. I believe so, yes.

Q. Did you investigate that, as well?

A. I don't -- when you mean investigate, what --

Q. What do you know about the investigation involving battery on a law enforcement officer?

MR. WHITEHEAD: Objection as to form. You can answer, if you know.

THE WITNESS: Just that there was an incident report generated following this incident.

BY MR. MILLER:

Q. Would that be an investigation of the incident that the -- all right. I'll just show you all the documents.

A. I apologize. I'm not trying to be difficult here.

Q. No. No. I don't think you are trying to be difficult at all. I'm going to show you or I'm showing you what is -- I'll represent to you is a folder that contains information produced by the City of Evansville in response to a subpoena that was served back in 2020, and you can see the folder

names and then there are two files.
A. Uh-huh.
Q. One of the folders is an OD manual, which I'm sure you know what that is, but I'm -- I'm confident -- well, does it have anything to do directly with the investigation?
A. No.
Q. Yeah. So is the investigation folder, if this is what it is -- and we'll look inside it here in a minute -- is the investigation folder -- sorry -- 19-20310 Snukis, comma, Edward?
A. Yes. That would be the --
Q. Is that the same name that the folder has on your -- on your -- when you look at it, is it called that 19-20310 Snukis, comma, Edward?
A. I believe so, yes.
Q. Okay. So let's look inside now. There's two sub-folders. Again, this is how it was produced. I'm asking you to assume, not asking you to affirm.
A. Uh-huh.
Q. Just assume, okay?
A. Okay.
Q. There's a case file in evidence, is that -- if I were to be on -- if you were to be on your system and looking at this and we'd drop down, is that

what you would see, case file evidence?

A. Yeah. I would create one of these. Anytime there's an incident that I'm investigating, that's how I do it.

Q. Yeah.

A. You know, I would have the initial folder. You would click into it and then you would have your case file, and that's where everything that can be converted into a PDF goes. And then the evidence is everything that's can't be. So like I said, video, crime scene photos, everything else would go in the evidence, so --

Q. Okay. Do you recall, in preparing for this deposition and reviewing the RMS, you know, file or folder for this incident, is it organized in this way on your system, case file evidence?

A. Yes. So the RMS is where the incident is initially at, and then I PDF it all and put it into a case file so it can be sent out for discovery or reviewed. But yes, that's -- sorry.

Q. All I'm trying to find out is do you create a folder, sub-folder underneath the incident called case file?

A. Yes.

Q. And another one called evidence?

A. Yes.

Q. Okay. So let's look at the case file. Again, this is the directory from what was produced on October 8th, 2020 by the City of Evansville. What am I -- what am I looking at here? What are these documents?

A. I can read them to you. Media release, report, sups, use of force report, and then just another -- looks like a PDF of the same case number and name that would be on the original folder. And then a CAD report.

Q. Okay. In preparing for the deposition, when you reviewed the case file, did it have this information in it?

A. This is -- so when I open mine --

Q. Yes, sir.

A. -- mine literally just says the case number and Snukis, comma, Edward and everything is PDF there. That's --

Q. It's not in a folder called case file?

A. No, it is, but this is not how mine looks.

Q. Well, what's different so I can try to understand that.

A. I didn't have the media release. And then my CAD report is already added in there.

the incident number, the folder name, but you have these other incident numbers on these other two documents, report and sups, and use of force report are all 20809. Can you explain that?

A. Without looking at --

Q. Okay.

A. Obviously, they are two different reports, so I don't know if that's from --

Q. All right. So I'm going to open up the one you've identified, and I'm going to make it Exhibit 2, which is -- if you'll give me a moment. I'll stop the share while I do that.

Okay. So now I'm going to show you what's been marked as Exhibit 2 Snukis. I'm sorry. Let me get the folder open. Nineteen -- the file name is Exhibit 2, 19-20310, Snukis comma Edward. You should be seeing on your screen.

A. Yes, sir.

Q. And it appears to be a lengthy document, and I apologize, 112 pages. I'm going to -- for the moment, I'm going to show it full -- a full-page view. We can blow it up if you need to. Obviously, you're only seeing the first page. I understand that. But tell me what you need to see in order to confirm that this is -- or what this

document is. I'm happy to scroll down and let you look at each page. But tell me what you need in order to tell me what this document consists of?

A. Just from this page, this is -- this is the first page from our RMS report, so this will basically lay out the date, the time, the nature of the case in terms of the crime or incident that it is. Let's see here. Then if you scroll down, if you scroll through it, I can tell you if this is what I looked at if that's what you're asking.

Q. Okay. Yeah.

A. That's part of it. Yeah. Supplements, yep. Uh-huh. Yeah, you can keep going. Yeah, there's -- those are supplements there.

