

# Evansville Police Department Operational Guideline



## ARRESTS

**OG 104.00**
**Effective: 05-01-09**                    **Order Numbers: 18-O-15**
**Reviewed: 06-08-18**
**CALEA Standards: 1.2.1, 1.2.5, 1.2.6, 1.2.7**

**Table of Contents**

Related Directives – Page 1
Related Statutes – Page 2
Policy – Page 3
Probable Cause – Page 3
Custodial Arrests – Page 3
Misdemeanor Arrests – Page 4
Felony Arrests – Page 4
Traffic Arrests – Page 5
Warrant and Warrantless Arrests – Page 5
ABK Electronic Monitoring Arrests – Page 5
Discretion in Making Arrests – Page 6
Alternatives to Making Arrests – Page 6
Crime Victim Notification Code – Page 7

**Related Directives**

OG 104.01 - Arrest of a Foreign National
OG 104.04 - Theft/Shoplifting
OG 104.05 - Effecting Juvenile Arrests
OG 104.06 - Handling of Juvenile Arrestees
OG 105.00 - Arrest Warrants
OG 106.00 - Traffic Control and Enforcement
OG 109.00 - OMVWI Arrests and Alcohol Testing
OG 114.00 - Use of Discretion
OG 136.00 - Domestic Violence/Disturbance Calls
OG 144.00 - Constitutional Requirements During Criminal Investigations
OG 153.00 - Handling and Transporting Prisoners
OG 161.00 - Pre-Charging Felony Arrests
OG 172.00 - Handling the Street Drunk

OG 184.00 - Emergency Detention of the Mentally Ill
OG 348.00 - Victim/Witness Assistance
OG 513.00 - Booking Arrested Persons
94-O-69 - Victim Notification Policy

**Related Statutes**

IC 9-30-2-5 Release from custody--Release upon deposit of security requirements for security deposit and written promise to appear in court--Deposit of nonresident's license--Deposit of valid motor club card

IC 9-30-2-6 Permissible arrests without warrant. A law enforcement officer may, without a warrant, arrest a person when the law enforcement officer has reasonable cause to believe that the violation was committed by the person.

IC 35-33-1-1 Arrests by law enforcement officers and persons authorized to act as law enforcement officers has probable cause to believe the person has committed or attempted to commit, a felony; has probable cause to believe the person is committing or attempting to commit a misdemeanor in the officer's presence; probable cause to believe the person has committed a battery resulting in bodily injury or domestic battery.

IC 35-33-12 Crime Victim Notification 35-40-5-8 Sec. 8. A victim has the right to information, upon request, about the disposition of the criminal case involving the victim or the conviction, sentence, and release of a person accused of committing a crime against the victim

IC 36-8-3-6 A warrant of search or arrest, issued by any judge, may be executed by municipal police--other duties of municipal police

IC 36-8-3-10 The police department shall, within the city: preserve peace; prevent offenses; detect and arrest criminals; suppress riots, mobs, and insurrections; disperse unlawful and dangerous assemblages and assemblages that obstruct the free passage of public streets, sidewalks, parks, and places; protect the rights of persons and property; guard the public health; preserve order at elections and public meetings; direct the movement of vehicles in public ways or public places; remove all nuisances in public parks or public ways; provide proper police assistance at fires; assist, advise, and protect strangers and travelers in public ways or at transportation facilities; carefully observe and inspect all places of business under license, or required to have them; and enforce and prevent the violation of all laws in force in the city. The police chief and each captain, in his precinct, may supervise and inspect all pawnbrokers, vendors, junkshop keepers, cartmen, expressmen, dealers in secondhand merchandise, intelligence offices, and auctions. Any member of the department may be authorized by the chief in writing to exercise the same powers.

**Policy**

One of the primary responsibilities of a law enforcement officer is to enforce the law and, when necessary, to make arrests. These actions must be carried out with justice and fairness and without regard to race, sex, age, handicap, etc. A police officer must have the capacity to make high quality decisions in stressful situations involving criminal and civil matters. As an officer is given the authority and responsibility to make arrests when necessary, it is also within the officer's authority to use discretion. When it is in the best interests of society and the individual, keeping in mind that the degree of discretion available is determined by the seriousness of the offense, an officer may and should exercise discretion. In addition to discretion, the department allows, and in some situations encourages, the use of alternatives to an actual arrest.

Statutory Authority

Police Officers in the State of Indiana derive their authority to make arrests from the Statutes of the State of Indiana. The specific statutes are IC 35-33-1-1, IC 36-8-3-6 and IC 36-8-3-10.

**Probable Cause**

1. When making an arrest, the conduct and the actions of an officer must be based on the facts, as they would appear to a reasonable person at the time. An officer is expected to be consistent and to rely on his training, experience and good judgment to guide him toward just and lawful decisions. An officer must never allow personal feelings or pressure from external sources to influence his decision in determining whether to make an arrest.

2. What is reasonable in terms of appropriate police action or what constitutes probable cause varies with each situation. Depending on specific facts, an officer may be justified in:

   A. Conducting an investigation

   B. Detaining, arresting and/or searching a person

   C. Taking no official action at all

3. The requirement that legal justification be present prior to acting imposes a limitation on all official police actions. In every case an officer must always act reasonably and within the limits of his authority as defined by state statutes, both the state and federal constitutions, and prior binding court decisions.

4. Officers must insure that the rights of the individual, as well as the public, are protected.

**Custodial Arrests**

1. Effect the arrest as efficiently and safely as possible.

2. Search the arrested person thoroughly as per OG 153.00.

3.  Handcuff the arrested person with his hands behind his back unless it is deemed unnecessary because of the arrested person's age or infirmity.

4.  If the arrested person is to be interviewed, advise him of his Miranda Rights.

5.  Complete the Victim Notification Form for any arrest involving crimes listed in IC 35-33-12.* The Vanderburgh County Correction Center (VCCC) will NOT accept any prisoner who is being charged with an included crime without this form.

    Officers will be responsible for completing the Arrest Info, Victim Request and Victim Info blocks on the form. If making a warrant arrest and victim information is unavailable, officers should check the box marked "the victim was unable to request notification" and add WARRANT ARREST at the end of this line.

*A copy of the Victim Notification Form and a complete listing of crimes are attached to this procedure. An original form must be used in each instance--no copies. Forms are available from Patrol, Records, and the sheriff's department.

6.  Transport the arrested person to VCCC.

7.  Book the arrested person.

8.  Complete any necessary paperwork.

**Misdemeanor Arrests**

1.  Follow the guidelines listed above.

2.  Complete an arrest sheet and probable cause affidavit, giving pertinent facts surrounding the arrest.

3.  Misdemeanor out-of-state violators may be handled as prescribed under IC 9-30-2-5.

**Felony Arrests**

1.  Follow the guidelines listed above.

2.  If the arrest is made at a crime scene:

    A. Request assistance from the appropriate investigative unit.

    B. Secure the scene and call for assistance from CSU if needed.

    C. Complete applicable reports and give to the investigating officer.

3.   If the arrest is not made at a crime scene:

    A. Notify the appropriate investigative supervisor on duty that a felony arrest has not been made.

    B. Submit the applicable report to a supervisor for review.

4.  Complete a probable cause affidavit.

5.  Cooperate fully with investigative personnel.

6.  Note: In cases of habitual traffic offenders, it is unnecessary to call out an investigator (see OG 106.00).

**Traffic Arrests**

See OG 106.00 (Traffic Control and Enforcement)

**Warrant and Warrantless Arrests**

1.  Arrest with Warrant (See OG 105.00 Arrest Warrant)

2.  Arrest without Warrant

    A.  Procedures to be followed for any warrantless arrest shall conform to IC 9-30-2-6 and IC 35-33-1-1.

    B. Follow the steps in the section of this procedure entitled "Custodial Arrests."

**ABK Electronic Monitoring Arrests**

The Evansville Police Department has contracted with ABK to be used for electronically monitoring of someone who has been arrested, but is confined to a medical facility and is unable to be transported to jail until released by a physician.   The department will use electronic monitoring only under specific conditions after following the below protocol:

1.  The decision to use ABK's electronic monitoring service will be decided on a case-by-case basis, and will only be used after approval at the deputy chief level or higher.

2.  Criteria to be considered when deciding which arrestees qualify for electronic monitoring:

    A.  The crime for which the person has been arrested

    B.  The specific circumstances under which the person was arrested

    C.  Prior criminal history of the person arrested

    D.  Length of time the person is expected to be in the hospital

3.  If a person has been arrested that may qualify for electronic monitoring, the following steps must be followed:

A. An on duty supervisor will contact the chain of command up to the deputy chief for approval to use electronic monitoring.   If the arrest occurs on second or third shift, the information pertaining to the arrest and the request for monitoring will be put in writing and forwarded up the chain of command for follow up on the next business day.  If the arrest occurs on the weekend, the follow up will occur on Monday morning.

B. With the final approval by a deputy chief or higher (during regular dayshift hours), the Vanderburgh County Prosecutor's Office will be contacted.  A Deputy Prosecutor will be responsible for contacting a Judge to get a court order for the electronic monitoring.

C. When a court order has been signed by a Judge allowing the use of electronic monitoring, a patrol supervisor will call Kim Brune Vanhoose at ABK (812-437-2141). ABK is to be called during normal dayshift business hours.  An officer will stay with the arrested person until someone from ABK arrives to put the arrested person on electronic monitoring.  A copy of the court order will be given to the ABK employee.

D. ABK will need the following information from EPD upon request of services: Name of the person arrested, date of birth, social security number, hospital and room number where the person is being held.

E. Once the monitoring system is on the arrested person, the officer is released from the hospital.

F. It is imperative that the officer instructs the hospital to contact the Evansville Police Department before the patient is discharged.  Once the hospital notifies EPD that the person is being discharged, an officer will be sent to stay with the person until ABK arrives to get their monitoring equipment.

## Discretion in Making Arrests

1. While the amount of discretion available in determining whether to make an arrest is great in infraction situations, it may be, for all practicable purposes, nonexistent in serious-misdemeanor and felony situations.

2. Just as an official record is made of every arrest, there will also be some official record made of each situation where an officer, through the use of discretion, makes a decision not to make an arrest. This record may extend from a note on his work record for infractions to an incident or case report on more serious situations. In situations involving Class A misdemeanors and felonies, the officer should, discuss his decision with his supervisor prior to any action. If that is impossible, he should report it to his supervisor as soon as possible.

## Alternatives to Making Arrests

1. When an officer encounters juveniles who have committed minor offenses which would be classified as infractions or Class B or Class C misdemeanors if committed by an adult, the officer may handle the situation in an informal manner with regard to the juvenile's past record and the satisfaction of all parties involved (see OG 104.05). As in the use of discretion, the officer will make a written report of the offense and his actions, which will be forwarded, to the Juvenile Section.

2.  In matters where mental illness is obviously the major problem and the offense is minor, an officer should follow OG 184.00.

3.  Where alcohol or drug addiction is the predominate problem and the individual requests to sign himself into a detoxification program at a recognized medical facility, the officer using his discretion and investigating the individual's past record, may allow the individual to do so as long as the institution is cooperative and will expedite the admission procedure (see OG 172.00).

4.  Other alternatives include referral of homeless and indigent individuals, individuals with family or domestic problems, and individuals involved in any situation where a minor criminal offense may have occurred. These individuals may be referred to the appropriate service or welfare agency (see OG 136.00 for list of available agencies. Again, as previously stated, the referring officer is responsible for making the appropriate written record describing the situation, the names of the individuals involved, and the action taken.

**Crime Victim Notification Code**

After reviewing IC 35-33-12, it is the opinion of the Vanderburgh County Prosecutor's Office that the following offenses are included crimes as listed in the Crime Victim Notification Code:

As used in this Indiana Code, "victim" means a person who has suffered direct harm as the result of the alleged commission of a crime described in:

(1) IC 35-42 (offenses against the person);

(2) IC 35-45-2-1 (intimidation);

(3) IC 35-45-2-2 (harassment); or

(4) IC 35-45-10 (stalking).

35-42-1-1 Murder
35-42-1-2 Causing Suicide
35-42-1-2.5 Assisting Suicide
35-42-1-3 Voluntary Manslaughter
35-42-1-4 Involuntary Manslaughter
35-42-1-5 Reckless Homicide
35-42-1-6 Feticide
35-42-1-7 Selling HIV Contaminated Blood
35-42-1-8 Sale of AIDS Testing Equipment
35-42-2-1 Battery
35-42-2-1.5 Aggravated Battery
35-42-2-2 Criminal Recklessness

35-42-2-3 Provocation
35-42-2-4 Obstructing Traffic
35-42-3-2 Kidnapping
35-42-3-3 Criminal Confinement
35-42-3-4 Violation of Custody Order
35-42-4-1 Rape
35-42-4-2 Criminal Deviate Conduct
35-42-4-3 Child Molesting
35-42-4-4 Child Exploitation: Possession of Child Pornography
35-42-4-5 Vicarious Sexual Gratification
35-42-4-6 Child Solicitation
35-42-4-7 Child Seduction
35-42-4-8 Sexual Battery
35-42-4-9 Sexual Misconduct with a Minor
35-42-5-1 Robbery
35-42-5-2 Carjacking
35-45-2-1 Intimidation
35-45-2-2 Harassment
35-45-10-5 Stalking


Obviously, some of these crimes may not have "victims", but law has put them on the list, and a form is required.

At the officer's discretion, he may complete a Victim Notification Form on any other arrest where he feels a victim may need notification.



# Evansville Police Department
# Operational Guideline



**USE OF DISCRETION**

**OG 114.00**
**Effective: 11-01-98**          **Order Numbers: 98-O-02**
**Reviewed: 07-12-13**
**CALEA Standards: 1.2.7, 81.2.4**

**Table of Contents**

Related Directives – Page 1
Use of Discretion – General – Page 1
Use of Discretion – Arrest – Page 1
Use of Discretion – Domestic Disturbances – Page 2
Use of Discretion – Juvenile Offenders – Page 3
Use of Discretion – Vehicle Pursuits – Page 3
Use of Discretion – Transporting Prisoners – Page 3
Mental Illness – Page 3
Referral to Outside Agencies – Page 3
Calling a Supervisor – Page 3

**Related Directives**

SOG 104.00 – Arrests
SOG 104.05 – Effecting Juvenile Arrests
SOG 111.00 – Vehicle Pursuits
SOG 136.00 – Domestic Violence/Disturbance Calls
SOG 145.01 – Requesting Assistance from a Supervisor
SOG 153.00 – Handling, Transporting, and Booking Prisoners
SOG 172.00 – Handling the Street Drunk
SOG 184.00 – Emergency Detention of the Mentally Ill

**Use of Discretion - General**

Sworn members of the Evansville Police Department have many opportunities to use discretion in making decisions involving their everyday police activities.

**Use of Discretion - Arrest**

1.    General Officers may use discretion in certain arrest situations, i.e., public intoxication. In certain traffic violation situations, officers may choose to warn the offender instead of issuing a citation. Another example would be when an officer stops someone for speeding and finds that the person is driving a family member to the hospital because of a health-related

emergency. Instead of citing the person, the officer may choose to escort the person to the hospital.

2.      Custodial or Non-Custodial Arrest Officers often during their work shifts must make decisions as whether or not to make an arrest. If an arrest is made, the officer must further decide if the arrest is to be custodial or non-custodial.

    A.      Traffic Arrests In most traffic-related offenses officers may issue a citation ordering the offender to appear in court in lieu of actually taking the offender into custody. Traffic offenses, which mandate a custody arrest, are listed in SOG 104.00.

    B.      Issuance of Summons Officers may issue summons for certain violations in lieu of custodial arrest, i.e., illegal littering or dumping, city ordinance violations.

    C.      Obtaining a Warrant Investigators may choose to obtain an arrest warrant in an investigation that they are conducting prior to making the custodial arrest of a suspect for whom they have probable cause to make such an arrest.

3.      Intoxicated Persons Department procedures allow officers flexibility in dealing with persons who are intoxicated in public places. See SOG 172.00 for specifics.

4.      Volatile Situations In some situations where a large hostile crowd has gathered, officers may opt not to make arrests for minor offenses if such action could trigger a major disturbance. If an arrest is necessary and it can be made at a different time under different circumstances, it may be advisable to do so. Officers will have to evaluate each situation depending on the seriousness of the offense and the need for immediate custodial arrest.

5.      Multiple Charges In some arrests officers may have the option of placing multiple charges against an arrested individual.

6.      Clearing Cases In some cases detectives may charge a suspect with a single burglary and clear up several others while interrogating the suspect.

**Use of Discretion - Domestic Disturbances**

In domestic disturbance situations, officers may use discretion under certain circumstances in deciding which if any charges to place against either party in the disturbance. The officer may use discretion in settling the disturbance by separating the persons involved, i.e., having one leave and go to another location. However, and as in other situations, if a felony or a serious misdemeanor has occurred, the officer should make an arrest if he has probable cause. In domestic violence/disturbance calls involving an "invasion of privacy" violation, the officer must arrest an offender when certain conditions are present (see SOG 136.00 for specifics).

**Use of Discretion - Juvenile Offenders**

When an officer encounters juveniles who have committed minor offenses which would be classified as infractions or Class B or Class C misdemeanors if committed by an adult, the officer may handle the situation in an informal manner with regard to the juvenile's past record and the satisfaction of all parties involved (see SOG 104.05). As in the use of discretion, the officer will make a written report of the offense and his actions, which will be forwarded, to the Juvenile Section.

**Use of Discretion - Vehicle Pursuits**

Officers may choose not to pursue, or break off a pursuit in progress, which would endanger innocent victims or officers can identify the pursued suspect. The suspect can be arrested at a later time when there will be less danger to all involved. Refer to SOG 111.00.

**Use of Discretion - Transporting Prisoners**

Officers may use discretion in handcuffing prisoners under certain circumstances. SOG 153.00 states "handcuff all prisoners ...unless you deem such action unnecessary because of the prisoner's age or infirmity". Officers may opt to transport a prisoner in their patrol car instead of the van if such action is deemed advisable, i.e., a hostile crowd has gathered and removing the prisoner from the scene as quickly as possible is called for.

**Mental Illness**

In matters where mental illness is obviously the major problem and the offense is minor, an officer should follow SOG 184.00.

**Referral to Outside Agencies**

Officers have a list of outside agencies to refer people to when the officers perceive a need for such action. These include referral of homeless or indigent individuals, individuals with family or domestic problems, and individuals involved in any situation where a minor criminal offense may have occurred. SOG 136.00 contains a list of outside agencies ranging from food and shelter for persons in need to counseling for people with alcohol-related problems. Officers may refer people to one or more of these agencies. The referring officer is responsible for making the appropriate written record describing the situation, the names of the individuals involved and the action taken.

**Calling a Supervisor**

If a situation arises where an officer is not certain of the amount of discretion he can use or he may request assistance by calling his supervisor for advice or notify the dispatcher of the location and the nature of the need.



## Evansville Police Department
## Operational Guideline



**ACCEPTING AND DELIVERING EMERGENCY MESSAGES**

OG 119.00

**Effective:  9-1-02**　　　　　　**Order Numbers: 02-O-57**　　　　　**Page 1 of 3**
**Reviewed: 07-31-12**
**CALEA Standards: 55.2.6 and 81.2.11**

**Table of Contents**

Related Documents – Page 1
Purpose – Page 1
Policy – Page 1
Accepting Emergency Messages – 2
Making Notification of Emergency Messages – 2

**Related Documents**

"In Person, In Time" Recommended Procedures for Death Notification*
　　　*Note: this document is located immediately following this procedure in all hard copies
　　　of the EPD Operations Manual

**Purpose**
The purpose of this procedure is to furnish personnel with guidelines when receiving and notifying persons of the death, serious injury, or illness of a family member due to a crime, a traffic accident, a heart attack, drowning, or other sudden and unexpected event.

