UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| EDWARD C. SNUKIS, JR. and SAMANTHA SNUKIS, Co-Administrators of the Estate of Edward C. Snukis, Plaintiffs, | ) ) ) ) ) ) |
| v. | ) CASE NO. 3:21-cv-00135-MPB-MJD ) |
| CITY OF EVANSVILLE, INDIANA; MATTHEW O. TAYLOR, in his individual capacity as an Evansville police officer; TREVOR KOONTZ, in his individual capacity as an Evansville police officer; and NICHOLAS HACKWORTH, in his individual capacity as an Evansville police officer, Defendants. | ) ) ) ) ) ) ) ) ) ) |

**PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS MATTHEW TAYLOR, TREVOR KOONTZ, AND NICHOLAS HACKWORTH**

Come now the Plaintiffs, by counsel, and submit their Response to the Motion for Summary Judgment (ECF 119) filed by the Defendants, Evansville police officers Matthew Taylor ("Taylor"), Trevor Koontz ("Koontz"), and Nicholas Hackworth ("Hackworth").

### I.   STATEMENT OF MATERIAL FACTS IN DISPUTE

On September 13, 2019, at approximately 7:44 PM, a 911 call was placed by an employee of D-Patrick Honda located at 4300 E. Division St., Evansville, Indiana. The 911 caller indicated that a person (Edward Snukis - "Ed") was "hanging around" and "appears to be impaired." The 911 caller indicated that Ed was standing out by the D-Patrick Collision center sign at Indiana and Congress near the road and that the caller was "afraid that he is going to get hit." The 911 caller did not indicate that Ed was violent, armed, or had committed any crime.

(Ex. A – 911 Call)

Evansville police officers Taylor, Koontz, and Hackworth responded to the call. Taylor and Koontz arrived on the scene at 7:52 p.m. (Ex. 5 – Koontz Vid., 00:30; Ex. 6 – Taylor Vid., 00:30; Ex. 1—CAD Report, p. 1). Hackworth arrived at 7: 55 p.m. (Ex. 10– Hackworth Vid. 1:25; Ex. 1—CAD Report, p. 1).

Taylor and Koontz aggressively approached Ed from the moment they arrived on the scene, grabbing him, tasering him multiple times, chasing him, laying on top of him, repeatedly striking him in the head, back, and shoulders while at the same time applying unreasonable and unnecessary positional and compressive force to him as he lay face down on the ground even after he had stopped breathing and become unresponsive (Ex. 5 – Koontz Vid., 00:32-2:57; Ex. 6 – Taylor Vid., 00:40-3:00). Once he arrived, Hackworth helped to restrain Ed even though he had already stopped breathing and was unresponsive (Ex. 10 – Hackworth Vid., 1:30).

Plaintiffs hired Robert Pusins, a police procedures expert with more than 30 years of law enforcement experience with the Ft. Lauderdale Police Department retiring in 2004 as assistant chief.  In 2013 he was hired by the Broward County Florida Sheriff's office and served as the Executive Director until 2018 (Ex. B – Pusins Affidavit, pp. 1-2).

According to Mr. Pusins, the Defendant officers escalated an unremarkable and common police service call into multiple and unreasonable use of force events, including the failure to render medical aid that resulted in the preventable death of Ed Snukis (Ex. B – Pusins Affidavit, ¶ 175).

Perhaps realizing the officers grave errors, the City withheld critical information from Dr. Christopher Kieffer, the pathologist who performed the official autopsy on Ed (Ex. C – Kieffer Depo., p. 73-74). Based on the information available to him, Dr. Kieffer concluded that Ed died

2

of methamphetamine intoxication (Ex. 12—Autopsy Report, p. 1).

