# In the Matter Of:

*EDWARD C. SNUKIS, JR., ET AL.*

*-v-*

*CITY OF EVANSVILLE, INDIANA, ET AL.*

_____

**Christopher J. Kiefer, M.D.**

*April 07, 2023*

_____



800.869.0873 | www.StewartRichardson.com

Reporting Driven by Excellence — Since 1975

INDIANAPOLIS | CARMEL | EVANSVILLE | FORT WAYNE | SOUTH BEND | VALPARAISO

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF INDIANA
 2                     EVANSVILLE DIVISION

 3   EDWARD C. SNUKIS, JR. and    )
     SAMANTHA SNUKIS,             )
 4   Co-Administrators of the     )
     Estate of Edward C.          )
 5   Snukis,                      )   CASE NO.
                                  )   3:21-cv-00135-TWP-MPB-
 6             Plaintiffs,        )   MJD
                                  )
 7         -v-                    )
                                  )
 8   CITY OF EVANSVILLE,          )
     INDIANA; MATTHEW O.          )
 9   TAYLOR, in his individual    )
     capacity as an Evansville    )
10   police officer; TREVOR       )
     KOONTZ, in his individual    )
11   capacity as an Evansville    )
     police officer; and          )
12   NICHOLAS HACKWORTH, in his   )
     individual capacity as an    )
13   Evansville police officer,   )
                                  )
14             Defendants.        )

15

16         The videoconference (recorded) deposition

17   upon oral examination of CHRISTOPHER J. KIEFER, M.D.,

18   a witness produced and sworn remotely before me,

19   Sherry D. Lenn, RPR, and Notary Public in and for the

20   County of Warrick, State of Indiana, taken on behalf

21   of the Plaintiffs, remotely via Zoom videoconference

22   on April 7, 2023, at 9:17 a.m., pursuant to the

23   Federal Rules of Civil Procedure.

24              STEWART RICHARDSON & ASSOCIATES
                Registered Professional Reporters
25                       (800)869-0873
```

1 -- I think it was the left side of his neck, and
2 that was concerning.  Unfortunately, the video
3 findings were not -- the camera position was not in
4 a good place to be able to tell -- from that
5 vantage point, I could not tell if there was
6 actually contact between the officer's knee and the
7 neck.  And in my discussions with people involved
8 in the investigation, there was no evidence or no
9 admission that that -- that officer's knee had
10 actually made contact.  That was not part of the
11 procedure.  They did not admit to that being part
12 of the tactic or -- or used in that case.
13 Q Were you told that one of the officers was
14 attempting pain compliance on Mr. Snukis?
15     MR. WHITEHEAD:  Objection to the extent it
16 calls for expert testimony.  You can answer if you
17 know.
18 A Yeah, I -- I'm not -- I'm not sure.  You're making
19 me -- you're jogging my memory, and I'm thinking of
20 a -- a comment that was made during the autopsy
21 that I did not recall but my assistant made a
22 comment on.  And I know that refutes my earlier
23 testimony that I did not talk to anybody about this
24 case since I've been deposed.  I did hear a comment
25 from my assistant about a -- a hemorrhage on the

1 right hip. So I -- I apologize for making that
2 mistake earlier.
3 Q No, it's fine. It's not a problem. I'm just
4 trying to, you know, understand what you did, and
5 it's okay I appreciate you bringing that up. I do.
6 But my question was do you recall being told by the
7 -- anyone, you know, with -- from the police
8 department or the coroner's office that one of --
9 at least one of the officers was attempting pain
10 compliance on Mr. Snukis?
11 A So when you -- when you asked this question, I
12 don't know specifically if that's -- if this is the
13 -- the moment where I was -- when I was instructed
14 about pain compliance. But in this recent
15 conversation with my assistant, I was forced to
16 remember there was a discussion about a -- a bruise
17 or a subcutaneous hemorrhage on the right hip where
18 an officer made a comment that that is -- or my
19 assistant made a comment that that is the tactic
20 where an officer very forcibly applies the knee to
21 some other person's leg. So if that's -- she might
22 have -- my assistant might have mentioned that. It
23 was called something similar to pain compliance.
24 That's the reason that's jogging my memory. So
25 that's -- that's the only thing I'm aware of as far

1    as that goes.
2  Q  Do you recall if any of the police officers told
3     you that one of the officers struck Mr. Snukis to
4     the head with a closed fist?
5  A  No, I don't recall that information.
6  Q  Do you recall being told that he struck Mr. Snukis
7     with a closed fist six times?
8  A  No.  I -- as far as I can remember, I was not aware
9     or I was not told that information.
10 Q  Is that information significant to an examination
11    and determination of cause of death of a person?
12 A  Of course that is -- that's very significant.  I
13    would have liked -- I would have -- I would like or
14    expect to know that information before I do an
15    autopsy.
16 Q  And do you recall whether, in the documentation you
17    were provided, if you were provided with a document
18    called Use of Force Report?
19 A  I might have seen that.  I don't remember.  I can't
20    say for sure that I haven't seen that.
21 Q  So if -- if it were true that the officer
22    self-reported that he struck Mr. Snukis to the head
23    on six -- six times with a closed fist, would that
24    be information that would cause you to want to
25    reexamine the records and determine the impact of

1     that -- those facts on your report?
2 A  Certainly it would help to -- well, it would have
3     helped to have that information, again, before the
4     autopsy so I could refine the steps that I take
5     during the autopsy. Most people wouldn't realize
6     that that's -- that's important. No autopsy is the
7     same. We follow the same standard procedure in
8     autopsies, but as in this case, there were special
9     additional dissections taken due to the nature of
10    the case. So I hope that is a good example of why
11    an autopsy needs to be performed according to the
12    specific nature of the case. So that would have
13    been helpful then -- having that information at
14    this point, I don't want to say would be of little
15    value, but it's difficult to use that information
16    after the report has been submitted.
17 Q  Why is that?
18 A  Well, for the reason I just said. And I'll say it
19    again if you want me to. The -- the autopsy -- the
20    approach to an autopsy in determining what specific
21    steps need to be taken during the autopsy are
22    determined by knowledge of the case. And -- and
23    like I just said, a specific example is -- is here
24    -- is evident here in this case. I -- I did a
25    different technique than I usually do in most cases

1    or I added an additional technique whereby the body
2    was rolled over and the skin was reflected off the
3    back of the extremities.  That would not have been
4    done if -- if no one had told me that this -- this
5    case was involved with a -- with officers.
6  Q  I'm sorry, I got a little lost there.  Which --
7  A  I'm sorry.  It's confusing.  I'm trying to explain
8    it simply, but it's confusing.
9  Q  Well, which case were you talking about?  The
10   Snukis case?
11 A  Specifically in this case.  To use an exam- -- I
12   was using an example from this case of why
13   knowledge before an autopsy of the case helps to
14   determine the outcome or the -- the set of
15   procedures that are used during the autopsy itself.
16   So the nature of the case and information about the
17   case helps guide a forensic pathologist when he's
18   making decisions about what to do exactly in the
19   autopsy.  Not all autopsies have the same
20   dissection procedures.  There are -- there are
21   several specific dissection procedures that can be
22   added on to a routine autopsy or added to the
23   routine steps in autopsy, therefore my statement
24   not all autopsies are the same.
25 Q  Okay.  I understand now.  Had you known, been told

1    at the time of your examination that Mr. Snukis had
2    been struck six times to the head with a closed
3    fist, what would you have done differently?
4  A  I would have considered other steps in the autopsy.
5    One of them would be just looking more carefully at
6    the -- at the skull for fracture lines.  Some
7    fracture lines are very hard to see without a very,
8    very careful assessment.  Probably the more
9    important thing would be having the brain examined
10   by what's called a forensic neuropathologist.  It's
11   -- someone in pathology, in forensics specifically,
12   that can look at brain tissue better than I can.
13 Q  I understand this is a hypothetical question, but
14   looking at it now, assuming you had those facts,
15   would you have done those things that you just
16   described?  Would you have brought in a different
17   pathologist?
18 A  I think the likelihood of that is high, actually.
19   I would have to know more about the -- so again,
20   this -- this would lead to more questions as to how
21   I would review the -- the body cam footage.  I
22   would want to find out if I was missing those hits
23   or the strikes to the head in the footage or if I
24   was missing them, why I was missing them, if
25   there's other footage available to me.  Maybe the

