**Robert R. Pusins & Associates, Inc.**
*Police Practices & Procedures Experts*
www.robertpusins.com

171 SE 14th Street,
Pompano Beach, FL 33060
robertpusins@att.net
954-303-2169

August 25, 2022

Mark E. Miller, Esq.

Mark Miller Law Office

915 Main Street, Suite 203

Evansville, Indiana 47730-23009

RE:    United States District Court

For The Southern District of Indiana

Civil Action No. 3:21-cv-135

Edward C. Snukis, Jr. and Samantha Snukis,

Co-Administrators of the Estate of

Edward C. Snukis

Plaintiffs

v.

Matthew O. Taylor, in his individual capacity as an Evansville police officer:

Trevor Koontz, in his individual capacity as an Evansville police officer;

Nicholas Hackworth, in his individual capacity as an Evansville police officer; the

City of Evansville, Indiana

Defendants

Dear Mr. Miller:

I have been retained by the Mark Miller Law Office in my capacity as a police practices and procedures expert and a use of force expert in the referenced case.[1] I was tasked to determine if the conduct of the Evansville Police Department (EPD), and Officer Matthew O. Taylor (Taylor), Officer Trevor Koontz (Koontz), and Officer Nicholas

---

[1] My curriculum vitae is attached, including my qualifications, a list of publications within the past 10 years, and a list of testimony within the past 4 years. My rate of compensation is $375.00 per hour.

Hackworth (Hackworth), was objectively reasonable under the totality of circumstances and in compliance with generally accepted police practices and customs regarding investigative stops, the use of force, rendering aid, policies, procedures, and training.

As background to my expert witness qualifications, I began my 35-year active-duty career in law enforcement in 1974 with the Fort Lauderdale Police Department (FL). I served Fort Lauderdale as a police officer, a field training officer, detective, sergeant, captain, district commander, major, and assistant chief. I retired in 2004 with over 30-years of law enforcement experience.

In 2013, I joined the Broward County Sheriff's Office as a member of the Sheriff's Executive Command Staff with the rank of Executive Director and served in that capacity for over 5-years before leaving the agency in 2018.

During my career in law enforcement, I have been involved in hundreds of stop and frisk and arrest encounters with suspects/individuals where force was not used by myself or other officers, as the facts and circumstances did not warrant a force response. I have also been involved in hundreds of stop and frisk and arrest encounters with suspects/individuals where force was used by myself or by other officers as the facts and circumstances warranted a force response.

I have supervised hundreds of officers and have reviewed their compliance with standards relating to police conduct and the use of force as both a supervisor and later in command and executive management positions. I have reviewed and evaluated the thoroughness of hundreds of such use of force investigations, including internal investigations regarding the use of force.

Over my career, I have had extensive law enforcement management, administrative, investigative, and operational experience, supplemented by practical, and formal education, and specialized training. I have received over 4,800 of hours of specialized and professional training in nearly all areas of law enforcement including particular emphasis in the area of investigations, use of force, police liability, and policies and

procedures. I have been involved and responsible for the development and updating of police policies and procedures for over 20-years during my law enforcement career.

I received a Bachelor of Arts degree from the University of South Florida in Tampa, Florida. I am a graduate of the FBI National Academy in Quantico, Virginia, and a graduate of the University of Louisville's Southern Police Institute Command Officers Development Course. I am a certified Force Science Analyst from the Force Science Institute of the University of Minnesota. I was also awarded "life member" status with the International Association of Chiefs of Police (IACP).

I have been consulting as an expert in the field of law enforcement since 1997 and have been retained as an expert in civil and criminal cases in thirty-one states, the District of Columbia, and in Canada. I have been qualified as an expert in the use of force by state and federal courts and have never been not qualified or prohibited to testify in any civil or criminal case as an expert.

A copy of my Curriculum Vitae is attached to this report. My Rule 26 Disclosure, documenting my testimony over the past 4-years in deposition or trial, as well as my publications over the past 10-years, is also attached to this report.

I. **Factual Allegations as taken directly from the Complaint, in part,:**

10. *On September 13, 2019, at approximately 7:44 PM, a 911 call was placed by an employee of D-Patrick Honda located at 4300 E Division St., Evansville, IN. The 911 caller indicated that Ed was "hanging around" and "appears to be impaired." The 911 caller indicated that Ed was standing out by the D- Patrick collision center sign at Indiana and Congress near the road and that the caller was "afraid that he is going to get hit." The 911 caller did not indicate that Ed was violent, armed, or had committed any crime.*

11. *The EPD Event Report States that the first dispatch was issued at approximately 7:49 PM. The report said that Ed was an "intoxicated person, and that the priority for the call was described as "Priority 4."*

12. *The priority of service calls is defined in the EPD Operational Guideline (OG 533.00). Priority 1 is a service call that involves a "Threat to life/public safety" and requires an "emergency response." Priority 2 is a service call that "has the potential to develop into threat to life or property" and requires and immediate response. Priority 3 is a service call that involves "Disorderly Conduct, Shoplifter, PD Accident, etc." and requires an "immediate response." Priority 4 is a service call for "Situations requiring a routine response in which there is no urgency involved. (Public intoxication Standby, General Complaints, etc.)." The expected response time for a Priority 4 service call is "within one hour".*

13. *Based upon the information available at the time, Koontz and Taylor had no reason to believe that Ed was a danger to himself or others.*

14. *Taylor and Koontz arrived at 7:52 PM. Ed was not injured, combative or in a restricted area. However, immediately upon arriving and without any cause, notice, or warning, Koontz aggressively approached add (sic) and repeatedly demanded that Ed "put [his] hands on [his] head."*

15. *Without speaking to Ed, Koontz grabbed Ed's arm. Ed asked, "Why? What's going on?" Koontz never answered those questions. By grabbing Ed's arm, Koontz was using force before it was justified or reasonable.*

16. *Koontz and Taylor began yelling at Ed in a manner that would cause fear and distress in any reasonable person. Throughout the ordeal, neither Koontz nor Taylor asked Ed to identify himself or explained to Ed who they were or why they were there.*

17. *As Ed pulled away from Koontz, Ed fell to the ground striking his head. Ed was tasered multiple times. Ed tried to stand up and he was tasered again. Koontz and Taylor continued yelling at Ed. In a clear state of fear, Ed got to his feet and ran away from Koontz and Taylor. Koontz and Taylor gave chase and eventually caught up with Ed. Ed fell face down on the ground and Taylor and Koontz jumped on Ed and held him down.*

18. *While on the ground unarmed and defenseless, Ed was assaulted and beaten by Koontz and Taylor. The Officers forced Ed to remain prone on the ground with his head, face, and mouth in the dirt as they try to*

*handcuff his hands behind his back. At the same time, the Officers used excessive force by exerting physical pressure with their hands, arms, and legs on Ed's head, neck, shoulders, chest, and back. Even as Ed's speech became slurred and then silent and his breathing became difficult and then stopped, Koontz and Taylor continued to assault and forcibly restrain Ed as he lay face down and lifeless on the ground.*

19. *Hackworth arrived on the scene and participated in the assault by assisting with restraining and handcuffing Ed.*

20. *The Officer's relentless assault was not justified under the law or circumstances and caused Ed fear, distress, extreme pain and suffering, unconsciousness, asphyxiation, and death. The Officers did not have probable cause to arrest add (sic) or reasonable suspicion to conduct and investigatory detention. Ed's actions were at all times reasonable responses to the excessive force used by the Officers.*

21. *The brutal attack on Ed was the proximate cause of his injuries and death. While the Officers assaulted Ed, who the Officers new had no weapons and was not a threat to anyone, Ed's speech became slurred, he became unresponsive, he stopped breathing, and died. At no time did the Officers have a justifiable reason to use the force they employed.*

22. *The Officers had a duty to properly monitor Ed's breathing and pulse. Once Ed was subdued, the Officers Knew or should have known that Ed was unresponsive and had stopped breathing. The Officers had the legal authority and duty once Ed was in their custody to provide him with immediate medical care and request medical assistance. Instead, the Officers left Ed handcuffed face down on the ground for several minutes without any medical care or assistance.*

23. *The Officers breached the standard of care and generally accepted police training and practices during their contact with Ed, including but not limited to the following:*

   a. *Koontz did not have reasonable suspicion or probable cause to justify making physical contact with Ed and to use any level of force against Ed.*

b. *Taylor, as the Field Training Officer, and who was supervising Koontz, had a duty and obligation to intervene and stop Koontz from making physical contact with Ed and to stop Koontz from using force against Ed and to stop Koontz from using force against Ed as Koontz did not have reasonable suspicion or probable cause to justify his conduct.*

c. *Taylor did not have reasonable suspicion or probable cause to justify using force against Ed.*

d. *Koontz and Taylor failed to recognize that Ed was exhibiting behavior that was indicative of a person who was in a mental health crisis and that he was not engaged in criminal conduct.*

e. *Taylor and Koontz failed to use de-escalation techniques during their contact with Ed to create time, distance, and space to allow for other viable resolutions, tactics and options during the contact with Ed.*

f. *The Officers failed to recognize that Ed was breathing in an abnormal fashion and was engaged in agonal breathing indicating that he was suffering from a medical emergency and was nearing death requiring the officers to cease assaulting him, provide immediate medical aid, and immediately summon emergency medical services for him.*

g. *The City failed to thoroughly investigate the Officer's conduct and the totality of circumstances that led to Ed's death while in the custody of the Officers and failed to hold the officers accountable for, among other issues, use of excessive force, failure to intervene, failure to recognize that Ed was in a mental health crisis, failure to recognize that Ed was suffering from a medical emergency requiring immediate police intervention, and failure to immediately provide/summon emergency medical services for Ed.*

h. *The City failed to investigate and recognize obvious falsehoods in the Officer's accounts that Ed was "aggressive" and was "approaching the officers in an aggressive manner" when compared to video recordings and other evidence of the Officers' contact with Ed that demonstrate that the Officer's accounts were false.*

     i.  *The City failed to train their officers and/or have sufficient policies on the core tasks of investigative detentions, searches, reasonable suspicion, probable cause, arrests use of force, crisis intervention, duty to intervene, agonal breathing, medical distress, and providing/summoning emergency medical services, to prevent illegal detentions, excessive force, and the deaths of persons who are in the custody of their officers.*

     j.  *But for the forementioned conduct of the Officers, Ed would not have lost his life on September 13, 2019.*

24. *The Defendants are not entitled to qualified immunity as the Officer's conduct violated a constitutional right clearly established at the time of the incident. The evidence is that the Officers attacked Ed from the moment they arrived on the scene, grabbing him, tasering him multiple times, chasing him, laying on top of him, repeatedly striking him in the head, back, and shoulders while at the same time applying unreasonable and unnecessary positional and compressive force to him as he lay face down on the ground even after he had stopped breathing and become unresponsive.*

25. *The right to be free from the use of excessive force was clearly established under the law before the incident in question. When the Officers arrived at the scene, they did not have reasonable suspicion to detain Ed nor probable cause to believe that Ed had committed any crime. The 911 caller indicated that Ed might be impaired and that he was worried that Ed might get hit by a car. The caller was concerned for Ed's wellbeing, and did not express any concern that Ed was a danger to others or violating any laws. There is nothing in the 911 call to justify the immediate aggression, both verbal and physical, shown by the Officers upon their arrival.*

26. The City failed to properly train the Officers, adopted unconstitutional policies and procedures for how its officers interact with the public and subdue individuals who fail to respond to their requests, and sanctioned unlawful and unconstitutional practices of its officers contrary to law and its own published policies and procedures. Ed had committed no crime and his conduct did not warrant the excessive and deadly assault by the Officers.

27. The Officers were, or should have been, trained by the City to have knowledge of the symptoms and effects of asphyxiation, how a law enforcement officers should appropriately and timely respond to a case of asphyxiation, and how the failure to immediately treat asphyxiation can cause death.

28. At all pertinent times, the Officers were employed by the City and acting under color of state law and in the course and scope of their employment with the City. The City is responsible for the wrongful acts that they committed within the scope of their employment pursuant to respondeat superior. To the extent the City claims that the Officers' actions are criminal, clearly outside the scope of their employment, malicious, or willful and wanton, Plaintiffs are suing the Officers in their individual capacity.

29. The assault on Ed was without legal justification and objectively unreasonable under the totality of circumstances. Pursuant to 42 U.S.C.A. 1983 and the Fourth and Fourteenth Amendments to the United States Constitution, the Defendants owed Ed a duty to act prudently and with reasonable care and to otherwise avoid the use of unnecessary, unreasonable, excessive, and/or deadly force. The Defendants violated Ed's right to be free from punishment and deprivation of life and liberty without due process of law and to be free from deliberate indifference to all of those rights by unjustifiably allowing him to die without providing immediate medical treatment.

30. After employing unnecessary, unreasonable, excessive, and deadly force resulting in injury to Ed, the Defendants failed to timely render and/or seek medical assistance for Ed.

31. The Defendants also conspired to fabricate and disseminate false accounts regarding the use of unnecessary, unlawful, and excessive force against Ed. The Defendants knowingly, falsely, and publicly stated that the Officers and others were in a dangerous situation and/or were justified in using the type of force they did. Statements made by the Defendants in the record and/or publicly that represented Ed to be at fault for his own death were voiced and announced prior to completion of a complete and objective investigation. A complete and objective investigation of the Defendant's actions has never been completed.

