CYRIL H. WECHT, M.D., J.D.
P.O. BOX 220
2507 WILDWOOD ROAD
WILDWOOD, PENNSYLVANIA 15091
(412) 281-9090
FAX (412) 261-3650
EMAIL wechtpath@cyrilwecht.com

FORENSIC PATHOLOGY
LEGAL MEDICINE

April 5, 2023

Mark E. Miller, Esquire

915 Main Street, Suite 203

Evansville, IN 47730

*Re: <u>Edward Snukis, deceased</u>*

Dear Mr. Miller:

Pursuant to your request, I have reviewed the following materials provided to me in the matter referenced above:

1. Autopsy Report of Christopher J. Kiefer
2. Autopsy Report of Cyril H. Wecht
3. Autopsy Photographs
4. Ascension St. Vincent Evansville Medical Records
5. Death Certificate
6. American Medical Response (AMR) Records
7. Evansville Fire Department Records
8. Complaint
9. Evansville Police Department Records

10. Body and Dash Camera Footage

11. Deposition of Matthew Taylor

12. Deposition of Nicholas Hackworth

13. Order on Defendants' Motion to Dismiss

14. Report of Robert R. Pusins

15. Oral Deposition of Matthew C. Sophy, D.O.

On September 13, 2019, Edward Snukis presented to the Emergency Department at about 8:27 PM in full cardiopulmonary arrest. He had gone into cardiac arrest en route to the hospital. Time of death was declared at 8:51 PM.

**Christopher J. Kiefer, M.D., Forensic Pathologist, performed a postmortem examination of Edward Snukis on September 14, 2019,** which documented the following:

Findings:

I. Methamphetamine intoxication:

   a. History of the decedent exhibiting agitation and aggression, behavior consistent with excited delirium syndrome, on police videographic recording.

   b. Pulmonary edema, weights 720 grams right and 750 grams left.

   c. Hospital blood positive for marked amount of methamphetamine and amphetamine.

II. Cardiomegaly:

   a. Cardiomegaly, weight 780 grams.

   b. Marked left ventricular hypertrophy, thickness 2.2 cm.

c. Abundant fibrosis and hypertrophied myocytes.
III. Death while in police custody:
   a. History of becoming unresponsive while being placed in restraints and shortly after receiving electrical shocks from conducted electrical weapon.
   b. Conducted electrical weapon barbs embedded in the outer right upper arm and the right elbow.
IV. Minor blunt force trauma:
   a. Abrasions and punctate wounds of the right scalp and the right forehead.
   b. Superficial linear abrasions of the left scalp and contusions of the left forehead.
   c. Superficial abrasions of the right upper back, the anterior right hip, and the right knee.
   d. Abrasions of the right forearm.
   e. Subcutaneous hemorrhage of the right elbow and the right hip.
V. Cerebellar telangiectasia.

The body was that of a well-developed adult Caucasian man, weighing 241 pounds and measuring 72.5 inches, whose appearance was consistent with the reported age of 55 years. The sclerae and conjunctivae were clear except for a few petechial hemorrhages of the upper and lower right palpebral conjunctivae and scleral tache noir.

An area of red abrasions covered most of the posterior right parietal scalp. A 1.5 inch linear array of four punctate abrasions was at the superior midline of the head near the forehead. A 1 inch red linear abrasion and a ¼ inch punctate wound were on the anterior right parietal scalp. A linear abrasion was just above the right eyebrow. A few round contusions were on the left side of the face in the anterior temple region. Faint, superficial linear abrasions were on the

left temporoparietal scalp, one vertical that was away from the ear, and one horizontal that was slightly above the ear. The undersurface of the scalp had hemorrhages corresponding to the left temporoparietal abrasions and the contusion and abrasions of the right superior head. The left temporalis muscle was diffusely congested. The tongue had two round contusions of the left edge that were centered between two superficial mucosal lacerations, and sectioning revealed superficial muscle hemorrhages that corresponded to the contusions of the tongue.

Over the posterior right shoulder and right upper back was a 2 x ½ inch superficial abrasion with loss of only the epidermis. A transverse fracture of the sternum at the level of the third intercostal space, rib fractures of the anterolateral right and left upper ribs, and fractures of the cartilaginous segments of right ribs two through seven and left ribs two, five, and six probably represented evidence of cardiopulmonary resuscitation. Reflection of the skin of the upper and mid-back revealed no subcutaneous or superficial muscle hemorrhages of these sites. The left lower scrotum had a focus of air-drying that appeared almost as a linear and nodular lesion. Superficial abrasions, or sloughing of the epidermis, were on the outer right inguinal area.

