UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

EDWARD C SNUKIS, JR,                    )
SAMANTHA SNUKIS,                        )
                                        )
            Plaintiffs,                 )
                                        )
            v.                          )        No. 3:21-cv-00135-MPB-MJD
                                        )
MATTHEW O TAYLOR,                       )
TREVOR KOONTZ,                          )
NICHOLAS HACKWORTH, and                 )
CITY OF EVANSVILLE, INDIANA,            )
                                        )
            Defendants.                 )

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on Defendant City of Evansville's ("the City") and

Defendants Matthew O. Taylor, Trevor Koontz, and Nicholas Hackworth's ("Individual

Defendants") Motions for Summary Judgment. (Docket No. 115; Docket No. 119). Plaintiffs

Edward Snukis, Jr. and Samantha Snukis argue that Defendants deprived Edward Snukis Sr.

("Mr. Snukis") of his constitutional rights when they detained him, and he died in custody. They

also assert state law tort claims and federal *Monell* and *Canton* claims against the City. For the

reasons set forth below, Defendants' Motions for Summary Judgment are **GRANTED**.

### I.      FACTUAL BACKGROUND

Plaintiffs rely on officer testimony and the body worn camera and dashboard camera

footage that captured parts of the encounter in question. Consequently, almost all the facts

recounted below are undisputed. The Court notes where any fact is in dispute.

Through the afternoon of September 13, 2019, Evansville's 911 dispatch received several

calls about a white, bald man "wearing no shirt" near Green River Road. (Docket No. 117-1 at

1

ECF pp. 1, 7, 9). The man reportedly looked into cars, potentially tried to steal something at a

back kitchen, and seemed intoxicated. (*Id.* at ECF pp. 1, 6, 7, 9). The callers described the man

as aggressive and unsteady on his feet. Docket No. 117-2 at ECF p. 1). He entered restricted

areas of workplaces, making employees feel uncomfortable. (*Id.* at ECF pp. 1, 4). That evening,

Officers Taylor and Koontz, both dressed in uniform and in a marked police car, were dispatched

to the area to look for the man. They found Mr. Snukis, who matched dispatch's description and

appeared to be intoxicated. (Taylor Video at 00:35; Docket No. 121-5 at ECF pp. 1–3).

Officer Koontz was an officer in training on September 13th. (Docket 141-4 at ECF p.

236). Plaintiffs and Defendants agree that Officer Taylor was Officer Koontz's Field Training

Officer. (Docket No. 141-4 at ECF p. 236). In training notes, Officer Koontz's training officer

wrote several times that he had Officer Koontz repeat statements about how suspects he dealt

with "may try to kill [him] and that he would "not make a mistake so that [his] wife is a widow."

(Docket No. 141-4 at ECF p. 237, 244).

Upon exiting their police vehicle, Officer Koontz asked Mr. Snukis to put his hands on

his head. (Docket No. 121-5 at ECF p. 3; Koontz Video at 00:30). Officers Taylor and Koontz

stated that they twice asked Mr. Snukis to put his hands up, and only when Mr. Snukis raised his

voice and assumed a fighting stance did they attempt to handcuff him. (Docket No. 120 at ECF

p. 5). Plaintiffs dispute this latter allegation, but the video evidence confirms that Mr. Snukis was

asked twice to put his hands on his head, and that Officer Koontz moved against Mr. Snukis and

began pulling his left arm behind his back within seconds of the second request. (Koontz Video

at 00:36).

As Officer Koontz attempted to get his hands behind his back, Mr. Snukis resisted, and a

struggle ensued for approximately nine seconds. (Taylor Video, 00:40–00:50). At one point, Mr.

2

Snukis threw himself into Officer Koontz, and they both fell to the ground. (Taylor Video at 00:47). Officers stated, and Plaintiffs do not dispute, that Mr. Snukis punched Officer Koontz in the nose. (Docket No. 120 at ECF p. 5). Officer Taylor then tased Mr. Snukis. (Taylor Video at 00:52). Both Officer Koontz and Officer Taylor yelled for Mr. Snukis to "get on the ground and put [his] hands up." Instead, Mr. Snukis rolled around and attempted to remove the taser barbs. (Taylor Video at 00:59). Officer Taylor again fired the taser, and Mr. Snukis again rolled, removed the barbs, then stood and ran away. (Taylor Video at 1:00–1:09). The body camera footage shows Mr. Snukis running down the road and into a nearby parking lot, where he tripped and fell to the ground. (Taylor Video at 1:20).