Q. And when you say supplements, you're referring now we're on page 10, that's a supplement?

A. Yes. Just of --

Q. Okay. I'm going to keep going. Did I go too fast?

A. No, no, you're fine. And then yes, this is the toxicology report.

Q. Okay.

A. If you keep going, there should be a -- these are the CAD incident -- or the run cards or run card.

Q. And, again, these are part of the --

A. Document.

Q. -- documents you reviewed. They were compiled by you as part of your investigation and reviewed by you in preparation for your deposition?
A. Yes, sir.
Q. Okay.
A. Autopsy report.
Q. Okay. I'm sorry. So what's this particular page?
A. This appears to be the second incident report that was generated. Looks like the crime is battery on public safety official, resist law enforcement and public intox.
Q. So that is something that was reviewed by you in connection with your investigation?
A. Yes.
Q. Okay.
A. They get related. You can link case in RMS, and then when you print it, they all come out.
Q. Were you the officer responsible for the investigation of the battery? Were you the detective, I should've said. Sorry.
A. Typically, on this, this -- I do long-term investigations. And this -- this would be -- so in a situation like that, you have battery on law enforcement, then it would be the officers that would handle the arrest and so forth in a case like

this. If that makes sense.
Q. Well, actually it doesn't make sense to me, and that's what I'm trying to figure it out. So I'm asking if you know anything about this investigation, which is identified as incident No. 19 -- or case number, excuse me, 19-20309, if you were involved in that, if you have any knowledge about it.
A. I was involved with the death investigation.
Q. Understood. And we'll get to -- we'll cover that.
A. Yes, sir.
Q. Right now, I'm trying to figure out what you -- else, if anything, you were involved in, and I'm asking if you were involved in the investigation identified as case number 19-20309?
A. Can you is scroll down real quick?
Q. Yes.
A. Sorry. I apologize.
Q. Yes. No problem.
A. That one should be -- again, again, again. Sorry. I --
Q. No, no, just -- I don't want to go too fast.
A. Another one, please. Another one. Again. Again. Again. Again. Next, please. Next. Again. Again. Again. Oh, back. That is my sup there.

Q. This one page?
A. Yes.
Q. And what is this one page telling me that relates to incident 1920309?
A. It was closed out by exception.
Q. What does that mean?
A. There were no criminal charges brought. Closed out by exception meaning that the defendant wouldn't -- this wouldn't go to trial.
Q. Do you know why it was closed out by exception?
A. Yeah. Mr. Snukis died.
Q. Right. So you did not have any role in the decision to close it out by exception? Or did you?
A. No. I mean, that's -- that was my decision, but we can't really go to court when the defendant's not there.
Q. I see. So the investigation, did -- this 20 -- 1920 -- first of all, we're looking at page 82 of the electronic documents, according to my screen, and we're -- I'm asking you if what preceded it, which was several pages, we'll go back to the -- when that first started. So that starts on page 63. Appears to be, would you agree with me, the supplements and reports regarding case number 19-20309?

A. Yes.

Q. Okay. And according to -- I think your testimony on page 82, you said you closed out the file by exception; is that what you said?

MR. WHITEHEAD: Objection as to form. You can answer.

THE WITNESS: Yes.

BY MR. MILLER:

Q. Clear by exception?

A. Yes.

Q. Is that the proper word?

A. Yes.

Q. Okay. In doing so, did you review the prior pages 20 pages or so?

MR. WHITEHEAD: Objection as to form.

BY MR. MILLER:

Q. Did you review the entire investigation report when you cleared this incident by exception?

MR. WHITEHEAD: Objection as to form.

THE WITNESS: I -- I don't know. I -- I'm not sure what you're asking.

BY MR. MILLER:

Q. I'm asking if the information that was collected by the various officers identified when we go through it page by page, but I -- really, all I want to

know is, did you consider this investigation report and supplements before clearing it by exception, or did you just clear it by exception because he was dead?

MR. WHITEHEAD: Objection as to form. You can answer, if you know.

THE WITNESS: I -- I mean I -- I -- reviewing, I mean, I was investigating the death investigation. This is all tied together.

BY MR. MILLER:

Q. We'll go through this page by page.

A. Okay.

Q. Page 63. Is there anything reflected on here that you did?

A. On the incident report --

Q. Yes.

A. -- on the basic RMS?

Q. Yes.

A. I don't know. I don't know if I added names or anything like that and it's been four years. I apologize.

Q. And you didn't review this incident investigation report in the RMS system in preparation for your deposition today?

A. No, I did review this. This was all added in

for the record.

What was my question, please?

(The reporter read back the last question.)

BY MR. MILLER:

Q. The answer is, you did review it, correct?

A. Yes, I did.

Q. Okay. So going back now to when you made the decision to clear this case, 19 -- just make sure we're real clear with the record -- 19-20309, you don't recall if you reviewed the contents of this incident report?