**Policy**
At times, police personnel are required to receive and make notifications of deceased, seriously injured, or seriously ill persons. Such notification will be made on a person-to-person basis and should be made promptly in a considerate manner. Information concerning notifications of death in the family will not be broadcast by Central Dispatch. Such information should be transmitted by telephone to the field officer who will make the person-to-person contact. Whenever possible, assistance should be obtained from a clergyman, a relative, or a close friend. If no one else is available, sending a second officer is advisable. A female/male team is advantageous. When two persons are responding to the notification, they should decide who will speak, what will be said, and how much can be said.

The survivor may go in to shock and have to be taken to a hospital. The person making the notification should be alert to this occurring. Be absolutely certain that there is positive identification of the victim. Mistaken death notifications can cause enormous trauma.

**ACCEPTING AND DELIVERING EMERGENCY MESSAGES**

**OG 119.00**                                                                                        **Page 2 of 3**

**Accepting Emergency Messages**

The following are the steps to take when accepting emergency messages.

1. Receive the information in a professional and dignified manner.

2. Obtain the full name, age, address, and location of the person who died or was seriously injured, or is seriously ill.

3. Obtain a telephone number, which may be used to receive further information, or for callback if notification cannot be made.

4. Obtain the full name, age, and address of the person who is to be notified.

5. Relay all of the information received to the officer who is going to make the notification.

**Making Notification of Emergency Messages**

1. Obtain all of the information listed above from the person who took the request.

2. Provide notification as soon as possible. Survivors may be devastated by learning of the death of a loved one from the media.

3. Make the notification in a professional and dignified manner. Relay the information, which was received from the requester.

4. When notifying aged or infirm individuals and it is deemed necessary, attempt to locate a friend or relative to remain with the notified individual until the initial shock has worn off.

5. Clearly identify yourself, present credentials if necessary and ask to come in. Do not make the notification at the doorstep. Ask to move inside, and get the survivor seated in the privacy of their home. Be sure you are speaking to the right person. You may offer to tell children separately if adult survivors desire that.

6. Relay the message directly in plain language. Survivors usually are served best by telling them directly what happened. The presence of a police officer(s) already has alerted them of a problem.

7. Begin by saying, "I have some very bad news to tell you", or a similar statement. This gives the survivor an important moment to prepare for the shock. Avoid vague expressions such as "Sally was lost" or "passed away." Examples of plain language include: "Your daughter was in a traffic accident and she was killed." "Your husband was shot today and he died." "Your father had a heart attack at his work place and he died."

## ACCEPTING AND DELIVERING EMERGENCY MESSAGES

**OG 119.00**                                                                    **Page 3 of 3**

8. Call the victim by name rather than "the body."

9. Patiently answer any questions about the cause of death (injury, illness, etc.) and the location of the victim. In death notifications explain how the deceased's body will be released and transported to a funeral home and whether an autopsy will be performed. If you do not know the answer to a question, don't be afraid to say so. Offer to get back with the survivor when more information is available, and be sure to follow through.

10. There are a few consoling words that survivors find helpful. However, it is always appropriate to say, "I am sorry this happened."

11. Remember: Your presence and compassion are the most important resources you bring to a notification. Accept the survivor's emotions and your own. Never try to "talk survivors out of their grief" or offer false hope.

12. Give the survivors of a death, helpful guidance and direction. Offer to call a friend or family member who may come to support the survivor. You may need to remain until the support person arrives.

13. If applicable, inform the person/survivor the location of the victim/deceased's body. Explain the condition of the deceased's body and any restrictions that may apply such as forensic concerns. If appropriate, explain that an autopsy will be done.

14. In cases of death, viewing the deceased's body should be the survivor's choice. Providing accurate information in advance will help a survivor make that decision. Some survivors will choose to see the body immediately, and this should be allowed if possible. Denying access to see the body is not an act of kindness.

15. Provide any other information that may be helpful.

16. Review the document entitled "In Person, In Time/Recommended Procedures for Death Notification" which is included with this procedure in all hard copies of the Operations Manual.

17. If unable to contact the individual:

    A. Check back periodically throughout the shift.

    B. If contact could not be made, relay the information to the relieving shift.

    C. If notification is impossible due to the individual having moved, etc., notify the person who received the request.





## Evansville Police Department
## Operational Guideline

**PRELIMINARY INVESTIGATIONS**

**OG 139.00**                                                                 **Page 1 of 3**
**Effective:  08-13-99**              **Order Numbers: 99-O-53**
**Reviewed: 08-02-12**
**CALEA Standards: 1.2.3, 42.1.4, and 42.2.1**

**Table of Contents**

Related Directives – Page 1
Purpose – Page 1
Policy – Page 1
Patrol Officer's Responsibility – Page 1
When to Call for Assistance from an Investigator – Page 2
Use of Force – Page 3
Supervisor's Responsibility – Page 3

**Related Directives**

OG 140.00 - Follow-up Investigations
OG 359.00 - Use of Force

**Purpose**

The purpose of this policy is to ensure the efficient and effective management of the criminal investigation function by providing the responsibilities and investigative process within the patrol and investigation sections.

**Policy**

Patrol officers are usually the first officers at the scene of a crime. This procedure describes the Patrol officer's responsibilities when responding to and conducting the preliminary investigation of a crime. It lists those crimes where the Patrol Officer will call for an investigator from the Criminal Investigations Section. It also lists the field supervisor's responsibilities.

**Patrol Officer's Responsibility**

1.      Patrol officers dispatched on a criminal complaint run are responsible for conducting the preliminary (initial) investigation and for assigned follow-up investigations.

2.      Steps in the preliminary investigation include:

A.     Obtaining needed medical or other emergency assistance.

B.     Observing all conditions, events and remarks.

C.      Maintaining the crime scene and protecting evidence.

D.     Arranging for the collection of evidence.

E.     Interviewing the victim/complainant.

F.     Locating all available possible witnesses.

     (1)     Identifying them by name, address, and phone number.

     (2)     Taking brief verbal statements.

G.     Interviewing the suspect.

H.     Arresting the perpetrator if possible.

I.     Reporting the incident fully and accurately.

J.     Maintaining a log at major crime scenes (recording names of persons entering the crime scene).

**When to Call for Assistance from an Investigator**

Patrol officers, when responding to calls involving the following crimes, will complete a preliminary investigation and any other applicable reports and call for the assistance of an investigator from the appropriate investigative unit. Patrol officers are responsible for safeguarding the crime scene pending the arrival of investigative officers and/or Crime Scene technicians.

1.     Any death investigation

2.     Rape and sexual assault

3.     Armed robbery

4.     Kidnapping

5.     Safe burglary

6.     Child abandonment

7.      Any loss in excess of $3,000

8.      Any major crime that demands immediate follow-up

9.      Any felony where the officer feels that an immediate investigation is called for:

      A.      Where evidence may be destroyed

      B.      Where witnesses may be hard to locate later

      C.      Where the offense or incident is of an unusual nature

10.      When assistance from an investigator is required, the officer will hold all witnesses at the scene for the investigator to interview.

**Use of Force**

For preliminary investigations into the use of force by police officers in the line of duty, refer to OG 359.00.

**Supervisor's Responsibility**

The preliminary investigation also requires that the field officer's supervisor be responsible for:

1.      Ensuring that each officer is adequately trained and motivated to conduct a complete investigation.

2.      Making available those tools and resources necessary to conduct a meaningful investigation.

3.      Providing field assistance in those cases where additional personnel are needed to complete the investigation.

4.      Allowing adequate time for the officer to do a thorough investigation.

5.      Recommending whether or not a follow-up investigation should be conducted.

6.      Reviewing each officer's report for completeness and compliance with established procedures.



# Evansville Police Department
# Operational Guideline



**FOLLOW-UP INVESTIGATIONS**

**OG 140.00**                                                                                        **Page 1 of 3**
**Effective:  08-13-99                    Order Numbers: 99-O-54**
**Reviewed: 08-02-12**
**CALEA Standards: 1.2.3, 42.1.2, 42.1.4, and 42.2.2**

**Table of Contents**

Related Directives – Page 1
Responsibility for Follow-Up Investigations – Page 1
Criteria Used in Determining Cases to be Followed Up – Page 1
Steps in Follow-Up Investigations – Page 2
Second Contact in Investigations – Page 2

**Related Directives**

OG 120.00 - Indication of Case Investigations
OG 139.00 - Preliminary Investigations
OG 348.00 - Victim/Witness Assistance
OG 500.00 - Initial Case Report/Misdemeanor Offenses

**Responsibility for Follow-Up Investigations**

Normally, the Patrol Section is responsible for following up on misdemeanor offenses and the
Criminal Investigations Section is responsible for following up on felonies.

**Criteria Used in Determining Cases to be Followed Up**

1.      The decision whether to follow up on an offense, the extent of the follow-up and the
        resources to be allotted is made at supervisory level. Each case is reviewed (screened) by
        a supervisor who, using documented experiences of the department, makes a decision
        based on the following criteria:

        A.      Solvability factors

        B.      Reviewing the narrative of the offense

        C.      Degree of seriousness factor

2.      When the decision is made to follow up on a specific case, the supervisor will designate a
        single person to be the principal investigator or case coordinator for that case. This

guideline does not preclude the assignment of more than one person to an investigation but is designed to place accountability for each case.

**Steps in Follow-Up Investigations**

The following steps should be used only in the event they are found to be necessary. For example, every follow-up investigation may not include a search. These steps are intended as a guide.

1.    Review and analyze all previous reports prepared in the preliminary investigation.

2.    Conduct additional interviews and interrogations.

3.    Review departmental records.

4.    Identify and apprehend suspects.

5.    Collect physical evidence.

6.    Determine involvement of suspects in other crimes.

7.    Check suspects' criminal histories.

8.    Seek additional information (from other officers, informants, etc.).

9.    Review results from laboratory examinations.

10.    Arrange for dissemination of information as appropriate.

11.    Plan, organize and conduct searches.

12.    Prepare cases for court presentation.

13.    Assist in prosecution.

**Second Contact in Investigations**

Members of the Criminal Investigations Section are responsible for making a second contact in cases requiring follow-up investigations by CID. Contacting a victim, complainant, or witness for a second time, after the lapse of several days, may result in the receipt of information leading to the clearance of a case. A second contact is also valuable in building public confidence in the department as well as indicating that officers are genuinely concerned about the welfare of the victim and other citizens associated with the case.

1.      The second contact with the victim or complainant is made before final disposition of a case is made.

2.      Phone or personal contact makes second contact.

3.      A supplementary report of findings specifies the results of the second contact.



# Evansville Police Department
# Operational Guideline



## REQUESTING ASSISTANCE FROM AN ADULT INVESTIGATOR

**OG 145.03**                                                                        **Page 1 of 2**
**Effective: 02-14-02**             **Order Numbers: 02-O-14**
**Reviewed: 08-03-12**
**CALEA Standards: N/A**

**Related Directives**

OG 145.00 – Requesting Assistance from the Organized Crime Section
OG 145.02 – Requesting Assistance from the Crime Scene Unit

**Policy**

An officer may request the assistance of an adult investigator from the Property Crimes or Violent Crimes Sections, as applicable, when he determines a need for such assistance. He should notify Central Dispatch when the assistance of an investigator is needed, and advise the nature and location of the need.

**When an Investigator Should be Called**

1.      Deaths

     A.      Any death reported to the department

     B.      Fatal and potentially fatal traffic accidents

2.      Robberies (including purse snatches)

3.       Criminal confinement

4.      Burglaries (residential and non-residential)

     A.      Where there is a definite suspect

     B.      Where there is a significant MO

     C.      Where there is a significant property loss

5.      Shootings (all shootings including self-inflicted ones)

**REQUESTING ASSISTANCE FROM AN ADULT**

OG 145.03                 **INVESTIGATOR**                 **Page 2 of 2**

6.     Battery where the injury is serious enough to constitute a felony

7.     Any felony that would normally be handled by the Violent Crimes or Property Crime Sections where the officer making the initial run has completed the basic steps in the case management system and determines that there may be additional leads, which need immediate follow-up by an investigator. This includes any follow up which would be impossible or difficult for the initial officer to follow up on such as witnesses being difficult to locate later, unusual circumstances surrounding the offense, an on-scene felony arrest has been made, etc.



# Evansville Police Department
## Operational Guideline



## HANDLING, TRANSPORTING AND BOOKING PRISONERS

**OG 153.00**
**Effective:  08-01-05**          **Order Numbers: 11-O-14**
**Reviewed: 08-06-12**
**CALEA Standards: 1.2.5, 70.1.1, 70.1.2, 70.1.3, 70.1.4, 70.1.5, 70.1.6, 70.1.7, 70.1.8, 70.2.1, 70.3.1, 70.3.2, 71.1.1 and 71.5.1**

**Table of Contents**

Related Directives – Page 1
Policy – Page 1
Definition – Page 1
General Rules – Page 2
Handcuffing and Searching the Prisoner – Page 2
Transporting the Prisoner – Page 3
Booking the Prisoner – Page 4
Paperwork Connected With Arrest – Page 5
Prisoners in the Temporary Detention Cell – Page 6
Prisoners Sprayed With O.C. Spray – Page 6
Acceptance by VCCC Personnel – Page 6
Searching the Vehicle – Page 6
Exceptions to Procedure – Page 7
Juvenile Processing – Page 7

**Related Directives**

SOG 153.02 – Injured, Ill, and Disabled Prisoners
SOG 125.04 – Juvenile Operations

**Policy**

Officers will employ extreme caution and vigilance when transporting prisoners.  They will exercise care to protect themselves as well as their prisoners from physical harm.  A prisoner's safety is the responsibility of the transporting officers.  For ill or injured prisoners, refer to SOG 153.02

**Definition**

**POSITIONAL ASPHYXIA** is most simply defined as death that occurs because the POSITION of a person's body interferes with respiration (breathing), and the person cannot get OUT of that

position. Death occurs due to the person's inability to BREATHE anymore. ANY body position that obstructs the AIRWAY, *OR* that interferes with the muscular or MECHANICAL MEANS of getting air into and out of the body (the body's "BELLOWS" function) will result in a positional asphyxia death, if the person cannot get out of it.

**General Rules**

1.  Constantly observe prisoners until they are placed in a secure area. Normally, no stops will be made while transporting a prisoner to be booked.  Only when the risk to a third party is both clear and grave and the risk to the prisoner is minimal should an officer stop to render assistance.

2.  When transporting someone of the opposite sex, make necessary modifications in the handling of such prisoners.

3.  Utilize the patrol wagon for transporting prisoners when available.

4.  Safety of the prisoner and transporting officer dictates that a prisoner's right to communicate with attorneys or others will not be exercised while the prisoner is being transported.

5.  If a prisoner is sick or injured and must be taken to a hospital by ambulance, an officer will ride in the ambulance with the prisoner if he is violent.  In cases of nonviolent prisoners, the arresting officers will follow the ambulance to the hospital (see SOG 153.02).

6.  When an officer observes or has reason to believe that a prisoner has ingested a controlled substance or other hazardous material, he will ensure that the prisoner is taken to a hospital emergency room for medical evaluation.

7.  Note the arrest and time on the Daily Activity Log.

**Handcuffing and Searching the Prisoner**

1.  Handcuff all prisoners with their hands behind their backs unless you deem such action unnecessary because of the prisoner's age or infirmity. The position of the subject handcuffed should be monitored to prevent Positional Asphyxia.  Double lock the handcuffs.  All prisoners are transported only when restrained in this manner.  A prisoner will not be handcuffed to a fixed object in a public place or handcuffed with hands in front and arms intertwining with another subject. Restraint chairs or benches should be used for combative or resistive prisoners. <70.2.1, 71.3.2>

2.  Search prisoners thoroughly at the arrest scene and prior to transporting.

3.  If convenient, steps should be taken to ensure that prisoners are searched by an officer of the same sex. In the case of a male officer arresting a female suspect, remove her purse

and any jacket or coat from reach.  If a female officer is not present at the scene, the male officer should do check of the prisoner's pockets, belt area, shoes, and socks for any items of concern. This check is to be limited to areas that are easily accessible to a handcuffed prisoner. The same policy will apply to a female officer conducting a search of a male prisoner.

4.      Thoroughly search the arrest scene for weapons and evidence left behind by the prisoner.

**Transporting the Prisoner**

1.      Utilize the patrol wagon if available or utilize other available units when more than one prisoner is being transported.

2.      When transporting in a police car, place the prisoner in the back seat on the passenger's side away from the driver. Prisoners should be seat belted in when being transported in a police car.

3.      The interior overhead rear light is left on when transporting a prisoner of the opposite sex unless the officers believe that leaving the light on would be unwise under the circumstances.

4.      Male and female prisoners are not transported together unless they are married except under extenuating circumstances.

5.      A two-officer unit will transport prisoners when possible.

6.      A unit will transport only one prisoner unless extenuating circumstances make this impossible.

7.      Upon leaving the arrest scene, notify the dispatcher that you will be in route to Headquarters or the VCCC. If transporting a prisoner of the opposite sex, state mileage and location over the radio and request a time check.  Note this information on the Daily Activity Log.

8.      Notify the dispatcher upon arrival at Headquarters or the VCCC.  If transporting a prisoner of the opposite sex, state mileage over the radio and request a time check.  Note this information on the Daily Activity Log.

9.      Park as close as possible to the security garage entrance if arriving at Headquarters. If arriving at the VCCC, pull up to the intercom box located at the south end of the VCCC complex and push the button. When asked announce the number of prisoners, sex, condition and if they are combative or cooperative.

10.     When male officers transport a female prisoner to the VCCC booking lobby, request a female deputy or corrections officer to assist in the booking process.  If a female deputy or

SOG 153.00    HANDLING, TRANSPORTING AND BOOKING PRISONERS    Page 4 of 7

corrections officer is unavailable, a female police officer will be called in the below-listed order upon availability.  This request for female officer assistance should be handled immediately unless there are extenuating circumstances.  (In cases where female officers transport male prisoners to the booking lobby, a male officer will be called to assist in the booking process.)

    A.      Patrol Section

    B.      Violent Crimes Section

    C.      Organized Crime Section

11.    After parking in the secured sallyport of the VCCC, officers will remove and secure their firearms before entering the VCCC at the designated lockers or officer's vehicle.

12.    Remove the prisoner from the vehicle while maintaining physical control of prisoner.

13.    If the prisoner should manage to escape, do the following:

    A.      Pursue the prisoner, attempting to apprehend him.

    B.      Immediately notify Central Dispatch, requesting additional units to assist and a BOL be broadcast.

    C.      Notify a supervisor and Criminal Investigations.

    D.      When conditions permit, complete a *Case Report* and required *Supplementary Reports*.

    E.      File additional charge of escape against the prisoner.

    F.      If not apprehended, obtain an arrest warrant.

**Booking the Prisoner**

1.    Upon arrival at the VCCC booking lobby, do not remove the prisoner's handcuffs until he either: has to sign for his property, is fingerprinted, or in the case of unruly or uncooperative prisoner is searched and placed in the secured section of the booking area.  This policy ensures the safety of prisoners, Police Department and VCCC Intake personnel during the booking procedure.

2.    Male and female prisoners will not be placed together in the secured section of the booking area.

SOG 153.00     HANDLING, TRANSPORTING AND BOOKING PRISONERS     Page 5 of 7

3.      At least one officer will remain with the prisoner during the entire booking procedure.

4.      A semi-strip search of the prisoner will be conducted prior to booking.

      A.      Remove the prisoner's coat or jacket and search it for items in the pockets or hidden in the lining.

      B.      Remove the prisoner's shoes and search them.

      C.      Remove the prisoner's belt and check belt buckle.

      D.      Turn all pockets inside out.

      E.      Check the prisoner's hair for hidden items.

      F.      Check all clothing, purses, handbags, etc. thoroughly.

5.      To further insure that the prisoner is not concealing any metal weapons or other metal objects on his person, the hand-held metal detector which is maintained at the booking station will be passed over the prisoner's body and clothing.

6.      Do not remove any medical alert necklace or bracelet that the prisoner may be wearing.  It is the policy of the VCCC that medical alert necklaces and bracelets are left on the prisoner. The staff and medical personnel of the VCCC will make the determination as to whether or not the *medical alert identifier* needs to be removed or left with the prisoner.