At his deposition, Dr. Kiefer testified that he was "not sure if he was told that the officers were attempting pain compliance (Ex. C – Kieffer Depo., p. 73). He also did not recall being told that one of the officers (Taylor) "struck Mr. Snukis to the head with a closed fist" (Ex. C – Kieffer Depo., p. 74, lines 2-9). When asked, "Is that information significant to an examination and determination of cause of death of a person?", Dr. Kiefer responded, "Of course that is -- that's very significant. I would have liked -- I would have -- I would like or expect to know that information before I do an autopsy" (Ex. C – Kieffer Depo., p. 74, line 12). When asked what he would have done differently if he had the information at the time of his examination, Dr. Kiefer testified that "I would have considered other steps in the autopsy. One of them would be just looking more carefully at the -- at the skull for fracture lines. Some fracture lines are very hard to see without a very, very careful assessment. Probably the more important thing would be having the brain examined by what's called a forensic neuropathologist. It's someone in pathology, in forensics specifically, that can look at brain tissue better than I can." (Ex. C – Kieffer Depo., p. 77, lines 2-12)

Plaintiffs hired an independent forensic pathologist, Dr. Cyril Wecht. (Ex. D-Wecht Affidavit, pp. 1-3) Dr. Wecht performed a forensic autopsy of Ed on September 22, 2019, just 9 days after Ed's death. (Ex. D-Wecht Affidavit, p. 3) Information regarding the multiple use of force events against Ed by the Evansville Police Department was provided to Dr. Wecht before the second autopsy on September 22, 2019. "This pertinent information led to the decision to perform additional dissections during the autopsy." (Ex. D-Wecht Affidavit, p. 7) Dr. Wecht concluded that Edward Snukis died from asphyxiation due to positional compression while restrained by and in the custody of the Evansville Police Department in Evansville, Indiana. (Ex.

D - Wecht Affidavit, p. 7)

Koontz was a probationary officer at the time of on the day Ed was killed, Taylor was Koontz's field training officer ("FTO") (Ex. E—FTO/DOR Reports, p. 236).

In the 8/13/2019, Daily Observation Report (DOR) for Koontz under PROBATIONARY OFFICERS EXPECTATIONS (Ex. E—FTO/DOR Reports, p. 146): "Constantly be aware of officer safety, both yours and your fellow officers. Pat downs should be performed on all subjects encountered (within reason). CONTROL EVERYON'S MOVEMENTS."

An undated DOR of Koontz (Ex. E—FTO/DOR Reports, p. 169) contains the following statements in the Weakest Area section regarding his direction to Koontz:

> We discussed the necessity to take control of every one on every run we encounter. We discussed a simple order of operations that can be applied to virtually everything that we do, which is the following: 1) take charge, 2) make it safe, 3) find out who we are dealing with. We also discussed, for the third time now, the fact that I expect all probationary officers to "pat down everyone we encounter (within reason)." This expectation was discussed on Ofc. Koontz's first night of this rotation (8/13/19) when I gave him a printed copy of the expectations for the rotation. We discussed it again on 08/16/19. We again discussed this today and I told Ofc. Koontz that for the rest of the rotation, I expect him to pat down as many people as possible on every run we are on (all still within reason). I also advised Ofc. Koontz that I expect him to step up and take control of runs and also of people's movements while we are dealing with them."

Taylor wrote in another DOR (Ex. E—FTO/DOR Reports, pp. 236-237) for Koontz, dated "Day 21: 09/13/19", the day Ed was killed, the following in response to the question on the form of Were there any supplemental training methods used?

> "Every shift on every run, Officer Koontz has to state the following:
> Whoever I am dealing with, may try to kill me.
> I will not make a mistake so that my wife is a widow.
> I will not search until after subject is handcuffed and properly secured."

This note, an obvious reference to the encounter with Ed, also appears in the same DOR: "During this shift we had a critical incident. It should be noted that Officer Koontz did a good job of maintaining control during a high stress situation." Under the circumstances, this praise

4

could only reenforce the training that everyone he meets may try to kill him.