```
 1      whole situation could be resolved by watching the
 2      body cam footage if I could see those blows on
 3      film.  That doesn't -- that doesn't mean
 4      necessarily that I would not still proceed with
 5      having the brain sent to a forensic
 6      neuropathologist, but that could deter me from
 7      doing that.  It all depends.  It is very much a
 8      hypothetical situation.
 9   Q  Do you recall if you noted in the video you saw any
10      unusual breathing patterns by Mr. Snukis?
11   A  I don't recall if I did.
12   Q  You're not saying you didn't, but you just don't
13      have that recollection?
14   A  No.  After this much time passing, if there was
15      something as standard as like agonal breaths, I
16      would not have recalled that.  That's the -- when I
17      say standard as agonal breaths, agonal breathing is
18      something that I've probably seen on video before.
19      I actually can't even say for sure if I've seen
20      that before, but I know that that is part of dying
21      and I've -- I've read so many reports of agonal
22      breaths at the time of death that I wouldn't be
23      surprised if that was present in a video in a case
24      like this.
25   Q  What would that -- if it were observed or
```

1     documented, what would that -- how would that have
2     affected your examination?
3   A I don't know that it would affect it.  If I -- if I
4     would have seen the video before the autopsy and I
5     saw agonal breathing, I would -- I would have been
6     more worried about a very rapid death as in
7     something like a brainstem lesion, which would be
8     from trauma, or could also be a natural death.  So
9     high blood pressure could also be some sort of a
10    brain stem lesion that would cause agonal
11    breathing.  It's hard to say.  It's hypothetical.
12    I don't know that it would have changed anything
13    with the autopsy.
14  Q You note in your summary that -- this is Exhibit 2.
15    Are you able to read that?  That's probably better,
16    right?
17  A Can I just put this on pause for just a second?
18  Q Of course.
19        (A brief recess was taken.)
20  MR. MILLER CONTINUES:
21  Q So I just want to walk through these findings with
22    you.  You say "History of the decedent exhibiting
23    agitation and aggression."  Do you recall on what
24    you based that?
25  A That comes from both discussions with people