32. At all times relevant the City, through the EPD and its officers, policymakers, and supervisors, pursued policies, practices, and customs that were a direct and proximate cause of the unlawful and unconstitutional acts alleged here and were the result of deliberate indifference. The policies included but are not limited to:

    a) failing to properly screen, supervise, discipline, transfer, counsel, or otherwise control police officers, including the officers who injured and killed Ed, who are known or should have been known to engage In improper use of excessive and deadly force;

    b) Employing a police code of silence where officers and supervisors cover up the use of excessive force by fabricating accounts and police reports, internal affairs investigations, and statements to the media, all of which were designed to falsely exonerate officers and protect the City from potential civil liability;

    c) Creating and implementing procedures that allow for and promote the use of excessive force in unwarranted and under unjustified circumstances;

> d) *Failing to train its police officers concerning the dangers of restraining persons and the dangers of the use of Taser electronic control devices;*
>
> e) *Failing to train its police officers concerning the dangers of positional and compression asphyxia;*
>
> f) *Failing to adequately investigate in-custody civilian deaths and failing to discipline officers involved;*
>
> g) *Failing to properly use, maintain, and monitor police body and dashboard video and audio recording equipment; and*
>
> h) *Other failures yet to be discovered.*

33. *At all times relevant, the individual Defendants were acting and/or interacting with Ed within the scope of their employment as employees and/or agents of the City. At all times relevant, as a result of the Indiana Constitution and/or statutes and/or common law and/or the special relationship that existed between Ed and the Defendants, Defendants had a duty to provide adequate medical care and/or treatment to Ed and to act with ordinary care for his safety.*

34. *Defendants breached their duty and acted with recklessness, willfulness, and wantonness and with a deliberate indifference as to whether harm would result by assaulting and battering Ed with their hands, fists, and feet, and by tasering him unnecessarily and by keeping him in a position that would have asphyxiate him. In addition to the mentioned actions and/or omissions, the Defendants acted in an extreme and outrageous manner with reckless disregard as to whether injury would result. The acts and/or omissions and/or conduct of the Defendants as alleged in the above stated causes of action constitute gross negligence and/or battery and/or intentional infliction of emotional distress under the laws of Indiana.*

35. *As a direct and proximate result of the Defendant's actions, omissions, and deliberate indifference, Ed suffered severe physical pain, injury,*

emotional distress, mental anguish, untimely and wrongful death, and
other damages and injuries resulting in his death.

36. But for the aforementioned conduct of the Defendants, Ed would not have
suffered severe pain and suffering or lost his life on September 13, 2019.

## II.  Methodology

In pursuing my analysis, I reviewed the following documents and materials relating to
the referenced case:

1. Complaint (21 pages)
2. EPD Incident/Investigation Report, 19-20309 (21 pages)
3. EPD Use of Force Report (8 pages)
4. EPD Incident/Investigation Report, 19-20310 (112 pages)
5. EPD Incident/Investigations Report, 19-20314 (3 pages)
6. Evansville/Vanderburgh Central Dispatch Event Report, 2019-206441, 206449 & 206474 (6 pages)
7. Audio recording of 911 call to EPD (1:39)
8. Video footage from Taylor's Body Worn Camera (BWC) (14:21)
9. Video footage from Koontz's BWC (14:45)
10. Video footage from Hackworth's BWC (33:02)
11. Video footage from Hackworth's vehicle dash cam (33:02)
12. Recording of Garrity Statement by Koontz (11:59)
13. Document labeled "Chain of Custody, created on 9/13/19 at 7:52:56 by Nicholas Hackworth" (5 pages)
14. Document labeled "Chain of Custody, created on 9/13/19 at 7:54:07 by Nicholas Hackworth" (7 pages)
15. EPD's Merit System, Chapter 2.175 (16 pages)
16. Rules, Regulations, and Procedures of the Police Department of the City of Evansville, Indiana, November 1977 (76 pages)
17. Taylor's Use of Force Report (8 pages)
18. EPD CAD (Computer Aided Dispatch) Report (4 pages)
19. AMR Patient Care Report, Case #, 7711417, DOS: 09/13/2019 (17 pages)

20. Ascension Medical Records (36 pages)

21. EPD Training Jacket for Trevor Koontz (343 pages)

22. EPD Training History Report for Trevor Koontz (1 page)

23. EPD Training History Report for Matthew Taylor (18 pages)

24. EPD Daily Observation Reports for Matthew Taylor (320 pages)

25. EPD Use of Force Analysis Reports (2016 -2020)

26. Postmortem Report of Edward Snukis, Case # VA-19-072 (14 pages)

27. March 3, 2020, report of Cyril W. Wecht & Pathology Associates, Inc. (16 pages)

28. Indiana State Department of Health Death Certificate of Edward Snukis (1 page)

29. Autopsy Photographs (89 photographs)

30. Photographs of Koontz, Taylor and Hackworth (24 photographs)

31. Photographs of Scene (36 photographs)

32. Photographs of Snukis (24 photographs)

33. Photographs of Black Vehicle Bearing PA tag of YZP 5038 (12 photographs)

34. Photographs of Black Vehicle Bearing PA tag of YZP 5038, including seven photographs of items and one photograph of a page marked Search Warrant (23 photographs)

35. Video recording of statement of Trevor Koontz (2:23)

36. Video recording of Garrity Statement of Trevor Koontz (11:59)

37. Audio recording of Garrity Statement of Matthew Taylor (20:02)

38. Audio recording of interview of Amanda Riordan (5:28)

39. Video and audio recording of interview of Brentlee Spurlock (9:26)

40. Video and audio recording of interview of Christy McGowan (17:23)

41. Video and audio recording of interview of Cyril Fraker (11:48)

42. Video and audio recording of interview of Dennis Smiley (10:08)

43. Video and audio recording of interview of Derrick Norton (6:30)

44. Video and audio recording of interview of Devon Holly (6:10)

45. Audio recording of telephone interview of Heidi Cook (14:04)

46. Audio recording of telephone interview of Heidi Cook #2  (56:16)

47. Video and audio recording of interview of Jason Gee (7:10)

48. Video and audio recording of interview of Justin Robinson (5:07)

49. Video and audio recording of interview of Kylena Page (3:41)

50. Audio recording of interview of Stephanie Spurlock (27.29)

51. August 12, 2019, letter to Snukis from Kaitlyn Clarkson, Esq. (7 pages)

52. Video footage with voiceover, labeled IMG_03601.3gp (0:41 seconds)

53. Audio Recording of a Voice Mail Message by Officer Taylor, labeled 227.m4a (0:21 seconds)

54. Notice of FRCP 30(b)(6) deposition of City of Evansville (5 pages)

55. Defendant's Initial Disclosures (7 pages)

56. Plaintiff's FRCP Rule 26(a)(1) Initial Disclosures (6 pages)

57. Transcript of February 21, 2022, deposition of Matthew Taylor, with Exhibits (169 pages)

58. Transcript of April 18, 2022 deposition of Nicholas Alan Hackworth (223 pages)

59. Defendant's Motion to Dismiss Counts I-IX, County XI, and Relief Sought (3 pages)

60. Defendant's Brief in Support of Motion to Dismiss Counts I-IX, County XI, and Relief Sought (17 pages)

61. Plaintiff's Response to Defendant's Motion to Dismiss (12 pages)

62. Defendant's Reply in Support of Motion to Dismiss Counts I-IX, County XI, and Relief Sought (9 pages)

63. Plaintiff's Preliminary Witness and Exhibit List (7 pages)

64. Defendant's Preliminary Witness List (4 pages)

65. Plaintiff's Answers to defendant, City of Evansville, Indiana's First Set of Interrogatories (30 pages)

66. Plaintiff's Answers to Defendant, Matthew O. Taylor's First Set of Interrogatories (20 pages)

67. Plaintiff's Answers to Defendant, Nicholas Hackworth's First Set of Interrogatories (14 pages)

68. Plaintiff's Answers to Defendant, Trevor Koontz's First Set of Interrogatories (19 pages)

69. Plaintiff's Answers to Defendant, Nicholas Hackworth's First Set of Requests for Production (7 pages)

70. Plaintiff's Answers to Defendant, Trevor Koontz's First Set of Requests for Production (6 pages)

71. Plaintiff's Answers to Defendant, Matthew O. Taylor's First Set of Requests for Production (7 pages)

72. EPD's 2020 Use of Force Analysis Report (8 pages)

73. EPD Operational Guideline (OG) Number: 11-O-14, *Handling, Transporting and Booking Prisoners*, Effective: 08-01-05; Reviewed: 08-06-12 (7 pages)

74. EPD OG Number: 00-O-57, *Handling the Street Drunk*, Effective: 09-14-00; Reviewed:08-08-12 (2 pages)

75. EPD OG Number: 99-O-6; *Stop and Frisk*, Effective: 01-21-99; Reviewed: 07-31-12 (2 pages)

76. EPD OG Number: *Arrests*, Effective: 05-01-09; Reviewed: 06-08-18 (8 pages)

77. EPD OG:  99-0-53: *Preliminary Investigations*, Effective: 08-13-99; Reviewed: 08-02-2012 (3 pages)

78. EPD OG: 19-O-13*; Use of Force,* Effective: 05-19-06; Reviewed: 03-06-19 (20 pages)

79. EPD OG Number: 14-O-28; *Protecting the Crime Scene*, Effective: 01-19-99; Reviewed: 10-02-14 (3 pages)

80. EPD OG: Number 15-O-07; *Responding to "Citizen Needs Assistance" Calls*, Effective: 04-15-98; Reviewed: 07-23-15 (3 pages)

81. EPD OG Number: 19-O-01, *Evidence and Property Management*, Effective: 11-15-05; Reviewed: 01-02-19 (14 pages)

82. EPD OG Number: 15-O-15, *Mental Illness and Commitment Papers*, Effective: 08-29-05; Reviewed 09-17-15 (7 pages)

83. EPD OG Number: 15-O-15,*Use of Discretion,* Effective 11-01-98; Reviewed:07-12-13 (3 pages)

84. EDP – FOP Contract, 1/1/19 – 12/31/21 (44 pages)

85. EPD Media Release (1 page)

86. EPD Press Conference recording (13:52)

87. EPD Press Conference Recording (5:23)

88. EPD Press Conference recording (2:43)

89. Recording of news media coverage of Snukis' death (1:17)

90. Recording of news media coverage of Snukis' death (2:37)

In the presentation of my opinions and conclusions, I relied upon and used the case materials identified above. I reached my opinions and conclusions by applying my specialized knowledge, skills, training, education, and experience obtained over 35 years in law enforcement to the analysis and evaluation of the facts and information provided to me. My opinions are provided with a reasonable degree of professional probability within the field of law enforcement and are intended to assist the trier of fact to understand the evidence and/or to determine a fact issue.

This report may include the use of terminology that overlap with other accepted legal terms or standards. My use of specific legal terms, or standards are not intended to draw legal conclusions or to subvert the function of the court or to inappropriately influence triers-of-facts. Specific legal terms are commonly used in the field of law enforcement and it is in that context that I use those terms when discussing law enforcement issues with both law enforcement practitioners and civilian audiences when offering expert opinions.

### III. Relevant and Well Known Law Enforcement Guidance

In this case, it is evident that each of the Defendant officers, Officer Matthew O. Taylor (Taylor), Officer Trevor Koontz (Koontz), and Officer Nicholas Hackworth (Hackworth), had contact with and used force against Edward C. Snukis (Snukis) on September 13, 2019.

It can be reasonably concluded from the evidence that Koontz and Taylor initially contacted Snukis and conducted an investigative detention of Snukis and that Koontz and Taylor subsequently used force against Snukis. It is also evident that Snukis may have been in a mental health crisis and may have been suffering from Excited Delirium, during his contact with the officers and later suffered a medical emergency during his continued contact with Koontz, Taylor, and Hackworth.

To assist with the analysis of whether Koontz, Taylor, and Hackworth, acted reasonably during their contact with Snukis, I looked to relevant and well known law enforcement

guidance provided to law enforcement officers. I considered publications from the International Association of Chiefs of Police (IACP)[2], the Police Executive Research Forum (PERF)[3], the Institute for the Prevention of In-Custody Deaths (IPICD)[4] and EPD's own OG's, as objective guidance in determining whether the actions of the officers were reasonable and consistent with generally accepted police practices and customs.

The IACP is a professional law enforcement association and for more than 120 years, the IACP has been launching internationally acclaimed programs, speaking on behalf of law enforcement, conducting groundbreaking research, and providing exemplary programs and services to members around the globe. Today, the IACP continues to be recognized as a leader in these areas. The IACP, through their National Law Enforcement Policy Center (Center), has been identifying leading practices and providing sound guidance for law enforcement agencies for over 30 years by addressing cutting edge issues confronting law enforcement through advocacy, programs, research, training, and other professional services.