An abrasion was on the back of the right arm just distal to the elbow. Several small lacerations were arranged in a linear fashion, almost extending distally from the abrasion on the back of the forearm near the elbow. A few punctate abrasions were on the back of the right hand near the base of the fourth digit. On the palm of the left hand were two punctate wounds, one of which had an embedded foreign body. Posterior reflection of the skin of the upper extremities revealed deep tissue hemorrhage at the prominence of the right elbow and a larger area of subcutaneous tissue hemorrhage, approximately 10 x 10 centimeters. The posterior right upper arm had two collections of blood between the superficial muscles and skin that had areas with

greatest dimensions of 4 cm and 3 cm, for the medial-most and posterior-most hemorrhages, respectively.

On the medial upper right knee was a 1 x 1 inch red abrasion. A ¼ inch abrasion was on the outer proximal right lower leg. The right ankle had red abrasions above and anterior to the lateral malleolus. On the outer proximal right hip was a large pocket of bloody fluid between the subcutaneous tissue and the muscle. The pocket of fluid was bordered on the anterior side by a 4 x 2 inch area of sloughed epidermis, or superficial abrasion. The reflection of the skin of the posterior, medial, and lateral left upper and left lower extremities revealed no sign of injury. The heart was markedly enlarged, had a globoid shape, and weighed 780 grams. The coronary arteries arose normally in a right-dominant pattern with focal atherosclerotic stenosis. The left anterior descending coronary artery had 50% stenosis. The myocardium was markedly hypertrophied in the interventricular septum and the walls of the left ventricle. The right ventricular wall thickness was 0.8 cm; the left ventricular wall was 2.2 cm thick.

In the lungs, the pulmonary parenchyma was dark red-purple and exuded moderate to marked amounts of blood and frothy fluid.

In the brain, sectioning of the right hemisphere of the cerebellum revealed a spongiform change of the white matter from the vermis to the lateral cerebellum; the many small channels appeared interconnected and contained bloody fluid. Small foci of soft, golden gliosis were in the white matter of the vermis and medial cerebellum. Foci of hemorrhage were within the spongiform white matter of the lateral cerebellum.

Microscopic analysis revealed marked hypertrophy of myocytes that were separated by wide bands of interstitial fibrosis in the heart. There was also congestion of the arterioles and mild anthracosis in the lungs, as well as florid centrilobular macrovesicular steatosis in the liver.

There was a tubular anomaly of the subcapsular cortex in the kidney. There were lacunae around the numerous vascular structures of the white matter of the right cerebellar hemisphere. The many vessels were ectatic and their walls had a glassy, hyaline change. The spaces contained some red blood cells and the nearest neuronal tissue was rimmed by extracellular basophilic bodies, possibly corpora amylacea.

Toxicological analysis revealed a marked amount of methamphetamine (4300 ng/mL) and a mild amount of amphetamine (57 ng/mL) in the blood collected from the hospital. The urine contained evidence of recent use of fentanyl and amphetamines. Vitreous fluid chemistry analysis revealed a mild increase of the concentration of urea nitrogen (36 ng/dL).

**Cause of death:** methamphetamine intoxication with a contribution by cardiomegaly.


**Cyril H. Wecht, M.D., J.D., Forensic Pathologist, performed a second autopsy of Edward Snukis on September 22, 2019, pursuant to the request of the legal next of kin,** which revealed the following:

Final Pathological Diagnoses:

I. Positional-compression asphyxiation.

II. Epidural hemorrhage, T11-T12.

III. Subperiosteal hemorrhage of mastoid regions.

IV. Death while in police custody:

    a. History of becoming unresponsive while being placed in restraints shortly after receiving electrical shocks from conducted electrical weapons.

    b. Conducted electrical weapon barbs embedded in the outer right upper arm and right elbow.

V. Abrasions and contusions of scalp, multiple, principally right-sided.

VI. Contusion of superior half of left ear with subscalpular, subgaleal, and subperiosteal hemorrhages, principally left side.

VII. Contusions of left cheek and chin.

VIII. Contusions of arms and dorsal surface of left hand.

IX. Contusions of mid-abdomen, two.

X. Contusions of scrotal sac with hemorrhage of left epididymis.

XI. Contusions of feet, bilateral, left greater than right.

XII. Lacerations and contusions with superficial intramuscular hemorrhage of left tongue.

XIII. Acute pulmonary congestion.

XIV. Acute methamphetamine intoxication.

XV. Cardiomegaly (heart weight 780 grams).

    a. Marked left ventricular hypertrophy (2.2 cm).

    b. Right ventricular hypertrophy (0.8 cm).