At this point, visibility from both Officer Koontz's and Officer Taylor's body camera feeds ended for several minutes, although the audio remained running on Officer Taylor's body camera. (Taylor Video at 1:26; Koontz Video at 1:29). The Officers allege, without dispute, that they got on top of Mr. Snukis—Officer Taylor on the top half of him, and Officer Koontz on his lower half. (Docket No. 117-6 at ECF p. 7). Mr. Snukis continued to resist the Officers' attempts to put him in handcuffs. (Docket No. 117-6 at ECF p. 7). Mr. Snukis reached at the two officers, swore at them, and disobeyed multiple commands to put his hands behind his back.  Mr. Snukis then grabbed at Officer Taylor's genitals at least three times and reached for Officer Taylor's taser holster. (Docket No. 117-7 at ECF p. 5; Docket No. 121-5 at ECF p. 5; Taylor Video at 1:30).

In response, Officer Taylor struck Mr. Snukis on the left side of the head four to six times to get him to release his grip on Officer Taylor and comply with commands. (Docket No. 117-7 at ECF p. 5). The body camera audio clearly recorded Mr. Snukis' fighting sounds as they faded from shouts and insults to guttural moans and rattling snoring sounds that Plaintiffs identify as signs of agonal breathing. (Taylor Video at 2:30-3:05). By minute three of the video, Mr. Snukis's

volume grew faint before he became quiet. (Taylor Video at 3:27).  After about two minutes of struggling on the ground, and just as Officer Hackworth arrived on scene, the Officers were able to place Snukis in handcuffs. (Taylor Video at 3:28).

Immediately after handcuffing Mr. Snukis and noting he was not responding, Officer Taylor stated, "looks like he's out—turn him over, make sure he's breathing." (Taylor Video at 3:54). After Officer Taylor's statement, Officer Hackworth radioed for medical assistance ("AMR"). (Hackworth Video 2 at 1:55). Within eleven seconds, Officer Koontz turned Mr. Snukis onto his back, performed a sternum rub, and shouted "sir—sir, can you hear me?" (Taylor Video at 4:07). Within another twenty seconds, the officers again checked for a heartbeat and confirmed that they felt one. (Taylor at 4:42). At minute 5:20 of the video, Officer Taylor asked, "still got a pulse?" and Officer Hackworth affirmed and stated that Mr. Snukis was swallowing. (Taylor Video at 5:22). Around minute 5:45 of the video, Officer Taylor went to talk to some onlookers, and when he returned at minute 6:45, there were several more officers on scene. (Taylor Video at 6:45). At minute 7:15, one of the new arrivals stated that he was not getting a pulse and instructed the other officers to take Mr. Snukis' handcuffs off so they could begin CPR. (Taylor Video). After removing his cuffs, one officer began chest compressions while Officer Hackworth ran to his car to get a defibrillator. (Taylor Video at 7:49).

By minute 8:45 of the body camera footage, Officer Hackworth attached the defibrillator to Mr. Snukis. The defibrillator initially registered that a shock was not advised, and officers on scene performed CPR for three minutes until paramedics arrived and took over. (Taylor Video at 9:15–12:45). One of Plaintiffs' expert witnesses concluded that Mr. Snukis was experiencing methamphetamine intoxication, suffered from cardiomegaly, and that these conditions

contributed to his death from asphyxiation due to positional compression while being restrained by the Officers. (Docket 141-3 at ECF p. 7–8).

The Evansville Police Department has many Operational Guidelines to aide officers in their interactions with citizens.[1] Plaintiff's expert concluded, and Defendants do not dispute, that the Operational Guideline for Use of Force does not contain language on de-escalation, nor does it contain language on a duty to provide emergency treatment or to intervene to prevent other officers from using excessive force. (Docket No. 147-1 at ECF p. 16, 29). Plaintiffs' expert noted that the Operational Guideline for Handling the Street Drunk does have a policy for providing emergency treatment where an officer encounters someone with stoppage of breath, severe bleeding, unconsciousness, or any other condition that presents a serious and immediate health threat. (Docket No. 141-1 at ECF p. 60). Officers Koontz and Taylor's training records do not contain a record of training on the specific tasks of intervening or on agonal breathing. (Docket No. 147-1 at ECF p. 60).

Mr. Snukis's adult children brought this suit on September 1, 2021, as co-administrators of his estate. They seek compensatory, special, and punitive damages, along with costs and disbursements and reasonable attorneys' fees and prejudgment interest under state and federal law, and for the appointment of a receiver to ensure the City properly trains and supervises police officers.

---

[1] In briefing, Defendant City refers and cites to many of the Police Department's Operational Guidelines by their numbers (for example, OG 119.00). However, the City did not follow this Court's Practices and Procedures requirements to add a descriptive identifier to their filed exhibits, nor did they follow the requirement to cite the docket number and page number for referenced evidence. The Court is not required to spend its time scouring the record for Defendants improperly cited evidence. Thus, the evidence cited in this paragraph relies on Plaintiffs' expert's review of the City's evidence referenced in his affidavit.