MR. WHITEHEAD: Object as to form.

THE WITNESS: I don't want to make assumptions, but I -- I don't know. It's been four years ago. I --

BY MR. MILLER:

Q. I see.

A. Like I said, I'm not trying to be difficult, but I don't.

Q. All right. So let's look at the second -- next page, which is page 64 of Exhibit 2. Did you, yourself, speak with any of these individuals?

A. Yes, I did.

Q. Okay. And did you speak with them in what context, what was the -- case number 19-20309 or case number

supplements, the interview of Fraker, Brentlee Spurlock, Sierra Snukis, and then son and sister of Mr. Snukis.

Q. Okay. And then as to Mr. Fracker, you say, came to EPD headquarters to give a formal statement of what he witnessed in this case. See video.

A. Uh-huh.

Q. Is the video part of this RMS folder that you reviewed in preparation for your deposition today?

A. It's under the evidence file.

Q. Okay. We'll come back to this document. So I did that pretty quickly. I apologize. So under 19- -- under the directory of documents produced on October 20 of -- October 8 of 2020, there's 19-20310 Snukis Edward and then there's an evidence folder that you see on your screen right now.

A. No.

Q. Okay. I'm going to open the -- you don't see this?

A. No.

Q. I'm sorry. Thank you for clarifying. Now, do you see the folder evidence?

A. Yes.

Q. I'm going to open that. And what am I looking at here?

A. Body camera photos, crime scene unit photos, the

files that I received from Heidi, interviews and other videos, and then there's a timeline.

Q. Okay. Is this timeline a document that you prepared?

A. Yes.

Q. Okay. And then these other folders, if you know, we can look at them, but these other folders you just identified, are they documents that you created or files you created or some that you did some that other officers did?

A. No, I created those folders.

Q. Understood. Let's just look at body cameras. Okay. These are officer body cameras?

A. Yes.

Q. Is that correct?

A. Yes.

Q. And how -- how were these particular officers' body cameras chosen to be included in this folder? Who made that decision?

A. I just go --

Q. As opposed to anybody?

A. Anytime I do an investigation, I go off the run card of who is on scene.

Q. Okay.

A. I create one and then get their body camera from a

specific time of when the incident first started and when it was closed out.

Q. Okay. Great. And did you review all that body cam footage as part of your investigation?

A. The majority of it. I don't review all of it.

Q. In the case of the investigation involving Mr. Snukis, did you review all of this body cam footage in this folder that's on the screen right now?

A. I -- I can't say if I reviewed all of it. I mean, I reviewed the majority, but I can't -- I can't say for certain if I reviewed all of it.

Q. Okay. So let's go ahead and make this an exhibit. It's a little small, but this is -- I've identified this as Exhibit 3, which is the directory folder that we've been looking at for body cam footage. Do you agree with me?

A. Yes.

Q. Okay. Looking at this listing of folder names, can you -- and, obviously, three of them say no video. I'm not asking you if you reviewed video that doesn't exist, but can you say which one of these officers' videos you did -- you do recall reviewing as part of the investigation?

A. Officer Taylor and Koontz.

Q. And let's look at -- you didn't look at Hackworth's

School of Interviewing?

MR. WHITEHEAD: Objection. No. That is outside of the scope of this notice for the deposition here today. I'll instruct him not to answer.

BY MR. MILLER:

Q. Tell me how you interview an incident report like a death. What's the method, please?

A. Can you clarify the -- I'm not understanding the question.

Q. What steps do you take in a death investigation?

A. I go interview witnesses, I review video, try to talk to involved parties, and then death investigation is -- big proponent is the autopsy report from the forensic pathologist, if that makes sense.

Q. Is it significant to you as the investigator of the death investigation of Mr. Snukis that the forensic pathologist that did not know that Officer Taylor had struck Mr. Snukis to the head several times when he did his report? Is that significant to you?

MR. WHITEHEAD: Objection as to form.

THE WITNESS: I don't know.

BY MR. MILLER:

Q. Is it significant to you that the pathologist -- forensic pathologist testified that had he known that information at the time he did his report, he would've done a different investigation, he would've done it differently?

MR. WHITEHEAD: Objection.

BY MR. MILLER:

Q. Would that affect your -- go ahead.

MR. WHITEHEAD: Well, no, is that your -- would that affect your?

MR. MILLER: Yeah, I'm done. I'm done. I'll withdraw that. Read back what I said, please.

THE REPORTER: Is it significant to you that the forensic pathologist testified that he had known -- that had he -- that had he known that information at the time he did his report he would've done a different- --

MR. MILLER: Stop.

BY MR. MILLER:

Q. That's my question. Is that significant to you?

MR. WHITEHEAD: Objection as to form and mischaracterizes the evidence and calls for speculation. You can answer, if you know.

THE WITNESS: I don't know. I go off