7.      When additional prisoners are waiting in the booking area to be booked they will be placed in holding cells.

8.      After completing the booking procedure VCCC personnel will take custody of the prisoner.

**Paperwork Connected With Arrest**

1.      Do whatever paperwork is necessary to get the prisoner processed including but not limited to the booking sheet and property inventory prior to being brought in the VCCC to be booked.

2.      *Case Reports, Affidavits* and other documents will be completed prior to leaving the VCCC.

      A.      The exception would be when Detectives at another location will be completing the Affidavit.

3.      After the Intake Officer processes the medical information, the arresting officer shall do a "pat down" search of the prisoner in front of the Intake Officer. The Intake Officer will then

**SOG 153.00    HANDLING, TRANSPORTING AND BOOKING PRISONERS    Page 6 of 7**

again do a "pat down" search of the prisoner prior to taking control of the prisoner.

4.    VCCC intake officer will book all prisoners by taking the required fingerprints and photographs.

5.    Juveniles shall be fingerprinted and photographed per SOG 125.04 at Central Records.

**Prisoners in the Temporary Detention Cell**

Officers are not required to remain in continuous physical contact with prisoners.  Prisoners can be monitored via the audio/video cameras from the VCCC Central Control. Officers are responsible for the prisoner until he is properly accepted by a VCCC official.  Officers must ensure that a prisoner is not injured by another prisoner or by himself

**Prisoners Sprayed With O.C. Spray**

When a prisoner has been sprayed with O.C. spray during an arrest:

1.    He needs to receive medical attention when applicable.

2.    He always needs to be allowed to wash up and cleanse the spray from his face and eyes.

3.    The arresting officer will note the time that the prisoner was allowed to wash up.

4.    VCCC personnel accepting the prisoner will be advised as to what time the prisoner was allowed to wash up.  (They are required to watch any sprayed prisoner for 45 minutes after being allowed to wash up to ensure there are no complications from the spray.  They need to know if the prisoner had any medical difficulty as a result of being sprayed and if he has received any professional medical attention as a result of the spray.)

**Acceptance by VCCC Personnel**

1.    When VCCC personnel accept the prisoner, they will be advised if there had been any problems with the prisoner or not, had been pepper sprayed, received medical attention, or any other pertinent information they might need to know about the prisoner such as being an unusual security risk.

2.    The emergency room staff at local hospitals uses the *Prisoner Clearance* form when medically clearing a prisoner to be admitted to the VCCC.  The VCCC will not accept prisoners who do not have a patient label from the hospital on the *Prisoner Clearance* form provided to local hospitals by Vanderburgh County Detention Center Medical Section.

**Searching the Vehicle**

Before transporting a prisoner and before going back into service after a transport, search the area of

**SOG 153.00   HANDLING, TRANSPORTING AND BOOKING PRISONERS   Page 7 of 7**

the vehicle where the prisoner is placed.  Vehicles used for transporting prisoners will be examined at the beginning of each shift for any possible weapons or contraband discarded by a prisoner.

**Exceptions to Procedure**

Exceptions to this procedure will be supervised by an officer holding the rank of sergeant or higher.

**Juvenile Processing**

Any juvenile required being photographed and fingerprinted will be taken to Central Records processing area.

1.    The juvenile will be in constant supervision by an officer.

2.    Officers will remove and secure their weapons before entering the processing area.

3.    Male and Female juveniles will not be brought to the processing room together.

4.    Portable radio emergency button will be used for emergencies if assistance is needed.

5.    The processing room outer doors to the workroom will remain locked to prevent escaping.



# Evansville Police Department
# Operational Guideline



## INJURED, ILL AND DISABLED PRISONERS

**OG 153.02**                                                            **Page 1 of 4**
**Effective: 07-23-01**                **Order Numbers: 17-O-16**
**Reviewed: 04-28-17**
**CALEA Standards: 1.2.5, 70.3.1, and 70.3.2**

**Table of Contents**
Related Directives - Page 1
Summary - Page 1
Policy - Page 1
When to Take a Prisoner to a Hospital - Page 1
Identification Tag/Card - Page 2
Use of Restraining Devices - Page 2
Transporting Injured / Ill / Disabled Prisoners - Page 2
Guidelines while at the Hospital - Page 3
DWI Arrests - Page 4
Sheriff's Department's Responsibility - Page 4

**Related Directives**
OG 153.00 - Transporting Prisoners

**Summary**

This procedure establishes guidelines for handling offenders who have been arrested and due to injury, sickness, or drunkenness the arresting officer has the offender transported to a hospital. If a prisoner becomes sick or is injured incidental to an arrest, the arresting officer should seek medical attention at that time if at all possible. The prisoner should either be taken to the hospital emergency room for treatment or an ambulance called as the circumstance dictates.

**When to Take a Prisoner to a Hospital**

1. Anyone taken into custody for subsequent incarceration in the Vanderburgh County Jail who has, or displays any of the following medical or health problems, MUST be taken to a hospital emergency room PRIOR to being booked:

    A. Unconscious, in a coma, cannot be roused

    B. Obvious (or even suspected) serious head wound, i.e., large bump, excessive swelling about face and head, bleeding from ears, unequal pupils, uncontrollable bleeding

    C. Gaping, profusely bleeding wound, (needs stitching, special   bandaging, etc.)

    D.       Obvious broken limb

    E.       When an officer observes or has reason to believe that a prisoner has ingested a controlled substance or other hazardous material

    F.       Any other obvious or suspected indication that subject requires emergency medical or MENTAL treatment/diagnosis

2.       If there is any question or doubt as to whether the arrested person needs emergency medical treatment, notify the jail sergeant immediately upon entering the booking lobby of your need for a medical analysis.  In most cases a jail officer will assist in that determination before the booking procedure is completed. If not, it remains the responsibility of the jail personnel to do this as soon as possible, which will greatly expedite officers returning to duty.

**Identification Tag/Card**

Any person carrying an identification tag or card that indicates an unusual illness or medical problem, i.e., communicable disease, epilepsy, subject to seizures, diabetic, etc., does create a different problem. Its vitally important that this information is given to jail personnel as soon as possible.

**Use of Restraining Devices**

Officers should use discretion in using restraining devices on injured, ill or disabled prisoners.  Some may not require any type of restraint. Others such as mentally disturbed prisoners may require extensive restraining to protect themselves as well as the officers. Care should be taken to prevent restraining devices from further injuring prisoners.

**Transporting Injured / Ill / Disabled Prisoners**

Appropriate security precautions will be taken when transporting prisoners to medical care facilities. Sick, injured and mental health prisoners will be transported via ambulance for treatment and diagnosis prior to confinement.

When transporting a prisoner in an ambulance, an officer should accompany the prisoner if there is reason to believe the prisoner may be a danger to himself or medical personnel. The safety of the detainee and the transporting officer requires due care when transporting disabled detainees. The VCCC should be contacted prior to transportation to verify the acceptance of the prisoner and for special arrangements to be made.

Physically and mentally disabled detainees present conditions for their transport that dictate special care and attention. If non-ambulatory prisoners that are obese or those requiring wheelchairs, crutches, prosthetic appliances or other disabilities that cannot be transported safely in a squad car or wagon, contact a supervisor to arrange for an alternative method such as the one of the private firms that transports disabled persons.

**Guidelines while at the Hospital**

1.    As long as the offender is in the emergency room area and no decision has been made to admit the offender, the officer or the officer designated by a supervisor will remain with the offender.

2.    If the offender is admitted to the hospital and there is nothing unusual concerning the offender or the arrest and it is not a felony arrest, the offender will at that time be released from custody. A patrol supervisor should decide any questions.

3.    If the offender is admitted to the hospital and is charged with a felony, a patrol supervisor will be called. A decision to guard, get an arrest warrant or contact the Sheriff's Department will be made based on the length of the hospital stay and the type of criminal charges.

   A.    All officers performing prisoner security shall be armed and in full uniform. The officer shall maintain a position relative to the prisoner that permits continuous observation.  The officer will remain with the prisoner during examination and emergency treatment unless doing so would hinder treatment. If there is a need for relief, a patrol supervisor should be contacted.

   B.    Considerations on restraints about being removed for treatment, degree of risk to hospital personnel and monitoring all contacts with the prisoner should be understood.

   C.    Any relevant information regarding the prisoner shall be recorded on a standardized "Hospitalized Prisoner Log" form (for tracking visitors, phone calls, etc.) during each shift, for the duration of the prisoner's hospital stay. This log will document any unusual occurrences that take place on any given shift. This log will stay with the officer in the room and will be passed on when the officer is properly relieved. No personal or prisoner medical information should be documented on this form.

   D.    Any officer that may be assigned the task of guarding prisoners while at the hospital should carry the "Hospitalized Prisoner Log" form with them. The forms is located in the EPD Documents Folder. The form shall be returned to EPD Records for scanning into the prisoner's name file once released.

   E.    Prior to the prisoner getting visitation privileges, the Criminal Investigations Commander needs to be contacted for approval.  Prisoners who are in the hospital for more than five (5) days may be eligible to one visitor at a time for 30 minutes, no more than three (3) times a week (Monday through Sunday). These visits will be documented on the "Hospitalized Prisoner Log" so that officers can ensure the number of visitations has not been exceeded.

   F.    If visitation is granted, then visitors shall not be allowed to bring personal items into the room. The visitor will be subject to a cursory search (pat down) to insure the officer's safety. The visitor must possess a valid identification card. This identification card will be shown to the officer prior to the visit.

G.    Prisoners that are classified as High Risk Prisoners shall not be allowed visitation privileges. Exceptions to this policy are permitted only with prior approval from the Patrol Shift Commander or Criminal Investigations Commander. Examples of exceptions can include, but are not limited to: the prisoner is hospitalized for 30 days or longer or the prisoner's attorney or clergy requests a visit.

H.    The patrol supervisor shall be notified of any exception to the visitation policy so that extra security precautions can be implemented.

I.    Prior to the prisoner getting phone privileges, the Criminal Investigations Commander needs to be contacted for approval.  If approved, prisoners will be allowed ten (10) minutes of telephone use per day. This time will be documented on the "Hospitalized Prisoner Log". The prisoner will only be allowed access to a landline hospital phone to place local calls and may receive a long distance phone call if it fits into the allotted ten (10) minute time.  Prisoners will not be allowed the use of a cell phone.  Cell phones will not be permitted into the hospital room by visitors.

J.    Prisoners are prohibited from receiving any items other than medication or food provided by hospital staff.  Any mail that the prisoner receives while at the hospital will be held.

4.    If the offender is intoxicated (including DWI) and he is not being admitted under a voluntary detox program, an officer should remain at the hospital with him until he is released or is considered no longer intoxicated. The City may be liable for the actions of an offender if he is released from a hospital while still in an intoxicated state.

5.    Do not ask hospital personnel to call the department when the offender is released. Once an offender is released from our custody, he should not be rearrested without a warrant or summons.

6.    The officer, at the time of release, will make a case report and the necessary supplements and process the case through the Prosecutor's Office with a request for a warrant or summons.

## DWI Arrests

1.    In DWI cases, the officer will take the driver's license of the arrested offender and process the case as directed by OG 109.00.  The officer can either write a ticket or request a summons be issued.

2.    In DWI cases, a request should always be made to have the court order the offender to go through the booking process including mugging and printing.

3.    As in any case involving intoxication, an officer will remain with the offender until he is no longer intoxicated.

## Sheriff's Department's Responsibility

The sheriff's department's responsibility begins when jail personnel take physical custody of the prisoner



# Evansville Police Department
# Operational Guideline



### HANDLING THE STREET DRUNK

**OG 172.00**                                                                    **Page 1 of 2**
**Effective:  09-14-00**                          **Order Numbers: 00-0-57**
**Reviewed: 08-08-12**
**CALEA Standards: <u>N/A</u>**

**Related Directives**

OG 104.00 - Arrests
OG 136.00 - Domestic Violence/Disturbance Calls
OG 153.00 - Handling and Transporting Prisoners

**Summary**

This procedure establishes guidelines for an officer to follow when handling an intoxicated person in a public place.  It lists the options, which the officer has.

**Choosing the Best Option**

An officer has several options in handling the street drunk.  He will choose the option, which, in his opinion, best fits the situation at hand.

**Guidelines**

1.      If the intoxicated individual is not injured and is not in a combative state, the officer may opt to:

      A.      Take him home or release him to the custody of a sober friend or relative.  (NOTE: Insure that all personal property, such as automobiles or other valuables are safeguarded.)

      B.      Take him to a detox center.  If the intoxicated person volunteers to admit himself to an alcoholic recovery program, have him transported to one of the local alcoholic treatment centers (see OG 136.00 under "Social Agencies" for detox center locations).  If he refuses to enter the treatment center after arrival, remove him from the premises and take whatever further action is deemed appropriate, i.e., release to a sober friend or relative or place in jail.

   C.  In all cases, the arresting officer reserves the right to jail the intoxicated person.

2.  If the intoxicated person is injured or ill:

   A.  Have him transported by ambulance to a hospital for treatment.

   B.  Emergency treatment is required in all cases of:

     (1)  Stoppage of breathing

     (2)  Severe bleeding

     (3)  Unconsciousness

     (4)  Any other condition which, in the judgment of the officer, presents a serious and immediate health threat

   C.  Illnesses, such as diabetes, hypertension and epilepsy sometimes cause symptoms of acute intoxication.  Remain alert to the possibility of illness-induced symptoms of intoxication.

   D.  If there is any question concerning a person's condition, have him transported to a hospital for medical attention.

3.  If the intoxicated person is disorderly, abusive or combative handle him at your discretion under the normal arrest procedure (OG 104.00).



# Evansville Police Department
# Operational Guideline



## SUPERVISORY REVIEW OF REPORTS

**OG 180.00**                                                                                          **Page 1 of 2**
**Effective:  10-04-02                    Order Numbers: 02-0-61**
**Reviewed: 08-08-12**
**CALEA Standards: N/A**

**Table of Contents**

Related Directives – Page 1
Policy – Page 1
Guidelines – Page 1
Reviewing Computer-Generated Reports via INCNENT – Page 2

**Related Directives**

Memorandum 02-MEM-64

**Policy**

1.  **It is the responsibility of a member's immediate supervisor to review all Initial Case, Supplementary, Incident, and Accident Reports generated by that member.**  This review entails that the supervisor ensures that the report is complete, accurate, and correctly filled out.  The supervisor will have the member make any necessary corrections before forwarding the report on.  Any uncorrected errors found in the report after supervisory review will be determined to be the failure of the supervisor in not properly reviewing the report in question.

2.  If a supervisor is unavailable for review, the unit commander may review the report in place of the supervisor.

**Guidelines**

1.  Members will submit reports to their supervisors for review prior to forwarding them on.

2.  The supervisor will review all reports for:

     A.    Completeness

     B.    Accuracy

     C.    Acceptability

     D.    Clarity

      E.      Neatness

      F.      Compliance with standard operating procedures

          (1)     Printed with a black-ink ballpoint pen or typed.

          (2)     Used upper and lower case letters as appropriate.

          (3)     The OG guidelines dealing with the specific type of report were followed.

3.      The supervisor will indicate approval of acceptable reports.

      A.      In the case of Initial Case Reports, the supervisor will sign and date the report at the appropriate place.

      B.      In reports, which do not have a specific block or line for the supervisor's signature or initials, the supervisor will initial the report in the lower left-hand corner.

4.      The supervisor will ensure that acceptable reports are forwarded to:

      A.      The Central Records Unit* and/or

      B.      Any other unit the report is supposed to go to.

          *Note: Reports forwarded to Records will not be left on the counter but placed in a special basket located at the side door (in the secured area hallway) of the Record Room or hand delivered to a Records employee.

5.      The supervisor will return any incomplete, inaccurate, or unacceptable report to the originating member for correction.  The report must be corrected and resubmitted prior to the end of the tour of duty of the member unless extenuating circumstances such as the unavailability of essential information would prevent the report's completion.

**Reviewing Computer-Generated Reports via INCNENT**

By using INCNENT, officers may complete their paperwork and compile it into the computer's RECORD MANAGEMENT SYSTEM (RMS).  Using that system to transfer reports to supervisors, supervisors can then review and approve the material via computer using the ICN option.  ICNLOG will display all reports entered and not yet approved.  The officer's name, badge number, and date the report was filed are listed on this display.  Using ICNENT, the supervisor must receive the report (RV) and then approve it (AP) before it can become an official part of the record.



# Evansville Police Department
# Operational Guideline



**MENTAL ILLNESS AND COMMITMENT PAPERS**

**OG 184.00**
**Effective:  08-29-05**              **Order Numbers: 15-O-15**
**Reviewed: 09-17-15**
**CALEA Standards: 41.2.7, 74.1.1**

**Index**

Purpose – Page 1
Policy – Page 1
Summary – Page 1
Statutory Authority – Page 2
Emergency Detention of the Mentally Ill – Page 2
CIT Arrest of the Mentally Ill – Page 3
Dealing with Mentally Ill Persons – Page 4
Immunity Provision – Page 5
Serving Commitment Papers - Page 5
Training in Dealing with Mentally Ill Persons – Page 7

**Purpose**

It is the purpose of this procedure to provide officers with information on the symptoms and effects of mental illness so that they may better recognize and deal with such persons in enforcement and related capacities.

**Policy**

Persons afflicted with mental illness are limited in their ability to effectively communicate, interact with others, and make reasoned decisions on their own. This can make interactions with such persons difficult in enforcement and other encounters and may result in inappropriate or counterproductive police actions if officers are not prepared to recognize and deal with symptomatic behaviors and reactions of such persons. The number of persons afflicted with such illness is increasing dramatically in the United States. Therefore, it is the policy of the Evansville Police Department that officers understand the symptomatic behavior of such persons and be prepared to deal with them in a manner that will best serve their needs and this department's law enforcement mission.

**Summary**

This procedure lists the statutory authority and provides guidelines for officers to detain mentally ill persons, who are a danger either to themselves or to others, and to transport and admit these

persons to a mental health facility.

There will be established in Central Records a computer file to house a record of court-ordered commitment papers served by the Evansville Police Department.  This file will be entitled the "Commitment Papers File."

All court-appointed commitment papers received by any office or unit within the police department will be submitted to Central Records for processing prior to service.

No exception contained in the Commitment Papers File will be revealed to any non-criminal justice agency, agent or individual that is not directly assigned to a law enforcement agency.

No information contained in the Commitment Papers File will be used by any agent or individual of any law enforcement agency in any manner whatsoever, except as provided by Statute or State or Federal regulations.

**Statutory Authority**

1.     IC 12-26-4-1 gives a police officer the authority to apprehend and transport to the nearest appropriate facility a person who the officer has reasonable grounds to believe is mentally ill, dangerous to himself or others, and in immediate need of hospitalization and treatment. If appropriate, the person may be charged with an offense.

2.     Under this statute, the officer must submit a written statement containing the basis for his conclusion that reasonable grounds exist for the apprehension and hospitalization of the person.  The person will be sent to the appropriate medical facility for an evaluation, which has a form to complete which takes the place of the written statement required by the statute.

**Emergency Detention of the Mentally Ill**

In order to comply with the preceding statute, members of the department will follow the following guidelines.

1.     When an officer encounters a situation in which a suspected mentally ill person is involved, he will notify Central Dispatch, who will dispatch a field supervisor to the scene.  If there is no supervisor available, a field commander will be sent.

2.     Reasonable grounds to suspect that someone is suffering from mental illness can be based on erratic behavior, delusions, actions that are a danger to others or himself/herself, a history of mental health problems, information from family and/or friends, or other sources of information.

3.     During interviews/interrogations, officers will observe for signs of mental illness and follow the guidelines of this procedure if mental illness is suspected.

4.     As soon as possible prior to taking a suspected mentally ill person into custody, the officer will contact the on duty care team professional at the medical facility and advise the on- duty care team professional of the person's symptoms.  If the person is in the presence of a relative, friend, etc., the officer should have that person explain the symptoms to the care team professional.