9 days later, Taylor says this about Koontz in the 9/22/2019 DOR (Ex. E—FTO/DOR Reports, p. 242):

> "I have asked Koontz to say out loud multiple times to state the following:
> The person I am getting ready to encounter may kill me.
> I will not make mistakes that leaves my wife a widow.
> I will only search after handcuffed and properly secured.
> I have not heard Officer Koontz say these items. He advised me that he is saying them to himself. I have asked his to say it out loud hoping that it will help jog his memory."

On 10/17/2019, Taylor wrote this in the DOR:

> After the 4 weeks of AT (additional training) I believe that Officer Koontz will not be able to make it past field training. Officer Koontz's actions will either get himself or others killed or hurt." (page 281 of 243)

The 11/07/2019 DOR entry by Steven Mark Kleeman simply states:

> "Koontz has resigned"

EPD OG on the Use of Force requires officers to "only use a reasonable amount of force when necessary to affect a lawful arrest, attain a lawful objective or overcome an attack to themselves or another person." (Ex. 16 – OG 350.0)

The *Rules, Regulations and Procedures of the Police Department of the City of Evansville, Indiana* (Ex. F – EPD Rules) states:

> • *A member may use force, including deadly force, only when legally justified and when all other reasonable means of accomplishing a lawful police purpose, have failed, or when a member reasonably believes that no other reasonable method can accomplish his intended purposes. (Chapter 5, Use of Force, Sec. 1)*

The *Law Enforcement Code of Ethics* states:

> • *I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence….(Rules, Regulations and Procedures of the Police Department of the City of Evansville, Indiana)*

5

The EPD Operational Guideline on Mental Illness and Commitment Papers, requires officers to:

> • Speak calmly and use non-threatening body language, with your hands at your sides. Using a stern, loud command to gain compliance will have no effect or a negative effect.
> • Keep the commotion down.
> • Prepare for a potentially long encounter. Dealing with such persons cannot be crushed unless it is an emergency situation. De-escalation of the situation, using calming communication techniques, can take time.
> • Repeat short, direct phrases in a calm voice.
> • Maintain a safe distance. (Ex. 16—Mentally Illness and Commitment Papers)

Each of the Defendant officers had contact with and used force against Ed on September 13, 2019 (Ex. 5—Koontz Vid; Ex. 6—Taylor Vid).

Upon the officers' initial contact with Snukis, Koontz used force by grabbing Snukis' left arm and continued that force by attempting to pull and force Snukis' left arm behind his back. (Ex. 5 - Koontz Vid. at 0:00:31; Ex. 6 - Taylor Vid., 00:37; Ex. 7)

Taylor also used force against Snukis as he twice deployed his Taser against Snukis during this first use of force incident. (Ex. B—Pusins Affidavit, ¶ 68; Ex. 5—Koontz Vid., 00:50; Ex. 6—Taylor Vid., 00:50).

The foot pursuit of Snukis and the subsequent ground struggle with Snukis where Snukis suffered from a medical emergency is a second but separate use of force incident involving separate and distinct use of force applications. (Ex. B—Pusins Affidavit, ¶ 67; Ex—5 Koontz Vid., 1:09; Ex. 6—Taylor Vid., 1:08).

The BWCs show that Ed was not aggressive with the officers until after Koontz grabs Ed's arm. Ed asked, "what's going on guys?" But the officers did not respond. Ed backs away from Koontz and Snukis is then seen taking a step backwards and not towards Koontz or Taylor. Taylor and Koontz were the aggressors, not Ed. (Ex. 5—Koontz Vid., 00:30-00:38; Ex. 6—

Taylor Vid., 00:34-00:40).

There has been no evidence presented that at the time Koontz used force against Snukis, that Koontz and/or Taylor had reason to believe that Snukis was armed, was engaged in criminal conduct or was engaged in the commission of a crime involving violence.

The CAD Report (Ex. 1) indicates that the officers were responding to a report of an intoxicated person who had been entering the back parking lot at D. Patrick Honda but was now "standing out by the body shop sign at Congress/Indiana right now."