The Center publishes Model Policies and Concepts and Issues Papers to provide guidelines, essential background material and supporting documentation to law enforcement agencies and officers, to provide greater understanding of the developmental philosophy and implementation requirements for the model policies. Reasonable law enforcement agencies and officers recognize that the Center makes every effort to ensure these papers and model policies incorporate the most current information and contemporary professional judgment on this issue.

The Center published a *National Consensus Policy and Discussion Paper on the Use of Force*[5]. The Center also published Model Policies and Concepts and Issues Papers on:

- *Arrests*[6],

---

[2] TheIACP.org
[3] Police Executive Research Forum, www.policeforum.org
[4] IPICD.com
[5] IACP *National Consensus Discussion Paper on Use of Force and Consensus Policy*, (originally Published October 2017)

- *Responding to Persons Experiencing a Mental Health Crisis[7],*
- *Excited Delirium[8], and*
- *Transportation of Prisoners[9].*
- Investigation of Allegations of Employee Misconduct[10]
- Reporting Use of Force[11]
- Crime Scene Processing[12]

I referred to and considered these documents during my analysis of this case.


The IACP also published:

- *Training Key # 646 - Investigative Detentions: Part I*[13];
- *Training Key # 647 - Investigative Detentions: Part II*[14];
- *Training Key #433* – Principles of Report Writing.[15]

 I referred to and considered those documents during my analysis of this case.


PERF, founded in 1976 as a nonprofit organization, is a police research and policy organization and a provider of management services, technical assistance, and executive level education to support law enforcement agencies. PERF helps improve the delivery of police services through the exercise of strong national leadership; public debate of police and criminal justice issues; and research and policy development.


PERF published the *Guiding Principles on the Use of Force[16]* and I referred to and considered this publication during my analysis of this case.

---

[6] IACP Model Policy and Concepts and Issues Paper, *Arrests,* August 2010
[7] IACP Model Policy and Concepts and Issues Paper, Responding to Persons Experiencing a Mental Health Crisis, August 2018
[8] IACP Model Policy and Concepts and Issues Paper, *Excited Delirium*, April 2017
[9] IACP Model Policy and Concepts and Issues Paper, *Transportation of Prisoners,* Sept 2015
[10] IACP Model Policy and Concepts and Issues Paper, *Investigation of Allegations of Employee Misconduct,* April 2019
[11] IACP Model Policy and Concepts and Issues Paper, Reporting Use of Force, March 2017
[12] IACP Model Policy and Concepts and Issues Paper, Crime Scene Processing, Jan 2003
[13] IACP Training Key #646, *Investigative Detentions: Part I*, 2010
[14] IACP Training Key #647, *Investigative Detentions: Part II*, 2010
[15] IACP Training Key #433, *Principles of Report Writing,* 1993
[16] PERF *Guiding Principles on the Use of Force*, March 2016

The IPICD was founded by John G. Peters, Jr., Ph.D. in 2005 with its sole purpose to educate interested parties about arrest-related and in-custody deaths. The IPICD is a clearinghouse, resource center, and training and litigation assistance provider dedicated to providing interested parties with objective, timely accurate qualitative and quantitative information, training, and operational guidance for the prevention and management of sudden and in custody deaths. I considered training guidance provided by the IPICD during my analysis of this case.

I also considered the publications *Evaluating Police Uses of Force*[17] *and The Law and Best Practices of Successful Police Operations, Sixth Edition*[18] during my analysis of this case.

**Investigative Detentions**

Reasonable officers know and understand that the Fourth Amendment prohibits unreasonable searches and seizures by the police and these protections extend to brief investigatory stops of persons that fall short of traditional arrest, and that officers can conduct a brief and limited pat-down search for weapons as long as the officer has reasonable suspicion that the individual is armed and dangerous.

Reasonable officers know and understand that an investigative detention as defined by the IACP Model Policy on Arrests is a "[t]emporary detention for investigative purposes of a person based upon reasonable suspicion that the person has committed, is committing, or is about to commit a crime, under circumstances that do not amount to probable cause for arrest (also known as a Terry Stop)." (III)

Reasonably prudent officers know and understand as stated, in part, by the IACP Model Policy on *Arrests*:

- *Officer's shall conduct an investigative detention based upon reasonable suspicion that the person detained has committed, is committing, or is about to commit a crime. (IV L 1)*

---

[17] Evaluating Police Uses of Force, Seth W. Stoughton, Jeffrey J. Noble, Geoffrey P. Alpert, 2020
[18] The Law and Best Practices of Successful Police Operations, Sixth Edition, Jack Ryan, Attorney, 2021

- *Officer's shall take precautionary measures for their own safety during an investigative detention, including display of firearms or handcuffing the detainee. Officers shall be aware that unnecessary or prolonged display of firearms, handcuffing and so on during the investigative detention may cause a court to view the detention as an actual arrest. (IV L 2)*
- *Officers who reasonably believe that a person under investigative detention may pose a threat to their safety shall conduct a frisk or pat down search of the detainees clothing for weapons. Officers shall not conduct any further search of an investigative detainee unless and until it appears that there is probable cause for the arrest of the detainee. (IV L 4)*

Reasonable officers know as stated, in part, by the IACP Training Key #646: Investigative Detentions: Part I:

- *"Officers must have sufficient grounds to detain the suspect: that is, reasonable suspicion." Reasonable officers also know and understand that reasonable suspicion is a particularized and objective basis, supported by specific and articulable facts, for suspecting a person of criminal activity and that reasonable suspicion must be more than a hunch or feeling but need not meet the test for probable cause sufficient to make an arrest.*

Reasonable officers know as stated, in part, by the IACP Training Key # 647: *Part II on Investigative Detentions*:

- *Although officers are allowed a great deal discretion in determining how best to protect themselves and conduct their investigation, the fact remains that detentions are classified as "seizures" under the Fourth Amendment, which means they are subject to the constitutional requirement of objective reasonableness.*
- *Officers may pat search a detainee if they reasonably believe that he or she is armed or otherwise presents a threat to officers or others. Although the courts routinely say that officers must reasonably believe that the detainee is armed and dangerous, either is sufficient.*

Reasonable EPD officers know as stated, in part, in the EPD OG on *Stop and Frisk*:

- *Grounds for Stop: An officer who initiates a stop and frisk must be able to explain the reason(s) for suspecting that he or others in the immediate area are in danger.*

  1. *To stop a person lawfully, the officer must have reasonable suspicion that the person stopped may be involved in criminal activity;*

  2. *Deliberate furtive actions or running from an officer or strangers is strong evidence of possible criminal activity and can contribute to grounds for a stop and frisk.*

  3. *The officer must have reasonable suspicion that the person stopped may be armed and/or dangerous.*

  4. *An officer, for his own protection and the protection of others, may conduct a "pat down" to find weapons.*

  5. *The search for weapons must be a limited intrusion. The "pat down" must be confined to an intrusion designed to discover guns, knives, clubs, or other hidden objects that could be used for an assault on the officer.*

**De-Escalation**

Reasonable officers know as stated, in part, by the IACP's National Consensus Policy and Discussion paper of the *Use of Force*:

*De-escalation is defined as: Taking action or communicating verbally or nonverbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the use of force or with a reduction in the force necessary. The de-escalation may include the use of such techniques as command presence advisements, warnings, verbal persuasion and tactical repositioning. (Policy, III, Definitions); and,*

*An officer shall use de-escalation techniques and other alternatives to higher levels of force consistent with his or her training whenever possible and appropriate before resorting to force and to reduce the need for force. (Policy, IV, B,1); and,*

*Whenever possible and when such delay will not compromise the safety of the officer or another and will not result in the destruction of evidence, escape of a suspect or Commission of a crime and officer shall allow an individual time and opportunity to submit to verbal commands before force is used. (Policy, IV, B, 2); and,*

*De-escalation is not a new concept and has been part of officer training for decades. Historically, de-escalation has been employed when officers respond to calls involving a person affected by mental illness or under the influence of alcohol or other drugs. In these situations, officers are instructed to approach the individual in a calm manner and remain composed while trying to establish trust and rapport. Responders are taught to speak in low, or non-threatening tones, and use positive statements such as "I want to help you" intended to aid in the process of calming the subject. Awareness of body language is also significant. For example, standing too close to an angry or agitated person might cause them to feel threatened. Another de-escalation technique is tactical repositioning in many cases officers can move to another location that lessens the level of danger. (Paper, III, B), and,*

*Agencies should strive to encourage officers to consider how time, distance, positioning, especially communication skills may be used to their advantage as de-escalation techniques and as potential alternatives to force and to provide training on identifying when these techniques will be most useful to mitigate the use of force. (Paper, III, B)*

The EPD OG on the *Use of Force* does not contain any language or guidance to officers regarding de-escalation during encounters involving the use of force and this is a departure from or inconsistent with generally accepted police practices regarding polices or OGs on the use of force. The EPD should provide guidance on de-escalation in the OG on the *Use of Force*.

While the EPD OG on *Mental Illness and Commitment Papers* does provide de-escalation guidance but this guidance is specific and can be considered limited and applicable to only when officers encounter persons suffering from mental illness and not applicable to use of force encounters.

By the plain meaning of the language in the OG on *Use of Force*, the EPD could not hold an officer accountable for failure to use de-escalation techniques or strategies during a use of force encounter with persons who were not suffering from mental illness and this is a departure from or inconsistent with generally accepted police practices regarding polices or OGs on the use de-escalation techniques or strategies during use of force encounters.

**Arrests**

Reasonable officers know as stated, in part, by the IACP Model Policy on *Arrests:*
*Officers shall conduct arrests only when based upon either probable cause or an arrest warrant. (IV, A)*

*Officer's shall use only that level of force that they reasonably believe is necessary to make an arrest in accordance with this department's use of force policy. (IV, B)*

*Officers shall be aware that, following an arrest, they are legally responsible for the safety of the arrestee, any victims present, and all bystanders. (IV, E, 5, a)*

*Officers who reasonably believe that a person under investigative detention may pose a threat to their safety shall conduct a frisk or pat down search of the detainees clothing for weapons. Officers shall not conduct any further search of an investigative detainee unless and until it appears that there is probable cause for the arrest of the detainee. (IV, L)*

Reasonable officers know as stated by the EPD OG on *Arrests* states, in part:
*When making an arrest, the conduct and actions of an officer must be based on the facts, as they would appear to a reasonable person at the time. An officer is expected to*

*be consistent and to rely on his training experience and good judgment to guide him toward just and lawful decisions. An officer must never allow personal feelings or pressure from external sources to influence his decision in determining whether to make an arrest, (Policy, Probable Cause, 1)* and,

*The requirement that legal justification be present prior to acting imposes a limitation on all official police actions. In every case an officer must always act reasonably and within the limits of his authority as defined by state statutes both the state and federal constitutions and prior binding court decisions, (Policy, Probable Cause, 3)* and,

*Officers must ensure that the rights of the individual as well as the public are protected. (Policy, Probable Cause, 4)*

*In matters where mental illness is obviously the major problem and the offense is minor, an officer should follow OG 184.00.* (Mental Illness and Commitment Papers) *(Alternatives to Arrests, 2)*

**Use of Force**

Reasonable officers know that the "objectively reasonable standard" is the legal standard used to determine the lawfulness of a use of force under the Fourth Amendment to the U.S. Constitution. The U.S. Supreme Court established this standard in its ruling in Graham v. Connor (490 - U.S. 386, 1989).

The examination of all instances of use of force, deadly or not, is to apply the facts and the totality of circumstances to the objectively reasonableness standard. Reasonably prudent officers know and understand to only use force that is objectively reasonable under the totality of circumstances and to only use that level of force that any reasonable and prudent officer would use under the same or similar circumstances.

Such officers know that the use of force is to be judged from the perspective of a reasonable officer under the same circumstances without the benefit of hindsight; that officers are often required to make split-second decisions, in circumstances that are

tense, uncertain, and rapidly evolving; and that force that is excessive, needless, and objectively unreasonable is a violation of the Fourth Amendment to the United States Constitution as well as established federal case law.[19]

It is also recognized that for any use of force encounter, information may be analyzed in terms of both *incidents* and *application.* A use of force *incident* is an encounter involving officers and a distinct subject on a distinct occasion. A use of force *application* is the use of a particular type of force by an officer. In any given force *incident* it is possible that officers use different types of force and/or apply force multiple times - such that one force *incident* may involve multiple *applications* of force to the same subject.