XVI. Marked pulmonary edema.

Multiple areas of abrasion and contusion were seen on the scalp which was completely bald. Small areas of injury were seen slightly to the right of the midline in the right anterior parietal region. A larger cluster of abrasions and contusions were noted on the right side in the mid-parietal area into the occipital region. Some abrasions and contusions were also seen in the left occipital region.

There was marked discoloration of the superior half of the right ear with diffuse hemorrhage throughout the tissues. However, the cartilaginous components appeared to be intact. An area of contusion was seen in the lateral midportion of the left cheek. An area of contusion

was seen on the chin extending in somewhat horizontal fashion from one side to the other. These can be visualized even through the beard growth.

There was an area of ecchymosis noted in the left antecubital fossa. Incision into the ecchymotic area in the left antecubital fossa revealed acute hemorrhage in the underlying soft tissues. There was a brownish-red ecchymotic area on the dorsal surface of the left hand. Two areas of abrasion were seen slightly to the left of the midline above the umbilicus. There was hemorrhagic discoloration of the scrotal sac, more marked on the left side. An area of abraded contusion was seen on the anterior aspect of the distal right thigh above knee level. An area of faint bluish contusion was seen overlying the left knee region. Diffuse contusion was noted on the medial aspect of the left foot, extending from the heel to the left great toe. An area of dark contusion was seen on the medial aspect of the right foot beginning proximal to the great toe and extending onto the medial aspect of the great toe.

The incision of the right arm was opened, revealing hemorrhage overlying the elbow region. The incision of the left arm was opened, revealing hemorrhage subjacent to the hemorrhage noted in the left antecubital fossa. The incision of the back was opened and revealed extensive hemorrhage in the upper posterior thoracic region extending from the base of the neck, through the suprascapular region, into the midportion of the scapular area extending to the medial regions of the scapulae.

The Y-shaped thoracoabdominal incision was opened, revealing hemorrhage in the intercostal regions extending from the first through tenth interspace on both sides laterally and posteriorly. Hemorrhage in the intercostal muscles was seen to extend from the costovertebral regions laterally and swept around through the lateral margins onto the anterior aspects of the intercostal musculature. This was quite extensive and involved the entire thoracic cavity. There

appeared to be a transverse fracture through the midportion of the body of the sternum. There were fractures of the rib cage anteriorly at the costochondral junctions involving ribs 3-6 and on the left side involving ribs 3-5. Hemorrhage was seen in the overlying and surrounding soft tissues of all the fractures. Hemorrhage was noted throughout the soft tissues of the entire thoracic region laterally and posteriorly. Hemorrhage was seen in the underlying soft tissues including the musculature of the lower abdomen extending into the pelvic region, extending from one side to the other. The area of hemorrhagic contusion of the scrotal sac was incised. Hemorrhage was seen involving the epididymis on the left side.

The cranial incision was opened, revealing diffuse subscalpular, subgaleal, and subperiosteal hemorrhage, principally on the left side, extending from the auricular area through the mid-posterior portion of the parietal zone into the occipital area. This appeared to be related to the marked contusion noted involving the superior half of the left ear. When the calvarium was removed, hemorrhage was seen in the subperiosteal regions of both mastoid areas. The mastoid processes were dissected and revealed hemorrhage throughout.

Lung tissues showed diffuse congestion with no evidence of emphysema or pneumonia.

The vertebral column was opened and removed, revealing no hemorrhage except for a small amount of epidural hemorrhage noted slightly to the left of the midline in the area of T11-T12. This hemorrhage was seen to extend posteriorly and reached the right side.

A detailed review and written report by Dr. Robert R. Pusins is completely supportive of my analysis and opinions.

**Death Certificate** revealed the following:

Edward Snukis died on September 13, 2019. Cause of death was listed as methamphetamine intoxication. Manner of death was listed as accident.

**American Medical Response (AMR) Records** revealed the following:

On September 13, 2019, around 7:59 PM, paramedics were dispatched to the scene and found Mr. Snukis lying on the ground, pulseless and apneic. Lung sounds were clear with equal chest rise and fall. There was no pulse at the time of arrival. Mr. Snukis was assessed with the EKG monitor and PEA was observed. He was transported to the hospital.