## II.     STANDARD OF REVIEW

Summary judgement is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine only if a reasonable jury could find for the non-moving party. *Id*. In ruling on a motion for summary judgment, the court reviews the record and draws all reasonable inferences in the light most favorable to the non-moving party. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016). However, "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgement; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

## III.     ANALYSIS

Individual Defendants argue that summary judgment should be granted as to Plaintiffs' §1983 claims for excessive force, failure to provide medical care, and failure to intervene. The City of Evansville argues that summary judgment should also be granted in full on Plaintiffs' *Monell* and *Canton* claims, as well as Plaintiffs' state claims in Count IV through Count XI.  The Court first addresses the Individual Defendants' Motion and then proceeds to the City's Motion.

### A.  Individual Defendants

#### 1.  Excessive Force

Defendants argue that Officer Taylor did not use excessive force in deploying his taser against an actively resisting Mr. Snukis, nor did he strike Mr. Snukis's head unreasonably in an attempt to get Mr. Snukis to release his grip on his genitals and stop reaching for his taser. Defendants also argue that Officer Koontz did not use force unreasonably when he restrained Mr.

Snukis in response to continued resistance, and that Officer Hackworth likewise did not use excessive force when he assisted in restraining Mr. Snukis. In response, Plaintiffs concede that Officer Hackworth did not use excessive force and that Officer Koontz did not push Mr. Snukis to the ground. Instead, they argue that Officer Koontz did not address other uses of force, and that Officer Taylor's use of force was not reasonable.

In *Graham v. Connor*, the Supreme Court held that the applicable standard for excessive force claims is the Fourth Amendment's "objective reasonableness" test. 490 U.S. 386, 395 (1989). Reasonableness is judged from the "perspective of a reasonable officer on the scene" and must allow "for the fact that police officers are often forced to make split-second judgments." *Id.* at 396. To decide whether the amount of force applied during seizure is excessive, a court must examine "the totality of the circumstances." *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000). This analysis requires considering factors including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "[A]ctive resistance" can "include kicking and flailing, declining to follow instructions while acting in a belligerent manner, and swatting an arresting officer's hands away while backpedaling." *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018) (internal citations omitted). Because the inquiry is fact-intensive, the Seventh Circuit has cautioned that summary judgment should be granted sparingly. *Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021).

### a. Officer Taylor

"Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable." *Abbott*, 705 F.3d at 727. Plaintiffs cite to *Abbott v. Sangamon County* to support their excessive force claim on taser

use. In *Abbott*, a woman was tased a second time while she was "lying on her back on the ground and not moving." *Id.* at 730. The woman had not committed a serious or violent crime, clearly did not pose a threat to officers, and was only exhibiting "passive noncompliance" against the order to "turn over onto her stomach." *Id.* The Court held that the second tasing could be found by a jury to be unreasonable. *Id.*; *see also Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (where officers tased a suspect between five and twelve times who had committed a misdemeanor at most, was not violent or armed but refused to release his arms for handcuffing, summary judgment was inappropriate).

Conversely, in *Dockery v. Blackburn*, the Seventh Circuit held that an "uncooperative and physically aggressive" suspect who pulled a taser prong out of his arm, kicked his feet in an officer's direction, attempted to stand, and ignored instructions to lie down, demonstrated that he did not submit to authority and that the officers involved were entitled to summary judgment. 911 F.3d 458, 467–69 (2018).

Unlike the *Abbott* plaintiff, video evidence of the police encounter with Mr. Snukis shows him resisting handcuffing, fighting with and yelling at the officers, pulling the taser prongs from his body, ignoring commands to get on the ground, rolling around to remove the remaining prongs, and running away. The facts much more closely track those of *Dockery*, where the suspect also did not submit to authority in part by removing taser prongs, attempting to stand, and ignoring instructions to lie down. 911 F.3d at 467–69. Additionally, under the *Graham* factors, Officer Taylor's use of his taser was constitutionally reasonable. Mr. Snukis posed a threat to the safety of the officers as he physically fought with them, actively resisted arrest even after he was twice tased, and attempted to evade arrest by flight.

Next, the Court applies the *Graham* factors to examine the "totality of the circumstances" surrounding Officer Taylor punching Mr. Snukis, "judged from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. Courts addressing excessive force claims against officers for hitting suspects analyze whether the officers "used the degree of force which a reasonable officer would believe was required to subdue the threat." *Alicea v. Thomas*, 815 F.3d 283, 290 (7th Cir. 2016). For example, where an officer approached a suspect in broad daylight whose arm was in the jaws of a police dog and was lying face-down on the ground and proceeded to "punch, kick and stomp on him," the court found that the suspect did not present a threat justifying the force and denied summary judgment. *Id.* at 291; *see also LaSalvia v. City of Evanston*, 806 F. Supp. 2d 1043, 1049 (N.D. Ill. 2011) (officer who punched an already subdued and restrained suspect in the head was denied summary judgment on an excessive force claim).