The care team professional will then advise the officer if they feel the suspected mentally ill person should be taken into custody.  However, it is within the officer's discretion to take or not take the individual into custody.  The officer should also solicit advice from the care team professional on how to handle the mentally ill person.

5.      Once a determination is made to take the person into custody, the officer should have the suspected mentally ill person and the relative, friend, etc. (if such person is present) transported to the medical facility. The mentally ill person will be transported in an ambulance accompanied by an officer whenever possible.  The individual who may sign the form can be transported by the officers or furnish his own transportation.  Upon arrival, the officer should have the relative, friend, etc. (if such person is present) complete and sign the first section of the committal form furnished by the medical facility representative.

6.      After the form has been signed, the person signing is advised by the officer to take the form to a Judge of the County Court for his signature.  The County Courts are open 8:00 a.m. – 4:00 p.m. Monday through Friday except on holidays.  When the Court is closed, the medical facility representative will use a pre-signed form that has been furnished by the Court.

7.      The transporting officers will stand by at the hospital until an evaluation is made.  After the evaluation is made, officers will escort the person to the medical facility and/or accompany the ambulance transporting the mentally ill person to the medical facility. In some instances a doctor, after consultation with the medical facility, may authorize a direct admittance to the medical facility, without the mentally ill person being transported to the Hospital Emergency Room.

8.      If an incident occurs where no one but the officer and the suspected mentally ill person are present, the officer should follow the same procedures as outlined in the above paragraphs with the exception that the officer will complete the first section of the form as applicant. In this regard, it is important to note that the applicant must believe the person is mentally ill, dangerous, and in need of immediate restraint.

9.      When an officer encounters a suspected mentally ill person or a subject expressing the intent to harm self or others, the officer **WILL** complete an incident report regardless of whether or not the subject wishes to submit to a voluntary evaluation or the officer is detaining the subject.      The subject **VOLUNTEERING** to be evaluated may be transported to Deaconess Hospital Emergency Room (600 Mary St.) or St. Mary's Hospital (East Side Campus). The officer will contact the on duty mental health professional at the appropriate hospital and advise them that a subject wanting to be evaluated will be arriving at the hospital and/or escort the ambulance/vehicle to the appropriate Hospital.   All officer initiated detentions or court ordered commitments will go to Deaconess Hospital Emergency Room (600 Mary St.) unless the court ordered commitment papers designates a different location.

**CIT Arrest of the Mentally Ill**

1.      Officers routinely deal with individuals with psychiatric issues who have demonstrated or stated they want to harm themselves or others and may require an evaluation. The following guidelines will be used when making a CIT arrest.

Note: Criminal charges supersede taking an individual to the hospital for an evaluation.

2.      When officers make an arrest, but feel the individual needs an evaluation, do not need to complete a CIT report.  The officer completes all other paperwork and informs VCCC the individual has indicated they want to harm themselves or others.  VCCC will take the appropriate steps to determine if the individual needs to be evaluated prior to release.   The officer's liability ends at the time VCCC was informed of any potential risk.

3.      There are times a CIT report has been completed and an individual is transported to the hospital for an evaluation.  The individual commits a crime while at the hospital and is taken into custody.  VCCC does not need any CIT paperwork that was completed.  Officers need to inform VCCC of the situation and VCCC will take the appropriate steps to determine if the individual still needs an evaluation at the time of release.

4.      CIT paperwork is not needed for an arrest because the individual may no longer be in crisis at the time of release.  VCCC evaluates all prisoners at the time of booking and release to determine if further action is required.

5.      If there is any confusion at the jail in the future, complete the booking process as requested by VCCC and notify your supervisor.
.

**Dealing with Mentally Ill Persons**

Persons suffering from mental illness may become easily upset and engage in self-destructive behavior or become aggressive. Fear, frustration and minor changes in their daily routines and surroundings may trigger such behavior. Officers should take measures to prevent such reactions, deescalating situations involving such persons in the course of taking enforcement and related actions.

1.      Speak calmly and use non-threatening body language, with your hands to your sides. Using a stern, loud command to gain compliance will have no effect or a negative effect.

2.      Keep the commotion down. Eliminate, to the degree possible, loud sounds, bright lights, and other sources of over stimulation. Turn off sirens and flashers. Ask others to move away or, if possible, move the mentally disturbed person to more peaceful surroundings.

3.      Keep animals away. Keep canines in the police vehicle and preferably away from the area. Ensure that other dogs are removed from the area.

4.      Look for personal identification such as medical ID tags.

5.      Prepare for a potentially long encounter. Dealing with such persons cannot be rushed unless it is an emergency situation. De-escalation of the situation, using calming communication techniques, can take time.

6.      Repeat short, direct phases in a calm voice. Use direct and simple language. Gaining eye contact is also important.

7.      Maintain a safe distance.

8. When interrogating a mentally ill person, consult with a mental health professional and the Prosecutor's Office to determine if the person is competent to understand his Miranda rights.

    A. Do not interpret lack of eye contact and strange actions or responses as indications of deceit, deception, or evasion of questions.

    B. Use simple, straightforward questions.

## Immunity Provision

<u>Note</u> IC 12-26-2-6 contains an immunity provision.

**12-26-2-6.    Immunity from liability of persons participating in proceedings.**

(a) A person who without malice, bad faith, or negligence acts according to this article and:

    (1) Participates in proceedings for the detention or commitment of an individual; or

    (2) Assists in the detention, care, and treatment of an individual alleged or adjudge to be mentally ill; is immune from any civil or criminal liability that might otherwise be imposed as a result of the person's actions.

(b) The immunity provided by this section does not permit a person to do either of he following:

    (1) Physically abuse an individual.

    (2) Deprive an individual of a personal or civil right except according to this article.

## Serving Commitment Papers

The purpose of this procedure is threefold:

1. To inform officers of any arrest or commitment record on the person named in the commitment papers prior to making service on these papers and taking the person into custody.

2. To inform officers of any records indicating that the person named in the commitment papers may have a firearm in his possession.

3. To establish and maintain a reference file on persons ordered committed by the courts.

Central Records' Responsibility

1. Upon receipt of court-ordered commitment papers, complete a *Record of Court Ordered Commitment.*

2. Conduct a record search of all fields on the person named in the court-ordered commitment. This search will include.

      A.      Arrest files/fingerprint files

      B.      Offense files

      C.      Handgun license application files

      D.      Gun registration files

      E.      Previous Commitments

3.      A *Record of Court Ordered Commitment* will be made, on which Central Records personnel will indicate any record found, or "no record" in *Record of Court Ordered Commitment.* Central Records personnel will place their initials, ID #, the date in *Record of Court Ordered Commitment* and will make a copy of the commitment papers. The Commitment papers log sheet will then be completed.

4.      Notify the Patrol supervisor (for the sector in which the papers will be served) for service of commitment papers. The Patrol supervisor will pick up the ORIGINAL set of commitment papers at the Records counter.

      Served Commitment Papers

          1.      Upon receiving returned Commitment Papers to Central Records, an alert in RMS under the person's name will have a notation that that court ordered commitment papers has been served.

          2.      Signed commitment papers are then filed in the Served Commitment Papers file cabinet with the logbook.

Patrol Section's Responsibility

1.      The Patrol supervisor will pick up the papers at Central Records counter when notified to do so.

2.      The supervisor will check the time frame to determine if the papers are still valid.  If so, the supervisor will check to see if a bed is available at the facility, which the papers direct the subject to be taken to.  If a bed is available, the supervisor will have a unit meet him.

3.      The supervisor will give the unit the commitment papers and advise the unit of all pertinent details.

4.      The assigned unit will pick up the subject and transport them to the assigned facility with the commitment papers.  The assigned unit will stay at the hospital long enough to ensure the subject being transported will not cause any problems and to relate any pertinent information to the care team professional.

5.      Central Dispatch will be kept advised in each step of the process so they are aware of the status of the assigned officers.

6.      Served Court Ordered Commitment Papers will be returned to Central Records by the assigned unit immediately after completing the commitment.

**Training in Dealing with Mentally Ill Persons**

The Training Unit will develop training in the area of recognition of and dealing with mentally ill persons. This training will be developed in collaboration with mental health professionals. The training will also include access to the court system and applicable case law. This training will be reviewed and repeated at least every three years for all members. Newly hired personnel will receive this training as part of their orientation or in the new officer school.



# Evansville Police Department

## Operational Guideline



**VEHICLES USED TO TRANSPORT PRISONERS**

**OG 226.00**                                                    **Page 1 of 2**

**Effective: 10-11-00**                  **Order Numbers: 09-O-11**

**Reviewed: 08-31-12**

**CALEA Standards: 70.4.1, 70.4.2_____**

**Table of Contents**

Related Directives - Page 1
Policy - Page 1
Guidelines - Page 1

**Related Directives**

OG 153.00 – Handling, Transporting, and Booking Prisoners
OG 225.00 – Department Vehicles: Assignment and Usage

**Policy**

It is the policy of the Evansville Police Department to transport prisoners in a safe and secure manner for the occupants in the front and rear compartment.

**Guidelines**

1. <u>Prisoner Transport Van</u>

    Prisoners will be transported in the prisoner transport van when available unless extenuating circumstances would make it impractical to do so. The prisoner transport van (see OG 225.00) is a special purpose vehicle, which has been modified to minimize opportunities for the prisoner to exit from the rear compartment of the vehicle without the aid of the transporting officer.

2. <u>Patrol Vehicles with safety barrier</u>

    Prisoners being transported shall, when available, use patrol vehicles with a safety barrier to prevent access to the front driver's compartment. Combative prisoners should be transported in the Prisoner Transport Van or a Patrol vehicle with the safety barrier.

3. <u>Other Patrol Vehicles</u>

All other police vehicles equipped for prisoner transportation will have the child safety lock on.

4.    <u>CID Vehicles</u>

Detectives will take proper precautions during prisoner transports. They may use handcuffs, waist restraints, leg shackles, and will disable the electric windows and will activate the child locks on the rear doors. During high risk prisoner transport, a second officer will be present and will ride in either in the front passenger or rear seat opposite of the prisoner.



# Evansville Police Department Operational Guideline



## FIREARMS QUALIFICATION AND RANGE PROCEDURES

**OG 356.01**
**Effective: 11-19-02**          **Order Numbers: 19-O-10**
**Reviewed: 02-20-19**

---

**Table of Contents**

Related Directives - Page 1
Purpose - Page 1
Policy - Page 1
Definition - Page 2
Qualification Periods - Page 2
Ammunition - Page 2
Qualifying Score - Page 2
Firearms Training Curriculum - Page 2
Range Officers - Page 3
Failure to Qualify - Page 3
Failure to Attend Scheduled Qualification and Practice Sessions - Page 4
Use of Range - Page 4
Firearms Practice - Page 4
Range Restrictions - Page 5
Range Electronic Key Fob - Page 5
Firearms Coordinator Duties - Page 5
Firearms Instructors Duties - Page 6
All Department Members Duties - Page 7

### Related Directives

OG 356.02 - Firearms Training/Special Weapons
OG 356.03 - Personal Patrol Rifle and Shotguns
OG 356.04 - Handguns
OG 380.00 - Dress, Equipment, and Personal Appearance

### Purpose

The purpose of the policy is to establish the procedure for range qualifications, use of the Police Range, and safe operation of approved firearms.

### Policy

It shall be policy to assure that each officer receives sufficient training in the use of authorized firearms, maintains their proficiency, and completes firearms qualification in accordance with this directive.

**Definition**

Qualified: Means an officer has passed an approved training course in the use of a specific firearm or firearms administered by the Firearms Training Coordinator or his designee.

**Qualification Periods**

1. Duty Handgun: Officers must qualify annually with their issued handgun.

2. Back-up Handgun: Officers must qualify annually with their back-up handgun *(see OG 356.04)*.

3. Shotgun: Qualification with the shotgun will be conducted annually. Any member of the department who carries a shotgun is required to attend all shotgun training.

4. Patrol Rifle: Qualification will be conducted annually. Any member of the department who carries a patrol rifle is required to pass the Patrol Rifle Certification Course taught by the Firearms Training Unit and qualify with their patrol rifle. They must also attend any additional annual patrol rifle training.

**Ammunition**

Ammo will be stored in the department arsenal. The department will supply ammunition for qualifying with duty handguns, shotguns, and patrol rifles using ammunition specified by the Chief. Ammunition will also be provided for .45 caliber back-up gun qualification. Officers wishing to qualify with 9mm approved backup weapons must provide their own ammunition.

**Qualifying Score**

The minimum qualifying score will be determined by the Department Firearms Training Coordinator with the approval of the Chain of Command of the Training Unit up to and including the Chief. Scores will be documented and maintained by the Department Firearms Training Coordinator.

**Firearms Training Curriculum**

The firearms training curriculum will be developed by the Firearms Training Coordinator in conjunction with departmental range officers and approved by the Chain of Command of the Training Unit up to and including the Chief of Police. The Firearms Training Coordinator will through study and research of contemporary police studies and recommendations maintain up-to-date training and practice techniques in the use of firearms by police personnel.

**Safety Briefing**

A safety briefing that covers, at minimum, the four rules of gun safety, will precede all firearms training and qualifications:

1. Treat all weapons as if they are loaded.

2. Do not point your weapon at anything you are not prepared to shoot.

3. Keep your finger outside the trigger guard until a conscious decision has been made to fire.

4. Identify your target and be aware of its immediate surrounding environment.

**Range Officers**

The Firearms Training Coordinator and all range officers will be certified as firearms instructors. The Firearms Training Coordinator will maintain a list of range officers and ensure that their training and methods are current. When new or replacement range officers are needed, the Firearms Training Coordinator will take the necessary steps to ensure that this is done. The Firearms Training Coordinator will assign range officers on a rotating basis so that all range officers have a chance to serve on the range.

**Failure to Qualify**

Qualifications will be scheduled annually. Officers will have 3 attempts to qualify with their duty and backup handguns.

If an officer fails to qualify with their duty handgun, the officer:

1.  Will be given a non-law enforcement assignment & receive a Written Counseling.

2.  Will report to the firearms training unit for remedial training as instructed.

3.  Will conduct no police actions (including off duty jobs) until completion of remedial training and required qualification.

4.  Officers will not operate a marked police vehicle or wear a department uniform until completion of remedial training and required qualification.

Remedial Training & Qualification:

1.  At the completion of their remedial training, officers must pass the qualification course 2 out of 3 times. Failure to do so will result in continued remedial training.

2.  Continued failure to pass qualification after the 5th remedial training day will result in in the notification up the officer's chain of command including the Chief. The Chief will then decide whether to order continued remedial training or to begin the administrative process to terminate the officer's employment. The Chief also has the discretion to end remedial training in excess of five days and start the administrative process.

If an officer fails to qualify with their backup handgun, the officer:

1.  Will not be allowed to carry the backup handgun for police purposes or off duty work.

2.  Must schedule and attend remedial training session as well as pass 2 out of 3 qualifications with the Firearms Training Unit.

3.  Must supply their own ammunition for their remedial training and qualifications.

Officers will not be permitted to carry any firearm for police purposes with which they have not been able to qualify during the calendar year.

An officer who has taken extended leave or suffered an illness or injury that could affect their use of firearms ability will be required to re-qualify before returning to enforcement duties.

**Failure to Attend Scheduled Qualification and Practice Sessions**

The Department Firearms Coordinator will notify the unit commander of any officer who fails to attend a scheduled qualification or practice session. An officer who fails to attend a scheduled qualification or practice session will submit a letter to their unit commander with copies to their chain of command through the Chief of Police explaining the reasons for their absence. Copies will be forwarded to the Firearms Training Unit and the Training Section.

**Use of Range**

The police firing range may be used for the following activities:

1.   Training officers in the use of their assigned firearms.

2.   Ensuring that all officers meet minimum proficiency qualification standards with their assigned firearm.

3.   Firearms practice by officers to improve their proficiency (See section of this procedure entitled "Firearms Practice.").

4.   Testing of new ammunition under the supervision of the Firearms Training Unit Coordinators.

**Firearms Practice**

1.   The range is available to all officers for firearm, less lethal, or taser practice. Any officer wanting to practice must contact a firearm instructor for access to the range. A minimum of two officers, one being a department firearm instructor, must be present on the range during the practice. A list of instructors is available in the Firearms Training Unit.

2.   Firearms will be limited to police-type duty and off-duty handguns. If necessary, the firearm instructor will determine which firearms may or may not be used.

3.   Officers will furnish their own ammunition. Only factory ammunition is permitted. No "slugs" or rifle calibers allowed. No "armor piercing" or "tracer" ammo. Frangible ammo in rifle caliber will be limited and only when approved by the Firearms Training Unit on a case by case basis.

4.   Officers will use proper eye and hearing protection when shooting or while in the firing area of the range.

5.   Officers must have the permission of their unit commander to practice during duty time.

6.   On-duty firearm instructors must also have permission from their unit commander to open the range.

7.   Overtime will not be permitted for either the officer or the firearms instructor. Off-duty practice is permissible as long as it does not interfere with scheduled firearms training and range maintenance.

## Range Restrictions

1. The range will be locked at all times when it is not in use.

2. No one will discharge a firearm on the range without the presence of a firearm instructor.

3. See above section for restrictions, which apply, specifically to firearm practice.

4. Only department-approved holsters are allowed on the range. Any holster that uses a trigger finger release style lock are prohibited from use on the range.

5. Officers from other law enforcement agencies and civilians cannot use the range without permission of the Chief.

6. No material may be removed from the range without the permission of the Firearms Training Unit or the Commander of the Training Section

## Range Electronic Key Fob

1. Access to the Range is controlled by an Electronic Key Fob. The Firearms Training Unit and Training Unit Commander will determine who will be granted Key Fob access to the range. The Firearms Training Unit will maintain a list of individuals who have been authorized Key Fob access to the range.

2. Authorized personnel with Key Fob access:

   A. The Chief of Police and the Assistant Chief of Police

   B. Training Unit Commander

   C. Department Firearms Training Coordinators

   D. Firearms instructors (for firearms practice, training, and qualification firing)

   E. Other personnel when authorized by the Chief of Police

## Firearms Coordinator Duties

1. The Department Firearms Training Coordinator is a certified firearms instructor and is assigned to the Firearms Training Unit. All Firearms Training Unit Coordinators will have CPR, basic first aid, and tourniquet training.

2. Duties of the Department Firearms Training Coordinator:

   A. Posts and enforces, with the assistance of the firearms instructors, regulations and orders for the safe operation of the range.

   B. Coordinates the activities of, and obtains training for, firearm instructors and armorers.

C.   Coordinates, with the assistance of armorers, an annual program for duty firearms inspection and repair.

D.   Coordinates, with the assistance of firearms instructors, firearms training and qualification for all officers including the initial training of probationary officers.

E.   Provides remedial training for officers with substandard range scores.

F.   Oversees the cleanliness and repair of the range.

G.   Ensures that adequate supplies are maintained in the range and that ample supplies of key sign-out forms are available in the Firearms Training Unit.

H.   Conducts an annual inventory of the range.

I.   Is available as a source of information for officers seeking to purchase firearms or to answer other questions involving firearms or ammunition.

3.   Another qualified member of the Training Section may be assigned the duties of the Department Firearms Training Coordinator in his absence.

**Firearms Instructors Duties**

1.   Firearm instructors will be selected by the Firearms Training Unit & Training Unit Commander. All firearms instructors will have CPR, basic first aid, and tourniquet training.

2.   Duties of Firearms Instructors:

A.   Follow the guidelines established by the Firearms Training Unit and standard operating procedures.

B.   If not already an ILEA Primary Instructor, firearms instructors will be expected to attend and pass the ILEA Instructor Development Course.

C.   Attend and Pass the NRA Law Enforcement Pistol & Shotgun Instructors Course as well as the NRA Law Enforcement Patrol Rifle Instructors Course.

D.   Enforce posted range notices and regulations.

E.   Coordinate scheduling of officers for firearms training with unit commanders.

F.   Record and report to the Firearms Training Unit any defects or malfunctions in firearms, range equipment, or ammunition.