There were two armed police officers, with weapons, with numerical superiority, training, and advantage over one unarmed possibly intoxicated individual. (Ex. 5—Koontz Vid., 00:30-1:09; Ex. 6—Taylor Vid. 00:30-1:08).

The BWC footage does not support the claims of the officers regarding Snukis' pre-contact behavior that he posed an immediate threat to their safety.

With respect to whether Snukis was actively resisting arrest or attempting to evade arrest by flight, there is no evidence that Snukis was under arrest for any offense at the time of the initial use of force by Koontz against Snukis (Ex. 5—Koontz Vid., 00:35; Exhibit 6—Taylor Vid., 00:35; Ex. B—Pusins Affidavit, ¶ 93).

There is no evidence that Taylor took any reasonable steps or made any effort to intervene and stop Koontz from using force against Snukis during the initial encounter with Snukis or during the second use of force event where Snukis was held down by the officers and handcuffed. BWCs (Ex. 5—Koontz Vid., 00:35-1:08 and 1:09-3:41 (respectively); Ex. 6—Taylor Vid. 00:35-1:07 and 1:08-3:40 (respectively); Ex. B—Pusins Affidavit, ¶ 106).

Koontz reported: (Ex. B—Pusins Affidavit, ¶ 117)

- So I grabbed his legs and lower body

7

- After securing his legs with my body weight, I grabbed his left arm

- I then hooked by left arm under his left arm and grabbed his wrist

- I also grabbed the same wrist with my right hand

- I then used both hands to apply forward pressure, towards Snukis' head, as to gain pain compliance.

- After more pressure from me on his arm and Officer Taylor's pressure on Snukis' arms and upper body, we were able to get his right hand free from under his body.

Taylor reported using force during the ground struggle with Snukis and also reported in his Use of Force Report that "I then struck Snukis in the left side of the head approximately 6 times in an attempt to get pain compliance and to get his to release his grip on my inner thigh." (Ex. 7—Taylor UoF Report, p. 3).

Taylor also stated in his Garrity Statement that he struck Snukis four to five times in the head for pain compliance. Taylor testified in his deposition that he struck Snukis with a closed hand for pain compliance but could not recall how many times (Ex. 9 Taylor Depo., 1:19:40-1:20:16).

Snukis was in a prone position on unpaved ground while being physically restrained by Koontz and Taylor, when Taylor admittedly delivered six strikes to Snukis' head (Ex. 5—Koontz Vid., 3:30; Ex. 6—Taylor Vid., 3:44).

There is no evidence that Taylor paused between blows to allow for Snukis to respond and comply with his commands before he delivered an additional strike.

The severity of the force used by Taylor by repeatedly striking Snukis in the head was exacerbated by the fact that Snukis was in a prone position with his head against the unpaved and solid ground (Ex. 5—Koontz Vid., 3:30; Ex. 6—Taylor Vid., 3:44).

Snukis was unable to physically comply with the officer's commands to put his hands behind his back due to his body positioning with his arms and hands pinned under his body by his own body weight and with the body weight of the officers or any additional pressure on his body as applied by the officers. (Ex. 10—Hackworth Vid., 1:28; Ex. 11—Hackworth Dash. Vid., 2:47).

The audio and video footage from Koontz's, Taylor's, and Hackworth's BWC's is evidence that Snukis went into a medical distress condition during the second use of force incident involving the handcuffing of Snukis. There was a significant delay in time from when Snukis was observed by the officer's to be in obvious medical distress to when CPR was started.

Koontz's (Ex. 5) BWC footage captures images and voices with the following timeline:

2:37 – 3:02: Snukis is heard to be making guttural and snoring sounds indicative of agonal breathing and that he is having difficulty breathing. The sounds become slower, lower in volume and then faint at the 3:02 mark and then all sounds from Snukis ceases. Officers are heard continually shouting commands to Snukis.