Reasonable officers know as stated by The *National Consensus Policy and Discussion Paper on the Use of Force*, in part:

1. *It should be the foremost policy of all law enforcement agencies to value and preserve human life.*

2. *Defines "objectively reasonable" as the determination that the necessity for using force and the level of force used is based upon the officer's evaluation of the situation in light of the totality of the circumstances known to the officer at the time the force is used and upon what a reasonably prudent officer would use under the same or similar circumstances.*

3. *Defines "serious bodily injury" as an injury that involves a substantial risk of death, protracted an obvious disfigurement, or extended loss or impairment of the function of a body part or organ.*

4. *Use only the amount of force that is objectively reasonable to effectively bring an incident under control, while protecting the safety of the officer and others.*

5. *The decision to employ any use of force, including the use of firearms, may be considered excessive by law and agency policy or both, if it knowingly exceeded a degree of force that reasonably appeared necessary based on the specific situation.*

6. *While the Consensus Policy strives to prohibit excess of force, the reality is that excessive force can occur no matter how well-crafted the policy or extensive the*

---

[19] Graham v. Connor, 490 U.C. 386, 396 (1989)

*training. In these situations, it is crucial that other officers at the scene intervene to prevent or stop the use of excessive force. By requiring a pro-active approach to these situations and encouraging accountability for all officers on the scene, agencies can work towards preventing excessive uses of force.*

7. *When de-escalation techniques are not effective or appropriate, an officer may consider the use of less-lethal force to control a non-compliant or actively resistant individual. An officer is authorized to use agency-approved, less-lethal force techniques and issued equipment:*

    1. *to protect the officer or others from immediate physical harm,*

    2. *to restrain or subdue an individual who is actively resisting or evading arrest,*

    3. *to bring an unlawful situation safely and effectively under control.*

Reasonable officers know that an important operational consideration is for officers to reevaluate the use of force throughout an incident and that what may be a reasonable force consideration at one point during an incident may become an unreasonable option as the incident de-escalates or if the officers or citizens surrounding the area are no longer in danger. Reasonable officers know that in order for a threat to be perceived as an immediate threat, it must be just that, an immediate threat and that if the threat has passed then the justification for using force has also passed.

Reasonable officers know that the review of force must carefully evaluate the individual facts and circumstances that were known to the officer at the moment of the use of force and consider the totality of circumstances. It is important to note that the review of force cannot view the actions of an officer with the luxury of 20/20 hindsight, but as an officer in the exact same situation in real time, while considering the severity of the crime at issue at the time the force was used; whether the subject posed an immediate physical threat to the safety of the officers or others, and the nature of that threat; and whether the subject is actively resisting or attempting to evade arrest by flight. Further, the inquiry must consider the level of resistance and the reasonableness of each application of force.

Reasonable officers know and understand that an officer's perception that an imminent threat exists is reasonable when the officer has reason to believe that an individual has the ability, opportunity, and intent to cause harm. Officers must explain that the three aspects of threat – ability, opportunity, and intent, is supported by specific, articulable observations, and not by conclusory statements that they feared for their safety or the safety of others.

Reasonable officers know that the existence of a bona fide threat must be predicated on an officer's articulation of details and circumstances that would lead a reasonable officer to conclude that the individual was physically capable of causing harm, was in a position to physically inflict that harm, and had manifested the apparent intent to do so. Reasonable officers know that for a use of force to be considered constitutionally permissible, an officer must have an objectively reasonable belief that something *is happening*, not that something might *possibly happen.*

When discussing the use of force, reasonable officers know and understand to only use force that is objectively reasonable under the totality of circumstances and to only use that level of force that any reasonable officer would use under the same or similar circumstances.

Such officers know that the use of force is to be judged from the perspective of a reasonable officer under the same circumstances without the benefit of hindsight; that officers are often required to make split-second decisions, in circumstances that are tense, uncertain, and rapidly evolving; and that force that is excessive, needless, and objectively unreasonable is a violation of the Fourth Amendment to the United States Constitution as well as established federal case law.[20]

I am not aware of any legitimate police training that instructs officers to strike subjects in the head or face except in circumstances where the officers are facing a threat that may result in death or serious bodily injury to the officer or others. Police agencies commonly

---

[20] Graham v. Connor, 490 U.C. 386 (1989)

instruct officers to avoid such strikes unless the circumstances justify the application of deadly force.

The EPD OG on the *Use of Force*, 359.00, states, in part:

- *Officers will only use a reasonable amount of force when necessary to affect a lawful arrest, attain a lawful objective or overcome an attack upon themselves or another person. (Policy)*
- *If the subject of the force is in need of medical aid, officers will ensure that the subject receives it. (Policy)*
- *Serious Bodily Injury" "Serious Bodily Injury" means bodily injury that creates a substantial risk of death or causes serious permanent disfigurement, unconsciousness, extreme pain, or permanent or protracted loss or impairment or the function of a bodily member or organ. (Definitions, 8)*
- *Hard Empty Hand Control: is designed to control Active Aggression, but can be used to control Defensive Resistance when lower forms of control have failed. These included, but are not limited to, Brachial Stun, Radial and Median, Common Peroneal, Femoral, Tibial and Superficial Peroneal. (Definitions, 13)*
- *Less-lethal intermediate weapons or control devices will only be used for an officer's defense, defense of the general public, and to effect an arrest or lawful custody of any individual who physically resists a lawful arrest or order to take him into custody. (Use of Less-Lethal Force, 2, A)*
- *When using other items as weapons such as metal flashlights, an officer must take due care when possible not to strike the assailant in a place that would likely cause serious bodily injury or death unless the officer believes no other reasonable means can possibly succeed. (Use of Less-Lethal Force, 2, A, 1),*
- *The CEW (Conducted Electrical Weapon) – The CEW may be used to control a dangerous or violent subject when deadly force does not appear to be justified and/or necessary, or attempts to subdue the subject by other conventional tactics have been, or will likely be, ineffective; or there is a reasonable expectation that it is unsafe for officers to approach within contact distance of the subject.*
- *All agency CEWs will be subject to periodic and random data downloading by the Less-Lethal Coordinator. The data will be reconciled with existing use-of-*

*force reports to ensure accountability between the cycles recorded and those documents in such report and occurring in the pre-shift testing. (Reporting, Auditing, 7)*

*The Rules, Regulations, and Procedures of the Police Department of the City of Evansville, Indiana (1977) states*, in part,:

- A member may use force, including deadly force, only when legally justified and when all other reasonable means of accomplishing a lawful police purpose, have failed, or when a member reasonably believes that no other reasonable method can accomplish his intended purposes. (Chapter 5, Use of Force, Sec. 1)

It is also recognized that for any use of force encounter, information may be analyzed in terms of both *incidents* and *application.* A use of force *incident* is an encounter involving officers and a distinct subject on a distinct occasion. A use of force *application* is the use of a particular type of force by an officer. In any given force *incident* it is possible that officers used different types of force and/or applied force multiple times - such that one force *incident* may involve multiple *applications* of force to the same subject.

**Mental Health Crisis**

Reasonably prudent officers know and understand as stated by the IACP's Model Policy on *Responding to Persons Experiencing a Mental Health Crisis, in part:*

*III. Definitions*

*Mental Health Crisis: An event or experience in which an individual's normal coping mechanisms are overwhelmed, causing them to have extreme emotional, physical, mental and/or behavioral response. Symptoms may include emotional reactions such as fear, anger, or excessive giddiness; psychological impairments such as inability to focus, confusion, or nightmares, and potentially even psychosis; physical reactions like vomiting/stomach issues, headaches, dizziness, excessive tiredness, or insomnia; and/or behavioral reactions including the trigger of a "freeze, fight, or flight" response.*

*Mental Illness: an impairment of an individual's normal cognitive, emotional, or behavioral functioning, caused by physiological or psychosocial factors. A person may be affected by mental illness if they display an inability to think rationally (e.g., delusions or hallucinations); exercise adequate control over behavior or impulses (e.g., aggressive*

suicidal, homicidal, sexual); and/or take reasonable care of their welfare with regard to basic provisions for clothing, food, shelter, or safety.

IV C. Response to PIC (Person In Crisis)

If the officer determines that an individual is experiencing a mental health crisis and is a potential threat to themselves, the officer, or others, law enforcement intervention may be required, as prescribed by statute. All necessary measures should be employed to resolve any conflict safely using the appropriate intervention to resolve the issue.

IV D. Taking Custody or Making Referrals to Mental Health Professionals

1. Based upon the overall circumstances of the situation, applicable law and statutes, and agency policy, an officer may take one of several courses of action when responding to a PIC.

c. Take the individual into custody and provide transportation to a mental health facility for an involuntary psychiatric evaluation.

Reasonably prudent officers know and understand as stated by the IACP's Concepts and Issues Paper on *Responding to Persons Experiencing a Mental Health Crisis, in part:*

c. Persons in Crisis

A person may experience a mental health crisis during times of stress and in response to real or perceived threats and/or loss of control. Symptoms may include emotional reaction such as fear, anger, or excessive giddiness; psychological impairments such as an inability to focus, confusion, nightmares, and potentially even psychosis; physical reactions like vomiting or stomach issues, headaches, dizziness, excessive tiredness, or insomnia; and/or behavioral , including the trigger of a "freeze, fight or flight" response.

G. Taking Custody of PIC or Making Referrals to Mental Health Professionals

At the same time, failure to take action when there are sufficient grounds to believe that a PIC maybe a danger to themselves or others can have serious consequences. In such situations officers may place themselves and/or their agency in jeopardy of civil

*liability should a serious incident develop as a result of their inaction. Jurisdictions that have developed a coordinated law enforcement-mental health partnership to respond to PIC are in a far better position to respond to these and other related issues.*

**Excited Delirium**

Reasonably prudent officers know and understand as stated by the IACP's Concepts and Issues Paper on *Excited Delirium*, in part,

- *Individuals with ExDS (Excited Delirium Syndrome) may exhibit some or all of the following specific signs and characteristic symptoms:*
    1. *Extreme aggression or violence*
    2. *Constant or near constant physical activity*
    3. *Irresponsiveness to law enforcement presence*
    4. *Attraction to bright lights and/or loud sounds*
    5. *Nakedness or inadequate clothing*
    6. *Hyperthermia (increased body temperature)*
    7. *Rapid breathing*
    8. *Profuse sweating*
    9. *Unintelligible or animal like noises*
    10. *Insensitivity to or extreme tolerance of pain*
    11. *Excessive, seemingly superhuman strength*
    12. *Lack of fatigue despite heavy exertion*
    13. *Screaming and/or incoherent talk (I, D)*

- *Even though the theory of ExDS Deaths caused solely by positional asphyxia has been questioned, it is still recommended that restrained individuals be placed on their sides to aid in breathing and to defend against claims that positional asphyxia is the cause of death. (I, F)*

- *One key variable is to reduce the amount of time the individual struggles with officers and/or against restraints, because it is theorized that the longer a person resists the higher the risk of sudden death. (II, A)*

- *Once in custody, the individual should be restrained as appropriate to control kicking or standing. Officers should never attempt to control continued resistance by pinning the subject to the ground or against a solid object using body weight.*

*Instead, officers should position the subject on his or her side to assist breathing and remove any unnecessary weight or compression to the chest, neck, or head. (II, A)*

- *While restrained, the individual's breathing status should be continuously monitored. (II, A)*
- *If the subject suddenly becomes calm and his or her breathing becomes shallow, it is an indication that he or she might be in jeopardy and requires immediate medical attention to avoid cardiac arrest. (II, A)*

Reasonably prudent officers know and understand as stated by the IACP's Model Policy on *Excited Delirium*, in part,:

- *When restrained, officers should position the subject in a manner that will assist breathing such as placement on his or her side to avoid pressure to the chest, neck or head.*
- *Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight.*
- *Officers should check the subject's pulse and respiration on a continual basis until transferred to EMS personnel.*
- *Following a struggle, the subject should be showing normal signs of physical exertion such as heavy breathing. However, if the subject becomes calm and breathing is not labored during or after the application of restraints it might be an indication that he or she is in jeopardy and requires immediate medical attention to avoid cardiac arrest. (IV, C, 6, 8, 9, 10)*

The EPD OG on the *Use of Force*, 359.00, when referring to Post-Deployment Considerations (of CEWs) states, in part:

- *They have exhibited signs of "excited delirium" as outlined and defined in training, prior to or during CEW exposure. (Conducted Electrical Weapon (CEW), 5, b, 8)*

It must be noted that this OG does not list, define or explain what officers are to know as the "signs of excited delirium" and leaves the officers to be forced to resort to recall of that information from training.

**Duty to Intervene**

Reasonable officers know as stated, in part, by the IACP's National Consensus Policy and Discussion Paper of the *Use of Force*:

*An officer has a duty to intervene to prevent or stop the use of excessive force by another officer when it is safe and reasonable to do so. (Policy, IV, A, 4); and*

*While the Consensus Policy strives to prohibit excessive force, the reality is that excessive force can occur no matter how well-crafted the policy or extensive the training. In these situations, it is critical that other officers at the scene intervene to prevent or stop the use of excessive force. By requiring a proactive approach to these situations and encouraging accountability for all officers on the scene, agencies can work together toward preventing excessive uses of force. (Paper, 4 A)*

Reasonable officers know that it is long recognized that officers have a constitutional duty to intervene on behalf of a citizen when they observe excessive force being used by an officer in their presence. Reasonable officers also recognize that an officer who fails to intervene in unconstitutional or illegal conduct is also violating their oath of office based on their oath to uphold the Constitution as well as state and federal law. Officers may not ignore the duty imposed by their office and must stop other officers from using excessive force or from engaging in unconstitutional conduct when they have a reasonable realistic opportunity to prevent the excessive force or unconstitutional conduct.

The EPD OG on the *Use of Force* does not contain language to provide guidance to officers regarding their duty to intervene to stop other officers from using excessive force and this is a departure from and inconsistent with generally accepted police practices regarding policies, OGs, and training regarding the duty to intervene.