**Complaint** revealed the following:

On September 13, 2019, at approximately 7:44 PM, a 911 call was made because the caller saw Edward Snukis standing by the road and was afraid he was going to get hit. Police arrived at 7:52 PM. Officer Koontz grabbed Mr. Snukis's arm. As he tried to pull away, Mr. Snukis fell to the ground, striking his head. He was Tasered multiple times. He got up, was eventually chased down by Officers Koontz and Taylor, and fell face down on the ground. The officers jumped on Mr. Snukis, held him down, and beat him while trying to arrest him. Officer Hackworth arrived on the scene and assisted in restraining and handcuffing Mr. Snukis.

**Evansville Police Department Records** revealed the following:

On September 13, 2019, officers were dispatched to 4300 E. Division Street for an intoxicated white male, Edward Snukis. When Officers Koontz and Taylor confronted Mr. Snukis, he began to fight them. Officer Koontz grabbed Mr. Snukis's left arm; Mr. Snukis struck him in the face with his free hand. Officer Taylor ordered Mr. Snukis to stay on the ground. He

did not comply, at which point Officer Taylor deployed his Conductive Electrical Weapon (CEW) and observed one of the darts in the back right side of Mr. Snukis. When Mr. Snukis continued to try to get up, Officer Taylor discharged the CEW a second time, but it was ineffective. Mr. Snukis fled and tripped over a manhole cover, falling to the ground. Both officers attempted to control and handcuff him on the ground. Officer Taylor felt Mr. Snukis grab his left inner thigh, believing that he was reaching towards his groin. In response, Officer Taylor struck him in the left side of the head approximately 6 times to get him to release his grip on his inner thigh. After he was placed in handcuffs with the assistance of Officer Hackworth, Mr. Snukis became unresponsive. The officers removed the handcuffs, rolled Mr. Snukis onto his back, and began CPR. Mr. Snukis was transported to the hospital, where an ER physician later pronounced him deceased.

**Review of Body and Dash Camera Footage** revealed the following:

On September 13, 2019, at 7:52 PM, Officer Koontz approached Mr. Snukis and told him to put his hands on his head. Mr. Snukis asked why, Officer Koontz grabbed Mr. Snukis's left arm; Mr. Snukis could be heard yelling "Hey" and "What's going on?" Mr. Snukis ran away and Officer Koontz chased after him. Officer Koontz fell and got back up. Officer Taylor deployed his Taser at Mr. Snukis, which appeared to strike him in the back. At this point, Mr. Snukis was on his knees and fell to the ground. The officers told him to get on the ground. He rolled over and attempted to get up; the officers yelled at him to stay on the ground. Mr. Snukis got up and continued to run away with both officers chasing after him. For a couple of minutes, the camera footage was black but Mr. Snukis could be heard screaming and the officers could be heard yelling at him to put his hands behind his back.

At 7:55 PM, Mr. Snukis was lying on his stomach on the ground, in the process of being handcuffed by multiple officers. Officer Hackworth arrived as Officers Koontz and Taylor were handcuffing Mr. Snukis. An officer said "turn him over" and Mr. Snukis was rolled onto his back. He was bleeding from his head and was not moving. Officer Koontz rubbed his sternum and yelled, "Wake up! Sir!" but Mr. Snukis did not respond. At 7:58 PM, Officer Taylor walked over to some witnesses and told them that Mr. Snukis passed out because he was drunk.

At 7:59 PM, the officers could not detect a pulse and began CPR. At 8:00 PM, the AED machine could be heard saying "shock not advised" and the officers continued taking turns performing CPR. Paramedics arrived at 8:04 PM.

**Deposition of Matthew Taylor** revealed the following:

On February 21, 2022, Officer Matthew Taylor testified that on September 13, 2019, he and Officer Koontz responded to a call involving Mr. Snukis. When Mr. Snukis attempted to grab Officer Taylor's genitalia, Officer Taylor struck him. Officer Taylor also attempted to use a Taser against Mr. Snukis, but it was ineffective.

**Deposition of Nicholas Hackworth** revealed the following:

On April 18, 2022, Officer Nicholas Hackworth testified that on September 13, 2019, he arrived on the scene and found Officers Taylor and Koontz attempting to arrest Mr. Snukis, who was face down on the ground. Officer Hackworth checked for a pulse and remembered finding one, but it was getting weaker. When he could no longer find a pulse, some officers started CPR. Officer Hackworth put the AED pads on Mr. Snukis while officers were performing CPR, but

the AED advised no shock. He helped with chest compressions until he was relieved by a firefighter.