Conversely, in *Duran v. Sirgedas*, a rowdy partygoer fleeing officers was kicked and hit by officers with batons and closed fists. 240 Fed. App'x. 104, 117–18 (7th Cir., May 1, 2007). The attendee admitted he bit an officer trying to arrest him but argued it was because the officer was choking him. 240 Fed. App'x. 104, 117. The Court concluded that because of the attendee's resistance to arrest, including biting an officer, the explosive nature of the scene, and the "need to quickly subdue [the attendee] before he injured the officers," it was reasonable for the officers to kick and hit him to achieve compliance. *Id.* at 118–120.

Here, the undisputed facts show that after Mr. Snukis tripped and fell, the Officers attempted to take control of him on the ground. (Docket No. 117-6 at ECF p. 7). Snukis continued to resist attempts to put him in handcuffs, grabbing at Officer Taylor's genitals at least three times, reaching for his taser holster, and disobeying commands to quit resisting. Officer Taylor responded by hitting Snukis in the left side of the head four to six times to stop him and

get him to comply. (Docket No. 117-7 at ECF p. 5). Snukis fought the officers "the entire time while they were attempting to handcuff and secure him." (Docket No. 120 at ECF p. 8).

Under these undisputed facts, the *Graham* factors weigh in favor of summary judgment for the defendants. Although Mr. Snukis was not observed by the officers committing a severe crime, he had been reported as acting aggressively to bystanders. Moreover, he did pose a safety threat to the officers, and he actively resisted arrest and attempted to escape. Unlike the suspects in *Alicea v. Thomas* and *LaSalvia v. City of Evanston*, who were hit after they were subdued or restrained, Snukis was punched while he disobeyed commands, reached for an officer's taser holster, fought handcuffs, and grabbed at an officer's genitals. Given Mr. Snukis' active resistance, it was reasonable for Officer Taylor to hit him to achieve compliance.

In their brief, Plaintiffs do not address the *Graham* factors, but instead summarize *Brumitt v. Smith*, without applying it to the facts at hand. In *Brumitt v. Smith*, a case currently on appeal to the Seventh Circuit, an officer approached a sleeping, potentially intoxicated man, woke him, moved to take a debit card or ID out of his pants pocket despite the man's warning not to.  The officer was hit in the face after the man gave a "wild, roundhouse swing." No. 3:20-CV-260, 2023 WL 403964, at *7 (S.D. Ind. Jan 25, 2023). The officer responded by immediately striking the man four times in the face, rendering him unconscious with a broken nose and lacerations requiring surgery. *Id.* at *2. The Court noted that the man had not yelled at or threatened the officer and had not tried to run away or refused any commands. *Id.* at *9. The officer had also not attempted to arrest the man or use any lesser level of force to detain him. *Id.* Thus, the Court held, the officer's use of force was not proportionate or reasonable. *Id. Brumitt* is readily distinguishable from the incident at hand, where the undisputed facts show that Snukis ran away, refused commands, and fought officers continuously.

Plaintiffs also cite *Cyrus v. Town of Mukwonago* without application. In *Cyrus*, the suspect plaintiff was not violent or armed and when he "did not immediately comply" with requests to show his hands, officers tased him a disputed five to twelve times. 624 F.3d 856, 860 (7th Cir. 2010). There, the Court found that summary judgment for the officers was not appropriate. Again, *Cyrus* is entirely distinguishable from the present case, where it is undisputed that Mr. Snukis fought officers and was non-compliant throughout the altercation.

### b.  Officer Koontz

Plaintiffs' Statement of Claims alleges that Officer Koontz tackled Mr. Snukis, resulting in his injury. (Docket No. 94 at ECF pp. 1–2). Plaintiffs, however, now concede that Officer Koontz did not tackle Mr. Snukis, and that rather Mr. Snukis tripped and fell.  (Docket No. 140 at ECF p. 17). Nevertheless, Plaintiffs now contend that Defendants did not address "any of the other uses of force by Koontz as described elsewhere in this brief." (Docket No. 140 at ECF p. 17). Plaintiffs do not include any citation or reference to the alleged "other uses of force." Summary judgment is the "put up or shut up" moment in a lawsuit. *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024). Without details of any other uses of force by Officer Koontz, and in light of Plaintiffs' concession, this Court grants summary judgment on this claim.