G.   When relieved by another firearms instructor, ensure that all empty shell casings have been picked up and the range is operational.

H.   Complete each officer's training and qualification record. Note if an officer is in need of remedial training.

I.   Maintain proficiency in instructor skills by following the guidelines developed by the Firearms Training Unit.

**All Department Members Duties**

1.   Unit Commanders will:

   A.   Relieve the firearms instructors from their normal duties during times they are assigned to range duty.

   B.   Cooperate with firearms instructors in the scheduling of their sworn personnel for firearms training.

2.   Individual officers will:

   A.   Report to the range when scheduled

   B.   Follow the instructions of the firearms instructors and all posted notices on the range.

   C.   Report any malfunctioning weapon or defective ammunition to the firearm instructor.



## Evansville Police Department Operational Guideline



**USE OF FORCE**

**OG 359.00**
**Effective: 05-19-06**          **Order Numbers: 19-O-13**
**Reviewed: 03-06-19**

---

**Table of Contents**

Related Directives – Page 1
Policy – Page 2
Use of Force Defined – Page 2
Definitions – Page 3
Use of Deadly Force – Page 4
Firing at Moving Vehicles – Page 5
Possibility of Killing or Injuring Innocent Persons – Page 5
Investigation of Fatal or Serious Bodily Injuries Inflicted in the Line of Duty or the Use of Lethal Force – Page 5
Use of Less-Lethal Force- Page 5
Approved Less-Lethal Intermediate Weapons – Page 6
Impact Weapon – Page 6
Pepperball – Page 6
Diversionary Devices – Page 7
Less-Lethal Extended Range Impact Devices (ERID) – Page 7
ERID Procedure – Page 7
40 mm Impact Munitions – Page 8
Deployment Areas – Page 8
Deployment Techniques – Page 9
40 mm Launcher – Page 10
OC Spray – Page 11
Chemical Munitions – Page 11
Hand Held Munitions – Page 12
Conducted Electrical Weapon (CEW) – Page 13
Other Less-Lethal Weapons - Page 17
Optional Use of Less-Lethal Weapons – Page 17
Use of Force Report – Page 18
Review of the Use of Force – Page 19
Analysis of Use of Force Reports – Page 20
Training in the Use of Force – Page 20
Training in the Use of Less-Lethal Weapons – Page 20

**Related Directives**

OG 111.00 - Vehicle Pursuit
OG 359.01 – Officer Involved Shooting and Use of Lethal Force Investigations
OG 359.02 - Reporting the Discharge of a Firearm
OG 359.03 - The Canine (K-9) Unit
OG 389.00 - Alcohol, Tobacco, Drug-Free Workplace and Employee Testing

**Policy**

Officers will only use a reasonable amount of force when necessary to affect a lawful arrest, attain a lawful objective or overcome an attack upon themselves or another person. When the subject of the force has been overcome and is under complete control, all force against him/her will cease.

If the subject of the force is in need of medical aid, officers will ensure that the subject receives it. When appropriate, the subject of the force will be taken to a medical facility for emergency treatment. (See section of this procedure entitled "Chemical Weapons" for procedures for immediate treatment after the use of a chemical weapon.)

Conducted Electrical Weapon (CEW) may be used by authorized and trained personnel in accordance with this use-of-force policy and additional guidelines established herein.

All officers, as part of their authorization to carry weapons, will be issued copies of and be instructed in this policy.

**Use of Force Defined**

1.  What is considered use of force?

    A.  Any striking or attempted striking of someone with hands, fists, feet, baton, less-lethal munitions, flashlight or other object

    B.  Using a ***department-approved*** chemical incapacitating agent against someone

    C.  Any usage of a Conducted Electrical Weapon (CEW) whether a subject is energized or not

    D.  Using a firearm against someone or discharging a firearm at someone

    E.  Where the resistance by someone is such that they are charged with resisting arrest, unless that resistance is only fleeing or interfering and force was not used in his/her apprehension.

    F.  If in the arrest procedure (handcuffing, etc.) the person being arrested is injured, a "Use of Force Report" is required. (See section of this procedure entitled "Use of Force Report").

    G.  Using a K-9 (see OG 359.03).

    H.  Using any type of pain compliance technique, strike or come-along hold.

2.  What is not considered use of force?

    A.  Using handcuffs alone is not considered use of force unless the handcuffs are used as a weapon.

**Definitions**

1.  <u>Suspect / Subject</u>: a person who is the focus of police operations.

2.  <u>Active Resistance</u>: when a subject takes affirmative action to defeat an officer's ability to take them into custody. Such as a subject showing aggression or the threat of violence toward the officer or others or fleeing arrest.

3.  <u>Bodily Injury</u>: "Bodily Injury" means any impairment of physical condition, including physical pain.

4.  <u>Deadly or Lethal Force</u>: Force which, when used or attempted, carries a great probability for causing death.

5.  <u>Less-Lethal Force</u>: Force, which in its normal use is less likely to cause serious bodily injury or death.

6.  <u>Probable Cause</u>: The existence of facts and circumstances within one's knowledge and/or where one has received reasonably reliable information which is sufficient in itself to warrant a person of reasonable caution to believe a crime has been committed.

7.  <u>Reasonable Belief</u>: Belief that is so conclusive that all reasonable doubt is removed from one's mind. A reasonable person is described as "one who exercises those qualities of attention, knowledge, intelligence, and judgment which society requires of its members for the protection of their own interests and those of others." Reasonable belief is not absolute belief.

8.  <u>Serious Bodily Injury</u>: "Serious Bodily Injury" means bodily injury that creates a substantial risk of death or that causes serious permanent disfigurement, unconsciousness, extreme pain, or permanent or protracted loss or impairment of the function of a bodily member or organ.

9.  <u>Passive Resistance</u>: Non-violent – Non-Cooperation; no immediate threat or resistance to the safety of the officer or others; is the practice of achieving socio-political goals through symbolic protests, civil disobedience, economic or political noncooperation, and other methods, without using violence.

10. <u>Peer Support Team Member</u>: An officer who has been trained in the areas of Critical Incident Stress Management, Individual Crisis Intervention, and Peer Support.

11. <u>Conducted Electrical Weapon (CEW)</u>: A device designed to disrupt a subject's central nervous system by deploying battery operated energy sufficient to cause uncontrolled muscle contractions and override voluntary motor responses

12. <u>Soft Empty Hand Control</u>: is designed to control *Passive or Defensive Resistance.* These techniques are used when verbal directions are not effective and there is noncompliance with lawful orders. These include, but are not limited to, strength techniques, escort techniques to limit a suspect's mobility, joint locks, or pressure points.

13. <u>Hard Empty Hand Control</u>: is designed to control Active Aggression, but can be used to control Defensive Resistance when lower forms of control have failed. These included, but are not limited to, Brachial Stun, Radial and Median, Common Peroneal, Femoral, Tibial and Superficial Peroneal.

**Use of Deadly Force**

1.  Justification for the use of Deadly Force: Officers of the Evansville Police Department are justified in using deadly force in the following circumstances:

    A.  When necessary in the defense of an officer's own life or to prevent serious bodily injury to himself when he reasonably believes that he has used all other reasonable means at his disposal to stop the subject, or when no other reasonable means can likely succeed..

    B.  When necessary in the defense of another person's life or to prevent serious bodily injury to the other person when he reasonably believes that he has used all other reasonable means at his disposal to stop the subject, or when no other reasonable means can likely succeed.

    C.  When necessary to prevent the escape of a felony suspect whom the officer reasonably believes poses a significant threat of serious physical harm including death or serious bodily injury either to himself or to another person.

    Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe the suspect has committed a crime involving the infliction of a serious bodily injury or death to others, deadly force may be used when necessary to prevent his escape, and when feasible, some warning has been given.

**NOTE**: Where a suspect has not posed and/or does not presently pose any immediate threat of serious bodily injury or death to others, the harm resulting from failing to apprehend the suspect does not justify the use of deadly force to do so. An officer may not seize an unarmed, non-dangerous suspect by using deadly force.

2.  Considerations in the Use of Firearms or Deadly Force: Officers should keep in mind the following considerations in regards to the use of firearms or deadly force.

    A.  Justification for the use of deadly force must be limited to what reasonably appears to be the facts known or perceived by an officer at the time he/she decides to act. Facts discovered after the officer's actions cannot be considered at a later time in determining if the actions were justified.

    B.  The Law of Justifiable Homicide authorizes an officer to use deadly force when it appears necessary to protect himself/herself or others from what reasonably appears as an immediate threat of serious bodily injury or death. The policy of the Evansville Police Department does not limit that law.

    C.  Officers may not intentionally use deadly force to affect the arrest or prevent the escape of a misdemeanant.

    D.  Warning shots are not permitted.

**Firing at Moving Vehicles**

Officers should not fire at moving vehicles unless the circumstances are such that to fail to do so would create an immediate threat of death or serious bodily injury to the officer or another person. However, even in these circumstances great care must be taken and no shots fired if the shots fired or the vehicle would create a life-threatening situation to the public (see OG 111.00, Vehicle Pursuit).  CEWs should not be used against suspects in physical control of a vehicle in motion to include automobiles, trucks, motorcycles, ATV's, bicycles, mopeds and scooters unless exigent circumstances exist.

**Possibility of Killing or Injuring Innocent Persons**

Even though an officer may be legally justified in using a firearm, the officer should not fire if there is a good possibility that innocent persons could be killed or injured.

**Investigation of Fatal or Serious Bodily Injuries Inflicted in the Line of Duty or the Attempted Use of Lethal Force**

(See OG 359.01 - Officer Involved Shooting and Use of Lethal Force Investigations)

**Use of Less-Lethal Force**

1.      Policy

Use of less-lethal force by an officer is permitted in situations where the officer is attacked or resisted by someone using less-lethal force. Less-lethal force should be commensurate with that force or resistance encountered by the officer. It should be such that it will allow the officer to quickly overcome the force or resistance used against him but not so great as to pose a danger of serious bodily injury or death in a situation where there was no such threat to the officer.

2.      Less-Lethal Intermediate Weapons

   A.      Less-lethal intermediate weapons or control devices will only be used for an officer's defense, defense of the general public, and to effect the arrest or lawful custody of any individual who physically resists a lawful arrest or order to take him into custody.

           Only that amount of force necessary to overcome an attack or physical resistance will be used. Only those less-lethal weapons and control devices authorized by the Chief of Police will be carried and used in any official capacity.

   A.      Officers, whenever possible, will only use those less-lethal intermediate weapons or control devices issued or approved to subdue a combative subject. Other emergency or improvised impact weapons may be used by the officer when the situation reaches a point where approved weapons have failed, or; the officer, in the normal course of his duty, was not armed with any issued or approved less-lethal intermediate weapons or control devices.

       1.      When using other items as weapons such as metal flashlights, an officer must take due care when possible not to strike the assailant in a place that would likely cause serious bodily injury or death unless the officer believes no other reasonable means can possibly succeed.

    C.      All less-lethal intermediate weapons or control devices are subject to inspection by an officer's supervisor and commanding officers.

**Approved Less-Lethal Intermediate Weapons**

A.  **Impact Weapon:**

A device made purposely for police work and to use in a proper method to subdue a person in a less-lethal manner.

B.  **Pepperball:**

1.    <u>Authorization</u>: Only authorized and trained sworn members may use approved Pepper Ball systems, consistent with the use of force policy and training.  The Pepper Ball launcher has several uses for law enforcement and may be utilized anytime soft empty hands up to deadly force is needed.

2.    <u>Description</u>: A Pepper Ball system consists of a compressed air launching device that delivers a .68 caliber plastic sphere projectiles filled with either: Oleoresin Capsicum (OC) powder, water, dye marker, or solid core. Pepper Ball is used to gain compliance when higher levels of force would not be warranted.  The Pepper Ball System is considered non-deadly force by its manufacturer, however, special care should be taken to aim for the torso and avoid headshots to avoid serious bodily injury to the suspect. Projectiles filled with OC are intended to subdue suspects by inflaming the mucous membrane in the nose, lungs, and respiratory tract. This may result in coughing, shortness of breath, involuntary closing of the eyes, and in some instances vomiting. Response to inhaling OC varies greatly among individuals, but in most cases the symptoms last for five to thirty minutes.  The Pepper Ball system can deliver projectiles with enough kinetic energy to produce temporary abrasions, bruises, and/or welts.  Water and dye marking projectiles are intended to foster (pain) compliance or to mark individuals for arrest.  Solid core projectiles are used to break or knock down barriers (such as glass) to deliver other projectiles.  **Solid core projectiles are not intended to be used on individuals**.

3.    <u>Training</u>: A less lethal pepper ball trainer will conduct all pepper ball training and successful completion of initial certification. A less lethal pepper ball trainer will conduct current annual re-certification.

4.    <u>Requirements</u>: Members will account for all Pepper Ball projectiles issued and expended.

    a.    Launching systems will only be serviced and repaired by authorized Pepper Ball Armorers. The launching system will be serviced every six months.

    b.    Launcher air systems will only be refilled with authorized equipment and will follow the directions given during training.  The locations of authorized refill tanks are the sergeant's office, West sector office, Field Training office, Records unit, and the Mobile Field Force vehicle.

    c.    No "paint ball" equipment, accessories, or ammunition will be used with the system.

5. <u>Post Deployment</u>: When feasible, qualified medical personnel will check all persons struck with Pepper Ball system projectiles.  Head, eyes, or throat injuries may need to be examined at an emergency room. Decontamination measures will be taken If OC projectiles are deployed, when feasible.

6. <u>Reporting:</u> Deployment or accidental discharge of the Pepper Ball System requires immediate notification of the on duty supervisor.

    a.  Deployment or accidental discharge of the Pepper Ball System will be documented in an Offense or Supplemental Report and/or a Use of Force report.

    b.  If deployment was used and no arrest is made, a Use of Force will be completed with as much information as possible and a reason for no arrest should be explained.

    c.  A department Use of Force Report will be completed after any use of a Pepperball launcher against a person and will be electronically forwarded to the officer's chain of command. Supervisors will review the Use of Force and forward the report to the chain of command, Internal Affairs, and the Less-Lethal Coordinator.

C.  **Diversionary Devices:**

These devices, commonly referred to as "flash bangs", produce a sound level of 174.5 dB and an instantaneous 2 million-candlepower flash of light to temporarily disorient a suspect. Only SWAT officers who are certified in their use are authorized to deploy diversionary devices.

D.  **Less-Lethal Extended Range Impact Devices (ERID):**

ERIDs – must be of a type approved by the department. Officers will only carry those impact weapons which are issued by the department and for which the officer has received departmental training**.**

**ERID Procedure**

A.  Officers shall not use any ERID unless they believe that such force is necessary to make a lawful arrest, to prevent escape, or to overcome resistance to arrest of being lawfully taken into custody, or to defend him/herself or another from bodily harm while making an arrest.

    1.      Only certified and trained officers are allowed to deploy an ERID.

B.  Technical Aspects – Extended Range Impact Devices

    **Drag stabilized – 12 gauge**

    a.  These rounds are referred to as "bean bag" rounds.

    b.  The Defense Technology Drag Stabilized bean bag round is about 2.5 inches and is housed in a plastic 12 gauge cartridge, containing a fabric bag with tails, filled with approximately 40 grams of #9 shot. Both the marking round and the unmarking round are authorized.

    c.  The bean bag has a muzzle velocity of approximately 270 feet per second.

**40mm Impact Munitions**

    a.   Defense Technology eXact iMpact 40mm smokeless powder sponge round

        1.   Lightweight, high-speed projectile consisting of a plastic body and a foam (sponge) nose that is spin stabilized via the incorporated rifling collar and the 40 mm launcher's rifled barrel.

        2.   The eXact iMpact round has a muzzle velocity of approximately 325 feet per second.

    b.   Defense Technology Direct Impact 40mm smokeless powder round

        1.   Lightweight, high-speed projectile consisting of a plastic body and a crushable foam nose which is spin stabilized via the incorporated rifling collar and the 40 mm launcher's rifled barrel. The round consists of a plastic body and a crushable foam nose that contains a powder payload. This payload area can hold inert, marking, OC, or CS powder. The crushable foam nose dissipates energy upon impact while releasing the powder payload. The inert, marking, OC, and CS rounds are all authorized for use.

        2.   The Direct Impact rounds have a muzzle velocity of approximately 295 feet per second.

    c.   Defense Technology 40mm Blunt Impact Projectile (BIP)

        1.   The blunt impact projectile with collapsible gel nose technology enables kinetic energy to be applied over a larger surface area of the body, targeting the lower torso or extremities. These areas provide sufficient pain stimulus, while greatly reducing serious or life-threatening injuries. The 40mm BIP Projectiles have payload options of OC, CS, Inert Powder, Marking Liquid or Marking Powder. All are authorized for use.

        2.   The BIP projectiles have a muzzle velocity of approximately 285 feet per second.

    d.   Any other munition approved by the department.

C.  Deployment areas

  1.  The less-lethal projectiles will be delivered to subject target areas based on the circumstance, the established safety priorities, and the level of force authorized.

  2.  The below strike chart is the recognized Department model for determining contact area for ERIDs, based on potential for injury.

      a. *Green areas - Zone 1* – These areas will be considered when incapacitation is necessary and a minimal potential for injury is the appropriate response.

      b. *Yellow areas - Zone 2* – These areas will be considered when an escalation of force above green areas is necessary and appropriate, acknowledging an increase in the potential for death or serious bodily injury.

      c. *Red areas - Zone 3* – Intentional impacts to these areas will be avoided unless the use of deadly force is justified, necessary, and appropriate.

    **d. If intentionally deployed to a "red area", ERID's are considered deadly force.**

    e. Strike Chart: Zones 1, 2, and 3.



E.   Deployment Techniques – 12 gauge

The less-lethal shotgun (bean bag gun) will be a dedicated system, used only for the deployment of kinetic energy projectiles. **At no time will a dedicated less-lethal shotgun be loaded with lethal munitions or a patrol shotgun loaded with less-lethal munitions. At no time will an officer carry a lethal shotgun in the same vehicle with a dedicated less-lethal shotgun.**

1.  The "bean bag" gun will be marked in such a manner as to be readily recognized as such. If bean bag gun is carried in a case it will also be readily recognized as such.

    The officer that is deploying the ERID should make every attempt to ensure that other officers on scene are aware that the shotgun being used contains bean bags and not lethal force munitions. If feasible, a verbal warning should be given before the ERID is deployed. This is done to help prevent sympathetic discharges by other officers and allows the suspect an opportunity to surrender.

2.  The bean bag gun will be carried with the chamber and magazine unloaded. Before deploying the bean bag gun, officers will ensure that the shotgun is clear of any lethal munitions. After ensuring there are no lethal munitions in the system, the officer will load the less-lethal projectiles. If practical, another officer should observe the loading.

3.  The department-approved Defense Technology Drag Stabilized bean bag rounds will be stored in the case with the dedicated gun or in a stock/receiver mounted ammunition storage device on the dedicated gun.

4.  If more than one officer is on scene, an officer will be responsible for supplying lethal cover to the officer who is deploying the ERID. A plan should also be formulated to make an arrest on the subject should he surrender at any point during the incident. A solo officer is discouraged against using an ERID until a backup officer arrives.

5. When using a beanbag shotgun, the recommended distance is no less than 20 feet and no more than 75 feet from the suspect. Beanbag rounds have an optimal effective range of 20 to 50 feet with a maximum effective range of 75 feet.

   a. Using a beanbag shotgun within 20 feet of an individual increases the chance of serious injury. In cases involving self-defense, defense of another, or a situation where the round is used as an alternative to deadly force when deadly force would be appropriate, then the use of the beanbag round at a distance less than 20 feet is acceptable.

6. Subjects/suspects who are struck by an ERID will be transported to a medical facility for examination. Photos will be taken of the subject who was struck by the ERID to include all areas that were impacted by the device.

**40mm Launcher**

The 40mm launcher is a dedicated system used only for the deployment of approved less lethal impact or chemical munitions.