0:3:48: Officer Taylor is heard to say the "subject is out."

0:3:51: Officer Taylor is heard to say, "turn him over, make sure he's breathing."

0:4:03: Officer Koontz applies a sternum rub to Snukis with no visible response from Snukis.

0:4:14: An officer is heard to state, "He is breathing, I feel his chest going up and down."

0:5:01: Officer Hackworth is heard to call for Fire Rescue stating, "subject is unresponsive."

0:5:46: Taylor is seen walking away to speak with witnesses.

9

0:6:40: An officer is heard to say, "breathing very little, has a faint purse, nonresponsive."

0:7:16: Sergeant McQuay is heard to say, "I'm not getting a pulse."

0:7:18: Sergent McQuay is heard to say, "get his handcuffs off, we'll start CPR."

0:7:46: CPR is initiated

Taylor's (Ex. 6) BWC footage captures images and voices with the following timeline:

0:01:26 to 0:03:08: Snukis is heard to be making guttural, snoring sounds with slurred speech, indicative of agonal breathing and that he is having difficulty breathing. The sounds become slower, lower in volume and then faint at the 3:08 mark and then all sounds from Snukis ceases. Officers are heard continually shouting commands to Snukis.

0:3:30: Snukis' arm is seen to be between the legs of an officer but his hand and fingers are completely limp, not moving, and unresponsive, during the handcuffing process.

0:3:47: An officer says, "in custody, the subject is out."

0:3:53: Taylor says, "turn him over, make sure he's breathing."

0:4:03: Hackworth says, "start AMR;" Koontz starts sternum rub.

0:4:34: Taylor says, "Nick, is he still breathing?"

0:4:50: Taylor asks dispatch to have someone secure his police vehicle that is in from of D. Patrick Honda.

0:4:49: Hackworth calls for Fire to respond, and says, "he's unresponsive."

0:5:47: Taylor walks away from Snukis, Koontz and Hackworth to talk with witnesses.

0:6:15: A witness asked Taylor why Snukis in not moving and Taylor responds, "he is passed out and is as drunk as a skunk."

0:6:47: Taylor walks back to the scene and Snukis can be seen being held in position on his side by an officer's hand and leg. No one appears to be attending to Snukis.

0:7:16: An officer is heard to say, "I'm not getting a pulse."

0:7:20: An officer says, "I'm not getting a pulse, get his handcuffs off, we're probably going to have to roll him over and start CPR."

0:07:45: CPR is initiated.

0:12:00: EMS makes contact with Snukis and advised the officer to continue CPR.

Hackworth's BWC footage captures images and voices with the following timeline:

0:01:29: Hackworth arrives and make contact with Snukis, Taylor and Koontz.

0:01:36: Hackworth radios "Everett 220, in custody, subject is out."

0:01:52: Hackworth radios for a sergeant to respond and for AMR to respond.

0:05:35: CPR is initiated.

It is evident from Koontz's, Taylor's, and Hackworth's BWC footage that the officers started CPR on Snukis approximately 4 minutes and 44 seconds after it was obvious that he was suffering from agonal breathing, was having difficulty breathing, and was in medical distress. CPR was started at least 3 minutes and 58 seconds after an officer said, "subject is out."

It is evident that there were no sounds coming from Snukis after the 0:3:02 mark on Taylor's, Koontz's and Hackworth's BWC footage that would indicate that he is breathing. In fact, Snukis' hands and fingers can be seen as limp with in Taylor's BWC footage while the officers are still attempting to handcuff Snukis.

Finally, during the deposition of Ed's daughter, Sierra, she was asked about the bodycam footage.

Q What about the body cam footage leads you to believe that the police killed your father?
A Because my dad said, "I can't breathe."
Q Anything else that stands out to you?
A I just heard him dying on the police cam. I heard him moaning, I heard him dying, I heard him saying multiple times, "I can't breathe." (Ex. G—Sierra Snukis Depo., pp. 21-22).