**Medical Emergency**

Reasonable officers know as stated, in part, by the IACP's Model Policy on *Transportation of Prisoners* that states, in part,:

The physical well-being of prisoners shall be monitored at all times.

> 1) *Particular attention shall be directed to persons reported or suspected of being under the influence of drugs and/or alcohol, those with mental illness or an intellectual/developmental disability, or who have a history or propensity for violence.*
>
> 2) *Prisoners who are visibly injured or report/display symptoms of injury or illness shall be provided emergency medical attention. (IV Procedures, F)*

Reasonable officers know as stated, in part, by the IACP's Concepts and Issues Paper on *Transportation of Prisoners* that states, in part,:

*At no time should the prisoner be left attended (sic) as stated previously officers should maintain visual contact at all times to ensure the prisoners safety and security. (III, D), and,*

*In the field of prisoner transportation, there are few issues of greater importance than the well-being of prisoners in custody. As the first link in the custody process, Transporting officers must be aware of the safety of their prisoners while also ensuring their security. Transportation following arrest can be a particularly traumatic time for the arrested individual. The prisoner may have been involved in a physical altercation with the arresting officer or others and is typically in an emotionally charged, if not volatile state of mind. Any obvious physical injuries should be treated as soon as possible rather than waiting for such a determination to be made at booking. All prisoner complaints of serious injury or physical problems should be taken seriously, and medical aid summoned immediately. (III, F)*

Reasonable officers know as stated, in part, by the IACP's Model Policy on *Arrests* that states, in part,:

*Officers shall be aware that, following an arrest, they are legally responsible for the safety of the arrestee, any victims present and all bystanders. Therefore, officers shall take all steps reasonably necessary to protect:*

1) The officer from the arrestee,

2) Victims and third parties from the arrestee, and

3) The arrestee from self-injury or injury by others. (IV, E, 5), and,

4) Reasonable officers know as stated, in part, by the IACP's Concepts and Issues Paper on Arrests that states, in part,:

Studies have indicated that when a suspect is faced down on his or her stomach, respiration is impaired and the result may be positional asphyxia - in effect the suspect dies of suffocation. This potential is more likely in situations where the suspect is overweight, has exerted substantial energy in resisting arrest or in other ways prior to being restrained and even more so if the suspect has ingested alcohol or drugs or both prior to the event. (II, E)

PERF's *Guiding Principles on Use of Force* states, in part,:

- Respect the sanctity of life by promptly rendering first aid. Officers should render first aid to subjects who have been injured as a result of police actions and should promptly request medical assistance. (Policy 7)

The IPICD provides guidance for police officers to recognize when a suspect exhibits signs of abnormal breathing, breathing difficulties, or agonal breathing, including uttering guttural and/or snoring sounds, that the officers must immediately shift to an understanding that they are dealing with a patient who is having a medical emergency who needs immediate medical intervention by qualified medical professionals. Visible signs of injury, becoming unresponsive and complaints of injury are medical emergencies which take precedent over the arrest procedure.

The EPD OG on *Use of Force* states, in part:

*If the subject of the force is in need of medical aid, officers will ensure that the subject receives it.* (Policy)

The EPD Operational Guideline on *Handling the Street Drunk* states, in part:

*Emergency treatment is required in all cases of:*

1) stoppage of breathing

2) *severe bleeding*

3) *unconsciousness*

4) *any other condition which, in the judgment of the officer, presents a serious and immediate health threat (Guideline, 2, B)*

However, the EPD OG on *Arrests* does not contain language to provide guidance to officers regarding their duty to be responsible for the well-being and safety of prisoners /arrestees and to immediately summon medical aid for any obvious injury and this is a departure from or inconsistent with generally accepted police practices regarding arrests.


**Video Footage**

It is also recognized that when video footage exists, the facts should be considered in the light depicted by the videotape. In this case, there is evidence of video footage from Body Worn Cameras and vehicle Dash Cams of the use of force used by EPD officers against Snukis.


For the purposes of this report, I will consider Taylor's and Koontz's initial contact with Snukis to consist of one *use of force incident* with separate and distinct *use of force applications*, including the tasing of Snukis by Taylor.


I will consider the foot pursuit of Snukis and the subsequent ground struggle with Snukis where Snukis suffered from a medical emergency as a second but separate *use of force incident* involving separate and distinct *use of force applications.*


With the above principles and reasoning in mind, I set out to examine the facts of this case.

**IV      Opinions**

**Issue #1 – Whether the force used by Koontz against Snukis, during the first use of force incident, was reasonable under the totality of circumstances?**

In this case, based upon the written police reports, video footage from the officer's body worn cameras (BWC), witness statements, the Garrity statements of Koontz and Taylor, and Taylor's deposition testimony, it is evident that upon the officers initial contact with Snukis that Koontz used force by grabbing Snukis' left arm and continued that force by attempting to pull and force Snukis' left arm behind his back. Taylor also used force against Snukis as he twice deployed his Taser against Snukis during this first use of force incident. It is also evident that there is a dispute of the facts when the officer's written reports, statements, and Taylor's deposition testimony are compared with BWC footage.

911 Call

The EPD police response was prompted by a 911 call from Cyril Fraker, sales manager of D. Patrick Honda. Fraker told the 911 call taker, in part,:

- A  gentleman keeps coming into the back lot, he appears to be impaired.
- He's talked to a few people.
- He's kind of refusing to leave.
- He's kind of hanging outside.
- He's wearing a green short sleeved shirt, button down but the buttons are open, carrying a white lunch Styrofoam thing.
- He's wearing jeans and standing out by the road.
- He is standing near the body shop sign at Congress and Indiana.
- He's just standing there and we are afraid he may get hit.

Koontz

Koontz wrote in his EPD Use of Force Report, in part,:

- We were dispatched to N Congress for a call regarding an  intoxicated person.
- As Officer Taylor and I arrived in the area, we immediately saw an individual matching the description of the subject later identified as Edward Snukis.

- Snukis began aggressively motioning towards our vehicle.
- When we pulled over and exited the vehicle, Snukis approached me yelling and throwing his hands in the air.
- He approached me in an aggressive way, and I asked him to put his hands on his head.
- At this point I grabbed his wrist with my hand and attempted to force his hands to his head.
- When doing so I felt Snukis tense up and he still refused to comply with simple commands.
- I then grabbed the upper section of the same arm with my other hand.
- I then applied pressure with my left hand and opposite pressure with my right hand to force his hand and arm behind his back to gain control of his movements.

Koontz testified in his Garrity statement, in part,:

- Snukis put his bag down and aggressively came at us.
- We turned from wondering what he was doing there to calm him down and why are you coming towards us in an aggressive manner.
- I feared he was coming there to harm us because he was stepping closer to our patrol car.
- I immediately told him to put his hands on his head and he refused and said I don't want to, I'm not going to.
- I approached closer, grabbed his left arm in an attempt to make him put his hands behind his back. He still refused.
- I felt him tense up. So I used my other arm to apply force to bring his arm around.
- He did not know whether Snukis was armed or not.
- He was going to check for weapons after he put Snukis in handcuffs.
- He aggressively came at us.
- He had his hands up like questioning "come on, hey, what are you doing?"
- When I first put hands on him, I could feel him tense up so I was fearful of what he was going to do and knew he could harm us.

<u>Taylor</u>

Taylor wrote in his EPD Use of Force Report, in part,:

- Officers were dispatched to the area of Congress and Indiana for a report of an intoxicated person in the area.

- When Officer Koontz and I arrived in the area, We located a white male subject matching the description provided by dispatch. The subject (later identified as Edward Snukis) appeared to be under some form of intoxication.

- As we exited the vehicle, he approached us in an aggressive manner.

- Officer Koontz stepped toward Snukis and asked him to place his hands on his head. Snukis did not comply.

- Snukis stepped into Officer Koontz.

- I observed Officer Koontz grab a hold of Snukis' left arm an attempt to gain control of Snukis.

Taylor testified in his Garrity statement, in part,:

- Koontz and Taylor were dealing with an intoxicated male,

- As Koontz exited the police vehicle, Snukis threw his hands up in an aggressive manner,

- Snukis was angry,

- Taylor could tell that Snukis did not want to deal with the officers,

- Snukis was told to put his hands behind his back,

- Taylor had reason to believe Snukis was intoxicated,

- Snukis was coming at the officers in an aggressive manner,

- Koontz grabbed his left arm to attempt to gain control, to talk to him to figure out what was going on.

- Koontz tried to get Snukis' left arm up behind his back to maintain control over him.

Taylor testified in his February 21, 2022, deposition, in part,:

- He was afraid of Snukis because he was a large individual, he struck Officer Koontz, he attempted to grab my genitalia, he did not respond to commands by

police officers but could not remember any other reason to be afraid of Snukis. (93:8-24)

- He believed Koontz was trying to gain control of Snukis. (97:13-18)

- He did not recall Snukis dropping anything on the ground, moving towards Koontz or making any verbal threats to the officers. (102)

- He and Koontz asked Snukis to stop and comply with them and to talk to them. (102:14-16)

- Taylor was the officer in charge. (103:17-19)

- He did not make any efforts to de-escalate the initial contact other than giving commands to Snukis to comply.

- The officers had many reasons to use force to gain control over Snukis including information on the run card but could not recall any of the reasons. (147:1 – 149:20)

Witnesses

Witness Dennis Smiley, an employee of D. Patrick Honda, provided a statement to EPD and stated, in part,:

- He was watching Snukis.

- Observed Snukis wave to the police to come over to him.

- Observed one officer grab Snukis' arm to put it behind his back.

- That's when Snukis "lost it."

- He did not state that he observed  or described Snukis acting aggressively toward the officers prior to the initial physical contact.

Witness Derrick Norton, an employee of D. Patrick Honda, provided a statement to EPD and stated, in part,:

- Observed Snukis standing on the corner and was concerned about the roadway and that Snukis may get hit by a car.

- Observed Snukis put down a Styrofoam container.

- Observed Snukis wave at the police officers as they pulled up.

- Observed Snukis raise his hand and heard him say "hey" as the police officer grabbed him.

- He did not state that he observe or described Snukis acting aggressively toward the officers prior to the initial physical contact.

Witness Jason Gee, an employee of D. Patrick Honda, provided a statement to EPD and stated, in part,:

- Observed Snukis put down a white container.
- Snukis met the officers who had arrived.
- Observed the officer from the passenger side of the police vehicle (Koontz) try to grab Snukis' left arm to detain him.
- He did not state that he observe or describe Snukis acting aggressively toward the officers prior to the initial physical contact.

Witness Cyril Fraker, sales manager at D. Patrick Honda and the original 911 caller, provided a statement to EPD and stated, in part,:

- Observed Snukis standing out by the Collision sign.
- He was afraid Snukis was going to fall into traffic.
- He called 911.
- Observed Snukis put a box down.
- Observed the police show up and it looked like Snukis was explaining to the police what was going on at the body shop.
- Snukis had nothing in his hands.
- Snukis started moving towards the officers "pretty aggressively" and one officer tried to put handcuffs on him.
- Fraker never explained nor was he asked by the detective what he meant by his description of "pretty aggressively" regarding Snukis' movements.

BWC Footage

The video footage from Koontz's and Taylor's BWC's that captured the first use of force event fails to support the claims by Koontz and Taylor regarding the pre-contact behavior of Snukis. In fact, the footage not only failed to support the officer's claims but is contrary to the officer's claims as discussed below:

Koontz's Use of Force Report

*"Snukis began aggressively motioning toward our vehicle."*

Koontz's BWC Footage – Snukis is seen standing still and pointing to his left and away from the officers with his left hand. Snukis is not seen aggressively motioning towards the police vehicle.

Taylor's BWC Footage - Snukis is seen standing still and pointing to his left and away from the officers with his left hand. Snukis is not seen aggressively motioning towards the police vehicle.

*"Snukis approached me yelling and throwing his hands is the air."*

Koontz's BWC Footage – Snukis is seen standing still as Koontz approaches him and is not yelling and is not throwing his hands in the air.

Taylor's BWC Footage - Snukis is seen standing still as Koontz approaches him and is not yelling and is not throwing his hands in the air.

*"He approached me in an aggressive way."*

Koontz's BWC Footage – Snukis is seen standing still as Koontz approaches him. Snukis is then seen taking a step backwards and not towards Koontz.

Taylor's BWC Footage - Snukis is seen standing still and was not approaching the officers.

Koontz's Garrity Statement

*"Snukis put his bag down and aggressively came at us."*

Koontz's BWC Footage – Snukis is seen standing still as Koontz approaches him. Snukis is then seen taking a step backwards and not towards Koontz or Taylor.

Taylor's BWC Footage - Snukis is seen standing still and was not approaching the officers.

*"I feared he was coming there to harm us because he was stepping closer to our patrol vehicle"*

Koontz's BWC Footage – Snukis is seen standing still as Koontz approaches him. Snukis in then seen taking a step backwards and not towards Koontz or the patrol vehicle.

Taylor's BWC Footage - Snukis is seen standing still and was not approaching the officers or the patrol vehicle.

*"As Koontz exited the police vehicle, Snukis threw his hands up in an aggressive manner."*

Koontz's BWC Footage – Snukis is seen standing still and pointing to his left and away from the officers with his left hand. Snukis is not seen throwing his hands up in an aggressive manner.