**Report of Robert R. Pusins** revealed the following:

Robert R. Pusins was retained as a police practices and procedures expert and use of force expert. Mr. Pusins concluded that upon the officers' initial contact with Mr. Snukis, Officer Koontz used force by grabbing Mr. Snukis's left arm and continued that force by attempting to pull and force Mr. Snukis's left arm behind his back. Officer Taylor also used force as he twice deployed his Taser against Mr. Snukis during this first use of force incident. Mr. Pusins concluded that the BWC footage evidence did not support the claims of the officers that Mr. Snukis posed an immediate threat to the safety of the officers. There was also no evidence that Mr. Snukis was under arrest for any offense at the time of the initial use of force by Officer Koontz.

Mr. Pusins concluded that Officers Koontz and Taylor failed to suspect that Mr. Snukis may have been in a mental health crisis or suffering from excited delirium; that failure resulted in the additional failure by the officers to follow the EPD Operational Guideline on Mental Illness and Commitment Papers. Officer Koontz should not have used force against Mr. Snukis. Officers Taylor and Koontz failed to completely and accurately report and document the pre-contact conduct of Mr. Snukis and their own actions during their contact with Mr. Snukis. Officer Koontz used force that was unreasonable and not consistent with generally accepted police practices.

Officer Taylor should also not have used force against Mr. Snukis. As the senir officer and Field Training Officer to Koontz, Officer Taylor should have immediately intervened and

stopped Officer Koontz from using force against Mr. Snukis. The second use of force incident, including the approximately six individual strikes to Mr. Snukis's head from Officer Taylor, was unreasonable and not consistent with generally accepted police practices. The severity of this use of force was exacerbated by the fact that Mr. Snukis was in a prone position with his head against the unpaved and solid ground. Additionally, Officer Taylor failed to allow time for himself to evaluate the effectiveness of each strike before delivering additional strikes to Mr. Snukis, which was unreasonable and not consistent with generally accepted police practices. Officers Koontz and Taylor failed to recognize that Mr. Snukis was in medical distress and failed to provide immediate medical intervention and the immediate summoning of emergency medical services.

Overall, Mr. Pusins concluded that it was the sole actions of Officers Taylor and Koontz that escalated an unremarkable and common police service call into multiple unreasonable use of force events, including the failure to render aid, which resulted in the preventable death of Mr. Snukis.

**Oral Deposition of Matthew C. Sophy, D.O.,** revealed the following:

On January 20, 2023, Dr. Matthew Sophy testified that he was Mr. Snukis's primary care doctor. In their first appointment on June 18, 2019, Mr. Snukis told Dr. Sophy that he had been in Lehigh Valley Hospital Medical Center on an involuntary psych commitment the previous year. He also told Dr. Sophy that he had used meth and marijuana before, but denied meth use since the previous year and denied marijuana use since 2010. Dr. Sophy's assessment was that he had many paranoid sounding thoughts, such as his belief that the police were out to get him and

14

that his life might be in danger. Dr. Sophy had no knowledge of whether Mr. Snukis obtained a psychiatric evaluation after it was recommended to him.

On July 9, 2019, Mr. Snukis had his blood drawn at Dr. Sophy's office, which resulted in a normal urine drug screen. The lab results also correlated with Ms. Snukis's history of polycythemia, a condition of having a high red blood count or hemoglobin. Mr. Snukis also had mild concentric left ventricular hypertrophy. His ejection fraction was 56%, an indicator of good heart function despite his high blood pressure and left ventricular hypertrophy.

On August 15, 2019, Mr. Snukis had his blood pressure checked. It was 160 over 100, which was still high. Another blood pressure was scheduled for October, but Mr. Snukis died before that appointment.

## MEDICOLEGAL QUESTIONS

1. **What was the cause of Edward Snukis's death?**

    Edward Snukis died as a result of asphyxiation produced by positional compression asphyxiation.

## OPINION

Following my review of the materials provided, it is my opinion, expressed with a reasonable degree of medical certainty, that Edward Snukis died from asphyxiation due to positional compression.

All of the opinions expressed herein are based upon my knowledge, training, education and experience and are to a reasonable degree of medical certainty unless stated otherwise. All of my opinions are based upon the materials provided for my review and are subject to revision upon review of additional information.

Very truly yours,

*Cyril H. Wecht*

Cyril H. Wecht, M.D., J.D.

/rgw