### c.  Qualified Immunity

Even if Officers Taylor and Koontz had acted objectively unreasonable and violated the Fourth Amendment, they would be entitled to qualified immunity. Once the qualified immunity "defense is raised, it becomes the plaintiff's burden to defeat it." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). "A state official is protected by qualified immunity unless the plaintiff shows: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Reed v. Palmer*, 906 F.3d 540, 546 (7th

Cir. 2018) (internal citations omitted). "If *either* inquiry is answered in the negative" the official is protected. *Id.* To show that a right is clearly established, a plaintiff must demonstrate that existing caselaw at the time of the events in question "placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (Officials violate law when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he was doing violates that right.") Qualified immunity cannot be defeated simply by "alleging [a] violation of extremely abstract rights. *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018).

Here, Defendants' present a qualified immunity argument on the taser use, strikes to Snukis's head, and their restraint of Snukis. In response, Plaintiffs reference *Brumitt*, but do not analyze it or apply it to the facts of their case. This Court has already addressed *Brumitt*, finding it easily distinguishable from the facts here. Officers Taylor and Koontz, therefore, would be entitled to qualified immunity on the excessive force claims.

### 2. Failure to Provide Medical Care

Defendants argue that the Officers Taylor, Koontz, and Hackworth rendered medical care as soon as they noticed that Snukis was experiencing a medical emergency and that their actions were objectively reasonable. In response, Plaintiffs argue that Dr. Wecht's affidavit supports that Mr. Snukis died from asphyxiation "due to positional compression while restrained by and in the custody of the Evansville Police Department." (Docket No. 140 at ECF p. 18). Plaintiffs cite no law in their two-paragraph argument on this issue.

The Fourth Amendment's reasonableness standard applies to Plaintiffs' failure to provide medical care claims. *Horton v. Pobjecky*, 883 F.3d 941, 953 (7th Cir. 2018). Plaintiffs must show that the officers' response to Mr. Snukis's medical needs was objectively unreasonable, and that

12

the officers' response caused harm. *Id.* The Court considers four factors: (1) whether the responding officer had notice of the medical needs by communication or observation, (2) seriousness of the medical need, (3) scope of requested treatment balanced against the severity of the medical need, and (4) police interests, including "administrative, penological, or investigatory concerns." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007); *see also Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). The Fourth Amendment requires a reasonable response, not an immediate one, *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010), and the reasonableness inquiry "takes into account the sufficiency of the steps that officers did take." *Florek v. Vill. of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011). Typically, promptly calling an ambulance qualifies as "reasonable" because officers "addressing an arrestee's medical needs will either procure treatment, provide treatment, or both." *Florek v. Vill. of Mundelein*, 649 F.3d 594, 599–601 (7th Cir. 2011); *see also Sallenger*, 630 F.3d at 504; *Seay v. City of Indianapolis*, No. 118-CV-161, 2020 WL 6710799, at *8 (S.D. Ind. Nov. 16, 2020) (where "medics were promptly requested to the scene" and "permitted to attend" to the suspect, police officers did not act unreasonably).

Plaintiffs address none of the applicable law. Nor do Plaintiffs assert any evidence showing that the Officers' response to Mr. Snukis's medical needs was objectively unreasonable and that the response caused harm. *Horton*, 883 F.3d at 953. Instead, they simply refer to their expert's affidavit in its entirety, which concludes that Mr. Snukis died from asphyxiation "due to positional compression." (Docket No. 141-3 at ECF p. 8). While this tragic assertion may be true, evidence provided by Defendants showing how quickly they provided medical care and called for help once they had notice of Snukis's medical needs is substantiated by the available body camera footage and, importantly, is entirely uncontradicted by Plaintiffs. Because Plaintiffs have

failed to raise a genuine dispute that the officers' treatment of Mr. Snukis was anything other than prompt and appropriate, summary judgment is granted on Plaintiffs' failure to provide medical care claim.

Defendants argue in the alternative that they would be entitled to qualified immunity on this claim. As noted above, it is Plaintiff's burden to show that a right is clearly established by demonstrating that existing caselaw at the time of the events in question "placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Plaintiffs do not address Defendants' qualified immunity argument at all, much less cite a case showing that the "contours of a right are sufficiently clear that every reasonable official would have understood that what he was doing violates that right." *Id.* Thus, even if the Officers' actions were objectively unreasonable, they would be entitled to qualified immunity on this claim.

### 3.   Failure to Intervene

Finally, Defendants argue that the Plaintiffs' failure to intervene claim against Officer Taylor fails because Officer Koontz did not violate Snukis's constitutional rights and because Officer Taylor did not have a reasonable opportunity to intervene. Plaintiffs respond by citing several cases about excessive force, not failure to intervene, and do not apply the cases to the facts at hand but simply state that "the evidence is on film." (Docket No. 140 at ECF p. 19).