   1) The officer that is deploying the 40 mm ERID should make every attempt to ensure that other officers on scene are aware that 40mm munitions are being deployed. If feasible, a verbal warning should be given before the ERID is deployed. This is done to help prevent sympathetic discharges by other officers and allows the suspect to surrender.

   2) The 40mm launcher will be carried with the chamber unloaded.  If practical, another officer should observe the loading to ensure that the proper munition is being used.

   3) The department-approved Defense Technology munitions will be stored in the case with the launcher when not in use.

   4) If more than one officer is on scene, an officer will be responsible for supplying lethal cover to the officer who is deploying the ERID. A plan should also be formulated to make an arrest on the subject should he surrender at any point during the incident.  A solo officer is discouraged against using the ERID until a backup officer arrives.

   5) Officers should deploy all 40mm munitions within the approved distances recommended by the manufacturer.

   6) Only officers that are certified or trained may deploy Impact Munitions.

   7) Subjects/suspects who are struck by an ERID will be transported to a medical facility for examination. Photos will be taken of the subject who was struck by the ERID to include all areas that were impacted by the device.

F. Reporting use ERIDs

   1. The use of ERIDs shall be reported as follows:

      a. The officer who used the less lethal device will immediately notify his/her immediate supervisor. A Use of Force report will be electronically forwarded to the officer's Chain of Command.  Supervisors will review the Use of Force report and forward it to the Chain of Command, Internal Affairs Section and to the Less-Lethal Coordinator.

    b.  If the shotgun ERID is deployed within 20 feet (from the muzzle), you must justify your actions in the use of force report.

**OC Spray:**

1.  OC Spray is designed to incapacitate an individual who is engaged in active resistance or attacking an officer or other person or for crowd management. Defense Technology (Def Tec) is the only authorized Oleoresin Capsicum (O/C) spray permitted for use by officers. Officers are required to carry .4% Major Capsaicinoid Content. .4% represents the Major Capsaicinoid level which is discharged at the nozzle at time of use. The O/C carried by officers must use a stream delivery system. The stream delivery system minimizes cross contamination and assists in targeting one person. The size of O/C canister carried can be determined by officers as long it meets the requirements of this policy. Only Officers trained in the use of chemical munitions, are authorized to use other chemical formulations, such as CS. O/C MUST NEVER BE USED NEAR AN OPEN FLAME, i.e., a cigarette lighter or match, as the aerosol spray will burn with great heat intensity when ignited.

2.  Officers are reminded that the improper use of OC spray can have detrimental effect on both themselves and their fellow officers. Extreme care should be taken when using OC spray in a confined space.

3.  When OC spray is used and the person is brought under control, the individual's eyes should be rinsed, if practical. If necessary, the individual should be taken to a medical facility for treatment. Do not leave the suspect on their stomach. Assist him/her to an upright position.

4.  When OC spray is used and no arrest is made, a Use of Force Report shall be completed as fully as possible and the reason that no arrest was made should be explained. A department Use of Force Report will be completed after any use of OC spray against a person, and will be electronically forwarded to the officer's Chain of Command. Supervisors will review the Use of Force report and forward it to the Chain of Command, Internal Affairs Section and to the Less-Lethal Coordinator.

**B.   Chemical Munitions:**

   1.  Chemical munitions are designed to incapacitate an individual who is engaged in active resistance, attacking an officer, or for crowd management purposes. Chemical munitions may also be used for dislodging or detecting barricaded subjects, and area denial.

   2.  Officers are reminded that the improper use of chemical munitions can have detrimental effect on both themselves and their fellow officers. Extreme care should be taken when using chemical munitions in a confined space, or under crowd control conditions.

   3.  When chemical munitions are used, officers should follow the recommended decontamination procedure recommended by the manufacturer of the munition used. If necessary, the individual should be taken to a medical facility for treatment. Do not leave the suspect on their stomach. Assist him/her to an upright position.

4. When chemical munitions are used and no arrest is made, a Use of Force Report shall be completed as fully as possible and the reason that no arrest was made should be explained. A department Use of Force Report will be completed after any use of chemical munitions against a person or crowd, and will be electronically forwarded to the officer's Chain of Command. Supervisors will review the Use of Force report and forward it to the Chain of Command, Internal Affairs Section and to the Less-Lethal Coordinator.

**Technical Aspects—Chemical Munitions**

**40 mm Chemical Munitions**

1) Defense Technology 40 mm Muzzle Blast

   a) The 40 mm Muzzle Blast is designed to deliver chemical agents in the immediate area, 30 feet of the grenadier, and provides instantaneous emission of chemical agent directly at or on riotous, non-compliant subjects close to officers or within confined spaces. It can be used in operations such as barricaded subjects, room clearing, space denial, and a means of contaminating crawl spaces and attics.

   b) The 40 mm Muzzle Blast round contains either a CS or OC payload. Both are authorized for use.

**Hand Held Munitions**

1) Defense Technology Aerosol OC/CS

   a) The Aerosol OC/CS grenade is designed to minimize the risks to all parties through pain compliance, temporary discomfort and/or incapacitation of potentially violent or dangerous subjects.

      The OC and CS combination provide sufficient effects in confined areas up to 1500 square feet, and is ideal for barricade situations.

   b) The OC/CS grenade is recommended for indoor use.

2) Defense Technology OC Vapor Aerosol

   a) The OC Vapor Aerosol Grenade delivers a very high concentration of OC in a powerful mist. The OC vapor requires minimal decontamination while the target

      effect and inhalation are dramatic. Removing the subject from the affected area to fresh air will resolve respiratory effects within minutes.

   b) The OC Vapor Aerosol is recommended for indoor use, but could be used outdoors.

3) Defense Technology Tri-Chamber Flameless Grenade

   a) The Tri-Chamber can be used in crowd control as well as tactical deployment situations. The purpose of the Tri-Chamber Flameless Grenade is to minimize the risks to all parties through pain compliance, temporary discomfort, and/or incapacitation of potentially violent or dangerous subjects.

   b) The Tri-Chamber contains either an OC, CS, or Smoke payload. The Tri-Chamber is designed for both indoor or outdoor use.

4) Defense Technology Triple Chaser Continuous Discharge Grenade

   a) The Triple-Chaser is a pyrotechnic grenade consisting of three (3) separate canisters pressed together with separating charges between each section. When deployed, this grenade will separate into three (3) distinct sub-munitions spaced approximately 20 feet apart – allowing increased area coverage in a short period of time, from one deployment. Terrain and surface conditions can affect the distance of the separating sub-munitions.

   b) The Triple-Chaser is designed for crowd management situations and outdoor use. The Triple-Chaser contains either a CS or Saf-Smoke payload.

5) Any other munition approved for department use.

   A. Only officers that are certified or trained may deploy 40mm chemical munitions or hand held munitions.

   B. SWAT may use addition munitions during SWAT operations that are approved by the department and SWAT commander.

## C.  Conducted Electrical Weapon (CEW)

1. General Guidelines

   The CEW may be used to control a dangerous or violent subject when deadly force does not appear to be justified and/or necessary; or attempts to subdue the subject by other conventional tactics have been, or will likely be, ineffective; or there is a reasonable expectation that it is unsafe for officers to approach within contact distance of the subject.

   The CEW is designed to disrupt a subject's nervous system or sensory nervous system by deploying battery-powered electrical energy sufficient to cause muscle contractions and override voluntary motor responses. It is not designed or intended to cause serious or permanent damage and its effects are temporary.

2. Authorized Users / Care and Maintenance

   a.   Only officers certified by the Evansville Police Department's CEW training program will carry or use the CEW. A list of all CEW-certified officers will be forwarded to Central Dispatch, Internal Affairs, and the Training Unit whenever changes occur.

        Only Taser Model X2 with the 25-foot heavy barb probes are authorized by the department.

   b.   Officers issued a CEW are responsible for maintaining a charged digital power magazine (battery) in the unit at all times. The Less Lethal Coordinator will issue replacement digital power magazines for CEWs. CEW officers are also responsible for the proper care and maintenance of their CEW, as taught in the certification class, and for its proper use as directed by department OG. The Less Lethal Coordinator will inspect all issued CEWs prior to assigning them to an officer.

   c.    Replacement CEW cartridges will be available from the Less-Lethal-Force Coordinator or through a Sector Patrol Sergeant.

Issue of replacement cartridges will require documentation as to the disposition of the previously used cartridge, either by a Use-of-Force Report or an Incident Report. All Taser CEW cartridges are serial numbered and that number is issued to the respective CEW officer. The Less Lethal Coordinator will maintain documentation on all issued CEWs and cartridges to department personnel.

d.    CEWs will not be left in department vehicles unless that vehicle is issued, or assigned for that shift to a CEW officer.

e.    Any CEW determined to be found unsafe by the officer to whom it is assigned or by the Less-Lethal-Force Coordinator will be removed from usage. The Less-Lethal-Force Coordinator will make arrangements for repairs to or replacement of the CEW.

3.   CEW Readiness

a.    The device will be carried in a department-approved holster on the side of the body opposite the service handgun. Officers not assigned to the Patrol Section may utilize other department-approved holsters and carry the CEW consistent with department training.

b.    The CEW shall be carried fully armed with the safety on in preparation for immediate use when authorized.

c.    Officers shall be issued a minimum of one spare cartridge as a backup in case of cartridge failure or the need for redeployment. The spare cartridge shall be stored and carried in a manner consistent with training, and the cartridges will be replaced consistent with the manufacturer's expiration requirements.

d.    Only manufacturer and department-approved power sources shall be used in the CEW.

e.    The CEW shall be subjected to a pre-shift "spark test" as defined in training to ensure that the device is functioning properly.

f.    No modifications or repairs shall be performed on the device unless authorized.

4.   Deployment

a.    The primary goal of the CEW is to overcome resistance and gain control of the subject. Officers are authorized to use the CEW on persons who demonstrate an overt intention to do any of the following:

1. Use force against the officer or another person,

2. Use force to resist arrest or detention,

3. Flee in order to avoid arrest or detention in circumstances where officers would pursue on foot and physically affect the arrest or detention, or

4. Engage in self-destructive behavior.

b.      The CEW may also be used in certain close-range deployment circumstances known as the "cartridge on drive stun" mode, which involves activating the device in the probe mode at the appropriate target, as determined in training, then moving the device and reapplying it to an alternate target area to facilitate spread. When the device is used in this manner, it is:

       1.    Potentially as effective at neuromuscular incapacitation (NMI) as a conventional cartridge-type probe spread deployment; and

       2.    Subject to the same deployment (use) guidelines and restrictions as any other CEW cartridge deployment.

c.     The CEW should not be used on those who passively resist, as defined in this policy, and should normally not be used in the following manner:

       1.    On a handcuffed or secured prisoner, absent overtly assaultive, self-destructive, or violently resistive behavior that cannot reasonably be addressed by other readily available means.

       *2.*    In any environment where an officer reasonably believes that a flammable volatile or explosive material is present, including, but not limited to, oleoresin capsicum (OC) spray with volatile propellant, gasoline, natural gas, or propane. Personnel should be especially aware of this when in known *clandestine lab environments.*

       3.    In any environment where the subject would likely fall from a height that could result in death or serious physical injury.

d.     Officers shall be aware of the general concerns raised when a CEW is used on a member of a sensitive population group. Officers are not prohibited from using a CEW on such persons, but use is limited to those exceptional circumstances where the need to use the device reasonably outweighs the risks to those involved. *Sensitive population groups*: Sensitive populations include those who reasonably appear to be, or are known to be, children, elderly, medically infirm, pregnant, or users of a cardiac pace maker.

e.     Upon activating the device against a person, the officer shall energize the subject for no longer than objectively reasonable to overcome resistance and bring the subject under control. Note that the CEW will cycle until the officer releases the trigger. Using the safety will turn the CEW off.

f.     To minimize the number of cycles needed to overcome resistance and bring the subject under control, the subject should be secured as soon as practical while affected by CEW power or immediately thereafter. In determining the need for additional energy cycles, officers should be aware that an energized subject might not be able to respond to commands during or immediately following exposure.

g.     When possible, a force back up option should be present alongside the CEW officer. The force back up will be based on the threat level the suspect poses and may include deadly force, if necessary. Officers should not attempt to control the suspect with a CEW if the suspect poses a clear and immediate deadly force threat.

h.     When feasible, a verbal warning should be given to the suspect. It is not necessary to specify what type of force may be used in the warning, only that force may be used.

It is the discretionary decision of the CEW officer whether a verbal warning is feasible or not.

i.   It is *forbidden* to use the CEW in a punitive or coercive manner or as an interrogation technique.

j.   Any repeated application of the CEW must be justified and the criteria used to justify re-deployment shall be clearly documented in the officer's Use-of-Force report. Note that each application of the CEW is a separate use of force and must be justified and documented in the Use of Force Report.

k.   All CEWs are clearly marked to distinguish them from the appearance of a handgun. Regardless, all officers at the scene should be advised before a CEW is used – if time and circumstances allow.

l.   If circumstances dictate and can be specifically articulated in a use-of force report, then more than one CEW may be used against a suspect at the same time.

m.   The preferred target area on the front of the body is to split the belt line - one probe above and one probe below. Below the neck is the target zone on the back of a subject. The legs are the secondary targets.

n.   The CEW shall be pointed at the ground in a safe direction with the safety on during loading, unloading, or when handled in other than an operational deployment.

5.   Post-Deployment Considerations

a.   If the CEW darts penetrated the suspect's skin, trained officers are allowed to remove the darts once the suspect is restrained and is under complete control. If it is necessary, the suspect can be transported to a medical facility with the darts still penetrating the suspect's skin. The CEW darts will only be removed when the suspect is restrained and under complete control. The CEW darts will be treated as a biohazard risk and disposed of accordingly.

b.   Officers shall ask all persons if they desire medical attention following exposure to a CEW. Persons shall be transported to a medical facility for examination if any of the following occur:

(1)  The person requests medical attention;

(2)  The person has been hit in a sensitive area (for example: eyes, face, head, throat, female breasts, genitals, bone, etc.). Officers will not remove these darts.

(3)  The person does not appear to recover in a reasonable period of time after being exposed, as determined by the officer following training guidelines:

(4)  The person is part of a sensitive population group as defined in this policy;

(5)  They have been energized more than three times;

(6)  They have received the effects of more than one CEW during the incident;

      (7) They are reasonably believed to have been subjected to a continuous energy cycle of 15 seconds or more; or

      (8) They have exhibited signs of "excited delirium," as outlined and defined in training, prior to and or during CEW exposure.

    c. If the probes penetrate the flesh, photographs of the contact area should be taken after they are removed.

6.    Reporting

A department Use of Force Report will be completed after any use of a CEW against a person, and will be electronically forwarded to the officer's chain of command. Supervisors will review the Use of Force and forward the report to the chain of command, Internal Affairs Section, and to the Less-Lethal Coordinator.

    a. The deploying officer shall notify his or her supervisor as soon as practical after using the device, and the appropriate Use of Force report shall be completed

    b. Each use of the CEW will be documented regardless of whether the probes were fired or it was used in the "cartridge on drive stun" mode.

    c. Officers shall specify the rationale in their use-of-force report for any instance in which:

      (1) A CEW is energized more than three times;

      (2) An energy cycle longer than 15 seconds in duration is used;

      (3) More than one CEW is used against a subject in any given incident; or

      (4) A CEW is used against an individual designated to be in a sensitive population group as defined in this policy.

7.    Auditing

All agency CEWs will be subjected to periodic and random data downloading by the Less-lethal Coordinator. The data obtained will be reconciled with existing use-of-force reports to ensure accountability between the cycles recorded and those documented in such reports and occurring in pre-shift testing.

## D.    **Other Less-Lethal Weapons**

Only officers who have been specifically trained in their use may use other less-lethal weapons. These weapons include tear gas, smoke grenades, and any other device approved by the department.

## E.    **Optional Use of Less-lethal Weapons**

The carrying and use of certain less lethal weapons such as *Oleoresin Capsicum* is at the discretion of the officer. *Oleoresin Capsicum* is not an issued item and the officer opting to carry it must purchase it out of his clothing and equipment allowance.

**Use of Force Report**

When a member of the department engages in a Use of Force as defined on Page 2, a complete and detailed "Use of Force" Report will be forwarded to the member's immediate supervisor. **If the use of force results in serious bodily injury or death, follow the directions in OG 359.01 (Officer Involved Shooting and Use of Lethal Force Investigations).** Access the "Use of Force" Report in the computer.

When Pepperballs or OC Sprays are used and no arrest is made a Use of Force Report shall be completed as much as possible and a reason for no arrest should be explained. The Use of Force report will be electronically forwarded to the officer's chain of command, Internal affairs Unit, and to the Less-Lethal Coordinator.

Officer's Responsibilities:

A.      If on duty, complete the report before the end of your shift. If off duty, complete the report immediately subsequent to the incident.

B.      Fill in all the information called for on the report form.

C.      Each officer who used force shall document their use of force in the report narrative individually.

Sergeant's Responsibilities:

A.      Respond to the scene and conduct an investigation into the use of force.

    1.  If the supervisor does not respond to the scene the reasons must be documented.

    2.  If the event is a deadly force incident follow the steps under OG 359.01 - Officer Involved Shooting and Use of Lethal Force Investigations.

B.      The responding supervisor shall visibly inspect the suspect for injury, interview the suspect for complaint of pain and ensure the suspect receives medical attention if required.

    1.  The supervisor will ensure the photographing of all claimed or visible injuries.

    2.  Photographs are to be taken if there are no visible injuries.

C.      Identify all involved officers and witness officers and interview accordingly.  Identify all civilian witnesses and interview.  Interview or attempt to interview the suspect and obtain his or her version of the events.  Record these interviews on body camera.

D.      View the incident on involved officers and witness officers' body cam footage if applicable.

    1.  If no footage available ensure officers document why. Take corrective actions if needed.

E.      Ensure involved officers properly complete the Use of Force Reports.

F.      Complete the Supervisor's Use of Force Report

G.  Evaluate the use of force used and determine which one of the following classifications that the force that was used falls under:

1.  Justified - Within Department Policy: The use of force is determined to be justified, and during the course of the incident the involved officers did not violate department policy.

2.  Justified - Policy Violation: The use of force is determined to be justified, but during course of the incident the involved officers violated a Department policy.

3.  Justified - Training Opportunity: The use of force is determined to be justified and no department policy violations occurred, but the investigation revealed errors that could be corrected through non-disciplinary training.

4.  Not Justified - Not within Department Policy: The use of force is determined to be not justified, and during the course of the incident the involved officers violated department policy.

H.  Notify each step in the chain of command up to the Chief and the Less-Lethal Coordinator of the use of force by e-mail. Notification should be made immediately if the situation warrants doing so.

I.  Notify Internal Affairs Section of the use of force by e-mail.

J.  K9 deployment use of force incidents should be investigated by following the above steps, however if the investigating supervisor is unsure of the determination of the force, they can reserve the final judgement to the K9 Unit supervisor.

Commanding Officer's Responsibilities

A.  Review all reports of use of force investigations by members of your command and verify that the force is reported accurately and completely. All information about the incident should be consistent in all reports.

B.  If any report warrants further investigation, initiate further investigation and advise this to your Superior when forwarding the report.

C.  Complete the "Command Level Review" section of the Use of Force Report in RMS.

**Review of the Use of Force**

1.  All incidents, in which there were an application of force through the use of weapons or otherwise by departmental personnel, will be reviewed by the chain of command. (See OG 359.02.)

2.  A report of findings, to include all relevant facts and circumstances surrounding the incident, will accompany the review. If the incident involved the discharge of a firearm, a conclusion as to whether the discharge violated any departmental directive will also be included (see OG 359.02).