## II. EXPERT TESTIMONY AT TRIAL

Plaintiffs' expert Robert Pusins will testify at the trial of this matter as to his opinions set forth in Exhibit B. For purposes of summary judgment, the disputed material facts support the following legal conclusions:

1. The force used by Koontz against Snukis, during the first use of force incident, was not reasonable under the totality of circumstances. Ex. B ¶¶ 68-101-

2. Taylor and Koontz failed to report their actions in complete, clear, concise, concrete, and correct police reports. See Exh B. ¶¶102-103.

3. Taylor failed to intervene and attempt to stop the use of force by Koontz against Snukis. See Exh. B ¶¶104-107.

4. The force used by Taylor against Snukis during the first use of force incident (tasers) was not reasonable under the totality of circumstances. Ex. B ¶¶108-115.

5. The force used by Koontz against Snukis during the second use of force incident involving the handcuffing of Snukis was not reasonable under the totality of circumstances. Ex. B ¶¶116-120.

6. The force used by Taylor against Snukis during the second use of force incident involving the handcuffing of Snukis was not reasonable under the totality of circumstances. Ex. B ¶¶121-133.

7. Koontz, Taylor, and Hackworth failed to recognize that Snukis was in medical distress and failed to summon or provide medical aid to Snukis in a reasonable amount of time.  Ex. B ¶¶ 134-143.

8. The EPD failed to train EPD officers on their duty to intervene to prevent an officer from using excessive force, on de-escalation skills and techniques during force events, and to recognize and respond to individuals suffering from medical distress, difficulty breathing, agonal breathing, and to suspect who state, "I cannot breathe?" Ex. B ¶¶144-155

9. The EPD failed to conduct a reasonable investigation of the use of force by Koontz and Taylor. Ex. B ¶¶156-159

10. The EPD OG's were not reasonable and consistent with generally accepted police practices regarding policies or operational guidelines.  Ex. B ¶¶ 160-169

11. The EPD failed to properly collect and preserve evidence in this case. Ex. B ¶¶ 170-176

### III.    STANDARD OF REVIEW

Summary judgment is only appropriate if the designated record shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Hemsworth v. Quotesmith.Com, Inc., 476 F.3d 487, 489-90 (7th Cir. 2007). The evidence of the nonmovant must be believed and all justifiable inferences must be drawn in his favor. Id. at 490. The district court is "not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." Id.

At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must

view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Because an excessive force case "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, the 7th Circuit Court of Appeals has held on many occasions that summary judgment as a matter of law in excessive force cases should be granted sparingly." Abdullahi v. City of Madison, 423 F.3d 763, 773 (7th Cir. 2005).  See Williams v. Boley, No. 4:21-cv-68-RLM-KMB, 2023 U.S. Dist. LEXIS 5678, at *9 (S.D. Ind. Jan. 12, 2023) ("'The obligation to consider the totality of the circumstances in these cases often makes resort to summary judgment inappropriate.") Siler v. City of Kenosha, 957 F.3d at 759. This is especially true in deadly force cases where "the witness most likely to contradict the officer's testimony—the victim—cannot testify." Cyrus v. Town of Mukwonago, 624 F.3d 856, 862 (7th Cir. 2010).

## IV.    ARGUMENT

### A. Defendant Officers used excessive force (Count I).

Plaintiff's expert, Robert Pusins has expressed his opinion that Taylor's use of force throughout this case was not reasonable under the totality of circumstances.  See Section III and Ex. B.

Taylor tries to divide and conquer his multiple uses of force by examining the type of force used in separate sections of his brief. (E.g., use of a taser, p.17 and strikes to Snukis' head p. 18.)

Taylor argues that the taser used by him against Ed was "reasonable" under Graham. (ECF 120 at 17) "…[T]he question is whether the officers' actions are 'objectively reasonable' in

14

light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989); see also Abdullahi v. City of Madison, 423 F.3d 763, 768 (7th Cir. 2005).