Taylor's BWC Footage - Snukis is seen standing still and pointing to his left and away from the officers with his left hand. Snukis is not seen throwing his hands up in an aggressive manner.

<u>Taylor's Use of Force Report</u>

*"The subject (later identified as Edward Snukis) appeared to be under some form of intoxication."*

Koontz's BWC Footage – Snukis is seen standing still and pointing to his left and away from the officers with his left hand. There is no indication on the video footage that would lead a reasonable officer to believe Snukis was under some form of intoxication.

Taylor's BWC Footage - Snukis is seen standing still and pointing to his left and away from the officers with his left hand. There is no indication on the video footage that would lead a reasonable officer to believe Snukis was under some form of intoxication.

*"As we exited the vehicle, he approached us in an aggressive manner"*

Koontz's BWC Footage – Snukis is seen standing still and pointing to his left and away from the officers with his left hand. Snukis is not seen approaching the officers.

Taylor's BWC Footage – as Taylor exits the police vehicle Snukis is seen standing still and pointing to his left and away from the officers with his left hand. Snukis is not seen approaching the officers.

*"Snukis stepped into Koontz"*

Koontz's BWC Footage – Snukis is seen standing still as Koontz approaches him and then Snukis is seen taking a step backwards and not towards Koontz or the patrol vehicle.

Taylor's BWC Footage - Snukis is seen standing still and was not approaching the officers or the patrol vehicle.

*"Snukis was angry."*

Koontz's BWC Footage – Snukis is not seen behaving in a manner that would lead a reasonable person to conclude that he was angry.

Taylor's BWC Footage – Snukis is not seen behaving in a manner that would lead a reasonable person to conclude that he was angry.

<u>Taylor's Deposition</u>

*He and Koontz asked Snukis to comply with them and to talk to them.*

Koontz's and Taylor's BWC Footage – The assertion by Taylor that he and Koontz had "asked Snukis to comply with them" and "to talk with them" is not seen or heard on either officer's BWC footage. What is seen and heard is the officer's yelling continuous commands to Snukis without providing Snukis with the time or opportunity to comply with those commands before Koontz used force by grabbing the left arm of Snukis.

The video footage from Koontz and Taylor's BWC's does support the witness statements provided by Smiley, Norton and Gee, that they did not see Snukis acting aggressively or in a threatening manner toward Koontz or Taylor.

Graham Factors

With respect to whether the use of force by Koontz against Snukis was objectively reasonable, the analysis of the facts and circumstances regarding the force must take the Graham Factors into consideration including the severity of the crime, whether Snukis posed an immediate threat to the safety of the officers or others, and whether Snukis was actively resisting arrest or attempting to evade arrest by flight.

Severity of the crime

There has been no evidence presented that at the time Koontz used force against Snukis, that Koontz and/or Taylor had reason to believe that Snukis was armed, was engaged in criminal conduct or was engaged in the commission of a crime involving violence. The EPD Event Report indicates that the officers were responding to a report of an intoxicated person who had been entering the back parking lot at D. Patrick Honda but was now "standing out by the body shop sign at Congress/Indiana right now." At most, the officers were aware that Snukis may have been intoxicated. It is my opinion that the factor regarding the severity of the crime must weigh in the favor of Snukis as being in an intoxicated state would be considered a very minor offense.

Whether Snukis Posed an Immediate Threat to the Officer's Safety

With respect to whether Snukis posed an immediate threat to the safety of the officers or others, an officer's concern regarding officer safety must be a legitimate concern and not a remote or theoretical threat. An officer's perception that an immediate threat exists is reasonable when the officer has reason to believe that an individual has the ability, opportunity, and intent to cause harm to the officer(s).

Reasonable officers know that even non-compliance with police directions and non-violent physical resistance do not necessarily create a threat to an officer's safety. In this case, it is evident that there were two armed police officers, with weapons, with

numerical superiority, training, and advantage over one unarmed individual, must be taken into consideration when considering the ability, opportunity and intent of Snukis to cause harm to the officers.

Koontz wrote in his EPD Use of Force Report, in part,:

- Snukis began aggressively motioning towards our vehicle.
- When we pulled over and exited the vehicle, Snukis approached me yelling and throwing his hands in the air.
- He approached me in an aggressive way, and I asked him to put his hands on his head.

Koontz testified in his Garrity statement, in part,:

- Snukis put his bag down and aggressively came at us.
- We turned from wondering what he was doing there to calm him down and why are you coming towards us in an aggressive manner.
- I feared he was coming there to harm us because he was stepping closer to our patrol car.

What is lacking is a reasonable understanding or explanation from Koontz of what it was about Snukis behavior at the time Koontz used force against Snukis, that was "aggressive" and would lead a reasonable officer to conclude that Snukis posed an immediate threat to the officer's safety. A claim that an individual is "aggressive" without factual basis to support that claim is mere and unsupported speculation.

Taylor testified in his Garrity statement, in part,:

- As Koontz exited the police vehicle, Snukis threw his hands up in an aggressive manner,
- Snukis was angry,
- Taylor could tell that Snukis did not want to deal with the officers,
- Snukis was coming at the officers in an aggressive manner,

Taylor testified in his February 21, 2022, deposition, in part,:

- He did not recall Snukis dropping anything on the ground, moving towards Koontz or making any verbal threats to the officers. (102)
- The officers had many reasons to use force to gain control over Snukis including information on the run card but could not recall any of the reasons. (147:1 – 149:20)

Similar to Koontz, Taylor failed to provide or describe a reasonable understanding or explanation of what was it about Snukis' behavior that was "aggressive" and what made him believe Snukis "was angry", that would lead a reasonable officer to conclude that Snukis posed an immediate threat to the safety of the officers. A claim that an individual is "aggressive" or "is angry" without factual basis to support that claim is mere and unsupported speculation.

Further, neither Koontz nor Taylor articulated in police reports, statements, or in Taylor's deposition, the facts and circumstances that would lead a reasonable officer to conclude that Snukis was armed or even possibly armed with a weapon.

Finally, as the BWC footage evidence was previously discussed in detail, the BWC footage undercuts and does not support the claims of the officer's regarding Snukis' pre-contact behavior that he posed an immediate threat to the safety of the officers. Consequently, it is my opinion that the factor of whether Snukis posed an immediate threat to the safety of Koontz and/or Taylor must weigh in the favor of Snukis.

Whether Snukis was resisting arrest or attempting to evade arrest by flight

With respect to whether Snukis was actively resisting arrest or attempting to evade arrest by flight, there is no evidence that Snukis was under arrest for any offense at the time of the initial use of force by Koontz against Snukis. It is also a reasonable response for an individual to flee from the police to avoid continued and unreasonable force used against him by the officers. Consequently, it is my opinion that the factor of whether Snukis was actively resisting arrest or attempting to evade arrest by flight weighs in the favor of Snukis.

Conclusion

It is my opinion that Koontz used unreasonable and unnecessary force against Snukis by grabbing his Snukis' arm and by trying to force his arm up behind Snukis' back without reasonable justification, and this was unreasonable, unnecessary, did not serve a legitimate law enforcement purpose, and was not consistent with generally accepted police practices regarding the use of force.

It is my opinion that the force used by Koontz was also in violation of the EPD OG on the *Use of Force* that requires officers to "only use a reasonable amount of force when necessary to affect a lawful arrest, attain a lawful objective or overcome an attack to themselves or another person."

It is my opinion that Koontz' use of unreasonable force was also in violation of the *Rules, Regulations and Procedures of the Police Department of the City of Evansville, Indiana* that states, in part,:

- *A member may use force, including deadly force, only when legally justified and when all other reasonable means of accomplishing a lawful police purpose, have failed, or when a member reasonably believes that no other reasonable method can accomplish his intended purposes. (Chapter 5, Use of Force, Sec. 1)*

It is my opinion that Koontz use of unreasonable force was also in violation of the *Law Enforcement Code of Ethics that states, in part,:*

- *I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence….(Rules, Regulations and Procedures of the Police Department of the City of Evansville, Indiana)*

It is my opinion that Koontz and Taylor failed to realize that Snukis may have been in a mental health crisis or suffering from excited delirium and that failure resulted in the additional failure by both officers to follow the EPD Operational Guideline on Mental Illness and Commitment Papers, requiring officers to, in part,:

- Speak calmly and use non-threatening body language, with your hands at your sides. Using a stern, loud command to gain compliance will have no effect or a negative effect.

- Keep the commotion down.
- Prepare for a potentially long encounter. Dealing with such persons cannot be rushed unless it is an emergency situation. De-escalation of the situation, using calming communication techniques, can take time.
- Repeat short, direct phrases in a calm voice.
- Maintain a safe distance. (Mentally Illness and Commitment Papers, 1, 2, 5, 6, 7)

It is my opinion that Koontz should not have used force against Snukis but instead should have recognized that Snukis may have been impaired, intoxicated, suffering from excited delirium or been in a mental health crisis and should have applied a de-escalation approach as outlined in the EPD Operational Guideline on Mental Illness and Commitment Papers.

It is also my opinion that no reasonable officer would conclude that the use of force by Koontz against Snukis was reasonable, necessary, served a legitimate law enforcement purpose or was consistent with generally accepted police practices regarding the use of force.

It is also my opinion that while the evidence shows that Snukis did resist and then fled on foot from the officers after the first use of force incident, it was reasonable and understandable that Snukis would resist and flee from officers to stop unreasonable force.

**Issue #2 – Whether Taylor and Koontz reported their actions in complete, clear, concise, concrete, and correct police reports?**

Reasonable officers know as stated by the IACP's Training Key #433 on Principles of Report Writing, in part,;

- From a prosecutorial standpoint, the most common deficiency of police reports is they lack detail, accuracy and clarity.
- Police reports are to be complete, clear, concise, concrete, and correct.

- The language used in the police report must be specific. Officers must stick to the facts while including sufficient detail. Vaguely worded sentences may result in different readers reaching different conclusions.
- Incorrect police reports are of little value.

As discussed in Issue #1, the Use of Force Reports completed by Taylor and Koontz, and their Garrity Statements are inconsistent with and in conflict with footage from the officer's BWC's. Further, Taylor's deposition testimony is also inconsistent with and in conflict with footage from the officer's BWC's.

Conclusion:

It is my opinion that both Taylor and Koontz failed to completely and accurately report and document the pre-contact conduct of Snukis and failed to completely and accurately report and document their own actions during their contact with Snukis, and this is unreasonable and not consistent with generally accepted police practices regarding the writing of police reports.

It is also my opinion that the deposition testimony of Taylor was not accurate regarding the pre-contact conduct of Snukis and the actions of both himself and Koontz during the use of force events with Snukis, as depicted in the officer's BWC footage, and this is unreasonable and not consistent with generally accepted police practices regarding providing sworn testimony on police events.

**Issue #3 – Whether Taylor intervened and attempted to stop the use of force by Koontz against Snukis?**

It is long recognized that officers have a constitutional duty to intervene on behalf of a citizen when they observe excessive force being used by an officer in their presence.

Reasonable officers also recognize that an officer who fails to intervene in unconstitutional or illegal conduct is also violating their oath of office to uphold the Constitution as well as state and federal law. Officers may not ignore the duty imposed by their oath of office and must stop or attempt to stop other officers from using

excessive force or from engaging in unconstitutional conduct when they have a reasonable and realistic opportunity to prevent excessive force or unconstitutional conduct.

Conclusion

In this case, it is my opinion that the evidence established that Koontz used force against Snukis that was unreasonable and not consistent with generally accepted police practices regarding the use of force. It is also evident that Taylor was present and witnessed the force applied by Koontz and had the opportunity to intervene to stop the force.

It is my opinion that there has been no evidence presented that Taylor took any reasonable steps or made any effort to intervene and stop Koontz from using force against Snukis during the initial encounter with Snukis or during the second use of force event where Snukis was held down by the officers and handcuffed. This was unreasonable and not consistent with generally accepted police practices regarding the duty of officers to intervene on behalf of citizens whose constitutional rights are being violated in their presence

It is my opinion that Taylor, as the senior officer and as the Field Training Officer (FTO) to Koontz, should have recognized that Koontz should not have used force against Snukis and should have immediately intervened and stopped or attempted to stop Koontz from using force against Snukis. Koontz should have intervened by immediately verbally directed Koontz to stop using force against Snukis and if that effort failed to then physically intervene to stop Koontz from continuing to use force against Snukis. Taylor had the opportunity to intervene but failed to do so.

**Issue #4 – Whether the force used by Taylor against Snukis, during the first use of force incident, was reasonable under the totality of circumstances?**

It is evident that Taylor used two separate *applications* of force against Snukis during the first use of force incident when he deployed two Taser cartridges at Snukis during the initial contact with Snukis. The deployments of the Taser occurred after and

subsequent to the force used by Koontz against Snukis. All of the facts and reasonings discussed with respect to the reasonableness of the force used by Koontz, including the Graham Factors, would apply and be transferred to the analysis of whether the force used by Taylor was reasonable.