For "there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation." *Rosado v. Gonzalez*, 832 F.3d 714, 718 (7th Cir. 2016) (quoting *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005)). Because this Court has found that Mr. Snukis's constitutional rights were not violated on the excessive force and failure to provide medical care claims, the failure to intervene claim necessarily fails on its face. Had this not been the case, an officer who fails to intervene is liable if they had reason to know "'(1) that

excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.'" *Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

Here, Plaintiffs do not dispute Defendants' body camera evidence that Mr. Snukis tripped over a manhole cover instead of being pushed by Officer Koontz, rendering Plaintiffs' allegation that Officer Koontz used excessive force in pushing Mr. Snukis to the ground moot. Plaintiffs maintain that Officer Koontz also used excessive force when he restrained Mr. Snukis and used pain compliance measures to subdue him after he tripped and fell. Because this claim fails on its face, it is unnecessary to analyze these allegations. Officer Taylor is entitled to summary judgment on the failure to intervene claim.

## B. The City

### 1. *Monell* Claims

Plaintiffs' *Monell* claims necessarily fail because this Court has found no underlying constitutional violations committed against Mr. Snukis. *Gonzalez v. McHenry Cnty.*, 40 F.4th 824, 830 (7th Cir. 2022). Further, even if Plaintiffs could show that a constitutional right was violated, they cannot satisfy the elements of a *Monell* claim.

A plaintiff may bring a *Monell* claim against a municipality if an alleged unconstitutional act is caused by "a governmental practice or custom that, although not officially authorized, is widespread and well settled." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). To succeed, a plaintiff must prove three elements: (1) the practice was so widespread it constituted custom or practice, (2) the municipality was deliberately indifferent to the plaintiff's constitutional rights, and (3), the municipality's action was the "'moving force' behind the

federal-rights violation." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986–87 (7th Cir. 2021).

A widespread practice is "persistent," "permanent," and "well settled." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *see also Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (a widespread practice "permeates a critical mass of an institutional body"). While there is no Seventh Circuit consensus on what is widespread enough, a plaintiff seeking to show a widespread governmental "practice or custom" must at minimum point to "more than one instance" of the challenged unconstitutional conduct. *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988); *see also Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002) (three incidents were not enough to establish a persistent and widespread practice).

To establish the municipality's deliberate indifference, a "plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *First Midwest Bank Guardian*, 988 F.3d at 987; *see also Thomas*, 604 F.3d at 303. Finally, to prove the municipality's action was the "moving force," a plaintiff must show a "'direct causal link' between the challenged municipal action and the violation of his constitutional rights." *First Midwest Bank Guardian of Est. of LaPorta*, 988 F.3d at 987 (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997)).

### a. De facto "code of silence"

Plaintiffs argue that the City employed a de facto code of silence of failing to adequately report and investigate uses of excessive force and failing to discipline the officers, leaving them to use excessive force "with impunity and without fear of retribution." (Docket No. 94 at ECF p. 2–3). The City argues that Plaintiff's *Monell* claim about the City's "code of silence" fails

because there was no constitutional violation by Defendant Officers, no express policy of Defendant City that caused Snukis's constitutional injury, no widespread practice of the City's that caused Snukis's constitutional injury, and no action by a policy maker.

Plaintiffs appear to entirely drop their *Monell* argument about a "code of silence" in their response brief to the City's motion. Plaintiffs provide no other examples of alleged unconstitutional conduct that could point to a governmental custom or practice besides the incident at issue. Plaintiffs also make no argument that the City's actions would lead to constitutional violations, that the City consciously disregarded those consequences, or that there was a direct causal link between the code of silence and the violation at hand. *First Midwest Bank Guardian of Est. of LaPorta*, 988 F.3d at 986–87. In the absence of evidence on these points, Plaintiffs' *Monell* claim could not survive summary judgment, even if the City had not been granted summary judgment on the constitutional violation claims.

### b.  Failure to adopt certain policies

Plaintiffs argue that the City failed to adopt certain policies to deter the use of excessive force and provide for meaningful investigation into complaints of excessive force. The City argues that this claim also fails because the Plaintiffs have presented no evidence to support it. In response, Plaintiffs do not cite any case law, but instead list the opinions of Mr. Pusins, their expert, that they believe preclude summary judgment. In reply, Defendant argues that Plaintiffs cite no legal authority or evidence showing the City had "actual or constructive knowledge" that failure to adopt policies or training would cause a constitutional violation. Defendants also argue that there is no evidence of other incidents similar to the Snukis incident.

A plaintiff asserting a *Monell* claim based on municipal inaction must still prove the general requirements of the *Monell* test. That is, they must show they were (1) "deprived of a

17

federal right," (2) that the inaction "reflect[ed] a conscious decision not to take action," (3) that it was "obvious that the municipality's [in]action would lead to constitutional violations and that the municipality consciously disregarded those consequences," and (4) that the municipality was the "moving force behind the federal-rights violation." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235, 240 (7th Cir. 2021) (citations omitted); *see also Thomas*, 604 F.3d at 303 ("[W]here rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable.").