**Analysis of the Use of Force**

1. The Internal Affairs Section will annually analyze "Use of Force" Reports to include the following:

    A. Discharges of firearms, for other than training or recreational purposes

    B. Actions that result in or are alleged to have resulted in injury or death of another person

    C. Force applied through the use of lethal or less-lethal weapons (ERID)

    D. Use of physical force as defined by this procedure

2. The Internal Affairs Section will forward copies of this analysis to the Executive Staff for their review.

**Training in the Use of Force**

1. All sworn personnel will receive annual instruction in the use of force policy and demonstrate proficiency with any approved weapon that they are authorized to use. A certified weapons instructor will monitor this training. Training in less-lethal weapons will be at done annually with the exception of OC, which will be biennially. All new officers will be instructed in these policies and must pass a written exam on these instructions prior to being authorized to carry a firearm. All training and proficiency will be documented.

2. All officers will receive copies of this policy procedure and will sign a receipt indicating the date they received their copy. A copy of the receipt will be maintained in each officer's training file and in any other file directed by the Chief.

**Training in the Use of Less-Lethal Weapons**

1. Impact Weapon: All officers will receive Impact Weapon training during their probationary training periods and periodically throughout their careers. Officers are reminded that the Impact Weapon used improperly can deliver a lethal blow. Officers should direct the use of the Impact Weapon to those areas of the body described to him/her during training. All officers will avoid blows to the head unless absolutely necessary. A metal flashlight or any similar device will not be used as a nightstick except when absolutely necessary.

2. OC Spray: All officers will receive training in the use and effects of OC spray during their probationary training period and periodically throughout their career.

3. SWAT officers are trained annually in the application of all levels of force. Refresher training is conducted annually for SWAT on all less-lethal weapon systems such as pepperball, diversionary devices, ERIDs, etc.

4. Recertification will be conducted annually for all CEW, Pepperball, and ERID device equipped officers.

5. Remedial training will be scheduled with the Less-Lethal Coordinator of any officer who fails to certify or qualify with any less-lethal weapon and will not carry such weapon until certified by a certified instructor.



# Evansville Police Department
# Operational Guideline



## OFFICER INVOLVED SHOOTING AND USE OF
## LETHAL FORCE INVESTIGATIONS

**OG 359.01**                                                                 Page 1 of 8
**Effective: 02-08-19**          **Order Numbers: 20-O-04**
**Reviewed: 02-19-20**

**Table of Contents**

Related Directives – Page 1

Policy – Page 1
Training – Page 2
Objective – Page 2
Media Plan – Page 2
Definitions – Page 2
Use of Deadly Force – Page 2
Firing at Moving Vehicles – Page 3
Possibility of Killing or Injuring Innocent Persons – Page 3
Investigation of Officer Involved Shootings, Infliction of Serious Bodily Injury or the Use of Lethal Force – Pages 3-7
Removal from Duty – Page 7

**Related Directives**

OG 359.00 – Use of Force
OG 359.02 – Reporting the Discharge of a Firearm
OG 111.00 – Vehicle Pursuit
OG 387.00 – News Media

**Policy**

Officers will only use a reasonable amount of force when necessary to affect a lawful arrest, attain a lawful objective or overcome an attack upon themselves or another person. When the subject of the force has been overcome and is under complete control, all force against him/her will cease.

If the subject of the force is in need of medical aid, officers will ensure that the subject receives it as soon as it is safe to do so. When appropriate, the subject of the force will be taken to a medical facility for emergency treatment. All officers, as part of their authorization to carry weapons, will be issued a copy of and be instructed regarding this guideline.

**Training**

The department will conduct periodic training on this guideline for all ranks. All new officers will receive training on this guideline prior to being assigned to a field unit. The department will also conduct process training for all newly promoted sergeants.

**Objective**

The objective of the guideline is to ensure that all incidents of force used by officers that resulted in serious bodily injury or death or had the potential to cause serious injury or death are thoroughly and expediently investigated and ruled upon.

**Media Plan**

The department Public Information Officer should be notified as soon as possible any time an officer is involved in a lethal force encounter. The PIO, or in his absence an officer designated by the Chief will be responsible for coordinating the release of information to the media. The PIO shall also serve as the media liaison to any other involved agencies to coordinate the release of information. (see OG 387.00, News Media)

**Definitions**

Suspect / Subject: A person who is the focus of police operations.

Probable Cause: The existence of facts and circumstances within one's knowledge and/or where one has received reasonably reliable information which is sufficient in itself to warrant a person of reasonable caution to believe a crime has been committed.

Reasonable Belief: Belief that is so conclusive that all reasonable doubt is removed from one's mind. A reasonable person is described as "one who exercises those qualities of attention, knowledge, intelligence, and judgment which society requires of its members for the protection of their own interests and those of others." Reasonable belief is not absolute belief.

Deadly or Lethal Force: Force, which when used or attempted, carries a great probability for causing death.

Serious Bodily Injury: Bodily injury that creates a substantial risk of death or that causes serious permanent disfigurement, unconsciousness, extreme pain, or permanent or protracted loss or impairment of the function of a bodily member or organ.

**Use of Deadly Force**

A. Justification for the use of Deadly Force: Officers are justified in using deadly force in the following circumstances:

   1. When necessary in the defense of an officer's own life or to prevent serious bodily injury to himself when he reasonably believes that he has used all other reasonable means at his disposal to stop the subject, or when no other reasonable means can likely succeed.

   2. When necessary in the defense of another person's life or to prevent serious bodily injury to the other person when he reasonably believes that he has used all other reasonable means at his disposal to stop the subject, or when no other reasonable means can likely succeed.

   3. When necessary to prevent the escape of a felony suspect whom the officer reasonably believes poses a significant threat of serious physical harm including death or serious bodily injury either to himself or to another person.

Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe the suspect has committed a crime involving the infliction of a serious bodily injury or death to others, deadly force may be used when necessary to prevent his escape, and when feasible, some warning has been given.

**NOTE**: Where a suspect has not posed and/or does not presently pose any immediate threat of serious bodily injury or death to others, the harm resulting from failing to apprehend the suspect does not justify the use of deadly force to do so. An officer may not seize an unarmed, non- dangerous suspect by using deadly force.

B.  Considerations in the Use of Firearms or Deadly Force: Officers should keep in mind the following considerations in regards to the use of firearms or deadly force.

1.  Justification for the use of deadly force must be limited to what reasonably appears to be the facts known or perceived by an officer at the time he decides to act. Facts discovered after the officer's actions cannot be considered at a later time in determining if the actions were justified.

2.  The Law of Justifiable Homicide authorizes an officer to use deadly force when it appears necessary to protect himself or others from what reasonably appears as an immediate threat of serious bodily injury or death. The policy of the Evansville Police Department does not limit that law.

3.  Officers may not intentionally use deadly force to affect the arrest or prevent the escape of a misdemeanant.

4.  Warning shots are not permitted.

**Firing at Moving Vehicles**

Officers should not fire at moving vehicles unless the circumstances are such that failure to do so would create an immediate threat of death or serious bodily injury to the officer or another person. In these circumstances, too, care must be taken and no shots fired if the shots fired or the vehicle would create a life-threatening situation to the public (see OG 111.00, Vehicle Pursuit).

**Possibility of Killing or Injuring Innocent Persons**

Even though an officer may be legally justified in using a firearm, the officer should not fire if there is a good possibility that innocent persons could be killed or injured.

**Investigation of Officer Involved Shootings, Infliction of Serious Bodily Injury or the Use of Lethal Force**

The following procedure will be followed whenever a police officer inflicts a fatal or serious bodily injury upon any person while in the performance of his duty, intentionally or by accident; or an officer discharges a firearm at a person, even if no one is shot. If the incident is an officer involved shooting, then there could be two separate investigations.

A.  One investigation would be conducted by the Adult Investigation Unit (AIU) and a criminal case file will be completed and turned over to the Vanderburgh County Prosecutor's Office (VCPO) for review.

Case 3:21-cv-00135-MPB-MJD Document 141-12 Filed 09/20/23 Page 77 of 99 PageID #:
988
OFFICER-INVOLVED SHOOTING AND USE OF
LETHAL FORCE INVESTIGATIONS

OG 359.01                                                                         Page 4 of 8

During this investigation, the involved officer(s) will be asked to give a detailed audio and video recorded statement of their actions to the Adult Investigation Investigators. The officer(s) will be read *Miranda Rights* prior to this interview.

If the officer invokes his constitutional right not to answer, he then will be required to provide the statement of his actions to his chain of command. AIU will complete the case file and forward it to the VCPO for review without the involved officer's statement.

B.  If the interview with AIU is declined, the officer will then be required to give a recorded statement to a supervisory officer within his chain of command who will be investigating the incident. The officer's supervisor will conduct the administrative investigation and will interview the officer. The officer will be read and given protection under *Garrity v. New Jersey*. If the officer is assigned to AIU, his chain of command will consult with the Chief to determine who will conduct the AIU investigation.

Once the investigation is completed, the Internal Affairs Unit will review the case file and any other pertinent material relating to the incident and issue a written report to the Chief advising if the department's rules and regulations were followed.

C.  The EPD's classroom will be the location for the involved officer to meet with the FOP attorney, another attorney of the officer's choosing, or a member of the Peer Support Team when arriving at the EPD. If the classroom is in use, the Chief's complex conference room will be utilized. No attorney or non-EPD personnel should be in any area where department investigations or discussions of the incident are taking place.

**D.  Officer's Responsibility**

1.  Render first aid if able and safe to do so

2.  Notify Central Dispatch and request:

    a.  Needed medical assistance
    b.  Necessary assistance to secure suspects, witnesses and preserve the crime scene
    c.  Immediate dispatch of an on-duty supervisor (field supervisor when available)

3.  Cooperate with investigators and stay at scene until released by the highest-ranking officer at the scene.

4.  When requested by a supervisor, turn over the firearm or weapon used during the incident and their body camera.

5.  Cooperate with the investigating officer as he/she conducts a preliminary interview.

6.  Undergo a blood-alcohol test and a drug test.

7.  Complete the Use of Force report prior to going off-duty. The officer may review his body camera video before completing the Use of Force report.

8.  Adhere to the investigation procedures set forth in Sections A and B directly above.

9.  Adhere to the Removal of Duty Section within this policy.

10. The officer will attend a counseling session as designated by the Chief of Police.

**E. Responding Supervisor's Responsibility**

1. Take command of the scene upon arrival.

   a. Treat the scene as a major crime scene.

   b. Protect the scene. Instruct posted guards that no one is to enter the scene without permission of the supervisor in charge.

   c. Allow no one, including police officers, in the scene unless they have an official duty to perform on scene.

   d. Instruct all personnel on duty at the scene that no potential evidence is to be touched, moved or altered except by Crime Scene Unit (CSU) officers in the official performance of their duty.

   e. Remove the involved officer from the immediate scene to a location nearby where he will be accessible to superiors and investigators, and remain with the officer to keep him secure from the general public, media, and other officers present in an unofficial capacity.

   f. Collect the officer's body camera.

   g. Contact the department's designated Peer Support Team supervisor if requested and have a team member respond to the location of where the involved officer is once they have been removed from the scene of the incident.

   h. Transport the involved officer to the hospital lab for a blood draw. The supervisor will be responsible for seeing that the involved officer's vehicle is secured and brought to headquarters.

   i. Upon arrival at headquarters, the involved officer will be placed in a location where his privacy is assured. The location should be near the investigative area but separate from the working investigators.

   j. Assign someone to escort the FOP attorney or any other non-EPD personnel that the involved officer requests to the department's classroom to meet with the involved officer.

   k. Assign someone to escort the involved officer to the classroom once they arrive on station in order to meet with their requested attorney, FOP representative, Peer Support Team, or another person of their choosing.

2. Request personnel or services from AIU and CSU through Central Dispatch.

3. Request the involved officer's unit and section commander. If they are unavailable, request the Assistant Chief or the Chief. If none of these are available, then request any other section commander.

4. If the incident involved the use of force with a weapon and the officer has the weapon in his possession, take it and secure it for CSU. If the weapon is on the scene, ensure that it is protected.

5. Advise the officer to remain at the scene until given permission to leave by the highest-ranking officer.

6. Ensure that an officer who inflicted a fatal or serious bodily injury in the line of duty or if any officer discharges a firearm at a person, even if no one was shot, undergoes a blood-alcohol test and a drug test and have it placed into a State Test Kit.

7. Submit the State Test Kit into evidence to be logged and then sent for testing.

8. Advise the officer that after the Removal from Duty leave, he will be requested to give a detailed audio and video recorded statement of his actions before, during, and after the incident. Advise the officer that he is required to cooperate in any official police investigation of a police action or activity.

9. If the incident involved the discharge of a firearm, notify the department's firearms coordinator.

10. Consult with the chain of command to determine who will conduct the administrative interview (if it is needed and not taken by AIU).

**F. Responsibility of the Crime Scene Unit**

1. Process the scene in the same manner as you would any major crime scene.

   a. Photograph the entire scene and all potential evidence.

   b. Process and recover all potential evidence. Take special care in securing the evidence both at the scene and at headquarters.

   c. Cooperate fully with the highest-ranking officer at the scene, the investigator in charge, and the Internal Affairs Investigator, if present. The highest-ranking officer at the scene will resolve any conflicts at the scene.

**G. Responsibility of the Adult Investigator in Charge**

1. Conduct the investigation in the same manner and care as that given to a major criminal investigation.

   a. Initiate call-up list for major criminal investigations.

   b. If the incident is an officer involved shooting, request a separate case number from the original run and title the report, "Officer Involved Shooting."

   c. Assign investigators to specific tasks of the investigation, including the interview.

   d. Locate, identify, and interview all possible participants and witnesses.

   e. Do a preliminary interview with the involved officer. The involved officer may have an attorney present. The attorney is limited to representing the officer and may not interject any questions or comments during the statement phase. If there are questions by the attorney, a recess in the interview should be documented.

   f. After the officer's Removal from Duty leave, request that the officer(s) give a formal audio and video recorded statement in an official department interview room.

g.  Advise the officer that the interview will be part of the case file submitted to the VCPO. Read the officer his *Miranda* Rights. If the officer invokes his right to remain silent, cease the interview and advise the officer that a supplement will be included in the case file documenting his decision to decline to answer.

h.  Complete the investigation and submit the completed case file to the VCPO for review.

2.  Cooperate fully with the Internal Affairs Investigator, if present. The highest-ranking officer at the scene will resolve any conflicts.

## H.  Responsibility of the Department Firearms Coordinator

1.  At his discretion, the highest-ranking officer at the scene may call for the department's firearms coordinator. If the coordinator is called to the scene, he should assess the scene for the formulation of future, relevant firearms training and bring a loaner gun for the officer (if needed). The coordinator will not participate in the actual on-scene investigation unless requested to do so in an advisory capacity.

## I.  Responsibility of the Internal Affairs Investigator

1.  At his discretion, the highest-ranking officer at the scene may call for an Internal Affairs Investigator. If an investigator is called to the scene, he should:

a.  Make the principal investigator aware of his presence.

b.  Conduct a standard Internal Affairs investigation when requested by the highest-ranking officer at the scene or the Chief of Police.

c.  Be there to do what the highest-ranking officer at the scene indicates.

2.  Post-investigation, the Internal Affairs Unit will review the investigation's case file and any other pertinent material relating to the incident and issue a written report for the Chief advising if the department's rules and regulations were followed.

## J.  Responsibility of the Highest-Ranking Officer

1.  Oversee all facets of the investigation.

2.  Insure that all responding units complete their assigned tasks.

3.  Resolve all disputes between responding units.

4.  Call Internal Affairs to the scene if needed.

5.  Take any additional steps that may be deemed necessary or prudent.

## Removal from Duty

Every officer directly involved in the use-of-force that causes death or serious bodily injury or who discharged a firearm in a manner that was likely to have caused death or serious bodily injury shall be assigned three consecutive days of administrative leave for the three days immediately following the incident, including days off.

The Chief will review all officer involved shootings and make a determination as to whether an officer needs more than three days of consecutive administrative leave, which may be granted dependent on an officer's well-being and the surrounding facts and circumstances of the incident. The involved officer may request additional days off if he feels that it is necessary for his personal well-being.

An officer will be assigned to maintain liaison with the involved officer and to keep him up to date on the progress of the investigation. After the three consecutive days of administrative leave, the involved officer shall give a formal recorded statement to investigators and attend a counseling session(s) as designated by the Chief.

The time frame to give a statement may be shortened upon agreement of the involved officer and the Chief; but, at no time shall the stated three days of consecutive administrative leave be shortened.

Prior to providing such statement, the involved officer shall be allowed the opportunity to review evidence known at the time by the department, such as, but not limited to, body camera video and non-departmental video.

The involved officer may choose not to review such material prior to giving the required statement. Should the department decide to release any video to media outlets, notice of the release shall be provided to the involved officer and the President of the Fraternal Order of Police so that the officer has an opportunity to review the video prior to its release, if the officer has not already done so.



**Evansville Police Department**

**Operational Guideline**



### TRESPASS

**OG 400.00**
**Effective:  06-26-01**          **Order Numbers: 19-O-11**
**Reviewed: 02-20-19**

---

**Table of Contents**

Related Directives – Page 1
Indiana Statute – Page 1
Purpose – Page 1
Policy – Page 1
Barred/Banned Subjects – Page 2
Alert Procedure – Page 3
Effective Period – Page 3
Special Notes – Page 3

**Related Directives**

OG 104.00 - Arrests
OG 500.00 - Initial Case Reports/Misdemeanor Offenses
OG 501.00 - The Initial Case Report

**Indiana Statue**

IC 35-43-2-2 Criminal trespass; denial of entry; permission to enter; exceptions

**Purpose**

This procedure provides general guidelines for handling trespass violations, as well as instructions on how to bar/ban subjects from properties for whom the officer acts as an agent.

Oftentimes, officers are requested to enforce specific criminal laws as a service to private citizens. An example of just such a request is the enforcement of Trespass laws on private property when the owner is absent. The owner may have an agent working on his behalf. A police officer may act as an agent for the property owner, if the owner has signed a Trespass Waiver, giving the Evansville Police Department permission to do so. The Trespass Waivers are maintained by the Crime Prevention Unit and must be renewed every two years. Officers can identify if a property is on the *No Trespass List* by:

    A.  Selecting the "Premise" button on the run card of their MCT

    B.  Contacting Central Dispatch and verifying the waiver is still valid

**Policy**

1.  The policy as guided by the Vanderburgh County Prosecutor's Office and the City Legal Department is that a property owner or a property owner's agent may request Trespassing be enforced if someone, not having a contractual interest in the property, knowingly and intentionally:

    A.  Enters the property, after being denied entry by the owner or the owner's agent, by:

        (1)  Oral or written personal communication

        (2)  A properly posted sign

        (3)  A purple mark placed on a tree or post around all areas of entry of the property pursuant with subsection (c)(4) of IC 35-43-2-2.

    B.  Refuses to leave the property after being asked to leave by the owner or the owner's agent. Interferes with the possession or use of the property without the owner or agent's consent.

    C.  If a person's name is not on a lease or mortgage, officers should note that contractual interest extends to establishing residency. Examples of establishing residency are: helping to pay bills, receiving mail at the residence, amount of personal items at the residence, obvious signs of living at the residence for an extended period, etc).

    D.  Officers should keep in mind that each situation will be different and use good judgement and common sense in dealing with each specific situation. Officers should examine the totality of the circumstances to determine if there is reasonable belief that the person is a resident.

2.  An officer may enforce the Trespassing law by:

    A.  Giving a verbal warning

    B.  Writing a City Ordinance Ticket

    C.  Writing a Uniform Traffic Ticket

    D.  Filling out an Initial Case Report

    E.  Making a custodial arrest

**Barred/Banned Subjects**

For those situations where the officer is acting as an agent of a property, that officer may verbally bar/ban a subject. The subject must be barred/banned in person by the officer, or the officer must be present with the subject when the property owner/agent requests the subject be barred/banned.

**Alert Procedure**

The barred/banned alert must be entered into that subject's alerts field in RMS,

      A.  including the involved officer's name,

      B.  a beginning date for the alert, and

      C.  a date/time stamp indicating when the alert was entered and

      D.  by whom

      E.  Optional longer or shorter than the two year period, the end date must be noted in the alert.

**Effective Period**

The bar/ban will be in effect for a period of 2 years from the entry date, unless otherwise requested by the property owner.