Taylor quotes Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 733 (7th Cir. 2013) Brief p. 17 for the proposition that, "Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable." Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 727 (7th Cir. 2013).  However, Abbott itself is an exception to the quoted rule.

The Court reversed summary judgment for the defendant on the reasonableness of using a taser multiple times.  In Abbott, a law enforcement officer tased woman that he thought was trying to help her son flee the scene.  The officer held up his hand and twice ordered the plaintiff to stop, but she failed to comply.  Without warning the officer shot the plaintiff in the abdomen with his taser, causing her to fall to the ground. The officer came closer to her and yelled for her to roll over onto her stomach, but she did not comply so the officer "hit her with another jolt of electricity." After the second jolt, the officer rolled her over onto her stomach.  Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 710–11 (7th Cir. 2013).

The trial court granted the officer's motion for summary judgment holding that because plaintiff had admitted that she disobeyed direct orders to stop and roll over on her stomach, "[a] reasonable officer would have believed that employing a taser gun [the first time] ... would not violate [a person's] constitutional rights." Id. (citation omitted). As to the second employment of the taser, the court dismissed [the plaintiff's] testimony that she did not comply because she could not move because " 'what matters for this question is not the arrestee's perspective but

15

rather the perspective of a reasonable officer on the scene.' " Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 712 (7th Cir. 2013).

The Court of Appeals reversed stating that "The totality of the circumstances, when viewed in a light favorable to [the plaintiff], demonstrates that [the officer's] second application *730 of the taser could be determined by a jury to have been unreasonable. [Plaintiff] was shot in dart mode both times, which caused her to lose control of her skeletal muscles, a very significant intrusion on her Fourth Amendment interests." Abbott v. Sangamon Cnty., Ill., 705 F.3d 706, 729–30 (7th Cir. 2013).

In the present case Taylor deployed his taser against Ed and demanded that he get on the ground. BWC When Ed did not comply, Taylor deployed the taser again. The tasing was preceded by a use of force by Koontz and succeeded by multiple uses of force by Taylor, Koontz, and Hackworth that left Ed dead on the ground. According to the case law and Plaintiff's expert the use of force was not reasonable.

Taylor then argues that six strikes to the head with a closed fist are reasonable under *Graham*. Brief at 21-22.

In <u>Brumitt v. Smith</u>, No. 320CV00260TWPMPB, 2023 WL 403964, at *13 (S.D. Ind. Jan. 25, 2023), this court addressed an Evansville police officer in a very similar situation. In that case the officer struck the plaintiff in the face 4 times with a closed fist. This court noted that "Closed-fist strikes, unlike taser or firearm deployments, can vary widely in severity. The extent of Brumitt's injuries is therefore "relevant, but not dispositive," in determining how much force Sergeant Smith used in administering four closed-first strikes, and whether the strikes were excessive." The officer's motion for summary judgment was denied. Brumitt v. Smith, No. 320CV00260TWPMPB, 2023 WL 403964, at *7 (S.D. Ind. Jan. 25, 2023.

In Cyrus v. Town of Mukwonago, 624 F.3d 856, 862–63 (7th Cir. 2010), the Court of Appeals an officer cannot continue to use force "only when exercised in proportion to the threat posed, …, and as the threat changes, so too should the degree of force, … Force also becomes increasingly severe the more often it is used; striking a resisting suspect once is not the same as striking him ten times. It's the totality of the circumstances, not the first forcible act, that determines objective reasonableness."

Next, Koontz argues that his use of force was also reasonable. Brief at 20 The only use of force identified by Koontz is that he did not tackle Snukis, Snukis tripped. Koontz does not address any of the other uses of force by Koontz as described elsewhere in this brief.

Hackworth argues that the only use of force alleged by Plaintiffs against Hackworth is that he assisted with restraining Snukis after he had stopped breathing. Plaintiffs claim against is Hackworth is limited to the failure to render aid.