Conclusion

As it is my opinion that the force used by Koontz was unreasonable, unnecessary, did not serve a legitimate law enforcement purpose and was not consistent with generally accepted police practices regarding the use of force, it is also my opinion that the force used by Taylor, for the same reasons as outline in the discussion of Issue #1, was also unreasonable, unnecessary, did not serve a legitimate law enforcement purpose, and was not consistent with generally accepted police practices regarding the use of force. Taylor should not have used force against Snukis.

The force used by Taylor was also in violation of the EPD Operational Guideline on the Use of Force that requires officers to "only use a reasonable amount of force when necessary to affect a lawful arrest, attain a lawful objective or overcome an attack to themselves or another person."

It is my opinion that the force used by Taylor was also in violation of the EPD OG on the *Use of Force* that requires officers to "only use a reasonable amount of force when necessary to affect a lawful arrest, attain a lawful objective or overcome an attack to themselves or another person."

It is my opinion that Taylor's use of unreasonable force was also in violation of the *Rules, Regulations and Procedures of the Police Department of the City of Evansville, Indiana* that states, in part,:

- *A member may use force, including deadly force, only when legally justified and when all other reasonable means of accomplishing a lawful police purpose, have failed, or when a member reasonably believes that no other reasonable method can accomplish his intended purposes. (Chapter 5, Use of Force, Sec. 1)*

It is my opinion that Taylor's use of unreasonable force was also in violation of the *Law Enforcement Code of Ethics that states, in part,:*

- *I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence….(Rules, Regulations and Procedures of the Police Department of the City of Evansville, Indiana)*

It is my opinion that Taylor should have recognized that Snukis may have been impaired, intoxicated, suffering from excited delirium or been in a mental health crisis requiring a de-escalation approach as outlined in the EPD Operational Guideline on Mental Illness and Commitment Papers.

It is my opinion that had Koontz not used force against Snukis during the first use of force incident, it is more likely than not, that Taylor would not have used force against Snukis by tasing him.

**Issue #5 – Whether the force used by Koontz against Snukis during the second use of force incident involving the handcuffing of Snukis was reasonable under the totality of circumstances?**

It is evident that Koontz used force against Snukis during the first use of force incident and it is also evident, by Koontz's own Use of Force Report, that he also used force against Snukis during the second use of force incident involving the handcuffing of Snukis.

Koontz reported, in part:

- So I grabbed his legs and lower body
- After securing his legs with my body weight, I grabbed his left arm
- I then hooked by left arm under his left arm and grabbed his wrist
- I also grabbed the same wrist with my right hand
- I then used both hands to apply forward pressure, towards Snukis' head, as to gain pain compliance.

- After more pressure from me on his arm and Officer Taylor's pressure on Snukis' arms and upper body, we were able to get his right hand free from under his body

All of the facts and reasonings discussed with respect to the reasonableness of the initial use of force by Koontz, including the Graham Factors, would apply and be transferred to the analysis of whether the force used by Koontz during the second use of force incident was reasonable.

Conclusion

As it is my opinion that the force used by Koontz during the initial use of force incident was unreasonable, unnecessary, did not serve a legitimate law enforcement purpose, and not consistent with generally accepted police practices regarding the use of force, it is also my opinion that the force used by Koontz during the second use of force incident was also unreasonable, unnecessary, did not serve a legitimate law enforcement purpose, and was not consistent with generally accepted police practices regarding the use of force.

Koontz should not have used force against Snukis during the first use of force incident and had he not used that force, it is more likely than not, that the second use of force incident would not have occurred.

**Issue #6 – Whether the force used by Taylor against Snukis during the second use of force incident involving the handcuffing of Snukis was reasonable under the totality of circumstances?**

It is evident that Taylor used force against Snukis by tasing Snukis during the first use of force incident and it is also evident, by Taylor's own Use of Force Report, that he also used force against Snukis during the second use of force incident involving the handcuffing of Snukis.

Taylor reported using force during the ground struggle with Snukis but also reported in his Use of Force Report that *"I then struck Snukis in the left side of the head*

*approximately 6 times in an attempt to get pain compliance and to get his to release his grip on my inner thigh."* Six strikes to an individual's head is considered to be *six applications of force* and should be analyzed as such.

All of the facts and reasonings discussed with respect to the reasonableness of the initial use of force by Koontz, including the Graham Factors, would apply and be transferred to the analysis of whether the force used by Taylor during the second use of force incident was reasonable. Koontz should not have used force against Snukis during the first use of force incident and had he not used that force, it is more likely than not, that the second use of force incident, including all of the use of force applications by Taylor, would not have occurred.

With respect to the six strikes delivered to the head of Snukis, Taylor reports in his Use of Force report that Snukis had grabbed his inner thing and had then *"gripped harder"* and that he struck Snukis to *"get pain compliance to get his to release his grip on my inner thigh."*

Taylor also stated in his Garrity Statement that he struck Snukis four to five times in the head for pain compliance. Taylor testified in his deposition that he struck Snukis with a closed hand for pain compliance but could not recall how many times. (75:16 – 76:6)

The evidence shows that Snukis was in a prone position on unpaved ground while being physically restrained by Koontz and Taylor, when Taylor admittedly delivered the approximately six strikes to the head of Snukis.

Reasonable officers know that when a subject is prone on a hard and solid surface without cushioning, and with restricted opportunity to move his head to recoil or compensate for the power of the punch, which restricted his ability to compensate for the strikes, that the subject's his head is absorbing 100% power of the strikes without being able to shed or avoid the power from the strikes.

<u>Conclusion</u>

As it is my opinion that the force used by Koontz during the initial use of force incident was unreasonable, unnecessary, did not serve a legitimate law enforcement purpose and was not consistent with generally accepted police practices regarding the use of force, it is also my opinion that all of the force applications used by Taylor during the second use of force incident, including each and every one of the approximately six individual strikes to the head of Snukis, was also unreasonable, unnecessary, did not serve a legitimate law enforcement purpose, and was not consistent with generally accepted police practices regarding the use of force.

It is my opinion that Koontz should not have used force against Snukis during the first use of force incident and had he not used that force, it is more likely than not, that the second use of force incident would not have occurred.

It is my opinion that Taylor failed to document whether he provided Snukis with a reasonable amount of time between the strikes to allow for Snukis to respond and comply with his commands before he delivered an additional strike. This was unreasonable and not consistent with generally accepted police practices regarding the use of force and the documentation of the use of force.

It is also my opinion that Taylor failed to allowed time for him to evaluate the effectiveness of each strike before delivering additional strikes to Snukis. This was unreasonable and not consistent with generally accepted police practices regarding the use of force and the documentation of the use of force.

If Taylor did not provide Snukis with the opportunity to respond, react and comply with his commands before repeating his use of force applications to the head, and did not evaluate the effectiveness of each individual strike before delivering another strike, then this would also be unreasonable and not consistent with generally accepted police practices regarding the use of force.

It is my opinion that the severity of the force used by Taylor by repeatedly striking Snukis in the head was exacerbated by the fact that Snukis was in a prone position with his head against the unpaved and solid ground and this was also unreasonable.

It is my opinion that it is also reasonable and possible to conclude that Snukis was unable to physically comply with the officer's commands to put his hands behind his back due to his body positioning with his arms and hands pinned under his body by his own body weight and with the body weight of the officers or any additional pressure on his body as applied by the officers.

**Issue #7 – Whether Koontz, Taylor, and Hackworth failed to recognize that Snukis was in medical distress and failed to summon or provide medical aid to Snukis in a reasonable amount of time?**

The audio and video footage from Koontz's, Taylor's, and Hackworth's BWC's is evidence that Snukis went into a medical distress condition during the second use of force incident involving the handcuffing of Snukis. It is also evident that there was a significant delay in time from when Snukis was observed by the officer's to be in obvious medical distress to when CPR was started.

**Koontz's BWC footage** captures images and voices with the following timeline:

**2:37 – 3:02:** Snukis is heard to be making guttural and snoring sounds indicative of agonal breathing and that he is having difficulty breathing. The sounds become slower, lower in volume and then faint at the 3:02 mark and then all sounds from Snukis ceases. Officers are heard continually shouting commands to Snukis.

**0:3:48:** An officer is heard to say the "subject is out."

**0:3:51:** An officer is heard to say, "turn him over."

**0:4:03:** An officer applies a sternum rub to Snukis with no visible response from Snukis.

**0:4:14:** An officer is heard to state, "He is breathing, I feel his chest going up and down."

**0:5:01:** An officer is heard to call for Fire Rescue stating, "subject is unresponsive."

**0:5:46:** Taylor is seen walking away to speak with witnesses.

**0:6:40:** An officer is heard to say, "breathing very little, has a faint purse, non-responsive."

**0:7:16:** An officer heard to say, I'm not getting a pulse."

**0:7:18:** An officer is heard to say, "get his handcuffs off, we'll start CPR."

**0:7:46:** CPR is initiated

**0:12:00:** EMS makes contact with Snukis and advised the officer to continue CPR.

**Taylor's BWC footage captures images and voices with the following timeline:**

**0:01:26 to 0:03:08:** Snukis is heard to be making guttural, snoring sounds with slurred speech, indicative of agonal breathing and that he is having difficulty breathing. The sounds become slower, lower in volume and then faint at the 3:08 mark and then all sounds from Snukis ceases. Officers are heard continually shouting commands to Snukis.

**0:3:30:** Snukis' arm is seen to be between the legs of an officer but his hand and fingers are completely limp, not moving, and unresponsive, during the handcuffing process.

**0:3:47:** An officer says, "in custody, the subject is out."

**0:3:53:** Taylor says, "turn him over, make sure he's breathing."

**0:4:03:** Hackworth says, "start AMR;" Koontz starts sternum rub.

**0:4:34:** Taylor says, "Nick, is he still breathing?"

**0:4:50:** Taylor asks dispatch to have someone secure his police vehicle that is in from of D. Patrick Honda.

**0:4:49:** Hackworth calls for Fire to respond, and says, "he's unresponsive."

**0:5:47:** Taylor walks away from Snukis, Koontz and Hackworth to talk with witnesses.

**0:6:15:** A witness asked Taylor why Snukis in not moving and Taylor responds, "he is passed out and is as drunk as a skunk."

**0:6:47:** Taylor walks back to the scene and Snukis can be seen being held in position on his side by an officer's hand and leg. No one appears to be attending to Snukis.

**0:7:16**: An officer is heard to say, "I'm not getting a pulse."

**0:7:20:** An officer says, "I'm not getting a pulse, get his handcuffs off, we're probably going to have to roll him over and start CPR."

**0:07:45**: CPR is initiated.

**0:12:00:** EMS makes contact with Snukis and advised the officer to continue CPR.

It is evident from Koontz's, Taylor's, and Hackworth's BWC footage that the officers started CPR on Snukis approximately 4 minutes and 44 seconds after it was obvious that he was suffering from agonal breathing, was having difficulty breathing, and was in medical distress. CPR was started at least 3 minutes and 58 seconds after an officer said, "subject is out."

**Hackworth's BWC footage captures images and voices with the following timeline:**

**0:01:29:** Hackworth arrives and make contact with Snukis, Taylor and Koontz.

**0:01:36:** Hackworth radios "Everett 220, in custody, subject is out."

**0:01:52:** Hackworth radios for a sergeant to respond and for AMR to respond.

**0:05:35:** CPR is initiated.

It is evident from Hackworth's BWC footage that ARM is requested to respond to the scene but the officer(s) never stated how AMR should respond in what response mode. Reasonable officers would have made it clear that they were dealing with a medical emergency and requested that any emergency medical services (AMR, Fire Rescue, EMS) respond in an emergency mode using emergency lights and sirens to expedite their response.

Conclusion

It is evident that there were no sounds coming from Snukis after the 0:3:02 mark on Taylor's, Koontz's and Hackworth's BWC footage that would indicate that he is breathing. In fact, Snukis' hand and fingers can be seen as limp in Taylor's BWC footage while the officers are still attempting to handcuff Snukis.

Witness Brentlee Spurlock told the EPD in her statement that she heard Snukis state "I cannot breathe" while one officer had his knees on Snukis' back with the other officer had him in a choke hold and that Snukis was limp.

Witness Christy McGowan told the EPD in her statement that Snukis' arms were caught underneath his body and that it was difficult for him to get his arms out while both officers were on top of him. McGowen also told EPD that one officer had his arm around

Snukis' throat, that Snukis became unresponsive and that one officer struck Snukis in the head with his fist.

It is my opinion that reasonable officers would associate the guttural and snoring sounds with agonal breathing and immediately recognize that Snukis is having difficulty breathing, requiring immediate medical intervention by the officers and the immediate summoning of emergency medical services in an emergency response mode.

It is my opinion that reasonable officers would also recognize that a combative subject who suddenly quiets down and stops fighting may indicate a medical emergency. It is my opinion that reasonable officers know that when a person states that they "cannot breathe" that the person is having difficulty breathing and is in medical distress requiring immediate medical intervention by the officers and the immediate summoning of emergency medical services in an emergency response mode.

It is my opinion that Koontz, Taylor, and Hackworth failed to recognize that Snukis was in medical distress by at least the 0:3:02 time mark on the BWC footage, and failed to provide immediate medical intervention and the immediate summoning of emergency medical services in an emergency response mode and this was unreasonable and not consistent with generally accepted police practices regarding responding to persons in medical distress.