Where a plaintiff relies on municipal policy that is not unconstitutional on its face, "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824, (1985); *see also Dean*, 18 F.4th at 236 ("[A] prior pattern of similar violations puts the municipality on notice of the unconstitutional consequences of its policy" such that continuing the policy might establish deliberate indifference.). In the Seventh Circuit, a plaintiff must also show the municipality had "some knowledge or an awareness—actual or imputed—of the custom and its consequences showing the municipality's approval, acquiescence, or encouragement of the alleged unconstitutional violation." *Jones v. City of Chicago*, 787 F.2d 200, 204 (7th Cir. 1986); *see also King v. Kramer,* 680 F.3d 1013, 1021 (7th Cir. 2012) (if a municipality is faced with "actual or constructive knowledge that its agents will probably violate constitutional rights, [it] may not adopt a policy of inaction").

In some exceptionally rare cases, "the risk of unconstitutional consequences from a municipal policy 'could be so patently obvious that a [municipality] could be liable under § 1983 without proof of a pre-existing pattern of violations.'" *Dean*, 18 F.4th at 236 (quoting *Connick v.*

18

*Thompson*, 563 U.S. 51, 64 (2011)). For example, in *King v. Kramer*, the Seventh Circuit found that where seven news articles had been published about the medication policy and the sheriff testified that he was aware of the jail's earlier problems, that was "enough evidence to create a question of material fact" that the municipality was deliberately indifferent. 680 F.3d at 1021. In 2017, the Seventh Circuit held that a jury could find a prison healthcare provider's failure to formally coordinate medical care for transferred prisoners was deliberately indifferent. *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 381 (2017). In doing so, the Court stated that a "single memo or decision showing that the choice not to act is deliberate" could be enough for liability. *Id.*

In briefing, Plaintiffs combine their argument on the failure to adopt certain policies with their argument on failure to train. This organization makes it difficult to sort which of Mr. Pusins' statements Plaintiffs believe apply to which argument. However, the Court first notes that Plaintiffs do not make an argument on the *Monell* elements, except to state that Mr. Snukis was deprived of a federal right. This Court herein granted summary judgment to the Officers on Mr. Snukis Fourth Amendment claims. Additionally, Plaintiffs presented no evidence that the City's inaction reflected a "conscious decision" to not take action, nor that it was "obvious" that the inaction would lead to a constitutional violation and that the City "consciously disregarded those consequences," nor that the City was the "moving force" behind the violation. *Dean*, 18 F.4th at 235.

Plaintiffs also do not argue that the policies in place were unconstitutional, only that they were "not reasonable and consistent with generally accepted police practices." (Docket No. 146

at ECF p. 21)[2]. If the policies at issue are "not unconstitutional on [their] face," Plaintiffs need "considerably more proof than the single incident" to establish fault. *City of Oklahoma City*, 471 U.S. at 824. However, here Plaintiffs provide no evidence of similar violations. Plaintiffs also do not provide any evidence showing that the City had actual or imputed awareness of the failure to adopt certain policies and the consequences of that failure—leaving the Court with no evidence that the City encouraged any alleged unconstitutional actions. *Jones*, 787 F.2d at 204.

Plaintiffs posit only that Mr. Snukis had his rights violated and that the express policies of the police department were not reasonable and consistent with generally accepted police practices. Plaintiffs do not explain how allegedly unreasonable or inconsistent policies relate to the elements required to prove *Monell* liability. While Plaintiffs summarize *Glisson*, the Seventh Circuit case about medical care for prisoners, they do not analogize it, nor any other case, to their claim for a failure to adopt certain policies. Even viewing this evidence in the light most favorable to Plaintiffs, there is no dispute of material fact on this claim, and the City is entitled to Summary Judgement.

### 2. *Canton* Claims

Plaintiffs' *Canton* claims necessarily fail because this Court has found no underlying constitutional violations committed against Mr. Snukis. *Flores v. City of S. Bend*, 997 F.3d 725, 731 (7th Cir. 2021). Even if Plaintiffs could show that a constitutional right was violated, they cannot satisfy the elements of a *Canton* claim. The City argues that it is entitled to summary judgment on Plaintiffs' *Canton* claims because there was no constitutional violation and no

---

[2] If Plaintiffs are attempting to argue that the policies are constitutionally unreasonable based on their expert, Mr. Pusins, testimony, this evidence would be excluded. It is clear that experts may address "ultimate issues" but cannot "merely tell the jury what result to reach." *United States v. Noel*, 581 F.3d 490, 497 (7th Cir. 2009) (internal citation omitted).