If the property owner specifies the bar/ban will be for a period either longer or shorter than the two year period, the end date must be noted in the alert.

**Special Notes:**

Letters mailed to the subject from the property owner/agent will not satisfy the requirements of this OG, and will not be used as a future foundation upon which to base trespassing charges.

Trespassing is a Class A Misdemeanor. In certain circumstances Trespassing may be a Level 5 or Level 6 Felony. There are other instances of Trespassing regarding vehicles, dwellings, railroads, research facilities, and school property that can be reviewed in the Indiana Criminal Code.



# Evansville Police Department
## Operational Guideline



**COMPLETING THE SUPERVISOR REPORT OF PROPERTY DAMAGE, ACCIDENT AND BODILY INJURY**

**OG 403.00**
**Effective: 11-01-00**          **Order Numbers: 00-O-84**
**Reviewed: 09-05-12**
**CALEA Standards: 11.4.5**

**Table of Contents**

Policy - Page 1
Purpose of the *Supervisor Report of Property Damage, Accident and Bodily Injury* - Page 1
Competing the Supervisor Report of Property Damage, Accident and Bodily Injury - Page 2

**Policy**

The *Supervisor Report of Property Damage, Accident and Bodily Injury* (hereinafter referred to as the *Supervisor Report*) form WILL NOT BE USED in any area where the department already has forms for adequate reporting such as traffic accidents, use-of-force incidents and injury to employees.

When damage to property such as doors, door frames, windows, etc. occurs in the serving of arrest warrants or in similar situations in the performance of an officer's duty the question generally arises as to who is responsible for the damage. In many cases the property owner or tenant will have to bear that responsibility.

In any case when the question arises refer the owner/tenant to the law department. The law department will determine liability.

The law department requests that the police department not advise property owners/tenants that the City is liable or that the City will take care of repairs. The law department will review each case and make a determination as to the City's liability, if any, and will notify the owner/tenant as to their determination.

**Purpose of the *Supervisor Report of Property Damage, Accident and Bodily Injury***

1.   The *Supervisor Report* was developed for use by all City departments in reporting bodily injury, property damage or any other potential liability that may result in a claim against the City. The Chief and Assistant Chief will be notified of any incidents where there may be a question as to the agency's liability or those which may result in heightened community interest.

**OG 402.00**                    **ADMINISTRATIVE REPORTS**                    **Page 2 of 2**

2.    The *Supervisor Report* form is only a fact-gathering information sheet to be used by the City and the City's insurance carrier.  Under no circumstances is the City assuming liability upon completion of this form.

3.    Under the City's insurance program, it is important that all incidents be reported to the City's carrier.  The City now has coverage in areas that were lacking in the past, and the information needs to be reported before it gets to the claim stage.

4.    Incidents to be reported on this form include those that are accidental and where liability to the City may result.

**Competing the Supervisor Report of Property Damage, Accident and Bodily Injury**

1.    The *Supervisor Report* WILL NOT BE USED in any area where we have forms for adequate reporting.

        A.    Vehicle accidents

        B.    Use of force

        C.    Injury to employee

2.    When an officer becomes involved in an incident, which may result in a claim against the City in any of the below-listed areas, he will contact his supervisor.

        A.    Property damage

        B.    Accident

        C.    Bodily Injury

3.    The *Supervisor Report* will be completed by the officer's supervisor and forwarded to the Personnel Section as soon as possible.

4.    Unit supervisors may, if they desire, maintain a copy of the *Supervisor Report* for their records.

5.    The Personnel Section will:

        A.    Maintain a copy on file of each *Supervisor Report* received

        B.    Forward the original report to the City Safety Manager in the City Personnel Department within 24 hours of the incident or as soon as possible on the first working day following a weekend or City holiday.



# Evansville Police Department
# Operational Guideline



## INVESTIGATIVE PROCEDURES

**OG 421.00**
**Effective:  09-01-99**          **Order Numbers: 11-O-08**          **Page 1 of 2**
**Reviewed: 03-10-11**
**CALEA Standards: 42.2.3**

**Table of Contents**

Related Directives – Page 1
Purpose – Page 1
The Investigative Process – Page 1
Information Development – Page 2
Interviews and Interrogations – Page 2
Collection, Preservation and Use of Physical Evidence – Page 2
Surveillance – Page 2
Investigative Checklists – Page 2

**Related Directives**

OG 139.00 - Preliminary Investigations
OG 140.00 - Follow-Up Investigations
OG 144.00 - Constitutional Requirements during Criminal Investigations
OG 156.00 - Property Management
OG 169.01 - Organized Crime and Vice Control
OG 169.02 - Criminal Intelligence
OG 169.03 - Confidential Informants
OG 346.00 - Field Interviews
OG 600.00 - Protecting the Crime Scene
Collection and Processing of Evidence Handbook

**Purpose**

The purpose of this procedure is to furnish overall guidelines in criminal investigations.  These items should be considered as minimum directions and should be supplemented by other procedures where applicable and when possible.

**The Investigative Process**

Investigation is defined as "observation or study by close examination and systematic inquiry--to make a systematic examination." The investigative process consists of the following:

1.      Information development

2.      Interviews and interrogation

3.      Collection, preservation and use of physical evidence

4.      Surveillance

## Information Development

Information is developed through preliminary (OG 139.00) and follow-up (OG 140.00) investigations. It is developed through the use of informants (OG 169.03) and field interviews (OG 346.00).

## Interviews and Interrogation

Criminal suspects are interrogated as part of the investigative process to obtain information in clearing a case. Victims and witnesses are interviewed to obtain information in clearing cases (see OG 144.00).

## Collection, Preservation and Use of Physical Evidence

The collection and preservation of evidence is the principal responsibility of the Crime Scene Unit. The initial officers arriving at crime scenes are responsible to protect the scene until properly relieved (OG 600.00). The collection and preservation of evidence is described in the *Collection and Processing of Evidence Handbook*. OG 156.00 concerns the storage, maintaining the chain of custody, signing out and the disposal of evidence that is no longer needed.

## Surveillance

Surveillance guidelines are listed in OG 169.01 and are conducted by the Criminal Investigations Section. Surveillance is a method of information gathering.

## Investigative Checklists

Investigative checklists from the Southern Police Institute homicide school may be used during any major investigation to assist investigators and supervisors. These will be used for initial notes and discarded after supplements are written up. These will not be a part of the case file. The checklists can be located in EPD Doc.



**Evansville Police Department**

**Operational Guideline**



## REPORTS

**OG 494.00**                                                                                      **Page 1 of 3**
**Effective:  12-01-98**              **Order Numbers: 19-O-17**
**Reviewed: 04-12-19**

---

**Table of Contents**

Related Directives – Page 1
Policy – Page 1
Required Reports – Page 1
Information Required – Page 2

**Related Directives**

OG 359.00 – Use of Force
OG 359.01 - Officer Involved Shooting and Use of Lethal Force Investigations
OG 359.02 – Reporting the Discharge of a Firearm

**Policy**

It is the policy of the Evansville Police Department to maintain a comprehensive reporting system of incidents that are alleged to have occurred within its jurisdiction. An accurate record of certain incidents is necessary to assess the effectiveness of the department and for operational and management purposes.

**Required Reports**

It is required that a report be taken and maintained for the following categories of incidents:

1.      Citizen Reports of Crimes

        An Initial Case Report will be taken either by a beat officer or by Records personnel according to the type of offense. Reports will be maintained by the Central Records Unit in RMS.

2.      Citizens' Complaints

        A report will be taken on all citizens' complaints, usually by a line supervisor or by Internal Affairs.  All reports will be maintained by Internal Affairs.

3.      <u>Citizens' Requests for Services</u>

Dispatchers at Central Dispatch will take all citizen requests for services. A report will be entered into CAD (Computer Aided Dispatch) whenever:

A.      An officer is dispatched

B.      An employee is assigned to investigate

C.      An employee is assigned to take action at a later time

4.      <u>All Criminal and Non-Criminal Cases Initiated By Law Enforcement Officers</u>

This would include any investigation conducted by the Adult Investigations Unit, the Juvenile Section, the Narcotics Unit, or any other officer on the department.

5.      <u>Incidents Involving Arrests, Citations or Summonses</u>

Information from these reports will be entered into the Records Management System

6.      <u>Use of Force Report</u>

When a member of the department uses force to subdue someone, or in any manner uses physical force against someone, a complete and detailed "Use of Force" Report will be forwarded to the member's immediate supervisor. (See OG 359.00 - Use of Force)

7.      <u>OIS, Use of Lethal Force, or Force Resulting in Serious Bodily Injury</u>

If the use of force results in serious bodily injury, death, or was the use of lethal force, follow the directions in OG 359.01 (Officer Involved Shooting and Use of Lethal Force Investigations)

8.      <u>Shots Fired Report</u>

When a member of the department discharges his firearm, either on duty or off duty, whether accidentally or officially, except at an approved firing range or facility, the incident will be reported in RMS under the "Use of Force" Module.


**Information Required**

1. All reports should contain at a minimum the following information:

A.  Date and time of the initial reporting

B. Name of the complainant, victim or the citizen requesting service, if available

C. Nature of the incident

    D. Nature, date, and time of any action taken

    E. Children not present during a narcotic arrest or citation shall be listed as involved others.

2. Reports may differ from each other in the required information. Refer to the applicable OG or other directive for the report in question.



# Evansville Police Department Operational Guideline



## INITIAL CASE REPORTS/MISDEMEANOR OFFENSES

**OG 500.00**
**Effective:  04-14-05**            **Order Numbers: 14-O-18**
**Reviewed: 10-31-19**

**Table of Contents**

Related Directives – Page 1
Purpose – Page 1
Policy – Page 1
Central Record's Hours – Page 1
Call-In Complaints/Walk-In Complaints – Page 2
Taking the Report – Page 3
Central Records Section's Responsibility – Page 3
Patrol Section's Responsibility – Page 3

**Related Directives**

SOP 495.00 The Central Records Section

**Purpose**

The purpose of this policy is to provide Record Personnel and officers with information and guidance on how to process Call-in and Walk-in complaints. If a caller insists on seeing an officer, a patrol car will be dispatched to meet with the complainant and take report.

**Policy**

1.      Central Records personnel or officers in the field (including supervisory personnel), according to the circumstances and the misdemeanor crime involved, may take reports.

2.      Patrol officers are responsible for conducting preliminary investigations of misdemeanor crimes, which contain certain solvability factors.

**Central Record's Hours**

Central Records will accept walk in reports Monday – Friday between 0700 hours and 1700 hours, excluding holidays.

Central Records will accept phone in reports Monday – Friday between 0700 hours and 2200 hours, excluding holidays.

**Call-In Complaints/Walk-In Complaints**

    1.    The following offenses may be taken by the Central Records Section.

*Auto Theft:* — Victim is at headquarters the Record Room personnel can take the report. Victim calls 911: Officers will be dispatched and take report.

*Battery:* — Walk-in:  Record Room personnel can take the report (Crime Scene to document). Victim calls 911: Officers will be dispatched and take report.

*Criminal mischief:* — These reports will be taken by phone or in person by Record Room personnel

*Criminal Recklessness:* — May be taken by Record Room personnel, unless the offense involves a deadly weapon.

*Custody disputes/Violation of Protective Orders:* — If the suspect is not on scene, Record Room personnel will take the report. If suspect is on scene, Officers will be dispatched and take report.

*Financial Crimes:* — Walk in, Record Room personnel takes an initial report.  Any evidence the victim is in possession of should be kept with them until the report is forwarded to Financial Crimes Unit and the unit will follow up on the report.

Victim calls 911, the report should be forwarded / taken by Records Room personnel. If the suspect is on scene, Officers will be dispatched and a report will be taken.

*Gasoline/Fuel drive offs:* — The Records Unit will take this theft report over the phone. When a gas drive off is called into Central Dispatch, they will provide the caller the phone number for the Records Unit report desk and advise the caller to report the theft to Records.

Central Records will accept phone-in reports Monday – Friday, between 0700 hours and 2200 hours, excluding holidays. If the gas drive off occurs when Records is not staffing the report desk, then the caller is to make the report the following business day. Even if the business has a vehicle plate and description of the suspect vehicle, that will still be sent to Records to be reported. If the business has video, the report taker should advise them to download the video and call in when that is completed. Crime Scene will be notified to obtain that video once it is downloaded.

| | |
|---|---|
| *Identity Theft:* | Must be reported in person either to Record Room personnel or dispatched Patrol Officer. |
| *Lost or stolen license plates:* | Must be reported in person at the Record Room. |
| *Missing Person:* | Record Room personnel will take the report unless it fits the following criteria: |

Officers will be sent:
- Person 12 years of age and under
- Elderly person
- Special needs

| | |
|---|---|
| *Telephone harassment:* | Record Room will take these reports. |
| *Theft:* | Record Room will take these reports if there is no known suspect, and the value is under $5,000.00. |
| *Trespass:* | If the suspect is no longer on scene, Records Personnel will take the report.  If the suspect is still on scene, officers will be sent. |

2.      A car should be sent when the following complaints are called in:

A.      Animal cruelty complaint in progress

B.      Hit and run

C.      Traffic Accident

**Taking the Report**

1.      If there are reasonable grounds to suspect that an offense has been committed, complete a case report obtaining as much information as possible from the complainant.

2.      If an on-scene arrest is made, a case report is made after the arrest.

**Central Records Section's Responsibility**

The Central Records Section will process all incoming case reports on misdemeanor offenses per SOP 495.00.

**Patrol Section's Responsibility**

Patrol officers may follow up on misdemeanor case reports except those for specialized units such as narcotics and vice.



# Evansville Police Department
# Operational Guideline



### INITIAL CASE, SUPPLEMENTARY, AND INCIDENT REPORTS

**OG 501.00**
**Effective: 05-21-02**          **Order Numbers: 17-O-14**          **Page 1 of 5**
**Reviewed: 04-19-17**
**CALEA Standards: 82.2.1, 82.2.4**

**Table of Contents**

Related Directives – Page 1
Forms to be Used – Page 1
Initial Case Reports – Page 1
Supplementary Reports – Page 2
Incident Reports – Page 3

**Related Directives**

OG 495.00 – Central Records Unit/Management and Operations
OG 500.00 - Initial Case Reports/Misdemeanor Offenses

**Purpose**

The purpose of this policy is to establish guidelines for maintaining the integrity of initial case, supplementary and incident reports.

**Policy**

It is the policy to ensure that the correct reports are used, properly filled out, maintained and submitted. Members will use the standard reporting forms as provided by the department. These forms will be accessible to officers in Records Management System or Mobile Field Reporting.

**Initial Case Reports**

1.      Officers in the field, CID, or the Central Records Unit may take initial Case Reports. Who takes the report will be based on the type of crime committed, the circumstances surrounding the crime, and the location of the complainant.

2.      Guidelines for Completing the Report

      A.      The report must be completed in its entirety.

B.   The report must be entered into RMS or MFR. Use upper and lower case letters as applicable.

C.   Basic facts must be contained in the narrative to support the type of crime reported.

D.   Once a case number is assigned, this number will not be removed or deleted and reassigned to another report.

E.   Theft of Prescription Medication reports will only be taken once the victim has completed the ***Affidavit: Theft of Medication*** form. The victim can obtain this form from the EPD Records Unit during regular business hours.

3.   Suspect Information: Suspect Information should be placed on the Suspect Information/Descriptors form.

**Supplementary Reports**

1.   Processing Supplementary Reports: Processing Supplementary Reports is a function of the Units supervisor.

   A.   Check for completeness of report:

      (1)   Complainant's name and address

      (2)   Classification of crime

      (3)   Initial Case Report number

      (4)   Name and Badge Number of submitting officer

   B.   If the Initial Case Report number is unknown, determine the number and add it to the report.

   C.   The report should be read by the person doing daily record review to determine if there is any information contained in the report which requires modification of computer data.

      (1)   Additional stolen property or information to be added

      (2)   Recovery of stolen property

      (3)   Suspect information

      (4)   Information concerning investigative status of the offense such as cleared, unfounded or suspended

2.   Cleared, Unfounded and Suspended Cases, and Recovered Property

   A.   Select the word "CLEARED", "UNFOUNDED", SUSPENDED" or "RECOVERED", as applicable.

B.   If the report includes both a cleared case and recovered property, write "CLEARED" at the beginning of the first paragraph and "RECOVERED" at the beginning of the second paragraph..

C.   Follow the word "CLEARED" with "Offense #" listing the Initial Case Report number.

D.   Follow the word "RECOVERED" with "From Offense #" listing the Initial Case Report number.

E.   Sample entries on Supplementary Report:

   (1)   Cleared offense

         <u>CLEARED:</u> Offense # 234500, Burglary, Cleared by arrest, 3 W/M's

         Robert Jones DOB 12-13-47
         J. T. Suthard DOB 01-01-
         01 Tom Korff DOB 01-07-
         37

<u>RECOVERED:</u> From Offense 234500, Sears Model #27, 12 ga. shotgun, ser. # 3131313

   (2)   Property recovered without clearance of offense

<u>RECOVERED:</u> 1 box misc. tools, 1 Smith & Wesson .38 revolver, ser.

#81420

**Incident Reports**

1.   <u>When to fill out an Incident Report</u>

   A.   An Incident Report should be used when an officer determines the need to make a record of events where there is not a prosecutable offense.

   B.   Incident Reports should be used in those instances where there is property to be placed in evidence without an associated offense.

   C.   When an officer makes a run on a "cutting" or other type of "battery" crime and the victim does not wish to prosecute, the officer should complete an Initial Case Report because this is a crime and could be a felony if serious enough. The victim may die and the State may wish to prosecute even though the victim does not.

   D.   The Incident Report is to be used for non-criminal matters as follows:

      (1)   Destruction of animals (shots fired)

      (2)   Mental patient call

**INITIAL CASE, SUPPLEMENTARY AND INCIDENT REPORTS**

           (3)     Attempted suicides

           (4)     Hazardous materials or situations

           (5)     Strikes, job actions, or disorders

           (6)     Suspicious occurrences

           (7)     Domestic violence occurrences where no arrest was made

           (8)     Other non-criminal information that needs to be brought to the attention of other sections, or units

    E.     Where it is known to an officer that several runs have been made concerning the same situation, he may, at his discretion, place this information on an Incident Report. If the officer determines there is a potential for serious bodily injury or death, a report should be completed.

2.     <u>Distribution:</u> Once the report is complete, distribution will be made.

    A.     The original will remain in the Central Records Unit, except as listed in OG 495.00.

    B.     Reports will be routed as follows:

           (1)     Attempted suicide or overdose/adult missing persons/crimes against property and persons committed by adults - Adult Investigations Unit

           (2)     Suspicious occurrences - Applicable investigative unit

           (3)     Lost or found property - Submitting unit (makes an extra copy and gives to the Property and Evidence Unit)

           (4)     Mental patient calls - Crisis Intervention Team

           (5)     Hazardous materials or situations - Notification should be made to the proper agency, which would have control over such materials or situations.

           (6)     Strikes, job actions, and disorders - Commanders of the Patrol Section and the Criminal Investigations Section

           (7)     Other non-criminal information - As determined by the facts surrounding the information or incident.

           (8)     Domestic Violence or Sexual Offenses – DV Unit/Sex Crimes

           (9)     Auto/Scooter theft reports – Auto Theft Unit

           (10)   Hit and Run Accidents – Hit and Run Unit

**INITIAL CASE, SUPPLEMENTARY AND INCIDENT REPORTS**

(11) Financial/Fraud/Identity Theft – Financial Crimes Unit

(12) Offenses with suspects under age 18/missing juveniles – Juvenile Investigation Unit

(13) Any offense against animals – Animal Control Officer

(14) Any incident involving endangered adults – Adult Protective Services

(15) Any narcotics offense or incident – Narcotics Unit

(16) Theft of Prescription Medication – Narcotics Unit

(17) Any crisis intervention report – Crisis Intervention Team

(18) Misdemeanor offense or incident report – Designated Sector

(19) Any criminal intelligence related to gangs, prostitution or other criminal activity – Intel/Vice Unit