Finally, Defendants collectively argue that "qualified immunity" forecloses certain of Plaintiffs' claims, specifically, the two uses of a taser, the strikes to the head, restraint, and pain compliance. Brief at 23. In *Brumitt, supra,* the Court held that genuine disputes of material fact as to whether Brumitt was unconscious and whether a reasonable officer would have perceived him as unconscious and had time to recalibrate his use of force preclude summary judgment on Sergeant Smith's qualified immunity argument. Brumitt v. Smith, No. 320CV00260TWPMPB, 2023 WL 403964, at *13 (S.D. Ind. Jan. 25, 2023).

Plaintiffs have shown here by the expert testimony of Dr. Wecht and Mr. Pusins and the additional materials designated that there are disputed material facts that preclude summary judgment on Plaintiffs' use of force claims.

**B. Defendants are not entitled to judgment in their favor as to Plaintiffs' § 1983 claim that Defendant Officers failed to provide medical care (Count I).**

The Defendants next argue that they are entitled to summary judgment on the claim that they failed to provided with reasonable medical care. Their argument rests entirely upon their interpretation of what can be seen on the officers bodycam footage. Plaintiffs have submitted the affidavit of Dr. Wecht which concludes that Edward Snukis died from asphyxiation due to positional compression while restrained by and in the custody of the Evansville Police Department in Evansville, Indiana. (Ex. D - Wecht Affidavit) Plaintiffs have also submitted a detailed timeline describing the events, including identifying Ed's difficulty breathing. See Section II of this Brief.

As acknowledged by Defendants in their brief, this Court has already determined that the allegations of the complaint establish Ed's right to medical care. CM/ECF 66. Plaintiffs have now supported those allegations in Section II of this Brief and by the affidavits of Dr. Wecht and Mr. Pusins.

**C. Officer Taylor is not entitled to judgment on Plaintiffs' claim for failure to intervene (Count I)**

In Abdullahi v. City of Madison, 423 F.3d 763, 774 (7th Cir. 2005) the Court of Appeals held that "[a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring."

In Thomas v. City of Fort Wayne, No. 1:06-CV-320 PS, 2008 WL 282348, at *6 (N.D. Ind. Jan. 31, 2008),the court held that "The Seventh Circuit has clearly stated that "it is one thing

to use force in subduing a potentially dangerous or violent suspect, and quite another to proceed to gratuitously beat him." *Frazell v. Flanigan,* 102 F.3d 877, 885 (7th Cir.1996); *see also Lester v. City of Chicago,* 830 F.2d 706, 714 (7th Cir.1987) (jury could have found excessive use of force if it believed plaintiff's testimony that even though she did not resist arrest, officers threatened to punch her, kneed her in the back, dragged her down a hallway, and handcuffed her so tightly her wrists were bruised), *overruled on other grounds by McNair v. Coffee,* 279 F.3d 463 (7th Cir.2002); *Herzog v. Vill. of Winnetka,* 309 F.3d 1041 (7th Cir.2002) (plaintiff entitled to jury trial on excessive force claim where she produced evidence that the arresting officer shoved her to the ground even though she was not resisting).

In this case much of the evidence is on film. The entire incident took minutes, not hours. There are two very different claims about what was said. The Defendants' want to talk about the vulgarities spoken by Mr. Snukis as he gasped for breath.

WHEREFORE, Plaintiffs respectfully request that this Court deny the Motion for Summary Judgment filed by the Defendants.

/s/Mark E. Miller
Mark E. Miller, Attorney No. 10458-82
Mark Miller Law Office
915 Main Street – Suite 203
P.O. Box 3009
Evansville, IN  47730
Phone:  (812) 303-3444
mmiller@indianalawonline.com
*Attorney for Plaintiffs*

## *Certificate of Service and Compliance*

I hereby certify that on October 27, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this case.

By: */s/ Mark E. Miller*
Mark E. Miller, Attorney No. 10458-82
*Attorney for Plaintiffs*