**Issue #8 – Whether the EPD failed to train EPD officers on their duty to intervene to prevent an officer from using excessive force, on de-escalation skills and techniques during force events, and to recognize and respond to individuals suffering from medical distress, difficulty breathing, agonal breathing, and to suspect who state, "I cannot breathe?"**

It is reasonable to conclude that law enforcement officers will routinely and frequently encounter events involving the use of excessive force by other officers requiring the need for officers to intervene to stop the excessive force. Officers will also encounter individuals who are suffering from difficulty in breathing, agonal breathing, and who state, "I cannot breathe." It is also reasonable to conclude that these events require

reasonable and appropriate responses from officers and that these responses can be categized as core tasks.

I have reviewed the training records of Koontz, and Taylor and have not found any records that either officer received training from  the EPD on these specific core tasks of the need to intervene and agonal breathing.

I have reviewed EPD's OGs as noted, and have reviewed the Rules, Regulations, and Procedures of the Police Department of the City of Evansville, Indiana, and have not found any guidance or instructions in these materials regarding these specific core tasks of an officer's duty to intervene or agonal breathing. The Operational Guideline on *Handling the Street Drunk* does contain language regarding response to an "intoxicated person" who is injured or ill  but no such guidance is found in the Operational Guideline on *Arrests* or *Use of Force.*

Conclusion:

It is my opinion that the EPD failed to provide Koontz and Taylor with training on these core tasks of the duty to intervene, and techniques and on how to respond to individuals who are suffering from difficulty in breathing, agonal breathing, and who state, "I cannot breathe," and de-escalation techniques and skills during use of force events, and this is unreasonable and not consistent with generally accepted police practices on training of these core tasks.

The EPD should have specific polices and specific training on these core tasks these core tasks. If such policies existed, the EPD should provide supervision of officers to ensure that they follow the policy and training on these core tasks. And if such policies exist, the EPD should hold officers accountable for those who fail to follow their training and the policies on these core tasks.

FTO Training

With respect to the training provided to Koontz by Taylor, in his capacity as Koontz's Field Training Officer (FTO), Taylor wrote in the 8/13/2019, Daily Observation Report (DOR) for Koontz under PROBATIONARY OFFICERS EXPECTATIONS:

- Constantly be aware of officer safety, both yours and your fellow officers. Pat downs should be preformed on all subjects encountered (within reason) **CONTROL EVERYON'S MOVEMENTS. (page 146 of 343)**

A review of Taylor's undated DOR of Koontz (Report 1.2, page 169 of 343), contains the following statements in the *Weakest Area* section regarding his direction to Koontz:

"*We discussed the necessity to take control of every one on every run we encounter. We discussed a simple order of operations that can be applied to virtually everything that we do, which is the following: 1) take charge, 2) make it safe, 3) find out who we are dealing with. We also discussed, for the third time now, the fact that I expect all probationary officers to "pat down everyone we encounter (within reason)." This expectation was discussed on Ofc. Koontz's first night of this rotation (8/13/19) when I gave him a printed copy of the expectations for the rotation. We discussed it again on 08/16/19. We again discussed this today and I told Ofc. Koontz that for the rest of the rotation, I expect him to pat down as many people as possible on every run we are on (all still within reason). I also advised Ofc. Koontz that I expect him to step up and take control of runs and also of people's movements while we are dealing with them.*"

Taylor also wrote in another DOR for Koontz, dated "Day 21: 09/13/19", the day of the police encounter with Snukis, the following in response to the question on the form of *Were there any supplemental training methods used?:*

"*Every shift on every run, Officer Koontz has to state the following:*

*Whoever I am dealing with, may try to kill me.*

*I will not make a mistake so that my wife is a widow.*

*I will not search until after subject is handcuffed and properly secured*.," and

"*I have asked Koontz to say out loud multiple times to state the following:*

*The person I am getting ready to encounter may kill me.*

*I will not make mistakes that leaves my wife a widow.*
*I will only search after handcuffed and properly secured.*
*I have not heard Officer Koontz say these items. He advised me that he is saying them*
*to himself. I have asked his to say it out loud hoping that it will help jog his memory."*

It is also of interest to note the following comments in Koontz's 10/17/2019 DOR by
Taylor:

"After the 4 weeks of AT (additional training) I believe that Officer Koontz will not be able
to make it past field training. Officer Koontz's actions will either get himself or others
killed or hurt." (page 281 of 243)

Unfortunately and sadly, Taylor's prediction that Koontz would *"either get himself or*
*others killed or hurt"* had already occurred as Snukis had died as a result of his
September 13, 2019, encounter with Taylor and Koontz.

The 11/07/2019 DOR entry by Steven Mark Kleeman simply states:
"Koontz has resigned"

Conclusion:
It is my opinion that Taylor, had provided improper and unreasonable instructions to
Koontz by writing in the DOR that *"I expect all probationary officers to "pat down*
*everyone we encounter (within reason)"* , and *"I expect him to pat down as many people*
*as possible on every run that we are on (all still within reason),* without providing a
written explanation of what is actually meant by "within reason" or "or still within reason."
These instructions are unreasonable and not consistent with generally accepted police
practices regarding training and training by an FTO.

Reasonable officers know that the Field Training Program is generally designed to
teach new officers while under the supervision and oversight of an FTO, how to apply
information learned in the police academy to field settings when functioning as a law
enforcement officer. Failing to provide Koontz with reasonable written instructions and
guidance as to the meaning of "within reason" could lead Koontz to "pat down" every

person he encounters regardless of whether he has the lawful authority to do so and could lead to violations of rights afforded by the U. S. Constitution.

It is my opinion that while officer safety is an extremely important issue for law enforcement officers, the repeated unreasonable warning instruction to a probationary officer that every person encountered by an officer "may try and kill me" or "may kill me' is unreasonable and not consistent with generally accepted police practices regarding training and training by an FTO.

It is also my opinion that such repeated unreasonable warnings may cause officers, including probationary officers, to have an unreasonable and unrealistic view that all citizens should be rendered as impersonal threats to their safety and devoid of constitutional rights. This approach may lead officers to use unreasonable force to conduct unreasonable "frisks" or "pat downs" of citizens without reasonable suspicion that the citizen had committed a crime, may be armed with a weapon(s) or poses an immediate threat to the officers. Such unreasonable views of the citizenry, those that law enforcement officers should be serving and protecting, could lead to violations of rights afforded by the U. S. Constitution and is not consistent with generally accepted police practices.

**Issue #9 – Whether the EPD conducted a reasonable investigation of the use of force by Koontz and Taylor?**

Reasonable officers know and understand as stated by the ICAP's *Concepts and Issues Paper on Investigation of Allegations of Employee Misconduct*, in part,:

- *Law enforcement agencies have the responsibility and duty to conduct internal investigations of allegations of misconduct in accordance with the law and professionally accepted practices and procedures. (I, B)*

In this case, the EPD failed to meaningfully investigate the incident and instead, conducted an internal investigation of the force use by Koontz and Taylor that was deeply flawed and contained substantial errors.

Koontz and Taylor each provided a "Garrity Statement' regarding their interactions with Snukis and were continually asked leading questions that were designed to exonerate the officers rather than seeking a complete, unbiased and impartial finding. Further, Taylor was provided, unprompted, with his own police report so he could read the report into his statement, instead of relying on his own independent memory of the encounter with Snukis and this was completely improper and not consistent with reasonable interview procedures.

Further, the investigation failed to thoroughly address or question the legal basis for stopping Snukis, failed to thoroughly investigate the need for the use of force, including the tasing, failed to reasonably address the discrepancies in the video footage when compared to the officer's reports and statements regarding Snukis' conduct, failed to reasonable reasonably address the force used by Snukis during the second struggle, failed to reasonable address the force used by Taylor when he delivered strikes to the head of Snukis, and failed to reasonable address the significant delay in providing medical aid to Snukis after he obviously stopped breathing.

Conclusion:

It is my opinion that this investigation failed to assess the conduct of the officers against well-established police practices and procedures and did not reflect the rigor of a police investigation that one would expect of such an inquiry regarding the events that lead to the death of an individual while in police custody, and this was unreasonable and not consistent with generally accepted police practices regarding use of force investigations. In my experience and training, it is hard to imagine any other person involved in a fatal incident being interviewed as these officers were.

**Issue #10 – Whether the EPD OG's were reasonable and consistent with generally accepted police practices regarding policies or operational guidelines?**

As discussed in this report, there are a number of EPD's OG's that can be described as insufficient, or EPD's OG's that are not consistent with generally accepted police practices regarding OG's, including:

- **EPD OG 539.00 – Use of Force**

This OG states, in part,: ***Policy*** - *Officers will only use a reasonable amount of force when necessary to affect a lawful arrest, attain a lawful objective or overcome an attack upon themselves or another person. When the subject of the force has been overcome and is under complete control, all force against him/her will cease.*

This OG fails to instruct officers that force must be *objectively reasonable*, and that the determination that the necessity for using force and the level of force used in based upon the officer's evaluation of the situation in light of the totality of circumstances known to the officer at the time the force was used and upon what a reasonably prudent officer would use under the same or similar circumstances, and that,

The decision to use force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight", and that,

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 hindsight…the question is whether the officer's action's are 'objectively reasonable' in light of the facts and circumstances confronting them."

Conclusion:

It is my opinion that the EPD OG 359.00 instructs officer's to use a "subjective standard" regarding when force can be used as opposed to the "objective reasonableness standard' and that is unreasonable and not consistent with generally accepted police practiced regarding OG's on the use of force.

It is also my opinion that the EDP OG 359.00 on the Use of Force fails to provide language addressing the officers responsibility and duty to intervene to prevent and stop the use of excessive force by another officer when it is safe and reasonable to do so.

It is my opinion that the EDP OG 359.00 on the Use of Force fails to provide language advising officers to use de-escalation techniques before resorting to force or to reduce the need for force.

The failure to have a Use of Force OG that addresses the duty to intervene and de-escalation techniques is unreasonable and inconsistent with generally accepted police practices regarding the OG's on the use of force.

**EPD OG 104.00 – Arrests**

As discussed in this report, this OG does not contain guidance that officers are responsible for the safety of any arrestees. As it is predictable and expected that officers, during arrest situations, will encounter individuals who are injured, who will become injured during the arrest process, or who will suffer from a medical emergency during the arrest process requiring medical intervention.

Conclusion:

Officers should be provided guidance and instruction regarding the rendering of immediate medical aid and summoning emergency medical services for such persons and the failure to have such guidance in the Arrest OG is unreasonable and inconsistent with generally accepted police practices regarding the safety of any arrestee.

**Issue #11 - Whether the EPD properly collected and preserved evidence in this case?**

Reasonable officers know as stated by the IACP's Model Policy on *Crime Scene Processing* that the collection and preservation of evidence is a basic and core task of investigations.

In this case, there were numerous references by Koontz, Taylor, and civilian witnesses that prior to the contact of Snukis by Koontz and Taylor, Snukis had possession of what was described in various terms as a bag, an item, a box, a white container, or as a white Styrofoam container, that Snukis allegedly put down, threw down, or dropped on the ground immediately prior to the contact with the officers.

However, I have not seen any video footage, photographs of the item(s) nor have I seen any evidence demonstrating that the item was collected and preserved as evidence by the EPD.

Conclusion:

It is my opinion that the EPD failed to collect and preserve the item that Snukis was carrying prior to his contact by the officers and this is unreasonable and not consistent with generally accepted police practices regarding crime scene processing and evidence.

**Closing Comments**

It is my opinion that Koontz and Taylor were dispatched to an unremarkable and common police service call that an individual was possibly "impaired" and that the 911 caller was concerned about his safety. Instead of making contact with Koontz in a reasonable fashion to provide for and ensure the safety of Snukis, by determining the issue, retaining space and distance for officer safety, and applying de-escalation strategies, Koontz followed the unreasonable training provided by Taylor to "take charge" and to "pat down everyone we encounter" and immediately used unreasonable force by grabbing Snukis by his arm in an attempt to detain him without reasonable suspicion or probable cause that Snukis had committed a crime, posed an immediate threat to the safety to the officer or others, was armed with a weapon(s) or was resisting arrests or attempting to resist arrest by flight.

It is my opinion that it was the sole actions of the Koontz and Taylor that escalated an unremarkable and common police service call into multiple and unreasonable use of

force events, including the failure to render aid and resulted in the preventable death of Snukis.

I have provided my opinions based upon my training, experience, and after a careful evaluation of the totality of all the materials and circumstances that have been provided to me in this matter. I used all of the facts and data known to me and applied generally accepted police operational, investigative, supervision, and management principles, procedures and methods. I hold the opinions set forth above to a reasonable degree of professional certainty in the field of law enforcement, based on longstanding and well accepted law enforcement practices.

This concludes my findings, conclusions, and opinions at this time. I respectfully reserve the right to supplement or otherwise modify my opinions based on the receipt and examination of additional information, including but not limited to, video footage, statements, deposition transcripts, or reports.

Sincerely,

*Robert R Pusins*