pattern of similar alleged constitutional violations. The City also argues that Plaintiffs cannot succeed on the "single-incident" theory, cannot show policy makers had "actual or constructive notice" to constitute deliberate indifference, and cannot show that a policymaker's decision was the "moving force" behind Snukis's constitutional deprivations. Plaintiffs respond that there is an underlying constitutional violation, and that there is evidence of defective training on de-escalation, preventing excessive force, and how to help people suffering from medical distress or trouble breathing.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). However, a city's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* A plaintiff must show that the failure to train "reflects a 'conscious' choice" amounting to "deliberate indifference to the rights of persons with whom the police [came] into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989); *see also Connick v. Thompson*, 563 U.S. 51, 61 (2011) (where policymakers are on "actual or constructive notice" that a training failure causes constitutional violations and retain that training program, they may be deemed deliberately indifferent). In addition, for municipal liability to attach, "the identified deficiency in a city's training program must be closely related to the ultimate injury." *Canton*, 489 U.S. at 391. In other words, a plaintiff must prove that the training deficiency "actually caused the police officers' indifference." *Id.*

Typically, plaintiffs must show "a pattern of similar constitutional violations" by untrained officers. *Connick*, 563 U.S. at 62. Where plaintiffs do not do so, they must show a single violation and assert a "recurring, obvious risk." *Flores*, 997 F.3d at 731; *see also Bd. of*

*Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997) ("evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations" may trigger municipal liability). Where a prison healthcare system repeatedly failed to protect an inmate from suicide and its work culture "permitted and condoned violations of policies" designed to protect inmates, the Seventh Circuit found *Canton* liability on a failure to train claim. *Woodward v. Corr. Med. Servs. of Illinois, Inc.*, 368 F.3d 917, 929 (7th Cir. 2004). The Circuit also found liability where a jail's sexual abuse training was limited to telling guards that sexual contact with inmates was prohibited, "holding a single training session that some officers, including the offender in the case, did not attend", and where jail leadership was aware of the misconduct, participated in denigrating talk about female inmates, and did not change its policy or training. *Flores*, 997 F.3d at 732 (citing *J.K.J.*, 960 F.3d at 382). The Supreme Court has stated that success on a theory of single incident liability will be "rare." *Connick*, 563 U.S. at 64.

Here, Plaintiffs present no evidence of recurring issues in the Evansville Police Department of failure to intervene or react to agonal breathing. Plaintiffs also present no evidence that the City was on notice of an issue with training on these subjects. Evidence on these two elements is crucial to a single incident liability *Canton* claim. Plaintiffs only argue that, based on their expert's review, the Evansville Police Department failed to train officers on de-escalation, preventing excessive force, and how to help people suffering from medical distress, or having trouble breathing. (Docket No. 146 at ECF p. 22; Docket No. 147-1 at ECF p. 60). The expert also believed that Officer Taylor provided improper instructions to Officer Koontz during field training, (Docket No. 147-1 at ECF p. 63), and that Officers Koontz and Taylor had not received training on agonal breathing or on the need to intervene to stop excessive force. (Docket

22

No. 147-1 at ECF p. 60). Plaintiffs do not explain how these alleged deficiencies relates to the "ultimate injury." *City of Canton, Ohio*, 489 U.S. at 388. Even viewing these facts in the light most favorable to the Plaintiffs, it is not enough to allege only insufficient training on a *Canton* claim without evidence of notice or recurrence. Thus, even if Plaintiffs had showed a constitutional violation committed against Mr. Snukis, there is no dispute of material fact on Plaintiffs' *Canton* claim, and the City is entitled to Summary Judgement.

### 3. State Law Claims

Exercising supplemental jurisdiction over state law claims once federal claims have been dismissed is a "purely discretionary" choice for federal district courts. *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015). There is a rebuttable presumption that the district court will relinquish jurisdiction to "minimiz[e] federal intrusion into areas of purely state law." *RWJ Mgmt. Co. v. BP Prod. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012) (internal citation omitted). The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and dismisses the same without prejudice.[3]

---

[3] The supplemental jurisdiction statute "stop[s] the clock" on state statutes of limitation for related state law claims filed in federal court. *Artis v. District of Columbia*, 583 U.S. 71 (2018). The statutes of limitations for related state law claims are thus "suspended during the pendency of the federal suit" and plaintiffs are "accorded a grace period of 30 days to refile in state court post dismissal of the federal case." *Id.* at 74.

## IV.    CONCLUSION

Summary Judgment is **GRANTED in full** to Individual Defendants and the City. (Docket No. 115; Docket No. 119). Plaintiffs state law claims are **DISMISSED without prejudice**. Defendants' Motion to Bifurcate and Stay Trial (Docket No. 134) is **DENIED as moot**. Defendants' Motion to Exclude Expert Testimony (Docket No. 179) and Motion in Limine to Exclude Expert Testimony (Docket No. 181) are also **DENIED as moot**.

IT IS SO ORDERED.

Date: 5/3/2024

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana

Served electronically on all ECF-registered counsel of record.